UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE RAMOS**

- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :        <u>**SEALED INDICTMENT**</u>
                                :
        - v. -                  :        21 Cr. ___
                                :
TREVOR MILTON,                  :        21 CRIM 478
                                :
        Defendant.              :
                                :
- - - - - - - - - - - - - - - - x

<u>**COUNT ONE**</u>
**(Securities Fraud)**

The Grand Jury Charges:

<u>**Overview**</u>

1.    From at least in or about November 2019 up through and including at least in or about September 2020, TREVOR MILTON, the defendant, engaged in a scheme to defraud investors by inducing them to purchase shares of Nikola Corporation ("Nikola"), the electric- and hydrogen-powered vehicle and energy company that MILTON founded, through false and misleading statements regarding Nikola's product and technology development. MILTON's scheme targeted individual, non-professional investors — so-called "retail investors" — by making false and misleading statements directly to the investing public through social media and television, print, and podcast interviews.

2.    The deceptive, false, and misleading claims made by TREVOR MILTON, the defendant, regarding the development of

Nikola's products and technology, addressed nearly all aspects of the business and included: (a) false and misleading statements that the company had early success in creating a "fully functioning" semi-truck prototype known as the "Nikola One," when MILTON knew that the prototype was inoperable; (b) false and misleading statements that Nikola had engineered and built an electric- and hydrogen-powered pickup truck known as "the Badger" from the "ground up" using Nikola's parts and technology, when MILTON knew that was not true; (c) false and misleading statements that Nikola was producing hydrogen and was doing so at a reduced cost, when MILTON knew that in fact no hydrogen was being produced at all by Nikola, at any cost; (d) false and misleading statements that Nikola had developed batteries and other important components in-house, when MILTON knew that Nikola was acquiring those parts from third parties; and (e) false and misleading claims that reservations made for the future delivery of Nikola's semi-trucks were binding orders representing billions in revenue, when the vast majority of those orders could be cancelled at any time and were for a truck Nikola had no intent to produce in the near-term.

3. TREVOR MILTON, the defendant, made these false and misleading statements regarding Nikola's products and capabilities to induce retail investors to purchase Nikola stock. Among the retail investors who ultimately invested in Nikola were investors who had no prior experience in the stock market and had begun

2

trading during the COVID-19 pandemic to replace or supplement lost income or to occupy their time while in lockdown. The value of Nikola's stock, including stock held by retail investors, plummeted after certain of MILTON's statements were revealed to be false and misleading. As a result, some of the retail investors that MILTON's fraudulent scheme targeted suffered tens and even hundreds of thousands of dollars in losses, including, in certain cases, the loss of their retirement savings or funds that they had borrowed to invest in Nikola.

4.    TREVOR MILTON, the defendant, was motivated to engage in the fraudulent scheme in order to enrich himself and elevate his stature as an entrepreneur. Indeed, during the course of the fraud, MILTON, who aspired to be listed among Forbes's 100 richest people, saw the market value of his interest in Nikola rise substantially. On or about March 3, 2020, when Nikola announced that it would go public by merging with a publicly traded special-purpose acquisition company ("SPAC"), Nikola claimed an enterprise value of approximately $3.324 billion, implying that the Nikola stock that MILTON would hold upon completion of the merger, through an entity called "M&M Residual," had a value of approximately $844 million. At opening on or about June 9, 2020, after the merger was complete, and when Nikola's stock peaked in the wake of announcements by MILTON about the Badger, the market value of Milton's stock was at least approximately $8.5 billion.

3

**Trevor Milton and Nikola**

5.   At all times relevant to this Indictment, TREVOR MILTON, the defendant, was the founder and largest single owner of Nikola's stock. MILTON is a serial entrepreneur from Utah with no formal background in engineering. MILTON founded Nikola in or about 2015. He was the Chief Executive Officer ("CEO") of Nikola from its founding until in or about June 2020, when Nikola's stock became publicly traded, and MILTON became the Executive Chairman of Nikola's Board of Directors. MILTON served as Executive Chairman of Nikola until his resignation on or about September 20, 2020.

6.   At all times relevant to this Indictment, Nikola was a corporation that described itself as a designer and manufacturer of zero-emission battery-electric and hydrogen-electric vehicles, electric vehicle drivetrains, vehicle components, energy storage systems, and hydrogen station infrastructure.

7.   Nikola described its primary intended products as battery- and hydrogen fuel cell-powered semi-trucks, including, as is relevant to this Indictment, Nikola's first model, the Nikola One, and its later designs, the Nikola Two and Tre. Nikola also marketed itself as vertically integrated, in that it would not only manufacture hydrogen-electric vehicles, but it would also produce hydrogen at a low cost at a network of hydrogen fueling stations that it was developing.

4

8.   At all times relevant to this Indictment, Nikola was a "pre-revenue company," meaning that it had yet to sell any vehicles or to produce a production-ready version of any of its products, or to produce or sell any hydrogen fuel. Indeed, as of July 22, 2021, according to Nikola's most recent quarterly report filed with the United States Securities and Exchange Commission ("SEC") Nikola remained a pre-revenue company.[1]

## Background on Special Purpose Acquisition Companies

9.   An initial public offering ("IPO") is the process by which a company first issues shares to be sold to the public on a stock exchange. Under federal securities laws, a company seeking to go public through an IPO must file a registration statement and prospectus with the SEC that describe in detail the business of the company, its financial condition, and the nature of the securities offering.

10.   Among other things, and generally in order to create fairness in the market and protect retail investors, federal securities laws impose what is commonly referred to as a "quiet period" in connection with IPOs. Among the purposes of a quiet

---

[1]   In or about 2019 and 2020, Nikola generated a small amount of revenue by installing solar panels, including for TREVOR MILTON, the defendant.  Nikola considered the amount of this revenue to be immaterial, and solar panel installation is not part of Nikola's business model nor is Nikola continuing to engage in any solar panel installation projects.

period is to create a level playing field by ensuring that all investors have the same access to information at the same time and to prevent executives from hyping or inflating the stock price. The quiet period lasts from the time the company issuing the stock discloses information about the issuance in its registration statement and prospectus until forty days after the new stock begins trading. During the quiet period, executives of the company generally may not provide to anyone any information about the company other than what was previously disclosed in the registration statement and prospectus.

11. A SPAC provides an alternative method for a private company to become a publicly traded company – that is, for a company's stock to be sold to the public on a stock exchange. A SPAC is a publicly traded company with no business of its own that is formed for the purpose of merging with a private company so that the private company may become publicly traded. To accomplish this goal, SPACs issue shares through an IPO with the plan to identify a promising company with which to merge. After its IPO, a SPAC seeks to combine with an operating company. Once the SPAC has identified such an opportunity, it negotiates with the operating company and, if approved by the SPAC shareholders, merges with the private operating company. After the deal is complete, the shares of the SPAC become the shares of the operating company, which then can be bought and sold by the public on a stock exchange.

12.   Unlike an IPO, a SPAC transaction is not subject to a quiet period. Therefore, unlike when shares are first issued through an IPO, when a private company becomes publicly traded through a merger with a SPAC, its executives are not limited in their ability to speak publicly about the business of the company.

## Nikola's Going Public Combination with VectoIQ

13.   The SPAC through which Nikola went public was VectoIQ Acquisition Corporation ("VectoIQ"). VectoIQ was founded in or about 2018 and based in Mamaroneck, New York. VectoIQ was formed to raise capital for the purpose of acquiring a private company in the transportation industry. VectoIQ itself had no business.

14.   In or about November 2019, VectoIQ and Nikola began negotiating a potential business combination that would result in Nikola's stock being publicly traded by Nikola merging with VectoIQ. During the course of negotiations over the business combination, and before that combination was consummated, VectoIQ and its principal shareholders, who were large investment management firms, had access to detailed, non-public information on which to conduct diligence. As a result, the VectoIQ shareholders were able to review Nikola's books and records, tour Nikola's facilities, and ask questions of Nikola's engineers and management.

15.   On March 3, 2020, Nikola announced that its stock would become publicly traded following a business combination with VectoIQ. At that time, VectoIQ's shares were already publicly traded on the Nasdaq stock exchange, in New York, New York, under the ticker "VTIQ." That same day, Nikola announced that it had obtained an additional $525 million in funding through a private investment in public equity ("PIPE"), in which investors purchased VectoIQ stock for $10 per share. The PIPE investors were largely investment management firms. Like the VectoIQ shareholders, the PIPE investors had the ability to review Nikola's books and records, tour Nikola's facilities, and ask questions of Nikola's engineers and management.

16.   On or about June 3, 2020, the business combination between Nikola and VectoIQ was completed, at which time the resulting company was named Nikola Corporation and VectoIQ's shares on the Nasdaq become Nikola shares, trading under the ticker "NKLA." Because investors could purchase shares of what would become NKLA stock after on or about March 3, 2020, but before on or about June 3, 2020, by purchasing VTIQ stock, NKLA and VTIQ are referred to together in this Indictment as "Nikola stock."

17.   As a result of the scheme to defraud undertaken by TREVOR MILTON, the defendant, many retail investors purchased Nikola stock based, at least in part, on false and misleading information promoted publicly by MILTON. By contrast, early strategic

investors, VectoIQ shareholders, and PIPE investors who had invested prior to the completion of the business combination between Nikola and VectoIQ had access to more complete and accurate information during their prior due diligence periods. Those investors were able to sell their Nikola stock for a profit at a time when retail and other investors were purchasing stock based, at least in part, on the false and misleading information provided by MILTON and described below.

### Milton's Stock Ownership and Compensation

18.     Pursuant to the terms of the combination between Nikola and VectoIQ, upon its completion, TREVOR MILTON, the defendant, owned, through M&M Residual, approximately 91,602,734 shares in Nikola, representing approximately 25.4% of the total ownership of the company. On or about June 3, 2020, when the business combination between Nikola and VectoIQ was completed, Nikola shares opened the day trading at approximately $33.69 per share, resulting in a value for MILTON's shares of approximately $3,086,096,108.

19.     Also pursuant to the terms of the combination between Nikola and VectoIQ, TREVOR MILTON, the defendant, was able to sell back to Nikola $70 million in additional shares in or about June 2020 when the business combination between Nikola and VectoIQ was consummated. MILTON's right to sell the $70 million in shares back to the company at that point in time was the result of a negotiation

between VectoIQ and its investors and MILTON on the issue, among other things, of whether MILTON would be subject to a "lock-up" that would prevent MILTON from selling any shares for a specified period of time following the consummated merger, and which MILTON did not want. Generally, one purpose of such a lock-up is to keep management invested in delivering on the business's plan rather than cashing out for short-term gain.

20.   TREVOR MILTON, the defendant, was ultimately subject to a six-month lock-up, which he negotiated down from an initial agreement of a one-year lock-up. Accordingly, the lock-up restricted MILTON from selling his remaining shares for the six-month period beginning June 3, 2020. During that six-month period, MILTON expressed his intention within the company to sell shares once the lock-up period ended.

21.   At the time of the business combination between Nikola and VectoIQ, TREVOR MILTON, the defendant, also entered into a new compensation agreement with Nikola. Except for an annual salary of $1, MILTON's compensation was entirely in the form of stock units that would vest over time, including bonus stock units that MILTON would receive if certain stock price milestones were achieved.

### The Scheme to Defraud

22.     From at least in or around November 2019 up through and including at least in or about September 2020, TREVOR MILTON, the defendant, sought to fraudulently induce retail and other investors to purchase Nikola's stock by making false and misleading statements about Nikola's products and milestones on social media and in television and podcast interviews. MILTON's false and misleading claims were intended to drive demand for Nikola's stock among retail investors, including at times when early strategic investors and other sophisticated investors were selling their stock, which might otherwise tend to cause the stock price to decrease.

23.     Beginning at least in or about March 2020 when Nikola announced that its stock would become publicly listed through Nikola's combination with VectoIQ, TREVOR MILTON, the defendant, became increasingly preoccupied with Nikola's stock price, and with keeping Nikola's stock price high.

24.     In order to generate popular demand for Nikola's stock, TREVOR MILTON, the defendant, used social media and television and podcast interviews to communicate directly with potential retail investors. For example, on or about March 2, 2020, which was the day before Nikola publicly announced that it would combine with VectoIQ, MILTON wrote in an email to a member of the board of directors of Nikola, that we "need to make sure we are getting

retail investors on our side. That is what prevents the stock short selling. This is super important to me."

25. Accordingly, TREVOR MILTON, the defendant, appeared for numerous interviews on podcasts and on television, and in print and online media, beginning immediately following the announcement of Nikola's going public combination with VectoIQ. MILTON was able to do so because Nikola went public by means of a SPAC combination, rather than an IPO, and MILTON was therefore not subject to the restrictions of a quiet period. MILTON himself explained on a podcast in or about June 2020 that the advantage of a SPAC was that he could "communicate with the market," and instead of "bankers . . . trying to tell people what your company is like," "I wanted to be in control, I wanted to be in communication with the public about what we are, who we are, how our company — our business model is so successful."

26. As set forth below, in order to encourage retail investors to purchase Nikola stock, and thereby to increase and support Nikola's stock price, TREVOR MILTON, the defendant, made false and misleading claims about Nikola's business, including false and misleading claims regarding:

      a. The company's early purported success in creating a functioning semi-truck prototype known as the "Nikola One";

      b. The development of an electric- and hydrogen-powered pickup truck known as "the Badger";

c.    Nikola's ability to produce hydrogen for the purpose of fueling its vehicles;

d.    Nikola's in-house development of technology and components; and

e.    The nature of the reservations for future delivery of Nikola's semi-trucks.

### False and Misleading Claims Regarding the Nikola One

27.    Throughout in or about 2020, TREVOR MILTON, the defendant, promoted a false and exaggerated narrative that Nikola was a first mover in the zero-emissions-trucking business. Specifically, MILTON emphasized that Nikola had defied expectations as a young, disruptive company when it managed to build its prototype Nikola One, which Nikola unveiled on or about December 1, 2016, at a large event that was filmed and broadcast on the internet. An image of the Nikola One at the unveiling event appears below:



28.   During that event and later, TREVOR MILTON, the defendant, claimed that the prototype Nikola One was a fully functioning truck, and emphasized that early purported success as a defining event for Nikola. For example, MILTON stated during the March 3, 2020 pre-recorded merger announcement conference call for Nikola's merger with VectoIQ: "I founded the company to completely disrupt the energy and transportation market. When our company first announced the Nikola One Semi truck in 2016, most other brands said zero emission would never work. WOW, were they wrong." Similarly, in a podcast that was recorded in or about January 2020, and broadcast on the internet on or about March 12, 2020, MILTON denied that the Nikola One was "vaporware," i.e. a product that is marketed but does not yet exist, and stated regarding the Nikola One, "what we did is we came out and we proved to everyone that we really did have what we promised, and that was a humongous kind of drop the mic moment for the industry. Every OEM [Original Equipment Manufacturer[2]] around the world now is spending billions just to catch up because they thought that Nikola was not legitimate, and now they're terrified." In podcasts recorded in or about July 2020, MILTON repeatedly stated that "Nikola was the first company to actually launch the zero emission semi-truck back in 2016." As

---

[2] Although the term OEM can have several different meanings, as used here and elsewhere by MILTON, OEM refers, in substance, to established automakers.

discussed below, these claims were false and misleading.

29.   Contrary to what TREVOR MILTON, the defendant, claimed, Nikola had not successfully reached the milestone of creating a fully functioning prototype at the Nikola One launch event on December 1, 2016. In fact, the Nikola One prototype was not completed, let alone tested and validated, by the time of the unveiling event.

30.   Indeed, the prototype was wholly missing significant parts, including gears and motors, and the control system (i.e., the system that communicates the driver's directions to the vehicle) was incomplete. The infotainment system in the cab was also incomplete. Instead, for the purpose of the unveiling event, tablet computers or other computer screens were mounted into the areas where the screens for the infotainment would be, and the screens were set to display images created to have the appearance of infotainment screens, with speedometers, maps, and other information displayed. Further, the truck was towed onto the stage at night prior to the event, and the screens and lights were powered by an external battery and a power cord running under the truck to the wall, which had to be manually disconnected as the stage spun. Similarly, an air line had to be connected to the vehicle to keep the truck's air suspension and air brakes working, because there was a slow leak in the truck's air supply. Nikola personnel operated the truck's headlights at the event by remote

control.

31.    Notwithstanding the actual state of the Nikola One prototype, the unveiling of the Nikola One occurred on or about December 1 and 2, 2016, under the direction of TREVOR MILTON, the defendant. On the first evening MILTON hosted an event at which the Nikola One was "unveiled" on a stage in front of a crowd. Individuals who had made reservations to purchase a Nikola One, potential business partners, and current and potential investors were invited.

32.    During the evening event on or about December 1, 2016, TREVOR MILTON, the defendant, falsely claimed that the Nikola One was fully functioning and could be driven. For example, MILTON stated, "We will have a chain on the -- on the seats to prevent people from coming in just for the safety . . . so we're going to try to keep people from driving off, but this thing fully functions and works, which is really incredible." A video of MILTON's presentation was posted on Nikola's YouTube channel, and the video was viewed over 1,450,000 times by in or about September 2020.

33.    On or about December 2, 2016, TREVOR MILTON, the defendant, was interviewed sitting in the Nikola One cab by an editor of a large technology and science website. The video of the interview was posted publicly online. During the interview, MILTON stated again that the Nikola One was a "fully functioning vehicle."

34.   Following the 2016 unveiling of the Nikola One, TREVOR MILTON, the defendant, determined not to complete the prototype, and no further substantial engineering was undertaken. The truck was never completed and has never been operable.

35.   In or about 2017, a representative of a large multinational corporation approached Nikola and asked to use the Nikola One in a commercial celebrating innovation. The concept for the video included a shot of the Nikola One coming to a stop in front of a stop sign. In order to accomplish this feat with a vehicle that could not drive, the Nikola One was towed to the top of hill, at which point the "driver" released the brakes, and the truck rolled down the hill until being brought to a stop in front of the stop sign. For additional takes, the truck was towed to the top of the hill and rolled down the hill twice more. Additionally, the Nikola One's door, which had been constructed using minivan parts, had to be taped up during the shoot to prevent it from falling off. Moreover, because the Nikola One had not been tested and was not safe (and indeed could not operate), certain precautions were taken before towing the vehicle to the commercial shoot. In particular, the turbine, which was designed to run on natural gas, and batteries were entirely removed from the vehicle to mitigate risk of fire, explosion, or damage. TREVOR MILTON, the defendant, attended the shoot.

36.   Following the commercial shoot, TREVOR MILTON, the defendant, directed a Nikola employee to make a condensed video of the Nikola One truck moving using raw footage from the shoot. MILTON further directed that the resulting video be uploaded to Nikola's YouTube channel. On or about January 25, 2018, at MILTON's direction, Nikola's Twitter account tweeted the following:



**Nikola Motor Company** ✔ @nikolamotor · Jan 25, 2018            ...
Behold, the Nikola One in motion. Pre-production units to hit fleets in 2019 for testing. The Nikola Hydrogen Electric trucks will take on any semi-truck and outperform them in every category; weight, acceleration, stopping, safety and features - all with 500-1,000 mile range!



▶  123.1K views                                    0:09 / 0:39  ⏸×  ↗

Embedded in the tweet is the video created from the raw commercial footage. In the video, the Nikola One appears to be driving down a road with no incline. In other words, the Nikola One appears to be driving on its own power, notwithstanding that the Nikola One could not do so and has never done so. Similarly, that same day, Nikola's Facebook account, also pursuant to MILTON's direction,

posted: "Behold, the 1,000 HP, zero emission Nikola semi-truck in motion," along with the same video.

37.   At least certain retail investors who purchased publicly traded Nikola stock between in or about June and September 2020 watched one or more of the above-described video presentations in which TREVOR MILTON, the defendant, made repeated false statements about the operability of the Nikola One. Although several years later, in or about April 2019, Nikola did complete two prototypes of a different model of semi-truck known as the Nikola Two, as a result of MILTON's statements, these retail investors purchased Nikola stock with the incorrect belief that Nikola had successfully created a fully functioning Nikola One in or about 2016.

38.   On or about June 17, 2020, approximately two weeks after Nikola's business combination with VectoIQ closed and Nikola was listed publicly on the Nasdaq stock exchange, an article was published in a widely read business magazine reporting, in substance, that the Nikola One was not functioning at the December 1, 2016 unveiling event. TREVOR MILTON, the defendant, who was interviewed prior to the publication of the article, conceded that the truck did not drive under its own power, but claimed that this was because the motors and gears were removed from the truck for safety reasons and that he "never deceived anyone."

39.   On or about June 17, 2020, following the publication of the article correctly and accurately reporting that TREVOR MILTON,

the defendant, had falsely stated that the Nikola One prototype was fully functional when it was not, MILTON published several tweets criticizing the article, accusing its author of lying, and threatening legal action. MILTON then texted a member of Nikola's board of directors regarding the article, and stating, among other things, "Share value went up after my response."

40.   In or about June and July 2020, TREVOR MILTON, the defendant, participated in several television and social media appearances, during which he stated, in substance and in part, that the Nikola One was operable, but that parts were removed and the prototype was not actually driven because of safety concerns. These statements were false and misleading because the Nikola One prototype was not functional or operable at the time of the unveiling, and never has been.

### False and Misleading Claims Regarding the Badger

41.   In or about February 2020, TREVOR MILTON, the defendant, announced publicly that Nikola was making a pickup truck called the Badger, which he claimed would out-pace its rivals and be unveiled at an event in or about late 2020. Many of Milton's statements contained false representations about the Badger truck. In particular, in order to give investors a false impression of the status of the Badger's engineering and development, Milton repeatedly stated that Nikola engineered and built the Badger from the "ground up" as a "clean sheet" vehicle using Nikola's in-house

components and intellectual property; that the company had been working on the program for years and had tapped into billions of dollars in Nikola engineering; that the building of prototype vehicles was complete and they were "real" trucks; and that an OEM partner (the "OEM Partner") would mass-produce the vehicle using Nikola's prototype design and engineering.

42.   In truth and in fact, at the time TREVOR MILTON, the defendant, announced the Badger, Nikola had little more than concept sketches and renderings, and that remained the case for several months. When Nikola started working on a "prototype," it did not engineer the vehicle from the ground up, but rather hired third party vendors to build a show truck by modifying pickup trucks manufactured by a large automobile company and employing third-party components. And under the terms of Nikola's agreement with the OEM Partner, very little, if any, of Nikola's design, engineering, or intellectual property were to be used in the production of the Badger. The OEM Partner never saw the "prototype" vehicles MILTON had claimed Nikola was working on, and the OEM Partner had no plan to use those vehicles in its development of a pickup truck. MILTON also boosted interest in the Badger and gave the misleading impression that the Badger was far along in development with additional deceptive statements, including that Nikola would start taking reservations on the truck, that certain

reservation packages were sold out, and that the truck had particular capabilities or technical features.

43. More specifically, in or about November 2019, TREVOR MILTON, the defendant, tweeted a rendering of a pickup truck in response to the public announcement by a large electric vehicle manufacturer that it would be producing an electric pickup truck. In or about January 2020, MILTON approached other executives at Nikola with a proposal to develop a pickup truck based on the image that he had previously tweeted. Although the executives were reluctant to agree to the plan, which they understood to be distracting from and potentially harmful to Nikola's core business plan, MILTON insisted on creating a pickup-truck line based on, among other things, his perception of the interest the pickup truck had generated on social media. MILTON agreed, however, that Nikola would only move forward with the pickup truck if he found an OEM partner to produce the vehicle. MILTON reached out to at least one OEM for potential partnership in or about January 2020 but did not secure a deal at that time.

44. In early February 2020, Nikola was working toward finalizing and announcing its deal with VectoIQ. On or about February 10, 2020, at the direction of TREVOR MILTON, the defendant, Nikola announced the pickup truck, named the Nikola Badger, in a press release and on social media. The next day, Nikola tweeted the following rendering of the Badger:



45.   On or about February 14, 2020, MILTON appeared on television and stated regarding the Badger, among other things, "we are building it from the ground up . . . . We do our own batteries, we do our own frames, we do our own vehicles from the ground up, our own inverters, our own infotainment, you know the cool screens, so ultimately the entire truck from the ground up is designed by Nikola . . . ."

46.   Nevertheless, in or about February 2020, TREVOR MILTON, the defendant, continued to seek an OEM partner to develop the Badger, for which Nikola had performed no significant engineering. Through the first quarter of 2020, however, MILTON's efforts to secure an OEM partnership for the Badger were not successful.

47.   In the absence of an OEM partner, in or about March 2020, TREVOR MILTON, the defendant, directed a small group of Nikola employees to build Badger prototypes. However, because the Nikola employees were focused on other Nikola development projects, the

production of Badger prototypes was outsourced, at MILTON's direction, to third parties, with one vendor contracted to create the upper body of the vehicles, and another to build the chassis. Neither component was being built from the ground up. Rather, Nikola purchased several Ford F-150 pickup trucks - a highly popular model to which MILTON had claimed his Badger would compare favorably - to use as "donor" or "surrogate" vehicles, and used the vehicles' chasses and bodies as the base for constructing the Badger prototypes. At MILTON's direction and with his approval, engineers working on the Badger prototypes took steps to hide from the public that Ford donor vehicles were used to produce the prototypes.

48.  Furthermore, even though MILTON had announced that there would be both a battery-electric version of the Badger and hydrogen fuel cell version of the Badger, MILTON directed, in order to make the construction of the prototypes easier, that both prototypes be battery-electric. Although neither of the prototypes was designed to operate on hydrogen fuel, MILTON directed that they be fitted with hydrogen fueling ports to make it appear as though they were.

49.  As of in or about June and July 2020, Nikola was still working on finalizing engineering plans for the prototypes, at which point Nikola only had renderings of the vehicles and concept sketches. In or about August 2020, Nikola began tooling, which means making the tools needed to make the parts of the vehicle

that Nikola's subcontractors were fabricating. The interior and exterior of the body, as well as the chassis, were not completed until in or about September or October 2020. Many of the parts coming from third parties — including, as discussed below, the batteries, inverters, and controls — were also not ready for installation until in or about October 2020. The prototypes were not finished until in or about November or December 2020.

50.   Notwithstanding the above, after Nikola announced its plans to go public through its merger with VectoIQ on or about March 3, 2020, TREVOR MILTON, the defendant, made false and misleading public statements describing the Badger as "real" and "fully functioning," despite the fact that Nikola had not yet built anything. For instance, during a podcast interview on or about April 20, 2020, a link to which MILTON subsequently tweeted, MILTON stated, "we built this thing to be a true vehicle," it is based on a "billion dollars of knowledge" from Nikola's semi-truck program, the "truck can go 700 miles in a real environment," and it can "whoop a Ford F-150 . . . whoop a Silverado . . . whoop a Dodge Ram." MILTON promised that at the truck's unveiling he would show off a "real truck" that is "fully functioning," not one of those "pushers everyone puts out there as a fake vehicle to show everyone what they're doing." Similarly, during an interview broadcast on YouTube on or about June 1, 2020, MILTON described the Badger as a "fully functioning vehicle inside and outside, HVAC [heating

ventilation and air conditioning], and everything, windows, all of it works . . . a real, real truck . . . not just some mock-up thing that other people have done."

51.   Once Nikola's stock was officially publicly traded, on or about June 3, 2020, TREVOR MILTON, the defendant, increased the number of public comments he made about the Badger. Many of those statements concerning the engineering of the Badger and the status of the truck were false and misleading, giving the impression that the truck's development or engineering was more advanced than it really was.

52.   On or about June 7, 2020, in the evening, TREVOR MILTON, the defendant, announced on Twitter that Nikola was going to start taking reservations for the Badger on June 29, 2020. On or about June 9, 2020, in response to a question about when the "first prototype [will] be produced," Milton tweeted, "Already." As noted, in truth and in fact, as of June 8, 2020, Nikola only had renderings of the vehicles and concept sketches.

53.   On or about June 8, 2020, the morning following the announcement by TREVOR MILTON, the defendant, that Nikola would take reservations for the Badger, Nikola's stock opened at $42 per share, $7 above where it had closed the prior day, and $9 above the price when it went public less than a week prior. On or about June 9, 2020, following the additional tweets referenced above, Nikola's stock price opened at $93.13 per share.

54.   During in or about June 2020, TREVOR MILTON, the defendant, continued to make false and misleading statements regarding the Badger on television and podcast interviews, including statements claiming, in substance and in part, that Nikola had built the Badger.

55.   On or about June 25, 2020, TREVOR MILTON, the defendant, issued several tweets making claims about how the Badger would use the water created as a by-product of the hydrogen fuel cell. In particular, MILTON tweeted that the Badger uses "most all of it for our windshield washer fluid and . . . a little bit for clean, pure, drinking water." Approximately several minutes later, MILTON tweeted, "Yes you heard that right, we will have a drinking fountain in our truck using the hydrogen bi product water for the drivers to have nice cold, clean, pure drinking water." In fact, at that point, MILTON had not discussed with Nikola's engineers the idea of using fuel cell by-product as washer fluid or drinking water, and several days later attempted to determine if it was even possible by searching on the internet, "can you drink water from a fuel cell?" Nonetheless, MILTON instructed that the Badger prototypes be built with drinking fountains, even though neither prototype was actually a fuel cell truck. MILTON continued to promote the Badger's drinking water system on television and social media in or about June and July 2020.

56.   On or about June 29, 2020, as TREVOR MILTON, the defendant, had previously announced, Nikola began taking deposits for the Badger truck with three differently priced reservations packages. Within days of Nikola starting to take reservations for the Badger, MILTON tweeted that the most expensive reservation was "sold out," thereby creating the misleading impression that Badger sales were going well, which they were not. In fact, on or about the day reservations opened, Nikola received approximately 2,411 preorders. Nikola received approximately 249 additional orders on or about June 30, 2020; approximately 87 on or about July 1, 2020; and approximately 124 on or about July 2, 2020. On or about July 2, 2020, after online speculation that reservation numbers were not being released because they were low, MILTON tweeted that the "$5,000 #nikolabadger deposit package [had] sold out." No one at Nikola knew of MILTON's plans to announce that the package had been sold out, and after he tweeted, Nikola employees had to scramble to remove the package from the company's website.

57.   During in or about July and August 2020, TREVOR MILTON, the defendant, continued to issue false and misleading statements regarding the status of the Badger. For example, on or about July 14, 2020, on an Instagram Live video – a link to which was tweeted by MILTON – MILTON stated that the Badger was "a real truck, comes from a billion dollar program," and is "legitimate." MILTON then asked rhetorically, in an apparent reference to the criticism he

was receiving on social media, "Why do I not show the Badger right now?" Answering his own question, MILTON stated, "Because I don't have to. And why else? Because it's marketing. So go get a degree in marketing, learn what it's like, even negative press brings great press. With every hater comes great followers and great investors."

58.    During in or about June, July, and August 2020, TREVOR MILTON, the defendant, continued to seek an OEM partner for the Badger. In or about August 2020, Nikola, at MILTON's direction, entered into an agreement with the OEM Partner, pursuant to which the OEM Partner would produce the Badger.

59.    On or about September 8, 2020, Nikola and the OEM Partner announced a strategic partnership. In tweets following the announcement on or about September 8 and 9, 2020, TREVOR MILTON, the defendant, stated that Nikola had "designed the Badger from a clean sheet," "built the [B]adger from the ground up," and that the OEM Partner "will use Nikola's design, and engineer it to fit on the existing [OEM Partner] modular EV platform." On or about September 9, 2020, during a television interview, MILTON stated that Nikola "built the Nikola Badger from the ground up ourselves, the whole thing" and that the vehicle is "pretty close" to the "final car" that the OEM Partner would be manufacturing. According to MILTON, while the OEM Partner would manufacture the truck and help with certain parts, "it's probably 70 percent Nikola 30

percent [the OEM Partner]" and Nikola was "really doing most of the IP internally . . . the over-air updating, the software, the controls, the infotainment, the design of the vehicle, the cab, the interior of the cab, . . . even the driver profile, we've been all the way down to suspension, that all comes from Nikola."

60. In truth and in fact, and as TREVOR MILTON, the defendant, well knew, Nikola had not built a Badger from "the ground up" using Nikola IP and parts and the OEM Partner in fact planned to build the Badger based on one of its own electric vehicle platforms. Moreover, the OEM Partner was responsible for all components of the Badger truck, except for the general aesthetic and potentially the infotainment system. With the possible exception of the infotainment system, there was no plan to use any parts over which Nikola had intellectual property rights. No one at the OEM Partner ever saw the Badger prototypes that Nikola had been working on and they were not part of the OEM Partner's engineering or development plans.

61. Furthermore, the two prototype Badgers built were little more than show cars and not real consumer vehicles. For example, the Badger prototypes could not be driven on roads because some of the parts of the body were carbon fiber composite and because they had not undergone safety testing. The Badger prototypes also lacked certain parts, such as airbags and an operable HVAC. Similarly, many of the lights in the interior of the Badger prototypes were

not operable and were merely backlit. Moreover, even though the prototypes were battery-electric trucks, TREVOR MILTON, the defendant, directed that they be built with hydrogen fueling ports as well as drinking fountains (which were simply connected to water reservoirs, as there was no fuel cell or system for converting fuel cell by-product to drinking water). For these reasons, among others, the statements made by MILTON that claimed in substance that the Badger was a real truck, that it had been completed, and it would be based on Nikola's technology and engineering were false and misleading.

### False and Misleading Claims Regarding Hydrogen Production

62. Since in or about 2016, a key component to the success of Nikola's business model has been the ability to produce, store, and dispense hydrogen efficiently and economically. This is because, as Nikola has stated publicly and in investor materials, Nikola has planned to construct a network of hundreds of hydrogen fueling stations along trucking routes and to include the cost of hydrogen as part of a bundled lease for its trucks. Furthermore, because the cost of electricity is the most significant cost input for operating the machines that create hydrogen (which are called "electrolyzers"), the profitability of Nikola's business model has been and is highly dependent on Nikola's ability to acquire electricity at a price that would permit Nikola to produce hydrogen

cheaply enough to make its leases economically viable for customers.

63. At all times relevant to this Indictment, Nikola had never obtained a permit for, let alone constructed, a hydrogen production station, nor had it produced any hydrogen. Although Nikola did complete a dispensing-only hydrogen fueling station at its Phoenix, Arizona headquarters in or about April 2019, that station has been plagued with problems because many components of the station were not built to withstand the extreme heat in Phoenix. Moreover, the hydrogen that was used to stock that station was not produced by Nikola, but was instead acquired from an outside vendor. An image of the dispensing-only station being stocked by the outside hydrogen vendor appears below:



Moreover, and contrary to public statements that TREVOR MILTON, the defendant, repeatedly made, at no time relevant to this

Indictment was the station permitted for hydrogen production, nor did it have an electrolyzer installed, or produce any hydrogen. Furthermore, at least by the time of MILTON's resignation, in or about September 2020, Nikola had not purchased land for any hydrogen production stations, nor had it reached any pricing agreements with utilities for electricity to power its electrolyzers.

64.   TREVOR MILTON, the defendant, recognized that if retail investors were aware that Nikola had not made material progress in developing its hydrogen production and fueling network they would doubt the company's success. Notably, on or about May 30, 2020, which was four days before Nikola's stock was officially listed and publicly traded on the Nasdaq stock exchange, MILTON sent an email to Nikola's board of directors seeking permission for Nikola to purchase five electrolyzers for $95 million. MILTON explained that, with Nikola going public, he was "getting ready to go on a media blitz and the most critical item in our business model is that we don't have stations." MILTON further explained that announcing the purchase publicly would allow him to boost the stock price and appeal to retail investors: "I would like to announce this on Monday as huge news. This will help our stock, create much stronger following and base layers of investors and it also will ease the criticism I am going to get going into interviews." MILTON made this request to the Board despite the fact that Nikola had

not procured any land for hydrogen stations, had nowhere to install the electrolyzers, and was still in the process of designing and troubleshooting its plans for hydrogen production facilities.

65.   To further his scheme to create demand for Nikola's stock, TREVOR MILTON, the defendant, also made false and misleading statements concerning Nikola's hydrogen business. Specifically, and among other things, MILTON made false and misleading claims regarding the status of Nikola's production of hydrogen; the current cost of producing hydrogen; the cost of electricity needed to produce hydrogen; Nikola's ability to produce hydrogen using clean energy; and the status of permits related to hydrogen production.

66.   For example, MILTON tweeted the following on January 23, 2020: "Hydrogen costs have plummeted through @nikolamotor efforts not other OEM's. Our costs are below $3 per kg." As another example, in a podcast that was recorded in or about January 2020, and broadcast on the internet on or about March 12, 2020, TREVOR MILTON, the defendant, stated, "Up until Nikola came in the market, hydrogen was around $16 a kilogram, U.S. dollars. Now Nikola is producing it well below $4 a kilogram." In truth and in fact, Nikola had neither secured electricity pricing sufficient to set the cost of hydrogen production at $4 per kilogram, nor had it produced any hydrogen at all.

67.   Similarly, in a podcast on or about June 11, 2020, TREVOR MILTON, the defendant, stated, "when we produce hydrogen, we produce it on freeways," and, when asked whether Nikola makes hydrogen on site, MILTON responded, "We do. We make it on site." In an article published by MILTON on a social media networking website, on or about June 21, 2020, MILTON stated,

> Most hydrogen that Nikola makes is on the freeway. This is near the main federal transmission lines where the voltage is incredibly high allowing for continuous output. . . . Nikola uses energy transmitted on the federal transmission lines before we enter the utility. We buy this clean energy directly from Wind, Solar and Hydro facilities directly. This allows us to get sub $.04 per kWh 20-year agreements on the freeways.

In truth and in fact, Nikola had not produced hydrogen anywhere, including on freeways or near main federal transmission lines; nor had Nikola purchased any energy for producing hydrogen, let alone energy transmitted on the federal transmission lines, clean energy from wind, solar, and hydroelectric facilities directly, or energy at less than $.04 per kWh.

68.   In another podcast on or about July 17, 2020, TREVOR MILTON, the defendant, stated, among other things,

> We tap directly into the main federal transmission lines and we contract directly with groups . . . an example would be . . . like a Tennessee Valley Authority or . . . one of those where you're where you have a huge hydro plan. . . . We're dealing directly with the generation group . . . all of our hydrogen's produced on the freeways . . . .

> We only look at areas where we can get this
> energy for sub three or 4 cents a kilowatt
> hour, guaranteed 24 hours a day. And we've
> been able to do that. And almost every one of
> our major locations that we're going up, and
> we're gobbling up those locations cause once
> Nikola takes them, they're almost impossible
> to get. And so we're just, we're just gobbling
> them up. . . . We get the prime location, we
> get the prime rate, we get a prime contract,
> 20 years lock them up.

In truth and in fact, Nikola had not tapped directly into main federal transmission lines, nor had Nikola contracted with Tennessee Valley Authority or any other energy provider for the purpose of hydrogen production, nor had Nikola purchased land or permitted for hydrogen production or produced any hydrogen, on freeways or otherwise.

69.   In that same July 17, 2020 podcast, TREVOR MILTON, the defendant, also stated, among other things, that when Nikola first started, hydrogen production stations "were going to be 50 to 60 million," but now Nikola is "down to, you know, 14, 14 million bucks" due to the "standardization of a hydrogen station." In truth and in fact, Nikola had not built a single hydrogen production station, much less "standardized" hydrogen production stations. At the time, due to the high cost of electricity in California, Nikola was seriously considering moving away from its plan to produce hydrogen on-site at all of its fueling stations, and instead was considering producing hydrogen at a central location through liquefaction. MILTON was well aware of the issues with Nikola's

hydrogen station plan, but directed that Nikola employees "[k]eep the liquefaction discussions quiet from the market."

### False and Misleading Claims Regarding In-House Technology

70.   Semi-trucks like the Nikola One, Two, and Tre must be constructed from thousands of parts, including motors, batteries, transmissions, drive shafts, axles, steering components, brakes, the chassis frame, the metal body, lighting, HVAC, and wheels, to name a few. Most truck and car manufacturers outsource production of many of the parts of a vehicle to third-party vendors. Some large manufacturers, however, produce some components in-house because it is cheaper due to economies of scale, or because technology is proprietary.

71.   Since at least in or about 2016, TREVOR MILTON, the defendant, has claimed that Nikola has intellectual property rights over important components of its semi-truck line. While MILTON has stated that Nikola outsources many parts of the trucks, like tires or windshields, MILTON has also repeatedly stated that Nikola makes the most important parts of the semi-trucks "in-house." MILTON has done so, among other reasons to claim that Nikola has valuable intellectual property, to support his claims that Nikola's trucks outperform competitors, and to differentiate the company from other electric vehicle manufacturers and startups. However, in order to induce retail investors to buy the stock, thereby supporting the stock price, MILTON exaggerated

Nikola's in-house development of batteries and other components, and falsely stated that the company made parts in-house when it did not.

72.   The components that are relevant to this Indictment include batteries, which are critical to an electric vehicle's operation because they store energy to run the motors, and the powertrain, which provides power to the wheels so that a truck can move. An electric vehicle, like Nikola's planned semi-trucks, has an electric powertrain, which is sometimes called an e-axle. An electric powertrain or e-axle is an electro-mechanical propulsion system, or traction motor system, containing an axle structure housing an electric motor, an inverter (which receives electricity from a battery or other electrical source, such as a fuel cell, and converts that electricity from direct current to alternative current to power the motor), and gears (also referred to as reducers).

73.   Since in or about the time that Nikola's stock started trading publicly, TREVOR MILTON, the defendant, has repeatedly claimed that Nikola makes important components of its semi-trucks in-house, including batteries and the powertrain. For example, on or about June 3, 2020, the same day that Nikola officially started trading on the Nasdaq, MILTON tweeted out a link to a podcast interview, during which he claimed that Nikola did its "own powertrains, battery, battery management systems, controls . . .

in-house." On or about June 4, 2020, in response to a tweet that another company "supplies the batteries," MILTON tweeted, "We do our own batteries at Nikola and have since day 1." On or about June 6, 2020, MILTON tweeted, "All the technology, software, controls, E axle, inverters etc. we do internally." On or about July 1, 2020, MILTON tweeted, "We make the entire [battery] pack like the top guys do. We do have an OEM making our truck but all internals are Nikola's IP; batteries, inverters, software, ota, infotainment, controls, etc. We own it all in-house." On or about July 6, 2020, MILTON tweeted, "All major components are done in-house; batteries, inverters, software, controls, infotainment, over the air, etc."

74.   On or about July 14, 2020, TREVOR MILTON, the defendant, broadcast on social media a live video of him showing and discussing component parts of Nikola's trucks. During a portion of the video, MILTON stated that Nikola does "all the e-axle design in-house, all the gears, the gear reductions, the thermal, the cooling, even the controls that go with it, and also the inverters as well." MILTON further stated, "[A]ll inverters on the Nikola truck are probably some of the most advanced software systems that . . . I know of anywhere in the automotive world. Why do I know that? It's because other OEMs are asking us to use it. . . ." MILTON further stated regarding the batteries to be used in Nikola trucks, that Nikola does not manufacture the battery cell, which

is a part within a vehicle's battery system, but does "make everything in our battery. All the cooling, the thermal, the battery management system, the software, the hardware, everything except for the cell."

75. These statements, and other, similar statements that TREVOR MILTON, the defendant, made in interviews and on social media, were false and misleading. In truth and in fact, although Nikola has partnered with various companies to try to develop proprietary battery technology, these efforts have not been successful, and Nikola had not successfully developed at any time relevant to this Indictment battery technology internally, and the batteries it planned to use in its semi-trucks were developed and manufactured by third parties. At all times relevant to this Indictment, Nikola also had not produced an inverter in-house and the inverters it planned to use in its semi-trucks were developed and manufactured by third parties.

### False and Misleading Claims Regarding Reservations for Nikola's Semi-Trucks

76. Beginning in or about May 2016, in connection with the announced development of the Nikola One, Nikola began taking reservations for the delivery of its semi-truck. Although Nikola at first required a deposit to make a reservation, which could range from $1 to $1,500, in or about April 2018, Nikola refunded all deposits and ceased requiring deposits for reservations.

Nikola has stated publicly, including in public filings, that it has approximately 14,000 such reservations. The majority of the reservations were made for the Nikola One, which Nikola marketed as a hydrogen-powered "sleeper" truck capable of handling long-haul trucking routes. With the exception of a reservation for approximately 800 semi-trucks, which is binding provided that Nikola meets certain conditions, these reservations are non-binding and cancellable at any time for any reason. Nevertheless, and notwithstanding that Nikola now plans first to produce a battery-powered truck intended for short-haul routes (the Nikola Tre) and has no timeline for the production of a hydrogen-powered sleeper truck as the Nikola One was purported to be, Nikola and TREVOR MILTON, the defendant, have pointed to these reservations as demonstrating interest in Nikola's planned semi-trucks.

77.   Moreover, TREVOR MILTON, the defendant, has repeatedly misstated the nature of Nikola's reservations to suggest that the reservations are firm and binding. These statements are inconsistent with the fact that approximately 13,200 of the approximately 14,000 reservations are non-binding and cancellable at any time, and with Nikola's own statements in SEC filings.

78.   For example, on or about June 1, 2020, in a podcast interview, TREVOR MILTON, the defendant, stated,

> We don't build on speculation; we build on
> orders. We're very similar to like Airbus or
> Boeing where we're sold out for many, many

41

> years. We're the only company in the world
> that is sold out for many, many years . . .
> It's all based on orders. I think that's the
> reason Nikola is worth so much money today.

On or about July 31, 2020, during a podcast interview, the host

referred to Nikola's reservations as "letters of intent." MILTON

stated that he wanted to correct that characterization and that

the reservations were "not letter of intents, they're actually

contracts." MILTON further stated:

> Yeah, billions and billions of dollars with
> the contracts. So I want to be clear about
> that 'cause a lot of people have thought that
> it's just like, a non-committal thing, it's
> not. These are like, sign on the dotted line,
> billions and billions and billions and
> billions of dollars in orders.

79.  The statements of TREVOR MILTON, the defendant, were

false and misleading, and designed to give an exaggerated and

inaccurate impression that Nikola had a predictable and committed

future stream of revenue. In truth and in fact, as noted above,

13,200 out of the 14,000 reservations were not commitments, nor

was Nikola "sold out" of any trucks, nor was Nikola building to

fulfill orders.

## Milton's False and Misleading Statements Induced Retail Investors to Purchase Nikola Stock

80.  After TREVOR MILTON, the defendant, made false and

misleading statements regarding Nikola's products and

capabilities, tens of thousands of retail investors purchased

Nikola stock, between in or around March and September 2020, and

many ultimately suffered significant financial losses. The value of Nikola's stock plummeted after the fact that certain of MILTON's statements had been false and misleading was disclosed to the market in or around September 2020. For example, on or about Friday, September 18, 2020, Nikola's stock closed at approximately $34.19 per share. On or about Sunday, September 20, 2020, when the market was not open, Nikola announced that MILTON would be resigning as Executive Chairman of Nikola's Board of Directors. On or about Monday, September 21, 2020, *The New York Times* ran a story indicating that MILTON'S resignation was related to claims that he had deceived investors about Nikola's technology, including by producing the video of the Nikola One described in paragraphs 35 and 36 above. By on or about Friday, September 25, 2020, Nikola's stock closed at approximately $19.46 per share. Thus, between September 18, 2020 and September 25, 2020, Nikola's market capitalization dropped approximately 43%. As a result, investors, including thousands of retail investors who were the targets of MILTON's fraudulent scheme, suffered substantial losses, in some case totaling in the tens or hundreds of thousands of dollars and compromising their financial security or retirement savings.

81.     During the same time period that many retail investors were purchasing Nikola stock at least in part on the basis of false and misleading claims by TREVOR MILTON, the defendant, certain institutional investors who received Nikola shares as part of the

SPAC transaction or the PIPE and had access to more complete information regarding Nikola's products and technology were able to sell their stock for a significant profit.

### Statutory Allegations

82.   From at least in or about November 2019 through at least in or about September 2020, in the Southern District of New York and elsewhere, TREVOR MILTON, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, MILTON engaged in a scheme to defraud investors in Nikola through false and misleading statements regarding the company's product and technology development.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

83.   The allegations contained in paragraphs 1 through 81 of this Indictment are repeated and realleged as if fully set forth herein.

84.   From at least in or about November 2019 through at least in or about September 2020, in the Southern District of New York and elsewhere, TREVOR MILTON, the defendant, willfully and knowingly executed a scheme and artifice to (a) defraud persons in connection with securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit, MILTON engaged in a scheme to defraud investors in Nikola through false and misleading statements regarding the company's product and technology development.

(Title 18, United States Code, Sections 1348 and 2.)

45

## COUNT THREE
### (Wire Fraud)

The Grand Jury further charges:

85.  The allegations contained in paragraphs 1 through 81 are repeated and realleged as if fully set forth herein.

86.  From at least in or about November 2019 through at least in or about September 2020, in the Southern District of New York and elsewhere, TREVOR MILTON, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MILTON engaged in a scheme to defraud investors in Nikola through false and misleading statements regarding the company's product and technology development, including through interstate wires.

(Title 18, United States code, Sections 1343 and 2.)

### FORFEITURE ALLEGATION

87.  As a result of committing one or more of the offenses charged in Counts One through Three of this Indictment, TREVOR MILTON, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and Title

28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendant personally obtained.

Substitute Assets Provision

88.  If any of the above-described forfeitable property, as a result of any act or omission by the defendant:

     a.  cannot be located upon the exercise of due diligence;

     b.  has been transferred or sold to, or deposited with, a third party;

     c.  has been placed beyond the jurisdiction of the court;

     d.  has been substantially diminished in value; or

     e.  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
AUDREY STRAUSS
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

— v. —

TREVOR MILTON,

Defendant.

### SEALED INDICTMENT

21 Cr. _____

(Title 15, United States Code, Sections
78j(b) and 78ff; Title 17, Code of Federal
Regulations, Section 240.10b-5; Title 18,
United States Code, Sections 2, 1343, and
1348.)

AUDREY STRAUSS
United States Attorney

**A TRUE BILL**

_____
Foreperson

*SEALED INDICTMENT FILED
7/28/21  USMJ SARAH
NETBURN*

*1 ARREST WARRANT*