UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

– against –

TREVOR MILTON,

                *Defendant.*

**OPINION AND ORDER**

21 Cr. 478 (ER)

---

Ramos, D.J.:

Pending before the Court is Trevor Milton's motion to dismiss the indictment for lack of venue, or in the alternative, for transfer of venue to the District of Arizona or District of Utah.  Doc. 11.  For the reasons set forth below, both motions are DENIED.

## I.   BACKGROUND

### A.  Factual Background

Milton is the founder and former chief executive officer ("CEO") of Nikola Corporation ("Nikola"), an electric- and hydrogen-powered vehicle and energy company that at all relevant times described and marketed itself as a designer and manufacturer of zero-emission battery-electric and hydrogen-electric vehicles, vehicle components, energy storage systems, and hydrogen station infrastructure.  ¶¶ 1, 5-6.[1]  Milton founded Nikola in 2015 and was its CEO from that time until June 2020, when the company began trading publicly on the NASDAQ stock exchange.[2]  ¶¶ 9, 16, 17.  The indictment alleges that, around the time Nikola began to sell shares to the public on the NASDAQ, Milton engaged in a scheme to defraud investors by inducing them to purchase shares of

---

[1] The factual background is taken from the allegations in the indictment, Doc. 1, which the Court accepts as true at this stage.  *See United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).  Unless otherwise noted, citations to ¶ _ refer to the indictment.

[2] From June 2020 until his resignation on September 20, 2020, Milton was Executive Chairman of Nikola's Board of Directors.  ¶¶ 5, 80.

Nikola stock by making false and misleading statements online and through the media about the capabilities of Nikola vehicles.  ¶¶ 22-26, 37-38.

In March 2020, Nikola announced its plan to go public through a merger with VectoIQ, a special purpose acquisition company ("SPAC") based in Mamaroneck, New York.  ¶¶ 4, 13, 50.  A SPAC is a publicly traded company that issues shares through an initial public offering ("IPO") but conducts no business of its own; its purpose is to merge with a private company so that that company may become publicly traded.  ¶ 11.  SPACs provide an alternative and faster method for private companies to become publicly traded, as compared to filing a registration statement and prospectus with the Securities and Exchange Commission ("SEC") before going public.  ¶¶ 9-11.  A private company's merger with a SPAC, unlike an IPO, is not subject to the quiet period imposed by federal securities laws, and therefore the private company's executives are not limited in their ability to speak publicly about the company prior to and just after the transaction.  ¶ 12. Prior to the June 3, 2020 merger, investors could purchase shares of what would become Nikola stock by purchasing VectoIQ stock, trading under the ticker VTIQ.  After the merger, investors could purchase Nikola stock under the ticker NKLA.  ¶ 16.

Following the announcement that Nikola would go public through the merger with VectoIQ, and in the runup to that transaction, Milton made statements on social media and gave many podcast, television, and print and online media interviews, touting the company, its vehicles, and its capabilities.  ¶¶ 23-25.  The indictment alleges that Milton made misleading statements in order to heighten interest in Nikola and to encourage retail investors to purchase Nikola stock, thereby increasing the stock price.[3] ¶ 26.  Milton's allegedly false and misleading statements included claims that Nikola had successfully created a functioning zero-emission semi-truck prototype (the "Nikola One")

---

[3] At the time of the merger between Nikola and VectoIQ, Milton entered into a new compensation agreement with Nikola that he would be compensated in stock units and would receive bonus stock units if the stock price reached certain milestones.  ¶ 21.

in 2016; that it had developed an electric- and hydrogen-powered pickup truck (the "Badger"); that it was able to produce hydrogen fuel; that it developed technology and components for its vehicles in-house; and that reservations made for future delivery of Nikola's trucks through the company's online system represented binding commitments to purchase the trucks.  ¶ 26.

In fact, the Nikola One prototype unveiled in December 2016 was not functional and not capable of being driven, contrary to Milton's claims at the launch event and in later interviews.  ¶¶ 32-33.  At the launch event, key parts of the prototype, including gears and motors, were incomplete; the screens for the infotainment system inside the truck's cab did not work, but instead displayed images of speedometers and maps; and the truck's light and the screens were powered by an external battery and power cord under the stage.  ¶¶ 29-30.  Nikola thereafter abandoned the prototype, ¶ 34, but Milton continued to promote the narrative that Nikola was an industry pioneer and had launched the first zero-emission semi-truck in 2016.  ¶¶ 27-28.  In 2018, at Milton's direction, Nikola's Twitter account posted a video of the Nikola One prototype, purporting to show the truck driving along a road on its own power.  ¶ 36.  In fact, at the location where footage for the video was taken in 2017, the Nikola One had been towed to the top of a hill and then been filmed rolling down the hill, with the door taped shut to prevent it from falling off.  ¶ 35.  A Nikola employee prepared the video for the company's Twitter account, using footage from the shoot edited to look like the truck was driving on a flat road on its own power.  ¶ 36.

In February 2020, Milton announced that Nikola was making a pickup truck called the Badger, stating that the company had engineered and built the Badger using Nikola's in-house intellectual property and components, and that the company had worked on the project for years and had already developed a prototype.  ¶ 41.  In fact, the company had only concept sketches at the time of his announcement.  ¶ 42.  Milton promoted the Badger through social media and in television and other media appearances

throughout 2020, making statements that the vehicle was real, functional, could drive 700 miles in a real environment, and would include a drinking fountain inside the truck dispensing drinking water created as a byproduct of the truck's hydrogen fuel.  ¶¶ 45-55. On June 7, 2020, Milton announced on Twitter that Nikola would take reservations for the Badger beginning on June 29, 2020, and on June 9, 2020, Milton tweeted, falsely, that the first prototype had already been produced.  ¶ 52.  Nikola's share price jumped following both of these statements.  ¶ 53.  In fact, no prototype existed until approximately November or December 2020.  ¶ 49.  The Badger prototypes, when they were built, were not built solely from Nikola components but instead out of Ford F-150 pickup truck parts and out of batteries, inverters, and other parts manufactured by third parties.  ¶¶ 47-49.  The two Badger prototypes were not operable as consumer vehicles and could not be driven on roads as they had not undergone safety testing; they also lacked airbags, operable lights, and other parts.  ¶ 61.

The indictment further alleges that Milton made false statements to hype reservations for the Badger and encourage consumers to make deposits on the trucks; false statements about Nikola's reservation system for the Badger and for Nikola's semi-trucks to the effect that the reservations represented binding commitments to purchase Nikola vehicles and thus a guaranteed future stream of revenue; false statements that Nikola had intellectual property rights for important components of its semi-truck line, including proprietary battery technology; and false statements about Nikola's ability to develop hydrogen fuel for its vehicles at a lower cost than other producers.  ¶¶ 56, 62-69, 71-75, 76-79.  The government alleges that these false statements induced tens of thousands of retail investors to purchase Nikola stock between March and September 2020, and many of them suffered significant financial losses when the value of Nikola stock dropped dramatically in September 2020, following a *New York Times* story that Milton's resignation was linked to claims that he had deceived investors about Nikola technology.  ¶ 80.  From September 18, 2020 to September 25, 2020, Nikola stock

dropped from $34.19 per share to $19.46 per share—a drop in market capitalization of 43%.  *Id.*  According to the indictment, during the same period that many retail investors were purchasing Nikola stock at least partly on the basis of Milton's claims, institutional investors who had received shares as part of the SPAC transaction were able to profit by selling their shares.  ¶ 81.

### B.  Procedural History

In July 2021, a Southern District grand jury returned an indictment charging Milton with two counts of securities fraud and one count of wire fraud.  Doc. 1.  Milton was arraigned on July 29, 2021.  On August 10, 2021, Milton filed a motion to dismiss the indictment, or in the alternative, to transfer venue.  Doc. 11.  The Court held an initial pretrial conference on August 13, 2021.  On September 15, 2021, the Court heard oral argument on Milton's motion.

## II.   DISCUSSION

### A.  Motion to Dismiss

Milton argues that the government has not alleged sufficient facts to support statutory venue in this district and further argues that prosecution in this district violates his constitutional rights under Article III, § 2 and the Sixth Amendment to the Constitution.  The government opposes on the basis that the indictment sufficiently alleges venue at this preliminary stage.

#### 1.   *Relevant Law*

At trial, the government must prove venue by a preponderance of the evidence as to all counts.  *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989).  However, "[w]here venue is challenged on a pre-trial motion to dismiss, the Government's burden is limited to showing that the indictment alleges facts sufficient to support venue."  *United States v. Peterson*, 357 F. Supp. 2d 748, 751-52 (S.D.N.Y. 2005) (citing *United States v. Szur,* No. S5 97 Cr. 108 (JGK), 1998 WL 132942, at *9; *United*

*States v. Korolkov*, 870 F. Supp. 60, 63-64 (S.D.N.Y. 1994)).  *See also United States v. Stein*, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006) ("[A]s long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied.").  At this initial stage, the government need only "allege that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information," and the question of whether there is sufficient evidence to establish venue is left for trial.  *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010) (internal quotations and citations omitted).

    *2. Discussion*

    The indictment charges Milton with using manipulative and deceptive practices in connection with the purchase and sale of securities in this district and alleges as to each count that Milton did these activities "in the Southern District of New York and elsewhere."  *See* ¶¶ 82, 84, 86.  Milton argues that venue is not present in this district, and the cases cited by the government are distinguishable because they include a more direct connection to or action by the defendant directed at the district:  the cases cited included "actual acts, overt acts either by a conspirator or actual acts or directionality to this district," such as the use of bank accounts or wires to the district.  Doc. 30, 09/15/2021 Hr'g Tr. at 3:14-5:3.  By contrast, Milton argues that the indictment does not allege any action or communication directed by him into this district, and therefore this district is not one where the offense, or an act or transaction constituting the violation, occurred, as required by Fed. R. Crim. P. 18, Art. III, § 2, Cl. 3 of and the Sixth Amendment to the Constitution, and 15 U.S.C. § 78aa(a) of the Securities Exchange Act.  Doc. 11 at 7-10.  Applying the "substantial contacts" rule articulated by the Second Circuit in *Beech-Nut Nutrition Corp.*, Milton urges that venue in this district is improper because he made the allegedly false and misleading statements at the core of the charged offenses not in this district or directed at this district, but instead in Arizona and Utah.  *Id.*

The government counters that Milton's arguments are not relevant on a motion to dismiss, at which stage the indictment need only allege, as in the instant indictment, that the charged crime occurred "in the Southern District of New York and elsewhere."  Doc. 15 at 5 (citing *Ohle*, 678 F. Supp. 2d at 231; *United States v. Elcock*, No. S1 07 CR 582 (CM), 2008 WL 123842, at *3 (S.D.N.Y. Jan. 10, 2008), *aff'd sub nom. United States v. Whittingham*, 346 F. App'x 683 (2d Cir. 2009)).  Moreover, the government writes that Milton's arguments ignore longstanding Second Circuit precedent on the requirements for venue in securities fraud and wire fraud charges.  Doc. 15 at 5-8.  The Court agrees with the government.

On a motion to dismiss the indictment, the allegations of the indictment are taken as true.  *See Goldberg*, 756 F.2d at 950.  In order to properly plead venue at this stage, the government "need only allege that criminal conduct occurred within the venue, 'even if phrased broadly[.]'"  *Ohle*, 678 F. Supp. 2d at 231 (S.D.N.Y. 2010) (quoting *United States v. Bronson*, No. 05 Cr. 714 (NGG), 2007 WL 2455138, at *4 (E.D.N.Y. Aug. 23, 2007)); *see also Szur*, 1998 WL 132942, at *9; *United States v. Chalmers*, 474 F. Supp. 2d 555, 574-75 (rejecting defendant's argument that the indictment failed to support venue because it did not indicate which specific criminal acts were committed in this district as premature at the pre-trial motion to dismiss stage).  That is all the government needs to allege at this stage in order to sufficiently plead venue.

Whether the government will ultimately be able to prove venue by a preponderance of the evidence is a question of fact to be decided by the jury.  *Szur*, 1998 WL 132942, at *9 (citing *Beech-Nut Nutrition Corp.*, 871 F.2d at 1188).  A defendant must be tried in the district where their crime was committed, and in the absence of a specific statutory provision, where the crime was committed "must be determined from the nature of the crime alleged and the location of the act or acts constituting it."  *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (citing U.S. Const. amend. IV; Fed. R. Crim. P. 18; *United States v. Cabrales,* 524 U.S. 1, 6-7 (1998)).  Venue is proper only where the

acts constituting the offense—the crime's "essential conduct elements"—took place. *Id.* (citing *United States v. Rodriguez-Moreno,* 526 U.S. 275, 280 (1999)). The act in question must be an act constituting the violation and not merely a preparatory act. *Id.* at 319.

The Second Circuit has repeatedly held that this test is satisfied in securities fraud cases where a defendant engaged in trades on a stock exchange located in the Southern District. *See, e.g.*, *United States v. Chow*, 993 F.3d 125, 143 (2d Cir. 2021) (upholding convictions for securities fraud and insider trading involving trading on the NASDAQ and stating "[w]here the defendant is charged with an offense involving the trading of securities on a stock exchange located in the SDNY, venue in that district is appropriate.") (citing *United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003)); *United States v. Geibel*, 369 F.3d 682, 697-98 (2d Cir. 2004) (upholding certain of the convictions for insider trading involving purchase of options executed on the American Stock Exchange located and headquartered in the SDNY); *United States v. Riley*, 638 F. App'x 56, 62 (2d Cir. 2016)).

Similarly, for wire fraud, "venue lies where a wire in furtherance of a scheme begins its course, continues, or ends." *United States v. Rutigliano*, 790 F.3d 389, 397 (2d Cir. 2015) (citing *United States v. Gilboe,* 684 F.2d 235, 239 (2d Cir.1982)). A wire is transmitted both where it is sent and where it is received. *United States v. Kim*, 246 F.3d 186, 191-92 (citing *Gilboe*, 684 F.2d at 239). Thus, assuming the government is able to meet its burden at trial, venue is proper in this district provided the government can prove that (1) the offenses involved trading Nikola stock on the NASDAQ and (2) Milton engaged in wire fraud (false representations transmitted or caused to be transmitted by wire, radio, or television communication) received in New York. However, these are questions of fact that the government will have to prove by a preponderance of the evidence at trial.

Milton's motion to dismiss for lack of venue is thus denied without prejudice to renewing the motion at the close of the government's case at trial. *Chalmers*, 474 F. Supp. at 575; *Ohle*, 678 F. Supp. 2d at 232.

**B.  Motion to Transfer**

In the alternative, Milton moves the Court to transfer venue either to the District of Arizona or the District of Utah.  That motion is also denied.

*1.  Relevant Law*

Fed. R. Crim. P. 21(b) provides that, "[u]pon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice."  Disposition of a Rule 21(b) motion lies within the discretion of the district court.  *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990).

"As a general rule a criminal prosecution should be retained in the original district.  To warrant a transfer from the district where an indictment was properly returned it should appear that a trial there would be so unduly burdensome that fairness requires the transfer to another district of proper venue where a trial would be less burdensome[.]"  *United States v. United States Steel Corporation*, 233 F. Supp. 154, 157 (S.D.N.Y. 1964); *see also United States v. Riley*, 296 F.R.D. 272, 275 (S.D.N.Y. 2014).  Although transfer motions are disfavored, transfer may be appropriate depending on the facts and circumstances of the case.  *United States v. Posner,* 549 F. Supp. 475, 477 (S.D.N.Y. 1982).  When deciding such motions, courts within the Second Circuit look to the ten factors articulated by the Supreme Court in *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240, 243-44 (1964).  *Maldonado-Rivera*, 922 F.2d at 966.  The defendant bears the burden of justifying transfer in light of the *Platt* factors, and "[t]hat burden is not often or easily met."  *United States v. Larsen*, No. 13 Cr. 688 (JMF), 2014 WL 177411, at *2 (S.D.N.Y. Jan. 16, 2014).

The *Platt* factors are:

(1) location of the defendant;

(2) location of the possible witnesses;

(3) location of the events likely to be at issue;

(4) location of relevant documents and records;

(5) potential for disruption of the defendant's businesses if transfer is denied;

(6) expenses to be incurred by the parties if transfer is denied;

(7) location of counsel;

(8) relative accessibility of the place of trial;

(9) docket conditions of each potential district; and

(10) any other special circumstance that might bear on the desirability of transfer.

*2.  Analysis*

Milton urges that the *Platt* factors weigh in favor of transfer and further argues that the prompt filing of his motion also weighs in favor of transfer, relying on *United States v. Rodriguez*, No. 16 Cr. 41 (FPG) (HBS), 2018 WL 2126429, at *5-6 (W.D.N.Y. May 9, 2018).  Doc. 11 at 22-23; 09/15/2021 Hr'g Tr. at 29: 21-25.  The *Rodriguez* decision, while not binding on this Court, does not explicitly endorse timeliness as a relevant factor, instead considering delay in filing the motion and the effects of any such delay on the relevant courts.  *Id.*  Furthermore, while delay weighs against the Court's exercising discretion to grant a motion to transfer, it does not necessarily follow that the lack of delay of a motion to transfer is a dispositive or even relevant factor.  While it is true that Milton promptly filed the instant motion for transfer of venue, that fact is not dispositive.

The first *Platt* factor weighs in favor of transfer from this district, as Milton resides in and operates a ranch in Utah, and he owns another home in Phoenix, Arizona. Doc. 11 at 16; 09/15/2021 Hr'g Tr. at 30:1-2.  *See United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 456-57 (S.D.N.Y. 1997).

Milton next argues that the location of witnesses weighs in favor of transfer, as all the witnesses whom the defense team intends to call are located outside this district, the majority in Arizona and Utah.  Doc. 11 at 17.  In order to justify transfer, Milton must

provide "specific examples of witnesses' testimony and their inability to testify because of the location of the trial," and the Court "must rely on 'concrete demonstrations' of the proposed testimony." *Spy Factory*, 951 F. Supp at 456-57 (citations omitted); *see also United States v. Blakstad*, No. 19 Cr. 486 (ER), 2020 WL 5992347, at *4 (S.D.N.Y. Oct. 9, 2020). Milton lists several of the witnesses whom he intends to call, all of whom are located in Arizona or Utah and several of whom work or worked for Nikola. Doc. 11 at 17 n.8. He argues that certain key witnesses are unvaccinated "for health and/or religious reasons," Doc. 30 at 21, or "have COVID co-morbidities" and thus are reluctant to travel to New York, 09/15/2021 Hr'g Tr. at 27:21–28:7. The government counters that it intends to call various New York-based witnesses, and that Milton has not articulated with sufficient specificity why his witnesses could not travel to New York. Doc. 15 at 14.

The Court agrees with the government and finds that this factor does not weigh in favor of transfer. Milton has provided specific examples of witnesses' testimony, but he has not carried his burden to explain their inability to testify because of the location of trial. *Spy Factory*, 951 F. Supp. at 456. The Court does not find witnesses' vaccination status or hesitance to travel to New York constitute an inability to testify at a trial in this district. By now, the FDA-approved COVID-19 vaccinations are "one of the most highly regarded" "tools to reduce viral transmission," and there is evidence that these vaccines "provide . . . robust protection" and "reduce the potential for hospitalization as compared to the unvaccinated population." *Maniscalo v. New York City Dep't of Educ.*, No. 21 Civ. 5055 (BMC), 2021 WL 4344267, at *4 (E.D.N.Y. Sept. 23, 2021), *aff'd*, No. 21-2343, 2021 WL 4814767 (2d Cir. Oct. 15, 2021). Moreover, as the Court noted at the conference, the rates of community transmission in New York City are far lower than in Arizona. 09/15/2021 Hr'g Tr. at 27: 24-25. The same is true as compared to Utah: as of the date of this order, current CDC data indicate a community positivity rate between 10-14.9% in both Arizona and Utah, while the positivity rate in New York state as a whole is below 5%, and below 2% in New York City. *See* https://covid.cdc.gov/covid-data-

tracker/#cases_community *and* https://www1.nyc.gov/site/doh/covid/covid-19-data.page

(last accessed November 12, 2021).  Moreover, New York City has one of the highest

rates of vaccination in the country—significantly higher than rates in Arizona or Utah—

meaning protection not only for the vaccinated but also for the larger community.  *See*

https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last accessed

November 12, 2021).  For this reason, the second *Platt* factor does not warrant transfer.

Of course, rates of transmission and the landscape of COVID as a whole have changed

rapidly over the course of the pandemic and may change again before the trial date.

However, while travel may undoubtedly be inconvenient for some witnesses and is more

burdensome than before the pandemic, Milton has not explained why COVID-19 pre-

vents witnesses from testifying in this district; instead, he has made only "naked allega-

tions" that witnesses will be inconvenienced by trial in New York.  *Spy Factory*, 951 F.

Supp. at 456.  As the government intends to call witnesses based in New York, this factor

does not weigh in favor of transfer.  By Milton's reasoning, other witnesses could face

greater health risk by a trial held in a district with a higher rate of community transmis-

sion than New York.

The third factor, the location of events, is also neutral.  Milton argues that the key

events are the alleged misstatements he made in Utah or Arizona, and that the events that

comprise the content of his statement (that is, Nikola's products and operations) took

place in Utah and Arizona.  Doc. 11 at 18.  The government responds that, while it is true

that Milton made many of the statements at issue at his home or office, outside this dis-

trict, "the geographic breadth of the scheme and . . . the fact that he broadcast these mis-

representations from Utah and Arizona across the country counsel against transfer."  Doc.

15 at 15.  Furthermore, events that took place in New York are critical to the alleged

scheme, including Nikola's merger with VectoIQ, which is based in New York, and the

trading of Nikola stock on the NASDAQ, which is also based in New York.  *Id.* at 16.

"Because the criminal activity that was alleged to have occurred in this case was

concededly national in scope, the location of the events at issue favors neither side." *Spy Factory, Inc.*, 951 F. Supp. at 457; *see also United States v. Ebbers*, No. 02 Cr. 1144, 2004 WL 2346154, at *1 (S.D.N.Y. Oct. 18, 2004) (finding third factor did not weigh in favor of transfer when securities fraud involved national company listed on the NASDAQ and the government's case focused on conversations the defendant had had with securities analysts in New York). Accordingly, the Court finds that the third factor does not weigh in favor of transfer to Arizona or Utah.

The fourth factor, the location of documents, is also neutral. Milton argues that the "'documents' are bulky, heavy, and in many instances, immovable physical evidence located in Arizona." Doc. 11 at 18. He intends to introduce at trial the Nikola One semi-truck prototype, the Badger pickup truck prototypes, multi-ton hydrogen electrolyzers, and the Nikola Tre semi-truck, all located in Arizona. *Id.* Milton states that the trial will require a hands-on demonstration for the jury of the trucks and hydrogen equipment and an in-person visit to the Nikola facilities where the trucks were developed and to Nikola's hydrogen fueling station. *Id.* at 19; 09/15/2021 Hr'g Tr. at 32:6-19. Transporting these multi-ton objects and semi-trucks will present many complications, including obtaining required permits for potentially hazardous materials and compliance with various road, tunnel, and bridge constraints and regulations across many state lines. *Id.* In particular, transporting hydrogen and lithium ion batteries will be difficult due to the flammability of hydrogen and restrictions on transportation of lithium ion batteries. 09/15/2021 Hr'g Tr. at 34:1-7. Milton stresses the importance of bringing these physical objects to the trial, precisely because the indictment concerns the functionality of the various prototypes and other Nikola equipment. *Id.* at 34:19-25. The government responds that the evidence in the case will consist primarily of testimony and documents, and that photographs and videos will suffice to illustrate the prototypes, vehicles, and equipment at issue. Doc. 15 at 17.

As a general rule, "[t]he location of documents and records is not a major concern in these days of easy and rapid transportation," *Spy Factory, Inc.*, 951 F. Supp. at 458 (citing *Posner*, 549 F. Supp. 475); *see also United States v. Estrada*, 880 F. Supp. 2d 478, 484 (S.D.N.Y. 2012). The defense has already received discovery in the form of documents on hard drives. 09/15/2021 Hr'g Tr. at 46:2-5. However, as Milton argues, introducing certain physical evidence at a trial in this district will, at best, present serious logistical complications. Nonetheless, the Court does not find this factor dispositive. The jury will be tasked with determining whether Milton made any misstatements as to the functionality of Nikola vehicles and equipment in the time period from 2016 to 2020; their functionality at the time of a trial that may be heard in 2022 will not necessarily bear on that determination. Since Milton's resignation over a year ago, Nikola has continued to operate as a company. This case is thus distinct from *Posner*, where the court determined that transfer to the district where the value of piece of land at issue was located was warranted because the defense might request that the jury view the land for themselves, and the land at issue was "unimproved real estate[] which . . . has not changed in the interim." 549 F. Supp. at 478. Moreover, Milton will be able to introduce evidence in the usual way in the form of photographs, videos, demonstratives, and/or expert testimony. *See id.*

Milton concedes that the fifth factor, potential interruption to the defendant's business, is neutral or at most weighs only slightly in favor of transfer. Doc. 11 at 19. The Court finds that this factor is neutral. Milton operates a ranch in Oakley, Utah. *Id.* at 16. However, transfer to Arizona, his preferred venue, or even standing trial in Salt Lake City, Utah, would similarly disrupt his ability to run his ranch. Accordingly, since "inconvenience and interference with normal occupational and personal activities" necessarily occur whenever a defendant is standing trial, this factor does not favor transfer. *Spy Factory*, 951 F. Supp. at 458.

The sixth, seventh, eighth, and ninth *Platt* factors likewise do not favor transfer. Milton concedes that the expense to the parties and the location of defense counsel are neutral factors. Doc. 11 at 20-21. The record before the Court indicates that, while trial in this district would likely be more expensive for Milton than trial in Arizona or Utah, "Milton is able to bear the costs of his defense[.]" *Id.* at 20. The government indicates that transfer of this case, and relocating the entire investigative and prosecutorial team, to either Arizona or Utah would impose enormous costs on the government. Doc. 15 at 19. This factor therefore does not weigh in favor of transfer. Similarly, Milton's defense counsel are based in New York City and Washington, D.C., not Arizona or Utah, and are "prepared to litigate anywhere." Doc. 11 at 21. The entire prosecution team is based in this district. Doc. 15 at 21. Thus, this factor weighs in favor of maintaining this action in New York. The eighth factor, relative accessibility of the venues, is neutral. New York City, Phoenix, and Salt Lake City are all readily accessible by air travel, although as the government points out, New York City is if anything more of a transportation hub. Doc. 15 at 21; *see Blakstad*, 2020 WL 5992347, at *5. Milton argues that the uncertainty surrounding transmission of COVID-19 and different regulatory responses across individual states have made travel more difficult, but his motion only discusses such travel inconvenience to proposed defense witnesses. Doc. 11 at 21. On balance, neither Arizona nor Utah is more accessible than New York City. Finally, docket conditions do not weigh in favor of transfer. While Milton points out that, according to 2020 data on federal judicial caseloads, the Districts of Arizona and Utah have fewer pending criminal cases than this district, that does not take into account the number of judges in each district, or each district's capacity to handle trials. Doc. 15 at 22. The parties do not dispute that the Court is able to hear this matter. *See United States v. Avenatti*, No. 19 Cr. 374 (DAB), 2019 WL 4640232, at *5 (S.D.N.Y. Sept. 24, 2019). Thus, none of these factors weigh in favor of transfer.

Finally, Milton argues that the tenth factor, special circumstances, supports trans-fer to Arizona or Utah.  Milton points to three special considerations:  the COVID-19 pandemic, the health of a close family member, and the fact that private civil securities fraud actions implicating the same events that have already been transferred from the Eastern District of New York to the District of Arizona.  Doc. 11 at 22.  Milton argues that a trial in Manhattan could raise questions about whether remote testimony satisfies the Confrontation Clause and whether testing or quarantine requirements will be im-posed.  *Id.*  However, as this Court has previously noted, arguments that the COVID-19 pandemic are arguments "against holding any trial at all, rather than *where* to hold the trial."  *Blakstad*, 2020 WL 5992347, at *6.  Furthermore, to date, despite the pandemic, Milton has been able to travel to and attend pre-trial conferences in New York.  While the Court is sympathetic to Milton's family member's health problems and the fact that he is an important caretaker for his family member, 09/15/2021 Hr'g Tr. at 27:2-13, he has not demonstrated that he would be unable to retain caretaker help if his family member were to remain in Utah or at the family's second home in Arizona, or in the alternative that his family member would be unable to travel to and access medical care in New York.  The Court concludes that Milton's family circumstances do weigh in favor of transfer, but "these facts alone are not sufficient to warrant transfer[.]"  *United States v. Hanley*, No. 94 Cr. 394, 1995 WL 60019, at *2 (S.D.N.Y. Feb. 10, 1995).  Finally, while there is likely to be some factual overlap with the private securities fraud action against Nikola originally brought in the Eastern District of New York, *Salem v. Nikola Corp. et al.*, Case No. 20 Civ. 04354, that case involves different parties, and the court in that case trans-ferred venue to the District of Arizona on the parties' joint motion.  *Salem v. Nikola Corp. et al.*, Case No. 20 Civ. 04354, ECF No. 45 (E.D.N.Y. Nov. 23, 2020).  Consider-ing that the cases involve different parties, are civil as compared to criminal in nature, and that the timing of the cases is likely to diverge, Milton has not sufficiently explained how transfer to the District of Arizona—much less the District of Utah—will result in

greater efficiency or resource saving.  Thus, the tenth *Platt* factor weighs only somewhat in favor of transfer from this district.

After consideration of each *Platt* factor, the Court finds that, on balance, Milton is not able to meet his burden given the presumption that a case should remain in the venue in which it was filed.  Two factors—Milton's residence and special circumstances—weigh in favor of transfer.  The remaining factors are either neutral or weigh against transfer.  Accordingly, the motion to transfer venue is denied.

## III.    CONCLUSION

For the foregoing reasons, Milton's motion to dismiss for improper venue is DENIED without prejudice for leave to renew at the close of the government's case at trial.  Milton's motion for transfer of venue is DENIED.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 11.


It is SO ORDERED.

Dated:  November 15, 2021
        New York, New York

_____
                Edgardo Ramos, U.S.D.J.