UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————

UNITED STATES OF AMERICA

      - against -

                            Case No. 1:21-cr-00478-ER

TREVOR MILTON,

                Defendant.

—————————————————————————

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE SURPLUSAGE

Bradley J. Bondi
CAHILL GORDON & REINDEL LLP
1990 K Street NW, Suite 950
Washington, DC 20006
(202) 862-8910
bbondi@cahill.com

Marc Mukasey
MUKASEY FRENCHMAN LLP
570 Lexington Avenue, Suite 3500
New York, NY 10022
(212) 466-6400
Marc.Mukasey@mfsllp.com

Terence Healy
HUGHES HUBBARD & REED LLP
1775 I Street NW
Washington, DC 20006
(202) 721-4676
terence.healy@hugheshubbard.com

*Counsel for Trevor Milton*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................ 1

   I.    Allegations Referring to the COVID-19 Pandemic........................................ 2

   II.   Allegations Relating to Wealth and Class............................................... 4

       A.  Selective References to Particular So-Called "Retail" Investors............... 4

       B.  Allegations Describing Mr. Milton's Aspirations........................................ 6

   III.  Allegations Comparing a SPAC Offering to an IPO ......................................... 6

   IV.  Allegations Relating to Mr. Milton's "Lock-Up" Period ................................. 8

   V.   Allegation Regarding Share Sales by Mr. Milton and Others.......................... 9

CONCLUSION ................................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Koufakis v. Carmel*,
  425 F.2d 892 (2d Cir. 1970)...................................................................................5

*Lockhart v. United States*,
  293 F.2d 314 (8th Cir. 1961) ................................................................................5

*United States v. Allen*,
  No. 09 Cr. 329 (RJA), 2014 WL 1745933 (W.D.N.Y. Apr. 30, 2014) ....................5

*United States v. Alsugair*,
  256 F. Supp. 2d 306 (D.N.J. 2003) .....................................................................10

*United States v. Awadallah*,
  202 F. Supp. 2d 17 (S.D.N.Y. 2002).....................................................................5

*United States v. Miller*,
  26 F. Supp. 2d 415 (N.D.N.Y. 1998).....................................................................4

*United States v. Mulder*,
  273 F.3d 91 (2d Cir. 2001).....................................................................................2

*United States v. Rainey*,
  946 F. Supp. 2d 518 (E.D. La. 2013).....................................................................4

*United States v. Reed*,
  No. 15 Cr. 100 (EEF), 2016 WL 54903 (E.D. La. Jan. 5, 2016) ...........................5

*United States v. Scarpa*,
  913 F.3d 993 (2d Cir. 1990)...................................................................................2

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940)...............................................................................................5

*United States v. Stahl*,
  616 F.2d 30 (2d Cir. 1980).....................................................................................5

*United States v. Zabawa*,
  39 F.3d 279 (10th Cir. 1994) .................................................................................3

**Periodicals**

Max H. Bazerman & Paresh Patel, *SPACs: What You Need to Know*, HARV. BUS. REV. (July 1, 2021), https://hbr.org/2021/07/spacs-what-you-need-to-know .................................................7

**Rules**

Fed. R. Crim. P. 7(d).................................................................................................................1

**Other Authorities**

*COVID-19 Timeline*, CDC Museum, (August 4, 2021),
    https://www.cdc.gov/museum/timeline/covid19.html ...........................................2n

Oxford English Dictionary (3d ed. 2010)................................................................6

Defendant Trevor Milton submits this memorandum of law in support of his motion, under Federal Rule of Criminal Procedure 7(d), to strike surplusage from the Indictment.[1]

## PRELIMINARY STATEMENT

Mr. Milton is innocent, and the Indictment contains numerous allegations that are not only irrelevant to the charged offenses but also are inflammatory and prejudicial.  *See* Indictment.  Those allegations include: (1) allegations intended to associate the alleged fraudulent conduct with the COVID-19 pandemic, even though the vast majority of relevant facts pre-date its onset; (2) allegations attempting to prejudice the jury by referencing the wealth and class status of Mr. Milton by comparison to a subset of alleged victims; (3) allegations which provide selective information about Nikola Corporation ("Nikola") going public through a Special Purpose Acquisition Company ("SPAC") that create an unfair implication that the SPAC process was chosen for improper purposes; and (4) an allegation regarding certain stock sales that create a false impression regarding Mr. Milton's transactions and the breadth of the alleged scheme.  Even if the government's theory of liability were sound, which it is not, the only purpose of these allegations is to create undue prejudice against Mr. Milton.  The Court should strike these allegations.

## ARGUMENT

The purpose of Rule 7(d) of the Federal Rules of Criminal Procedure is to "protect[] the defendant against immaterial or irrelevant allegations in an indictment . . . which may, however, be prejudicial."  Fed R. Crim. P. 7, 1944 Advisory Committee Note.  Pursuant to Rule 7(d), "[u]pon the defendant's motion, the court may strike surplusage from the indictment or

---

[1] As set forth in Mr. Milton's Motion to Dismiss the Indictment or, in the Alternative, to Transfer Venue (ECF 11), and his pending appeal of the Court's venue decision (ECF 33), this case should be dismissed because, respectfully, venue is not proper in the Southern District of New York.  Mr. Milton does not waive his constitutional right to venue in a proper district and submits this motion to the Court pursuant to the Court's previously ordered schedule.

information."  Such motions will be granted "where the challenged allegations are not relevant to

the crime charged and are inflammatory and prejudicial."  *United States v. Mulder*, 273 F.3d 91,

100 (2d Cir. 2001) (quoting *United States v. Scarpa*, 913 F.3d 993, 1013 (2d Cir. 1990)

(evidence will not be stricken if it is "admissible and relevant to the charge")).  Although this

standard is "exacting," *Scarpa*, 913 F.3d at 1013, it is met here with respect to numerous

inflammatory or prejudicial (or both) allegations that are unrelated to the offenses charged.

## I.     Allegations Referring to the COVID-19 Pandemic

In the Indictment's "Overview" section, the government singled out a portion of so-called

"retail" investors as individuals "who had no prior experience in the stock market and had begun

trading during the COVID-19 pandemic to replace or supplement lost income or to occupy their

time while in lockdown."  Indictment ¶ 3.  This language represents a transparent and improper

attempt to prejudice the jury by connecting the alleged scheme in jurors' minds to the entirely

unrelated COVID-19 pandemic and to prominent media stories about unrelated, potential market

manipulation (which has not been charged here) that affected retail investors in other stocks

during this period.  The government makes no effort—beyond shoehorning in this reference to

inexperienced "retail" investors—to allege that Mr. Milton intended to target any particular

"retail" investors with the alleged scheme to defraud, much less take advantage of the pandemic.[2]

Indeed, the government could not make that allegation, as nearly all the relevant factual

allegations occurred *before* the outbreak of the pandemic[3] in the United States, including:

---

[2] The government's conjecture over these purported inexperienced "retail" investors is evident.  To date, the government has not identified a single "retail" investor in response to Mr. Milton's venue challenges, let alone one that purportedly "had no prior experience."

[3] The World Health Organization declared COVID-19 a Pandemic on March 11, 2020 and President Trump declared a nationwide emergency two days later.  *See COVID-19 Timeline*, CDC MUSEUM, (August 4, 2021), https://www.cdc.gov/museum/timeline/covid19.html.  The first state lockdowns and/or closures to prevent the spread of the virus began on March 15, 2020.  *Id.*

- Statements about Nikola's ownership of intellectual property relating to the semi-truck line ("Since at least in or about 2016"), Indictment ¶ 71;

- Statements made regarding the Nikola One's functionality (December 1–2, 2016), Indictment ¶¶ 27–28;

- The recording of the Nikola One commercial ("In or about 2017"), Indictment ¶ 35;

- The commercial's subsequent release (January 25, 2018), Indictment ¶ 36;

- Nikola's negotiations to go public ("In or about November 2019"), Indictment ¶ 14;

- The first tweets regarding the Badger pickup (November 2019), Indictment ¶ 43;

- Statements made in podcasts regarding the Nikola One ("recorded in or about January 2020"), Indictment ¶ 28;

- Podcast interview about hydrogen costs (January 2020),  Indictment ¶ 66;

- Tweets regarding Nikola's hydrogen costs (January 23, 2020), Indictment ¶ 66;

- Nikola's announcement regarding the Badger pickup (February 2020), Indictment ¶ 41;

- Mr. Milton's television interviews about the Badger pickup (February 14, 2020), Indictment ¶ 45; and

- Nikola's announcement that a deal to take Nikola public had been reached (March 3, 2020), Indictment ¶ 15.

Other courts have stricken from indictments language that ties a charge relating to a defendant's statements or actions to a broader, more newsworthy and/or tragic event.  *See, e.g.*, *United States v. Zabawa*, 39 F.3d 279, 285 (10th Cir. 1994) (affirming striking of language describing broader conspiracy and thousands of victims when paragraph "is part of a multi-defendant indictment involving individuals with varying degrees of responsibility in perpetrating

the fraud and is not an integral part of the indictment as a whole."); *United States v. Rainey,* 946 F. Supp. 2d 518, 545 (E.D. La. 2013) (in prosecution regarding statements made to Congress regarding *Deepwater Horizon* oil spill, striking language regarding the effect of the spill as a whole because it was surplusage that "present[ed] a substantial risk of unfair prejudice"), *rev'd on other grounds*, 757 F.3d 234 (5th Cir. 2014); *United States v. Miller*, 26 F. Supp. 2d 415 (N.D.N.Y. 1998) (striking language regarding previous confrontations between paramilitary group and law enforcement in indictment charging commercial smuggling of cigarettes and tobacco).  The reference in the Indictment here to the COVID-19 pandemic is even more attenuated than any of the events in these cases.  The Court should order that this portion of paragraph 3 of the Indictment be stricken as surplusage.

## II.   Allegations Relating to Wealth and Class

### A.  Selective References to Particular So-Called "Retail" Investors

Two sentences after referencing the COVID-19 pandemic, when alleging that so-called "retail" investors suffered losses because of Mr. Milton's alleged "scheme," the Indictment puts forth the claim that "in certain cases" these losses resulted in "*the loss of their retirement savings or funds that they had borrowed to invest in Nikola.*"  Indictment ¶ 3 (emphasis added).  Another similar inflammatory allegation relating to a subset of so-called "retail" investors comes again later, with the allegation that "[a]s a result [of changes in the stock price], investors, including thousands of retail investors who were the targets of MILTON's fraudulent scheme, suffered substantial losses, *in some cases totaling in the tens or hundreds of thousands of dollars and compromising their financial security or retirement savings*."  Indictment ¶ 80 (emphasis added).

Unlike a prosecution involving a statute that protects particular or vulnerable victims, the securities laws do not require the government to prove the financial stability of the "retail"

investors in Nikola to prove its case.  The government also does not allege that Mr. Milton targeted these so-called "retail" investors based on their sources of investment capital, be it retirement accounts, borrowed funds, or otherwise.  This information is therefore surplusage. *See, e.g.*, *Lockhart v. United States*, 293 F.2d 314, 316 (8th Cir. 1961) (finding description of victim of postal robbery's title, position, or duty beyond the responsibility set out in the statute to be surplusage); *United States v. Reed*, No. 15 Cr. 100 (EEF), 2016 WL 54903, at *2 (E.D. La. Jan. 5, 2016) (striking "extraneous information" that related to elements of crimes not alleged in indictment as "neither relevant nor material" to charges at hand); *see also United States v. Allen*, No. 09 Cr. 329 (RJA), 2014 WL 1745933, at *6 (W.D.N.Y. Apr. 30, 2014) (striking use of inflammatory nickname in indictment when identity was not at issue at trial); *United States v. Awadallah*, 202 F. Supp. 2d 17, 54 (S.D.N.Y. 2002) (striking reference to evidence found on defendant that was unrelated to sole charge of perjury in indictment).

The Indictment includes these allegations as an attempt to inflame jurors by referencing differences in wealth and class distinctions between Mr. Milton and a subset of alleged victims. Because of the unfair prejudice that this strategy creates, "such appeals are improper and have no place in a court room[.]"  *United States v. Stahl*, 616 F.2d 30 (2d Cir. 1980) (citations omitted); *see also, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 239–40 (1940); *Koufakis v. Carmel*, 425 F.2d 892, 902 (2d Cir. 1970) ("Remarks such as these, which can be taken as suggesting that the defendant should respond in damages because he is rich and the plaintiff is poor, are grounds for new trial.") (citations omitted).  These allegations represent inflammatory and prejudicial surplusage, and the Court should strike them from the Indictment.

### B. Allegations Describing Mr. Milton's Aspirations

The government makes similar appeals to class status in paragraphs 4 and 5 of the Indictment, describing Mr. Milton as a "serial entrepreneur" and as "someone who aspired to be listed among Forbes's 100 richest people[.]"  Indictment ¶¶ 4–5.  With respect to the former, the government's choice to modify the word "entrepreneur" with the adjective "serial" serves no purpose but to create a negative implication of criminality, as when used to define a person, "serial" is most often associated with criminal behavior.  *See Serial,* OXFORD ENGLISH DICTIONARY (3d ed. 2010) ("*spec.* (of a criminal) repeatedly committing the same offence and typically following a similar characteristic behavior pattern").  The phrase "serial entrepreneur" may have an innocuous meaning when an entrepreneur describes himself, but it carries an entirely different and sinister connotation when used by the government in a charging document alleging federal crimes.  Further, the allegation that Mr. Milton aspired to be included in the Forbes list referenced in paragraph 5—a lawful goal even if true—serves no purpose but to associate Mr. Milton with the richest members of American society, at a time when wealth inequality and the expanding wealth of billionaires is an oft-discussed and polarizing topic.  *See* Indictment ¶ 5.  These two phrases, like the Indictment's references to the lack of financial stability of a particular subset of so-called "retail" investors, serve only to create class distinctions between Mr. Milton, alleged victims, and potential jurors.  *See* Indictment ¶ 3.  For the same reasons, the Court should strike them from the Indictment.

### III.   Allegations Comparing a SPAC Offering to an IPO

Beginning with the section titled, "Background on Special Purpose Acquisition Companies" and continuing through the description of Nikola's becoming a public company, the Indictment cherry-picks limited information regarding the nature of the SPAC process and

presents irrelevant comparisons to the process of a company going public via what the government describes as a "traditional" IPO. *See* Indictment ¶¶ 9–12 (background section), ¶¶ 14–15 (references to due diligence conducted by SPAC sponsors and private investment in public equity ("PIPE") investors), ¶ 17 (comparison of information available to "retail" investors versus others), ¶ 25 (allegation that Mr. Milton was able to give interviews prior to going public, "because Nikola went public by means of a SPAC combination, rather than an IPO, and MILTON was therefore not subject to the restrictions of a quiet period."). The effect of this misleading comparison is to prejudice Mr. Milton by creating the false implication that taking a company public by means of a SPAC is an uncommon, improper, and underhanded strategy, the only purpose of which is to evade disclosure requirements to deceive potential investors. This implication is untrue and prejudicial.

As an initial matter, as of 2020—the year that Nikola went public—the majority of newly publicly listed companies across all industries in the United States came to market as a SPAC, rather than through an IPO. *See* Max H. Bazerman & Paresh Patel, *SPACs: What You Need to Know*, HARV. BUS. REV. (July 1, 2021), https://hbr.org/2021/07/spacs-what-you-need-to-know. Further, SPACs create significant benefits for consumer and technology companies like Nikola, as "SPACs have allowed many such companies to raise more funds than alternative options do, propelling innovation in a range of industries." *Id*. SPACs also allow companies to have more certainty about the amount of capital they will be able to raise by going public, to do so far more quickly, and to avoid the conflict of interest that arises from reliance on underwriters of an IPO to sell shares to their investor clients. *Id*.

The Indictment includes none of these virtues of SPACs when providing what it calls a "Background" on them. Instead, the government focuses on the fact that SPACs are not subject

to a "quiet period," which the Indictment describes as necessary "in order to create fairness in the market and protect retail investors . . . [and] to create a level playing field by ensuring that all investors have the same access to information at the same time and to prevent executives from hyping or inflating the stock price."  Indictment ¶ 10.  This focus on the lack of a "quiet period" strongly implies that the SPAC process—which is lawful—is nonetheless suspicious, if not unfair.

The time spent laying out this one-sided comparison between an IPO and a SPAC pays off later in the Indictment, when the government highlights that Mr. Milton was able to give interviews "because Nikola went public by means of a SPAC combination, rather than an IPO, and MILTON was therefore not subject to the restrictions of a quiet period[,]" Indictment ¶ 25, and that Mr. Milton and early SPAC and PIPE investors had more information than so-called "retail" investors.  Indictment ¶ 81.  Although the prosecution may prefer that companies going public do so only via a "traditional" IPO, existing law and regulations allow for another, equally legitimate means of doing so.  By contrast, the Indictment implies that the SPAC process is unfair to investors.  Because these allegations serve only to create an undue prejudice with potential jurors by implying that these lawful business practices are improper, underhanded, or unfair, the Court should strike these allegations comparing a SPAC offering to an IPO.

## IV.    Allegations Relating to Mr. Milton's "Lock-Up" Period

The Indictment also includes surplusage regarding the negotiations between Mr. Milton and the SPAC investors regarding Mr. Milton's sale of his shares, first to Nikola at the time the SPAC transaction was consummated and later to others at the conclusion of a lock-up period.  *See* Indictment ¶¶ 19–20.  These allegations follow the same formula described above.  The government describes only one purpose of a lock-up period, saying "one purpose of such a lock-

up [period] is to keep management invested in delivering on the business's plan rather than cashing out for short-term gain."  Indictment ¶ 19.  On either side of this explanation, the Indictment alleges that Mr. Milton "did not want" to be subject to a lock-up period, Indictment ¶ 19, and that he "was ultimately subject to a six-month lock-up, which he negotiated down from an initial agreement of a one-year lock-up[.]" Indictment ¶ 20.

Read together, these paragraphs further prejudice Mr. Milton.  The clear implication to a jury is that a company founder negotiating a lock-up period would only do so to avoid, as the Indictment characterizes it, "delivering on the business's plan rather than cashing out for short-term gain."  Indictment ¶ 19.  Because of this undue prejudice, the Court should strike these allegations from the Indictment.

## V.     Allegation Regarding Share Sales by Mr. Milton and Others

Lastly, in the final paragraph in the "Scheme to Defraud" section, the Indictment alleges that, while so-called "retail" investors were purchasing Nikola shares based on alleged false and misleading claims by Mr. Milton, "certain institutional investors who [received shares prior to their being publicly available] and had access to more complete information regarding Nikola's products and technology were able to sell their stock for a significant profit."  Indictment ¶ 81.

This allegation is surplusage that should be stricken for two reasons.  First, the allegation with respect to Mr. Milton is prejudicial because the allegation creates the implication that Mr. Milton sold shares of Nikola to these so-called "retail" investors between March and September 2020 while the share price was as high as "$34.19 per share."  Indictment ¶ 81.  As the government knows, however, Mr. Milton did not sell any of his shares to third parties—retail investors or otherwise—until March 2, 2021, when he did so at a share price of $14.48 per share. This sale occurred long after Mr. Milton voluntarily left Nikola.

Second, the allegation with respect to the reference to the sale of shares by SPAC and PIPE investors is improper because the allegation implies that these other investors were either involved in or were the intended beneficiaries of the alleged scheme to defraud, something not alleged elsewhere in the Indictment.  Such an implication can prejudice a defendant "by leading the jury to believe that there exists a broader scope of illegal activity than is actually charged in the indictment."  *United States v. Alsugair*, 256 F. Supp. 2d 306, 317–18 (D.N.J. 2003).  Because this allegation unfairly prejudices Mr. Milton by falsely implying that he sold shares at inflated prices prior to September 2020 and that early investors were co-conspirators and/or intended beneficiaries of the alleged scheme, the Court should strike this allegation regarding share sales from the Indictment.

## **CONCLUSION**

The Indictment contains prejudicial surplusage that is irrelevant to the crimes charged and prejudicial to Mr. Milton.  Consistent with Rule 7(d), the Court therefore should order that these portions of the Indictment, as set forth above, be stricken.

Dated: December 15, 2021

Respectfully submitted,

/s/

_____ _

Bradley J. Bondi
CAHILL GORDON & REINDEL LLP
1990 K Street NW, Suite 950
Washington, DC 20006
(202) 862-8910
bbondi@cahill.com

Marc Mukasey
MUKASEY FRENCHMAN LLP
570 Lexington Avenue, Suite 3500
New York, NY 1002
(212) 466-6400
Marc.Mukasey@mfsllp.com

Terence Healy
HUGHES HUBBARD & REED LLP
1775 I Street NW
Washington, DC 20006
(202) 721-4676
terence.healy@hugheshubbard.com

*Counsel for Trevor Milton*