UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

UNITED STATES OF AMERICA        :

                        :

    - v. -                   :       21 Cr. 478 (ER)

                        :

TREVOR MILTON,              :

                        :

              Defendant.    :

                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTIONS *IN LIMINE*


                    DAMIAN WILLIAMS
                    United States Attorney
                    Southern District of New York
                    One St. Andrew's Plaza
                    New York, New York 10007


Jordan Estes
Matthew Podolsky
Nicolas Roos
Assistant United States Attorneys
- Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 1

ARGUMENT .......................................................................................................... 5

I.    The Court Should Preclude Testimony by the Defendant's Proposed Experts and Require Supplemental Expert Disclosure ................................................................. 5

    A.    Relevant Background ................................................................................ 5

    B.    Applicable Law ......................................................................................... 6

        1.    Rule 16 .......................................................................................... 6

        2.    Rule 702 ........................................................................................ 7

        3.    Rules 401-403 ............................................................................... 10

    C.    Discussion .............................................................................................. 10

        1.    The Court Should Preclude Professor Kurfess's Testimony ................... 11

            a.    Vehicle Development Generally ......................................... 11

            b.    Physical and Virtual Prototypes ......................................... 12

            c.    Battery Technology ........................................................... 13

            d.    Hydrogen Fuel Technology ............................................... 13

            e.    Collaboration with Suppliers ............................................. 15

        2.    The Court Should Preclude Professor Ferrell's Testimony Regarding the Stock Market Generally and the Proper Method for Evaluating Materiality ................................................................. 17

        3.    The Court Should Require the Defendant to Provide Supplemental Disclosure for Professor Ferrell's Testimony and Conduct a Daubert Hearing ............................................................... 18

II.    The Court Should Preclude Any Advice-of-Counsel or Purported Presence-of-Counsel Defense ............................................................................. 19

    A.    Applicable Law ....................................................................................... 19

        1.    Good Faith .................................................................................... 19

        2.    Advice-of-Counsel ....................................................................... 20

        3.     Notice of and Discovery Concerning an Advice-of-Counsel Defense ..... 21

   B.     Discussion ................................................................................................ 22

        1.     Absent Immediate Notification and Disclosure the Court Should Preclude Any Advice of Counsel Defense.................................................................... 22

        2.     The Defendant Should Be Precluded From Offering Evidence or Argument Suggesting He Is Not Guilty Based on the Approval, Lack of Disapproval, or Presence of Counsel ....................................................... 22

III.   The Court Should Preclude the Defendant From Arguing that Victims Acted Negligently or Carelessly.............................................................................................................. 26

   A.     Applicable Law........................................................................................ 26

   B.     Discussion ................................................................................................ 27

IV.   The Court Should Preclude Evidence and Argument that the Defendant Lacked Intent to Defraud Because He Believed Victims Would Ultimately Not Suffer Harm ................. 28

   A.     Applicable Law........................................................................................ 28

   B.     Discussion ................................................................................................ 29

V.    The Court Should Preclude Testimony and Evidence About Nikola's Product and Technology Development After September 2020 ............................................................ 30

VI.   The Court Should Preclude So-Called "Good Acts" Evidence ....................................... 32

VII.  The Court Should Admit Evidence of the Defendants' Compensation and Purchases of Property.......................................................................................................................... 35

VIII. Statements of Nikola Employees Are Admissible Under Rule 801(d)(2)(D) ................. 38

   A.     Applicable Law........................................................................................ 38

   B.     Discussion ................................................................................................ 40

**CONCLUSION** ....................................................................................................................... **43**

# TABLE OF AUTHORITIES

## **Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ................................. 8, 9

*Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705 (2d Cir. 1989) ................................... 8, 9

*Bourjaily v. United States*, 483 U.S. 171 (1987) ........................................................................... 7

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) .................................................... 8, 10

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .......................................................................... 7

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................................. 8, 9

*Lurie v. Wittner*, 228 F.3d 113 (2d Cir. 2000) ............................................................................. 21

*Martinez v. Altec Indus. Inc.*, No. 2 Civ. 1100J32TEM, 2005 WL 1862677 (M.D. Fla. Aug. 3, 2005) ........................................................................................................................................ 5

*Neder v. United States*, 527 U.S. 1 (1999) .................................................................................. 27

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ..................................................... 8, 9, 10

*O'Neal v. Esty*, 637 F.2d 846 (2d Cir. 1980) ............................................................................... 40

*Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534 (2d Cir. 1992) ..................................... 38, 42

*Penguin Books U.S.A. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251 (S.D.N.Y. 2003) ....................................................................................................................... 40

*SEC v. Lek Sec. Corp.*, No. 17 Civ. 1789 (DLC) 2019 WL 5703944 (S.D.N.Y. Nov. 5, 2019) .. 25

*SEC v. Lipson*, 46 F. Supp. 2d 758 (N.D. Ill. 1998) ...................................................................... 9

*SEC v. Stoker*, No. 11 Civ. 7388 (JSR) (S.D.N.Y. 2012) ............................................................ 24

*SEC v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013) .......................................................... 23, 25

*Shakur v. United States*, 32 F. Supp. 2d 651 (S.D.N.Y. 1999) .................................................... 33

*Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457 (S.D.N.Y. 2007) ......................................... 8

*United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011) ........................................................... 33

*United States v. Amico*, 486 F.3d 764 (2d Cir. 2007) ................................................................. 28

*United States v. Atias*, No. 14 Cr. 403 (DRH), 2017 WL 563978 (E.D.N.Y. Feb. 10, 2017) 21, 25

*United States v. Barile*, 286 F.3d 749 (4th Cir. 2002) .................................................................. 6

*United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989) ................................ 21

*United States v. Benedetto*, 571 F.2d 1246 (2d Cir. 1978) .......................................................... 33

*United States v. Berger*, 188 F. Supp. 2d 307 (S.D.N.Y. 2002) ................................................. 28

*United States v. Binday*, No. 12 Cr. 152 (CM), 2013 WL 12154927 (S.D.N.Y. Sept. 16, 2013) 29

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015) ........................................ 23

*United States v. Bulgin*, 563 F. App'x 843 (2d Cir. 2014) ......................................... 36

*United States v. Chan*, No. 97 Cr. 1053 (PKL), 2002 WL 109528 (S.D.N.Y. Jan. 25, 2002) ..... 33

*United States v. Colasuonno*, 697 F.3d 164 (2d Cir. 2012) ....................................... 21

*United States v. Doyle*, 130 F.3d 523 (2d Cir. 1997) .............................................. 33

*United States v. Evangelista*, 122 F.3d 112 (2d Cir. 1997) ...................................... 21

*United States v. Ferguson*, No. 06 Cr. 137 (CFD), 2007 WL 4240782 (D. Conn. Nov. 30, 2007) ........................................................................................................................ 37

*United States v. Godwin*, 272 F.3d 659 (4th Cir. 2001) ........................................... 28

*United States v. Gole*, 21 F. Supp. 2d 161 (E.D.N.Y. 1997) ..................................... 28

*United States v. Gramins*, 939 F.3d 429 (2d Cir. 2019) ........................................... 26

*United States v. Greenberg*, 835 F.3d 295 (2d Cir. 2016) ........................................ 27

*United States v. Greenspan*, 923 F.3d 138 (3d Cir. 2019) .................................... 20, 21

*United States v. Hatfield*, No. 06 Cr. 550 (JS), 2010 WL 183522 (E.D.N.Y. Jan. 8, 2010) ......... 22

*United States v. Landesman*, 17 F.4th 298 (2d Cir. 2021) ........................................ 17

*United States v. Lange*, 834 F.3d 58 (2d Cir. 2016) ............................................... 29

*United States v. Lauersen*, 348 F.3d 329 (2d Cir. 2003) .......................................... 43

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) ............................................. 29

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) .............................................. 17

*United States v. Logan*, 250 F.3d 350 (6th Cir. 2001) ............................................. 36

*United States v. Lombardozzi*, No. 02 Cr. 273 (PKL), 2003 WL 1907965 (S.D.N.Y. Apr. 17, 2003) ............................................................................................................................ 9

*United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738 (E.D.N.Y. Apr. 24, 2007)... 7

*United States v. Males*, 459 F.3d 154 (2d Cir. 2006) ............................................... 28

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) ................................................ 7

*United States v. Miller*, 626 F.3d 682 (2d Cir. 2010) .............................................. 26

*United States v. Nektalov*, No. 03 Cr. 828 (PKL), 2004 WL 1637010 (S.D.N.Y. July 21, 2004) ........................................................................................................................ 32, 33

*United States v. O'Connor*, 580 F.2d 38 (2d Cir. 1978) ........................................... 33

*United States v. Okun*, Cr. No. 08-132, 2009 WL 414009 (E.D. Va. Feb. 18, 2009) ................. 28

*United States v. Peters*, 543 F. App'x 5 (2d Cir. 2013) ........................................... 37

*United States v. Petit*, No. 19 Cr. 850 (JSR) (S.D.N.Y.) ..................................... 25, 31

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006) ............................................................ 36

*United States v. Quinones*, 417 F. App'x 65 (2d Cir. 2011) ........................................................ 21

*United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996) ............................................ 39, 41, 42

*United States v. Rybicki*, 287 F.3d 257 (2d Cir. 2002) ............................................................. 27

*United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 461441 (S.D.N.Y. Jan. 18, 2018) .. 21, 22

*United States v. Scully*, 877 F.3d 464 (2d Cir. 2017) ......................................................... 20, 21

*United States v. Shea*, No. 20 Cr. 412 (AT) ............................................................................. 25

*United States v. Sturman*, No. 96 Cr. 318 (BSJ), 1998 WL 126066 (S.D.N.Y. Mar. 20, 1998) .... 7

*United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004) ............................................................. 27

*United States v. Van Allen*, 524 F.3d 814 (7th Cir. 2008) .......................................................... 20

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) .................................................................. 27

*United States v. Watts*, 934 F. Supp. 2d 451 (E.D.N.Y. 2013) .................................................. 29

*United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017) ......................................................... 26, 27

*United States v. Weiss*, 914 F.2d 1514 (2d Cir. 1990) ............................................................. 36

*United States v. Wilson*, 493 F. Supp. 2d 484 (E.D.N.Y. 2006) .................................................. 7

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) .................................................................. 8

*Williamson v. United States*, 207 U.S. 425 (1908) .................................................................. 20

*Zaken v. Boerer*, 964 F.2d 1319 (2d Cir. 1992) ................................................................. 39, 41

**Other Authorities**

Advisory Committee Note to Fed. R. Evid. 404(a) ..................................................................... 31

Sand, *Modern Federal Jury Instructions*, ¶ 44 ......................................................................... 27

Sand, *Modern Federal Jury Instructions*, 8 ............................................................................. 20

**Rules**

Fed. R. Crim. P. 16 ................................................................................................................ 18

Fed. R. Evid. 402 ................................................................................................................... 25

Fed. R. Evid. 403 ................................................................................................................... 25

Fed. R. Evid. 405 ................................................................................................................... 31

Fed. R. Evid. 702 ..................................................................................................................... 9

Fed. R. Evid. 801 ............................................................................................................ 37, 40

## PRELIMINARY STATEMENT

The Government submits this memorandum of law in support of its motions *in limine*. For the reasons set forth below, the Government seeks rulings in advance of trial to:

- Preclude testimony by the defendant's proposed experts;

- Preclude any advice-of-counsel defense as well as evidence or argument concerning alleged reliance on the approval, lack of disapproval, or presence of counsel;

- Preclude evidence and argument that retail investors were negligent or otherwise to blame;

- Preclude evidence and argument that the defendant lacked intent to defraud because he believed no ultimate harm would come to the victims;

- Preclude evidence about Nikola's product and technology development after the defendant's scheme ended in September 2020;

- Preclude so-called "good acts" evidence;

- Admit certain evidence regarding the defendant's compensation and certain purchases; and

- Admit certain statements by Nikola employees as statements by the defendant's agents.[1]

## FACTUAL BACKGROUND

On July 28, 2021, a grand jury sitting in this district charged the defendant, Trevor Milton, with engaging in a scheme to induce investors—particularly individual, non-professional or "retail" investors—to invest in the company Milton founded, led, and in substantial part owned,

---

[1]  The Government respectfully requests permission to file this consolidated, oversized brief in support of its motions *in limine*.

Nikola, based on false and misleading statements made by Milton directly to the investing public through social media and television, print, and podcast interviews.

Milton made these false and misleading statements in the context of Nikola's efforts, in 2020, to go public via a blank check company or Special Purpose Acquisition Vehicle ("SPAC"). In order to induce retail investors to purchase stock in Nikola and its predecessor company, as alleged in the Indictment, and as the evidence will show at trial, Milton made false and misleading statements regarding nearly all aspects of Nikola's business, which was to design and manufacture zero-emission battery-electric and hydrogen-electric vehicles, electric vehicle drivetrains, vehicle components, energy storage systems, and hydrogen station infrastructure.

Among the retail investors who ultimately invested in Nikola were investors who had no prior experience in the stock market and had begun trading during the COVID-19 pandemic to replace or supplement lost income or to occupy their time while in lockdown. The value of Nikola's stock, including stock held by retail investors, plummeted after certain of Milton's statements were revealed to be false and misleading.

Milton was motivated to engage in the fraudulent scheme in order to enrich himself and elevate his stature as an entrepreneur. Indeed, during the course of the fraud, Milton saw the market value of his interest in Nikola rise substantially. On or about March 3, 2020, when Nikola announced that it would go public by merging with a publicly traded special-purpose acquisition company ("SPAC") based in New York, Nikola claimed an enterprise value of approximately $3.324 billion, implying that the Nikola stock that Milton would hold upon completion of the merger, through an entity called "M&M Residual," had a value of approximately $844 million. At opening on or about June 9, 2020, after the merger was complete, and when Nikola's stock peaked

in the wake of announcements by Milton about the Badger, the market value of Milton's stock was at least approximately $8.5 billion.

Milton's false and misleading claims included the following categories of misrepresentations:

False and misleading statements about early success on the Nikola One. In the course of taking Nikola public in 2020, Milton promoted a false and exaggerated narrative that Nikola was a first mover in the zero-emissions-trucking business. Specifically, Milton emphasized that Nikola had defied expectations as a young, disruptive company when it managed to build its prototype Nikola One, which Nikola unveiled on December 1, 2016, at a large event that was filmed and broadcast on the internet. During that event, Milton claimed that the prototype Nikola One was a fully functioning truck and that it was capable of driving off the stage. Contrary to Milton's claim both at the time and in 2020, when Nikola was going public, the Nikola One was not fully functional, nor could it drive under its own power. In fact, the truck was towed onto the stage at night prior to the event, and the screens and lights were powered by an external battery and a power cord running under the truck to the wall, which had to be manually disconnected as the stage spun.

False and misleading statements about the Badger. In February 2020, Milton announced publicly that Nikola was making a pickup truck called the Badger, which he claimed would out-pace its rivals and be unveiled at an event in or about late 2020. Many of Milton's statements contained false representations about the Badger truck. In particular, in order to give investors a false impression of the status of the Badger's engineering and development, Milton repeatedly stated that Nikola engineered and built the Badger from the "ground up" as a "clean sheet" vehicle using Nikola's in-house components and intellectual property; that the company had been working

3

on the program for years and had tapped into billions of dollars in Nikola engineering; that the building of prototype vehicles was complete and they were "real" trucks; and that an Original Equipment Manufacturer ("OEM") partner would mass-produce the vehicle using Nikola's prototype design and engineering. In truth, when Milton announced the Badger, Nikola had little more than concept sketches and renderings, and that remained the case for several months, and Nikola's OEM partner for producing the Badger intended to use its own technology and engineering.

       <u>False and misleading statements about hydrogen production and hydrogen production cost</u>. Milton has made dozens of false and misleading statements concerning Nikola's hydrogen business, including claims that Nikola was producing hydrogen, that Nikola was producing hydrogen for below $4 a kilogram, that Nikola was producing hydrogen using clean energy, that Nikola had contracted with energy providers to obtain electricity for hydrogen production, and that Nikola had standardized hydrogen production stations. In truth, at the time of Milton's statements, Nikola had never produced hydrogen, much less at a certain price point. Nor had Nikola contracted with energy providers or standardized hydrogen production stations. These statements were significant, because a key component to the success of Nikola's business model was the ability to produce, store, and dispense hydrogen efficiently and economically.

       <u>False and misleading statements about reservations</u>. Milton repeatedly misstated the nature of Nikola's reservations to suggest that the reservations were firm and binding. These statements were inconsistent with the fact that approximately 13,200 of Nikola's approximately 14,000 reservations were non-binding and cancellable at any time by the customer.

4

## ARGUMENT

I. **The Court Should Preclude Testimony by the Defendant's Proposed Experts and Require Supplemental Expert Disclosure**

A. **Relevant Background**

The defendant provided the Government with an expert disclosure (the "Disclosure") concerning two anticipated expert witnesses: Professor Thomas Kurfess, a purported automotive engineering expert,[2] and Professor Allen Ferrell, an economist. The Disclosure is attached as Exhibit A.

Professor Kurfess's proffered testimony can be divided into five general categories. First, he intends to testify about vehicle development generally, including the time it takes for a vehicle to go from concept to production. Second, he intends to testify about vehicle prototypes, including "virtual prototypes," and his inspection of physical and virtual prototypes in this case. Third, he will testify that battery technology is a viable source of power for semi-trucks. Fourth, he will testify about hydrogen fuel cell technology, including that hydrogen is cheap and abundant and that Nikola's plans to build hydrogen stations along trucking routes are viable. Fifth, he will testify about the relationship between automakers and suppliers, including that it is customary for automakers to use parts from suppliers.

Professor Ferrell's proffered testimony can be divided into seven general categories. First, he will testify about investments in the stock market generally, including that it can be "risky to invest in a company's stock." Second, he will testify about event studies, which have yet to be

---

[2] Professor Kurfess has previously offered testimony in other cases as a mechanical engineering expert. At least one court has excluded his testimony for not being sufficiently reliable. *See Martinez v. Altec Indus. Inc.*, No. 2 Civ. 1100J32TEM, 2005 WL 1862677, at *9 (M.D. Fla. Aug. 3, 2005).

disclosed, showing that Nikola's stock price moved in statistically significant ways on certain days during the relevant period.[3] Third, he will testify that Nikola's stock price was not artificially inflated between June 3, 2020 and September 21, 2020. Fourth, he will testify about the behavior of retail and institutional investors. Fifth, he will testify about "social media activity related to Mr. Milton, Nikola and competitors." Sixth, he will testify that investing in VectoIQ was not equivalent to investing in Nikola, because the merger was subject to certain conditions. Seventh, he will testify that after September 21, 2020, none of the statistically significant stock price movements were traceable to corrective disclosures.

### B.   Applicable Law

#### 1.   Rule 16

A defendant must "give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial." Fed. R. Crim. P. 16(b)(1)(C). "This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id.*

The purpose of this requirement is "to provide the opponent with a fair opportunity to test the merits of the expert's testimony through focused cross-examination" and "to permit more complete pretrial preparation." Rule 16 Adv. Comm. Notes, 1993 Amendment. A court may preclude the testimony as a whole, or any part that it determines was not properly disclosed to the Government. *See United States v. Barile*, 286 F.3d 749, 759 (4th Cir. 2002) (allowing expert witness to testify on the "procedure, practice, and history of 510(k) submissions but not give his

---

[3]     The Government anticipates introducing evidence of the stock price of VectoIQ and then Nikola, in the form of a summary chart, through the end of September 2020.

opinion regarding the materiality of the misrepresentations . . . [b]ecause [defendant] did not give a proper summary of [the expert's] opinion on materiality . . . [or] the bases and reasons for his opinions. . . .”). Even if the disclosure provides a sufficient summary of any opinions to be offered by the witness, it may be excluded if the defendant “has made no attempt at all to describe the bases and reasons for those opinions as required by [Rule 16(b)(1)(C) ].” *United States v. Mahaffy*, No. 05 Cr. 613 (ILG), 2007 WL 1213738, at *2 (E.D.N.Y. Apr. 24, 2007) (citing *United States v. Wilson*, 493 F. Supp. 2d 484, 487, at *3 (E.D.N.Y. 2006)) (quotations omitted). The disclosure must be specific; a “general description of possible bases does not meet the requirements of Rule 16(b)(1)(C).” *United States v. Sturman*, No. 96 Cr. 318 (BSJ), 1998 WL 126066, at *1 (S.D.N.Y. Mar. 20, 1998).

## 2.      Rule 702

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The party that proffers expert testimony bears the burden of showing that it is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 172-73 (1987). The district court's exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

At the threshold, the party seeking admission of expert testimony must demonstrate that the testimony is based on the witness's specialized knowledge. *See United States v. Mejia*, 545 F.3d 179, 196 (2d Cir. 2008) (district court erred in allowing expert testimony “about matters that

required no specialized knowledge"). Expert testimony is plainly inadmissible when it merely addresses "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

The trial court must also find that proposed expert testimony is both relevant and reliable prior to admitting it into evidence. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Specifically, in *Daubert*, the Supreme Court held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. "*Daubert* applies to both defense and government experts." *United States v. Yousef*, 327 F.3d 56, 148 (2d Cir. 2003).

Applying Rule 702, the Court must determine whether the expert's reasoning and methodology underlying his testimony is valid, and whether that reasoning or methodology was applied reliably to the facts, so as to be relevant and helpful to the jury. *See Kumho Tire Co.*, 526 U.S. 148-49; *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (district court should undertake a rigorous examination of the facts on which the expert relies, the expert's methodology, and the application of that methodology to the facts); *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007) (citing *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005)) (the Court "must make several determinations before allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact"). The fact that an expert may generally possess "specialized knowledge" does not automatically render his opinions reliable. *See SEC v. Lipson*, 46 F. Supp. 2d 758, 761

(N.D. Ill. 1998) (fact that witness is a certified public accountant, generally possessing the "specialized knowledge" to qualify as an expert witness, does not automatically render his opinions reliable).

Expert testimony is relevant when it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Although "Rule 702 embodies a liberal standard of admissibility for expert opinions," *Nimely*, 414 F.3d at 395-96, such testimony "should be limited to situations in which the subject matter is beyond the ken of the average juror," *United States v. Lombardozzi*, No. 02 Cr. 273 (PKL), 2003 WL 1907965, at *2 (S.D.N.Y. Apr. 17, 2003). Accordingly, expert testimony is not proper with respect to "matters which a jury is capable of understanding and deciding without the expert's help." *Andrews*, 882 F.2d at 708.

The reliability inquiry is flexible and "must be tied to the facts of a particular case." *Kumho Tire Co.*, 526 U.S. at 150. The Second Circuit has emphasized that "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.*; *see also id.* at 265 ("[T]he district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" (quoting Fed. R. Evid. 702)). Minor flaws with an otherwise reliable expert opinion will not bar admission of that evidence; however, the Court should exclude

the expert evidence "if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* at 267 (quotation marks omitted).

### 3.   Rules 401-403

Rules 401 through 403 of the Federal Rules of Evidence provide that relevant evidence is admissible when it tends to make the existence of any fact that is of consequence more or less probable than it would be without the evidence, but it may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, and misleading the jury. Thus, even if a proposed expert has admissible testimony to offer that satisfies Rule 401, such expert testimony may nonetheless be excluded under Rule 403. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (internal citations omitted); *see also Nimely*, 414 F.3d at 397 ("Indeed, the Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations.").

### C.   Discussion

With respect to Professor Kurfess, the Court should preclude the proposed testimony in its entirety as irrelevant and in certain respects unreliable. Moreover, to the extent that any of Professor Kurfess's testimony might have any plausible relevance to a fact at issue, its probative value would be far outweighed by risk of unfair prejudice, confusing the issues, misleading the jury, and wasting time. With respect to Professor Ferrell, certain of the proposed testimony is transparently irrelevant and invades the province of the Court and jury, and should be precluded

10

on that basis. The defendant has failed to provide disclosures adequate to support the admissibility of the remainder of Professor Ferrell's proposed testimony, and therefore the Court should direct the defendant to make supplemental disclosures and hold a *Daubert* hearing as necessary, or preclude the testimony.

### 1.     The Court Should Preclude Professor Kurfess's Testimony

As noted above, the defendant proposes to offer the testimony of Professor Kurfess on five distinct topics. The proposed testimony on each of these topics would be irrelevant or cumulative and unhelpful to the jury and should be precluded.

### a.     Vehicle Development Generally

The defendant proposes to have Professor Kurfess opine generally on the difficulties of developing electric or hydrogen-powered vehicles, and that developing these vehicles is a "time-consuming undertaking." (Disclosure 3). This testimony sheds no light on whether any statements made by the defendant were false or misleading, whether the defendant possessed an intent to defraud, or any other fact in dispute. Vehicle development may well be time-consuming and difficult, but those facts provide no assistance to the jury in evaluating whether Milton misled investors about the state of Nikola's products and business. Indeed, the only apparent purpose of such testimony would be the improper goal of suggesting that Milton's statements should be excused because, in substance, he was working hard to accomplish a difficult task.

Moreover, to the extent that the scope of the efforts needed to produce the prototypes or other technology or products at issue in this case had any relevance, those topics may be addressed with the numerous engineers and fact witnesses with direct knowledge of Nikola's work who will testify at this trial. Any expert testimony generally opining on how hard it is to develop a truck would be cumulative and a waste of the jury's time.

11

####    b.        Physical and Virtual Prototypes

The defendant seeks to offer testimony by Professor Kurfess regarding the necessity and use of prototypes in the automotive industry, as well as unspecified opinions about Nikola's prototypes, including prototypes of no relevance to the issues at stake in this case. (Disclosure 3-4). As with respect to the Professor Kurfess's opinions on vehicle development generally, these opinions have no relevance to any fact in dispute and are of no use to the jury. There will be no dispute at trial that Nikola developed prototypes, nor will there be any dispute about whether prototypes are generally necessary, good, or bad with respect to the development of vehicles. To the extent that the jury must be educated regarding how prototypes are used, such testimony may be provided by the multiple fact witnesses who actually worked on the relevant Nikola prototypes and can describe how the prototypes at issue actually were used. Finally, Professor Kurfess's general—and unspecified—opinions regarding Nikola's prototypes would provide no relevant testimony as to the facts in dispute here, which principally concern whether Milton's statements accurately described the state of those prototypes at the time of Milton's speaking. It is clear from the nature of the proposed testimony and the fact that the proposed testimony concerns prototypes not at issue in this case that the intended effect of such testimony would be to attempt to impress the jury generally with the quality of the prototypes in an effort to distract from the actual question of whether the defendant intentionally misled investors.

Even if any of this testimony were relevant and admissible, the defendant has failed to provide adequate bases and reasons for the testimony. For example, the defendant's expert disclosure proffers that Professor Kurfess will testify about the "significant role of virtual prototypes in the design, development, and engineering of cars and trucks today." (Disclosure 3). Professor Kurfess also proposes to testify about "virtual prototypes received through discovery in

12

this case," and how those virtual prototypes are consistent with the virtual prototypes of other OEMs. (Disclosure 3). But the disclosure wholly fails to specify the bases and reasons for Professor Kurfess's testimony, including how Professor Kurfess is familiar with the virtual prototypes of established automakers. The disclosure is likewise lacking with respect to the proposed testimony on physical prototypes. On that topic, the disclosure states only that Professor Kurfess will testify about physical prototypes he has inspected in the case (Disclosure 4); it fails to explain what he has "evaluated," and what Professor Kurfess's opinion on these physical prototypes will be. Accordingly, the Court should, at a minimum, require the defendant to supplement his disclosure pursuant to Rule 16(d).

### c.      Battery Technology

The Court should similarly preclude testimony regarding whether "battery technology is a viable source of power for semi-trucks" or is "advantageous" in some way. (Disclosure 4). There will be no dispute at trial regarding the general merits of battery technology, and indeed, such a dispute would be irrelevant and a waste of the jury's time. To the extent that the defendant seeks to justify or promote generally Nikola's business plan to create battery-powered vehicles, such testimony would be irrelevant and useful only to encourage jurors to focus on reactions to the green vehicle business generally rather than on whether the evidence is sufficient to establish the charged schemes to defraud.

### d.      Hydrogen Fuel Technology

As with respect to battery technology, the Court should preclude the proposed testimony regarding the virtues of hydrogen fuel cell technology. (Disclosure 4-5). Professor Kurfess's testimony appears merely to provide justification or approval of the use of hydrogen fuel technology or of Nikola's business model generally, neither of which are relevant to any fact at

13

issue in this case, and to the extent that facts about how hydrogen fuel technology works are relevant to the case, they will be sufficiently explained by the fact witnesses who worked with that technology at Nikola.

For example, the current viability of Nikola's plans to produce hydrogen stations is entirely irrelevant. Milton's false statements regarding hydrogen stations related to the status of the stations in 2020; he falsely claimed on multiple occasions that Nikola was currently producing hydrogen and that it was doing so at a price of less than $4 a kilogram. Whether Nikola can one day produce hydrogen at such a price point is entirely irrelevant to the truth or falsity of Milton's statements in 2020.

Moreover, the Court should preclude Professor Kurfess's testimony on hydrogen fuel cell technology for the additional reasons that (i) Professor Kurfess is not qualified to give such testimony, and (ii) the defendant's Disclosure does not adequately disclose the bases and reasons for Professor Kurfess's testimony.

First, the defendant has failed to meet his burden of showing that Professor Kurfess is qualified to give testimony on hydrogen fuel cell technology under Rule 702. Professor Kurfess's curriculum vitae ("CV") is attached as Exhibit B. As reflected in his 93-page CV, Professor Kurfess has extensive experience in manufacturing engineering. Some of that experience relates to vehicle manufacturing, although much of it relates to manufacturing engineering more generally. Notably, neither "hydrogen" nor "fuel cell" appears at any point in Professor Kurfess's lengthy CV.

Much of Professor Kurfess's proffered testimony does not relate to engineering at all. Professor Kurfess's proffered testimony includes testimony that: (i) "hydrogen is cheap and

14

abundant"; (ii) "hydrogen can be made on-site at a service station"; (iii) "the most significant cost input is the cost of electricity"; (iv) "hydrogen is clean"; and (v) Nikola's plans to produce hydrogen stations are capital intensive but viable. (Disclosure 4-5).

These topics relate to clean energy, the cost of electricity, and Nikola's financial model for hydrogen stations. Based on the defendant's disclosure to date, Professor Kurfess appears wholly unqualified to offer testimony on any of these topics. He has not received formal training in these areas and has not written articles or given presentations on these topics. On this record, there is no basis to qualify him as an expert in these areas. At the very least, the Court should hold a *Daubert* hearing before allowing Professor Kurfess to testify on these topics.

Second, the defendant's disclosure does not adequately disclose the bases and reasons for certain of Professor Kurfess's opinions. For example, the defense has not disclosed the bases and reasons for Professor Kurfess's opinions that: (i) "hydrogen is cheap and abundant"; (ii) "hydrogen can be made on-site at a service station"; and (iii) Nikola's plans to produce hydrogen stations are capital intensive but viable. (*See* Disclosure 4-5). In addition to precluding the proposed testimony as irrelevant, a waste of time, and cumulative, the Court should preclude Professor Kurfess's insufficiently disclosed testimony or, in the alternative, require supplemental disclosure, pursuant to Fed. R. Crim. P. 16(d).

### e.   Collaboration with Suppliers

Professor Kurfess's fifth category of testimony relates to automakers' collaboration with suppliers. Specifically, the defendant proposes that Professor Kurfess testify that:

- "It is normal and customary for an automaker to collaborate with a supplier to make a part that is custom and bespoke, and to consider that part to be the technology of the automaker."

15

- "When parts are not purchased 'off the shelf,' the supplier is working at the direction of and on behalf of the automaker, and it is the automaker that has control and decision-making authority."

- "It is also normal and customary for an automaker to pursue an internal program to make a part by itself, even when it is simultaneously working with a supplier to make that same part."

(Disclosure 5-6).

As with respect to the other topics that the defendant seeks to offer testimony with the imprimatur of expertise, these topics shed no light on the fact issues to be decided by the jury. It may well be that automakers customarily collaborate with suppliers, but the question in this case is whether Milton's statements accurately reflected the affairs at Nikola, a matter on which Professor Kurfess can provide no useful testimony.

Furthermore, even if any of this testimony were otherwise admissible, the defendant has failed to meet his burden of showing that Professor Kurfess is qualified to give expert testimony on these topics. To be sure, Professor Kurfess is qualified as an expert in manufacturing engineering generally. But it is not apparent from his CV that he has worked for an automaker or a supplier, or has any other basis to testify about what is or is not customary for automakers or suppliers. Accordingly, the Court should conduct a *Daubert* hearing to further develop the record on Professor Kurfess's qualifications.

To that end, the defendant's disclosure fails to set forth any bases and reasons for Professor Kurfess's opinion on this topic. Accordingly, the Court should preclude Professor Kurfess's testimony, or at a minimum, require supplemental disclosure, pursuant to Fed. R. Crim. P. 16(d).

      2.     **The Court Should Preclude Professor Ferrell's Testimony Regarding the Stock Market Generally and the Proper Method for Evaluating Materiality**

The defendant proposes to have Professor Ferrell opine that Nikola's shares are traded on a stock exchange, that it is risky to invest in a company's stock, and that "firm-specific stock price movement is the most accepted measure of whether any public information about the company is deemed to be value relevant and new by investors in the market." (Disclosure 7). These matters are little more than an improper and thinly-veiled attempt to instruct the jury on how to evaluate materiality in this case.

First, expert testimony is wholly unnecessary on the fact of whether Nikola's stock is traded on a public exchange. Second, expert testimony telling the jury that investment in the stock market is risky is both unnecessary and improper, as it does little more than blame victims for their losses. Third, while it may well be proper to offer testimony regarding the price impact of certain statements if sufficient disclosures to support reliability have been made, testimony purporting to instruct the jury on the "most accepted measure" of evaluating whether public information "is deemed to be value relevant and new by investors in the market" is simply effort to instruct the jury on how to evaluate materiality—the sole province of the court—and, in the guise of expert testimony, to direct the jury on the question of materiality—the sole province of the jury. *See United States v. Landesman*, 17 F.4th 298, 341 (2d Cir. 2021) ("Whether a given omission or misrepresentation is material "is a mixed question of law and fact that the Supreme Court has identified as especially 'well suited for jury determination.'" (quoting *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015)). This testimony should therefore be precluded.

### 3. The Court Should Require the Defendant to Provide Supplemental Disclosure for Professor Ferrell's Testimony and Conduct a Daubert Hearing

While certain other aspects of Professor Ferrell's testimony may be relevant and admissible, the Government and the Court currently lack sufficient information to make that assessment. As an initial matter, the defendant proffers that Professor Ferrell will give testimony on the behavior of retail investors, as well as "social media activity related to Mr. Milton, Nikola, and competitors." (Disclosure 8). But it is not apparent from Professor Ferrell's CV, which is attached as Exhibit C, that he has any particular expertise in retail investors, much less in social media. In particular, he does not appear to have published or given presentations on either topic. Accordingly, the Court should direct disclosure of any relevant experience and conduct a *Daubert* hearing to develop the record on Professor Ferrell's qualifications to give testimony on these topics.

The defendant's disclosure regarding Professor Ferrell's testimony is also inadequate because it fails to specify the bases and reasons for Professor Ferrell's opinions. *See* Fed. R. Crim. P. 16(b)(1)(C). In particular, the disclosure provides no bases or reasons for the following opinions:

- Nikola stock reacted to public information in a similar fashion as other stocks in the market.

- Based on event studies, Professor Ferrell will testify that, on certain days between June 3, 2020 and September 21, 2020, Nikola's stock price moved in a statistically significant way.

- On every trading day between June 3, 2020 and September 21, 2020 for which there was no statistically significant firm-specific stock price movement, the price movement on those days is explainable by market movement, industry sector movement and normal random volatility.

- Nikola's stock price was not artificially inflated between June 3, 2020 and September 21, 2020.

18

- Retail investors in Nikola acted similarly in terms of net purchase flows of Nikola as that of other stocks that were attractive to retail investors.

- Statistically significant price movements in Nikola after September 21, 2020 did not reflect corrective disclosures.

(Disclosure 7-9).

Despite the Disclosure's reference to "event studies," the defendant has disclosed no such event studies to the Government, and accordingly, the bases and reasons for Professor Ferrell's opinions are entirely unknown to the Government. This failure has left the Government completely unable to evaluate Professor Ferrell's proffered testimony, including whether it meets the requisite admissibility standards under Rule 702 and *Daubert*. Accordingly, the Court should preclude the testimony of Professor Ferrell, or at a minimum, require the defendant to provide a supplemental disclosure on Professor Ferrell's proposed testimony, including by disclosing the event studies and any other analyses that form the basis of it.

## II.    The Court Should Preclude Any Advice-of-Counsel or Purported Presence-of-Counsel Defense

Prior to the filing of the parties' motions *in limine*, the defendant advised the Government, in response to an inquiry, that he did not intend to advance an advice-of-counsel defense, but indicated that he is likely to offer evidence and argument that he relied on the approval, lack of disapproval, or presence of counsel, including of the general counsel of Nikola. Such a defense is entirely improper and should be excluded.

### A.    Applicable Law

#### 1.    Good Faith

When fraudulent or wrongful intent or willfulness is an element of an offense charged, a defendant may request a "good faith" instruction that specifies that acting based on an honestly

held belief negates the element of intent with respect to that offense. *See* Sand *et al.*, *Modern Federal Jury Instructions*, Instr. 8-01.

### 2.    Advice-of-Counsel

The advice-of-counsel (or reliance-on-counsel) defense is a more specific form of the defense of good faith, available in limited circumstances in which a good faith instruction may otherwise be applicable. *See, e.g.*, *United States v. Greenspan*, 923 F.3d 138, 146 (3d Cir. 2019); *see also* Sand *et al.*, *Modern Federal Jury Instructions*, Instr. 8-04. Advice-of-counsel "is not a free-standing defense." *United States v. Van Allen*, 524 F.3d 814, 823 (7th Cir. 2008) (internal quotation marks omitted).

To establish a colorable advice-of-counsel defense, and thus be entitled to a jury instruction with respect to those offenses to which it may apply, the defendant must be able to identify admissible evidence that:

> 1. Before taking action, he in good faith sought the advice of an attorney whom he considered competent to advise him on the matter; and
>
> 2. He consulted this attorney for the purpose of securing advice on the lawfulness of his possible future conduct; and
>
> 3. He made a full and accurate report to his attorney of all material facts that he knew; and
>
> 4. He then acted strictly in accordance with the advice of this attorney.

*United States v. Scully*, 877 F.3d 464, 478 (2d Cir. 2017) (In addition to the model instruction in Sand *et al.*, *Modern Federal Jury Instructions*, "[w]e also refer district courts to the model instructions drafted by our sister circuits, particularly the Seventh Circuit's model, which reads [as set forth above]."); *see also Williamson v. United States*, 207 U.S. 425, 453 (1908); *United States*

*v. Colasuonno*, 697 F.3d 164, 181 (2d Cir. 2012); *United States v. Evangelista*, 122 F.3d 112, 117

(2d Cir. 1997); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1194 (2d Cir. 1989).

"Each requirement must be satisfied." *Colasuonno*, 697 F.3d at 181. Where the defendant

fails to meet one or more requirement, he is not entitled to a jury instruction. *Id.*; *see also, e.g.*,

*Greenspan*, 923 F.3d at 146-47; *Scully*, 877 F.3d at 476; *Evangelista*, 122 F.3d at 117. Nor is he

entitled to argue, directly or indirectly, that he has such a defense. *See, e.g.*, *United States v.*

*Quinones*, 417 F. App'x 65, 67 (2d Cir. 2011) (affirming denial of instruction and order precluding

defense from arguing advice of counsel; "defendants are not entitled to such an instruction unless

there are sufficient facts in the record to support the defense," and "the defendants [in this case]

have not shown the required factual predicate for an advice-of-counsel defense"); *United States v.*

*Atias*, No. 14 Cr. 403 (DRH), 2017 WL 563978, at *3 (E.D.N.Y. Feb. 10, 2017) ("All available

information indicates that the [pertinent] attorney represented [another], not defendants.

Accordingly, the term 'advice of counsel' should not be employed in referring to [the attorney].

Doing so would be legally inappropriate and likely to mislead the jury.").

In short, the "situations in which the advice-of-counsel defense may be employed are

severely limited." *Lurie v. Wittner*, 228 F.3d 113, 134 (2d Cir. 2000).

### 3.      Notice of and Discovery Concerning an Advice-of-Counsel Defense

Given the complexity and potential issues concerning an advice-of-counsel defense, courts

routinely order defendants to provide notice of whether they intend to advance such a defense in

advance of trial, and, if so, to provide discovery materials concerning the defense. *See, e.g.*, *United*

*States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 461441, at *8 (S.D.N.Y. Jan. 18, 2018). That

"disclosure should include not only those documents which support [the] defense, but also all

documents (including attorney-client and attorney work product documents) that might impeach

or undermine such a defense." *United States v. Hatfield*, No. 06 Cr. 550 (JS), 2010 WL 183522, at *13 (E.D.N.Y. Jan. 8, 2010).

**B.    Discussion**

### 1.    Absent Immediate Notification and Disclosure the Court Should Preclude Any Advice of Counsel Defense

As noted above, the defendant has informed the Government that he does not intend to offer an advice-of-counsel defense. This is not surprising, given that the Government has debriefed an attorney for Nikola who did not approve of Milton's statements on podcasts and social media before he made them. Accordingly, absent the immediate provision by the defendant to the Government of (i) written notice of any alleged advice-of-counsel defense, including its bases, scope, and to which counts he believes it applies, and (ii) any discovery materials in support of this defense, to the extent not already in the Government's possession, the Court should preclude the defendant from offering any advice-of-counsel defense. *See Scali*, 2018 WL 461441, at *8; *Hatfield*, 2010 WL 183522, at *13.

### 2.    The Defendant Should Be Precluded From Offering Evidence or Argument Suggesting He Is Not Guilty Based on the Approval, Lack of Disapproval, or Presence of Counsel

The defendant has indicated to the Government that he is likely to offer evidence and argument that he acted in good faith because he relied on the approval, lack of disapproval, or presence of counsel, including of the general counsel of Nikola, when making the false and misleading statements at issue in this case. The defendant should not be permitted to advance what would amount to a quasi-advice-of-counsel defense. Put differently, having failed to meet the requirements for the defense, he should not be permitted to argue nonetheless that he should not

be found guilty because a lawyer purportedly approved of or did not object to the defendant's conduct.

Courts in this district have rightly approached the presence of counsel defense with caution, mindful that it risks injecting irrelevant or prejudicial information into criminal trials. The advice-of-counsel defense is subject to multiple and meaningful restrictions—including that a defendant seek the advice of a lawyer acting as his lawyer, communicate all material facts to his lawyer, and strictly follow the advice of his lawyer—because a defense based on alleged legal advice or approval that does not meet these strictures is ripe for abuse. The defendant should not be permitted to engage in an end-run around that defense's requirements. *Cf. SEC v. Tourre*, 950 F. Supp. 2d 666, 684 (S.D.N.Y. 2013) (The defendant "argues that the presence of lawyers is relevant to the overall context of the transaction, but that is such a fine-grained distinction from a reliance on counsel defense, that it would likely confuse the jury. A lay jury could easily believe that the fact that a lawyer is present at a meeting means that he or she must have implicitly or explicitly 'blessed' the legality of all aspects of a transaction. . . . This misunderstanding would give the defendant all of the essential benefits of an advice of counsel defense without having to bear the burden of proving any of the elements of the defense."); *see United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) (There is no "advice-of-counsel defense without demonstrating advice of counsel.").

Apart from the concern of allowing the defendant to benefit from an incomplete advice of counsel defense, the presence of counsel defense risks injecting irrelevant or confusing evidence into the trial, because the involvement of counsel is not probative of the defendant's state of mind if the lawyers were not informed of the relevant facts or consulted in advance. For example, an

23

argument that the defendant relied on the lack of disapproval from Nikola's lawyers would be misleading absent evidence that Nikola attorneys reviewed and approved of Milton's public statements.

Courts have protected against abuse of these rules by precluding evidence and argument and, where necessary, instructing the jury that a reliance-on-counsel defense is unavailable and should not be considered. For example, in *SEC v. Stoker*, No. 11 Civ. 7388 (JSR) (S.D.N.Y. 2012), the court took issue with defense counsel's efforts to highlight, through questioning, the fact that attorneys had reviewed certain offering materials that the SEC contended were materially misleading. The court recognized that "absent evidence that counsel knew either the information that Mr. Stoker allegedly kept secret, at least form outsiders, or knew the information that the SEC claims were distorted misrepresentations, the role of counsel in any of this [was] totally irrelevant." *Stoker*, July 23, 2012 Trial Tr. at 895-96. And, although the defendant proffered an alternative reason for the questioning, the court recognized that counsel's tact was a "disguised reliance argument," *id.* at 973, and that, even if the testimony were offered for some other purpose, questioning about the role of attorneys invited "all the dangers of the jury misunderstanding the alleged purpose" of the testimony. *Id.* at 981. Ultimately, the court gave the jury a supplemental instruction that this testimony's relevance could be limited based upon what information about the transaction counsel had received. *See Id.* at 969 ("So if counsel have not received all the relevant information, then their signing off on something may or may not be of any relevance to you."); *see also SEC v. Lek Sec. Corp.*, No. 17 Civ. 1789 (DLC), 2019 WL 5703944, at *4 (S.D.N.Y. Nov. 5,

2019) ("References to counsel's communications are not relevant in the absence of an advice-of-counsel defense and should be excluded as well pursuant to Rule 403.").[4]

Of course, the defendant, if he elects to testify, and within the bounds of the Federal Rules of Evidence, may talk about whether he believed himself to be acting with intent to defraud or with a good faith belief in the truth of his statements. Evidence tending to show that others within Nikola, including individuals with shared responsibility for the accuracy of investor communications, were aware of Milton's statements and did not raise objections to Milton may potentially be relevant, depending on the arguments advanced by the defense. What he should not be permitted to do, however, is argue or suggest that he should be acquitted because lawyers purportedly approved of, did not object to, or were generally around at the time of certain conduct unless the defendant can satisfy each of the several requirements of an advice-of-counsel defense. *See Atias*, 2017 WL 563978, at *3; *Tourre*, 950 F. Supp. 2d at 684.

Accordingly, consistent with the court's ruling in *Tourre*, defense counsel should be precluded from mentioning lawyers specifically in jury addresses, and should be precluded in

---

[4]    Courts in this District have consistently provided the jury with cautioning instructions where, as appears to be the be the case here, the defendants offers improper reliance arguments. *See, e.g.*, *United States v. Shea*, No. 20 Cr. 412 (AT), May 31, 2022 Tr. at 787 ("You have heard evidence that We Build the Wall hired lawyers.  A lawyer's involvement with an individual or entity does not itself constitute a defense to any charge in this case. The defense has not claimed, and cannot claim, that the defendant's conduct was lawful because he acted in good faith on the advice of a lawyer."); *United States v. Petit*, No. 19 Cr. 580 (JSR) (S.D.N.Y.), Oct. 26, 2020 Tr. at 2402 ("There have been some documents in this case of communications with the woman, who was the general counsel of MiMedx. You should understand, there is no defense in this case of so-called reliance on counsel. There is no suggestion that she was opining on the legality or illegality of anything. Those emails came in because they were relevant for other issues in this case, and you can consider them for all the issues that are relevant in this case, but there is no defense here of reliance on counsel, and you should not even speculate about that.").

questioning of witnesses from "zeroing in on the presence or involvement of lawyers for the sake of highlighting their presence or involvement." *Tourre*, 950 F. Supp. 2d at 685.

## III.   The Court Should Preclude the Defendant From Arguing that Victims Acted Negligently or Carelessly

The federal fraud statutes do not require the Government to prove reliance on a defendant's conduct as an element of the offense. The defense should therefore be precluded from suggesting during the trial—whether in jury addresses or witness examinations—that the victims of the defendant's fraud—including retail investors—are to blame, either because they failed to conduct sufficient diligence, were negligent, or otherwise acted unreasonably in relying on the defendant's misrepresentations.

### A.   Applicable Law

Under Federal Rule of Evidence 402, "[i]rrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Rule 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also United States v. Miller*, 626 F.3d 682, 689 (2d Cir. 2010).

To "prove the existence of a scheme to defraud, the government must also prove that the misrepresentations were material, and that the defendant acted with fraudulent intent." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (internal citations and quotation marks omitted); *see also United States v. Gramins*, 939 F.3d 429, 444-45 (2d Cir. 2019). A "statement is material if the misinformation or omission would naturally tend to lead or is capable of leading a reasonable [person] to change [his] conduct." *Id.* In other words, materiality is an objective standard, and actual reliance is not an element of criminal fraud. *Neder v. United States*, 527 U.S. 1, 24-25

(1999); *United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) (reliance not an element of criminal securities fraud).

In *United States v. Thomas*, the Second Circuit rejected as a matter of law the proposition that a victim's "vigilance (or lack thereof) was relevant." 377 F.3d 232, 241, 243 (2d Cir. 2004); *see also Weaver*, 860 F.3d at 95 ("[T]he unreasonableness of a fraud victim in relying (or not) on a misrepresentation does not bear on a defendant's criminal intent in designing the fraudulent scheme, whereas the materiality of the false statement does."). Just as "justifiable reliance" is not an element of criminal fraud, neither does the Government need to prove damages, because the fraud statutes criminalize the "scheme" rather than the completed fraud. *Weaver*, 860 F.3d at 95; *see also United States v. Rybicki*, 287 F.3d 257, 262 (2d Cir. 2002), *on reh'g en banc*, 354 F.3d 124 (2d Cir. 2003) ("[T]he only significance in a fraud case of proof of actual harm befalling the victim as a result of the scheme is that it may serve as circumstantial evidence from which a jury could infer the defendant's intent to cause harm."). It is enough to show that the defendant "contemplated some actual harm or injury to [the] victims." *Weaver*, 860 F.3d at 95 (quoting *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) (emphasis in original)). The pertinent statute therefore focuses on the defendant's statements and intent, not on the state of mind of his victims.

## B.    Discussion

Because such evidence would be irrelevant under Rules 401 and 402, and unduly confusing under Rule 403, the defendant should be precluded from offering evidence or argument that, had retail or other investors been more sophisticated or diligent in some respect, they would not have been fooled by his representations, or that the defendant is otherwise innocent because victims of his fraud were unreasonable in their reliance on his misrepresentations or could have been more

diligent in their evaluation of Nikola stock. *E.g.*, *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) ("The majority of circuits to address the issue have rejected this defense, holding that a victim's lack of sophistication is not relevant to the intent element of . . . wire fraud" (citations omitted)). For example, the defendant should not be permitted to argue that he should not be held to account for otherwise material misrepresentations because an investor might have been able through investigation to uncover the truth. In short, the defendant should be precluded from blaming his victims—whether through argument or evidence elicited through direct testimony or cross examination—because such evidence is irrelevant and inadmissible under Rule 403.

## IV.   The Court Should Preclude Evidence and Argument that the Defendant Lacked Intent to Defraud Because He Believed Victims Would Ultimately Not Suffer Harm

### A.   Applicable Law

The "well-intentioned belief that a business venture in which a defendant was involved would be successful and would allow for repayment of money taken from victims does not supply a basis for a defense that there was a good faith belief that a representation was true." *United States v. Okun*, Cr. No. 08-132, 2009 WL 414009 (E.D. Va. Feb. 18, 2009) (citing *United States v. Godwin*, 272 F.3d 659, 666-67 (4th Cir. 2001)); *see also United States v. Males*, 459 F.3d 154, 159 (2d Cir. 2006) (holding that jury instruction for wire fraud charge that "the requirement of contemplated harm or injury does not require that [defendant] intended to permanently de[p]rive the victim's money or property" "was an accurate statement of the applicable law"); *United States v. Gole*, 21 F. Supp. 2d 161, 166 (E.D.N.Y. 1997) ("The definition of good faith addresses the defendant's belief in the truth of the representations, and not the defendant's belief as to the ultimate success of the plan.") (citing 1A Sand, *Modern Federal Jury Instructions*, ¶ 44.01); *United States v. Berger*, 188 F. Supp. 2d 307, 329 (S.D.N.Y. 2002) (finding that a guilty

verdict on securities fraud charges based on the fact that the defendant intentionally caused others to issue false or misleading statements to investors would be proper regardless of evidence of the defendant's belief that his investment strategy would be successful financially).

Thus, where there is evidence that a defendant made false representations to victims to obtain property, but he argues that he believed there would be no harm in the long run, the Court should instruct the jury that a belief by the defendant that eventually everything would work out so that victims eventually made or did not lose money does not mean that the defendant acted in good faith. *See, e.g.*, *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016) ("[T]here was a factual predicate for the instruction, because there was evidence that [the conspirators] intended to immediately deprive investors of their capital through fraud, even if they truly believed that in the long-term [the companies] would ultimately succeed, deriving profits for the defrauded investors."); *United States v. Leonard*, 529 F.3d 83, 91-92 (2d Cir. 2008) (predicate established by evidence that defendants "intended to deprive [victims] of the full information they needed to make refined, discretionary judgments," yet defendants argued that they believed that the victims ultimately "would be no worse off" because of completion of project). And where it is clear prior to trial that the defense may seek to advance an improper legal theory, the argument should be precluded. *See United States v. Watts*, 934 F. Supp. 2d 451, 473 (E.D.N.Y. 2013) (precluding argument that defendant believed his lies to a victim lender would cause no ultimate harm because the lender would be repaid); *accord United States v. Binday*, No. 12 Cr. 152 (CM), 2013 WL 12154927 (S.D.N.Y. Sept. 16, 2013).

## B.    Discussion

The defendant should be precluded from making any argument, or offering evidence to show, that he lacked an intent to defraud because he believed that investors would ultimately make

money on Nikola stock, notwithstanding the defendant's false representations to induce their investments. Accordingly, and as discussed further below, the defendant should be precluded from offering evidence of later developments at Nikola to support an argument that he believed investors would not ultimately be harmed or other evidence to demonstrate generally that he believed in Nikola and its long-term success. Such arguments and evidence bear no relevance to the veracity of the defendant's misrepresentations or his good faith belief in their truth at the time they were made, but rather would support only the improper claim that he lacked intent to defraud because he believed that his victims would not ultimately suffer loss.

## V.   The Court Should Preclude Testimony and Evidence About Nikola's Product and Technology Development After September 2020

The Government understands that the defendant intends to offer into evidence facts concerning events or developments that have transpired at Nikola after the conclusion of the defendant's criminal scheme. The Government anticipates that Milton may argue that he had no intent to defraud because Nikola later achieved certain milestones, or, in substance, that victims suffered no loss or harm because of advancements at Nikola after his departure.[5] For example, Milton may argue that his 2020 statements that Nikola had gotten the price of electricity below 3.5 cents per kilogram are supported by Nikola's 2021 agreement with the utility Arizona Public Service ("APS") or that the fact that Nikola has produced several battery-powered "Nikola Tre" vehicles in some manner validates his claims. Such evidence should be precluded because it is irrelevant and likely to confuse the jury and cause undue delay.

---

[5]     Any argument that victims suffered no harm would be belied by evidence of Nikola's stock price, which dropped substantially after the allegations of fraud came to light and has never recovered.

As background, the Government expects the evidence to establish that in 2020, Nikola was a pre-revenue company. Because it was pre-revenue, investors could not assess the company by looking at revenue. Instead, the milestones Nikola had achieved were an important metric of its success. Under these circumstances, Milton's statements that Nikola had *achieved* certain milestones, like producing hydrogen and building a Badger prototype, were particularly significant.

Evidence that Nikola later achieved, or in many cases did not achieve, these milestones is irrelevant and risks confusing the jury. *See United States v. Petit*, No. 19 Cr. 850 (JSR) (S.D.N.Y.), Dkt. No. 115 at 7 (in accounting fraud case, granting motion to exclude evidence that outstanding debts were ultimately repaid). For example, evidence of the 2021 agreement with APS is simply not relevant to the truth or falsity of Milton's June 4, 2020 statement that "[w]e can now produce it for well under $4 a kilogram," or his June 11, 2020 statement that "Today, our hydrogen costs are less than $4.00." In addition, allowing evidence that post-dates the fraudulent scheme creates the risk of mini-trials. For example, if the APS agreement were admitted, the Government would then call an APS witness to explain what it means, the rate of electricity involved, and why the electricity rate was given. The Government would also call multiple witnesses to show that such a rate would not be achievable in other locations.

Likewise, evidence of work on the Badger after Milton left Nikola would be irrelevant to the status of the Badger in the summer of 2020. Moreover, if evidence of the Badger's progress after Milton left were admitted, the Government would anticipate introducing evidence about the Badger program's discontinuance and the reasoning behind it. In other words, should Milton be permitted to introduce into evidence facts regarding what Nikola has done since he left the

company, the Government would be forced to offer evidence regarding what Nikola has not accomplished, and the trial would become a lengthy exploration of precisely what is not at issue here: the general quality of Nikola as a company since Milton was asked to resign.

In short, evidence regarding what Nikola may or may not have achieved after Milton let the company cannot possibly shed light on the veracity of statements previously made by Milton regarding what the company had already achieved. Accordingly, such evidence should be excluded under Rule 401 and 403.

## VI.     The Court Should Preclude So-Called "Good Acts" Evidence

The Government will establish at trial that Milton made numerous false and misleading statements about Nikola's products and technology, including that Nikola had built a fully functioning prototype of the Nikola One, that Nikola was building the Badger from the "ground up" with Nikola's parts and technology, that Nikola was producing hydrogen at a certain price point, and that Nikola had billions of dollars in orders for its trucks. The Government understands that the defense may seek to introduce evidence that Milton, at times, conveyed accurate information about other aspects of Nikola's business. For example, the defense may seek to introduce portions of podcasts or interviews that discuss the other semi-trucks Nikola was developing or Nikola's plans to build a hydrogen fueling network. The defendant should be precluded from offering evidence of these "other good acts" and arguing that Milton's accurate statements on other occasions show that he lacked intent to defraud.

While the accused may introduce evidence of a pertinent character trait through generalized opinion or reputation testimony, *see* Fed. R. Evid. 405(a); *United States v. Nektalov*, No. 03 Cr. 828 (PKL), 2004 WL 1637010, at *1-3 (S.D.N.Y. July 21, 2004) (summarizing principles governing application of Rule 405(a)); *United States v. Chan*, No. 97 Cr. 1053 (PKL), 2002 WL

109528, at *1-2 (S.D.N.Y. Jan. 25, 2002) (same), Federal Rule of Evidence 405(b) expressly precludes proof of a defendant's good character by specific acts where, as here,[6] the defendant's character or trait of character is not an essential element of the crime charged. *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (explaining that defense-proffered character evidence of defendant's specific acts in the past was improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *Nektalov*, 2004 WL 1637010, at *2 (explaining that defendant "may offer direct testimony about his good character, but must do so by testimony about his reputation and by opinion testimony, and not by testimony about specific instances of conduct"). The admission of evidence of a defendant's prior good conduct to establish his innocence is also impermissible under Federal Rule of Evidence 404(b) ("Rule 404(b)"), because such evidence "would in effect be an attempt to demonstrate appellant's good character by proof of specific good acts." *United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978); *see also United States v. Al Kassar*, 660 F.3d 108, 123 (2d Cir. 2011) (upholding district court's decision to exclude evidence of prior good acts as inadmissible under Rule 404(b)). Thus, the defendant may not offer evidence about instances where he did not lie to investors.

---

[6]     As the Advisory Committee Notes and applicable case law make plain, cases in which character is an essential element of the crime charged are rare: "Illustrations are: the chastity of the victim under a statute specifying her chastity as an element of the crime of seduction, or the competency of the driver in an action for negligently entrusting a motor vehicle to an incompetent driver." Advisory Committee Note to Fed. R. Evid. 404(a); *see, e.g.*, *United States v. Doyle*, 130 F.3d 523, 542 (2d Cir. 1997) (explaining that "the exception of Rule 405(b)" cannot be read to "swallow the general rule of 405(a) that proof of specific acts is not allowed"); *Shakur v. United States*, 32 F. Supp. 2d 651, 668-69 (S.D.N.Y. 1999) (discussing this rule).

For example, the defense may seek to introduce evidence of Milton's statements about the Nikola Tre, a truck Nikola was developing for short-haul routes. But Milton's truthful statements about the Nikola Tre, which was farther along in the development process because of Nikola's partnership with another company, have no bearing on whether Milton lied about the Nikola One, the Badger, and Nikola's hydrogen production stations. Indeed, it is wholly unsurprising that Milton was, at times, truthful about the Nikola Tre, because Nikola had made more progress on that vehicle, which was developed in partnership with and based on a vehicle previously engineered by a separate large commercial truck manufacturer. Milton lied about Nikola's products and technology that had not progressed in the same manner.

Similarly, the defense may try to introduce evidence of Milton's statements about Nikola's plans to build a network of 700 hydrogen stations. Likewise here, Milton's truthful statements about his future plans for the entire network of hydrogen stations do not bear on whether he lied about Nikola's progress on hydrogen production.

Such evidence should also be precluded under Rule 403, because it creates a risk of confusing the issues, misleading the jury, and wasting time over tangential matters. For example, should the defense introduce evidence of Milton's statements about the Nikola Tre, the Government would anticipate introducing other statements by Milton about the Tre that are misleading, such as his statement in July 2020 that five Nikola Tres were "coming off the assembly line," which falsely suggested that full production of the Tres was imminent. As this illustrates, allowing evidence of other truthful statements by Milton could devolve into mini-trials on whether Milton was, in fact, completely honest on these issues. To avoid confusing the issues, misleading the jury, and wasting time, the Court should preclude such evidence under Rule 403.

### VII.   The Court Should Admit Evidence of the Defendants' Compensation and Purchases of Property

At trial, the Government intends to offer evidence relating to the defendant's stock holdings and compensation during the time period of the charged scheme. The Government intends to offer evidence that according to Nikola's June 15, 2020 registration statement, the defendant was the beneficial owner of 91,602,734 shares of Nikola, representing 25.4% of outstanding stock. The evidence will show that in light of the defendant's substantial holding of shares, he was incentivized to increase the stock price to grow his wealth and is thus admissible to show the defendant's motive.

For example, the defendant was able to grow his wealth from roughly $1 billion to $3 billion by tripling the share price of $11.64—which is where the SPAC was trading the day it announced a combination with Nikola—to $33.69—which is where the price was the day Nikola was officially listed on the Nasdaq. Additionally, the evidence will show that the compensation plan put into place when Nikola went public made the entirety of the defendant's compensation dependent on the trading value of Nikola's stock. Specifically, the defendant was entitled to a "performance" award of stock if Nikola's stock reached and maintained certain threshold prices for twenty consecutive days. Thus, under the terms of the compensation plan, if Nikola's stock hit and maintained a price of $55 for twenty consecutive days, the defendant would have been entitled to over $267 million in additional stock. In short, the evidence will show that the defendant's sizeable holding of shares and his compensation plan motivated him to increase Nikola's share price, both to maximize the value of his shares and to be awarded additional shares of stock.

The Government also intends to offer evidence that after the defendant founded Nikola, he repeatedly sold Nikola stock and used the proceeds to purchase property. Specifically, the

defendant purchased multiple multi-million dollar properties in Utah, a property in an airline community in Wyoming, a property in Arizona, and a property in Turks and Caicos, along with five airplanes and multiple luxury sportscars. The evidence will show that the defendant made these purchases by selling stock and using the proceeds to purchase the property, or by trading stock for the property. For instance, in 2020, the defendant exchanged stock for a Gulfstream aircraft from another investor. In the same year, the defendant negotiated to extinguish a promissory note on a $32.5 million ranch in Utah by giving the noteholder Nikola stock. The defendant also attempted several transactions where he intended to pay in stock or stock options that were subject to a lockup, and in an effort to complete those transactions, the defendant pressured Nikola's board to shorten the restriction on his sale of stock.

This evidence is admissible to prove the defendant's motive to perpetrate a securities and wire fraud intended to raise and maintain Nikola's stock price. Courts routinely admit such evidence. *See, e.g.*, *United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (evidence of the defendant's substantial wealth and compensation—over $200 million in two years—properly admitted, including because it was "relevant to [the defendant's] motive to protect his reputation and that of [his company]") (collecting cases); *United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001) (evidence of defendants' income "relevant to demonstrate that financial gain was the motive for the crime charged") (cited in *Quattrone*); *United States v. Weiss*, 914 F.2d 1514, 1523-24 (2d Cir. 1990) (evidence of defendant's wealth was not prejudicial when Government argued that it showed defendant's motive to commit Medicare fraud) (cited in *Quattrone*); *United States v. Bulgin*, 563 F. App'x 843, 846 (2d Cir. 2014) ("we have upheld a district court's decision to allow evidence of monetary gain when a defendant is on trial for a crime in which pecuniary gain is the

36

usual motive") (internal quotation marks omitted); *United States v. Peters*, 543 F. App'x 5, 10 (2d Cir. 2013) ("The record shows . . . that the district court appropriately limited the prosecution's references to the defendant's lifestyle, and that some evidence of the defendant's wealth was relevant to the question of motive.").

The evidence of the defendant's compensation is directly relevant to show the defendant's motive to keep the stock high. The district court's decision in *United States v. Ferguson*, No. 06 Cr. 137 (CFD), 2007 WL 4240782, at *1 (D. Conn. Nov. 30, 2007), is instructive. There, the defendant—also coincidentally named Milton—argued that his compensation while at AIG was inadmissible. The court disagreed, holding that "[t]he evidence concerning Milton's deferred compensation plan is relevant to proving motive, because AIG's performance affected Milton's benefits under the plan" and therefore "Milton's financial interest in AIG's performance . . . is relevant to Milton's motive to manipulate AIG's financial statements to maintain AIG's stock price." Here too, the defendant's net worth and his future compensation were both tied to Nikola's stock price performance, and therefore evidence of his stock holding, wealth, and compensation are relevant to the defendant's motive to attempt to raise and maintain the stock price.

Similarly, evidence of how the defendant sold and exchanged stock and used it to buy property is relevant to the defendant's motive. Such evidence establishes that the value of Nikola's stock was important to the defendant's ability to purchase property that he wanted. Absent such evidence, the jury could be left with the incorrect impression that the defendant did not care about the value of his stock holdings, that they were not important in his day to day life, or that he did not intend to cash out his stock. Thus, for the jury to understand the defendant's motive to commit fraud, it is necessary to present evidence of both how manipulation of Nikola's stock price affected

the defendant's total stock holding, and how the value of those holdings was important to the defendant at the time he was engaged in fraud.

Accordingly, evidence of the defendant's stock holdings, his compensation plan, and instances in which he sold or traded stock for property is relevant and admissible at trial.

## VIII.   Statements of Nikola Employees Are Admissible Under Rule 801(d)(2)(D)

The Government expects that the evidence will show that all Nikola employees reported directly or indirectly to the defendant, who was the CEO and later Executive Chairman of the company. In the course of those employees' employment, they communicated with each other about, among other things, engineering, product development, the defendant's directions to them, and the defendant's statements about the company. At trial, the Government expects to introduce emails and text messages among employees about those topics. Those statements are admissible for their truth under Federal Rule of Evidence 801(d)(2)(D), because they were made within the scope of the employees' employment under the defendant.

### A.      Applicable Law

Federal Rule of Evidence 802 generally bars hearsay, which is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). However, Rule 801(d)(2)(D) provides that a statement is not hearsay if "[t]he statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship while it existed." To fall within this exception, the Government must establish: "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992).

For purposes of Rule 801(d)(2)(D), an agency relationship can exist between two employees at the same company. "[W]hen a statement made by one corporate employee" is sought to be introduced against a defendant "employee, instead of the corporation," admissibility "depends on the relationship between the declarant and the defendant." *Zaken v. Boerer*, 964 F.2d 1319 (2d Cir. 1992). Applying that standard, the Second Circuit has held that, if the defendant runs the company or organization, statements made by employees who are responsible to that defendant may be admitted under the Rule. For example, in *United States v. Rioux*, the Second Circuit considered whether statements made by supervisors in a sheriff's office were admissible against the defendant sheriff. 97 F.3d 648, 660 (2d Cir. 1996). The Court found that the statements were properly admitted, even though the defendant did not "control[] the daily tasks" of the supervisors and some of the supervisors operated under a "Supervisory Special Deputy Sheriff," rather than the defendant. *Id.* It was sufficient, the Court explained, that the supervisors "were answerable and directly responsible to [the defendant], who directed the sheriff's office operations." *Id.*; *see also Zaken*, 964 F.2d at 1323 (admitting statements of vice president against president because declarant was "directly responsible" to the president, who directed the company's operations).

If the required relationship exists between the employee and the defendant, the employee's statements are admissible under Rule 801(d)(2)(D) if the statements were made during and within the scope of the declarant's employment. The employee does not need to be "the final decisionmaker" on a matter for that topic to fall within the scope of employment. *Rioux*, 97 F.3d at 661. "Rather, he [or she] need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement." *Id.* That includes topics on which the employee provides input so that the defendant can make "informed decisions." *Id.*

"Whether a statement concerns a matter within the scope of employment/agency under . . . [Rule 801(d)(2)(D)] is [a] preliminary matter to be determined by the trial court." *Penguin Books U.S.A. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 261 (S.D.N.Y. 2003). The question for the court is "whether or not a juror could reasonably find that the admission was made within the scope of employment/agency or within the speaking authority." *Id.* (citing *O'Neal v. Esty*, 637 F.2d 846, 851 (2d Cir. 1980)).

### B.      Discussion

At trial, the Government expects to offer statements made by several Nikola employees who reported to the defendant. Those employees include engineers who reported directly or through an intermediate supervisor, marketing employees who worked directly with the defendant, and other members of the company's executive suite. Early employees of Nikola, like the engineers who worked on Nikola's first semitruck, are expected to testify that they reported directly to the defendant. The Government also expects that the employee witnesses will testify that even as the company grew, the defendant was still very hands on, eschewing corporate structure, and dealt directly with employees. For instance, employees who worked on Nikola's pickup truck project in 2020 are expected to testify that the defendant spoke and tasked them directly.

During the direct examination of some of these employees, the Government will offer emails and text messages written by the employees in the course of their employment. Many of these messages will not be offered for their truth, but rather as context for the defendant's

statements or for their effect on the listener.[7] But to the extent the statements are being offered for their truth, they are plainly admissible under Rule 801(d)(2)(D).

Here, the Nikola employees that the Government expects to call at trial—engineers, individuals in the marketing department, and other executives—were also the defendant's employees for purposes of Rule 801(d)(2)(D). The defendant was Nikola's CEO and then Executive Chairman prior to and throughout the period covered by the Indictment. Witness testimony and internal Nikola emails will show that he "directed the [company's] operations" and was a hand-on manager, actively supervising the company's employees. *See Rioux*, 97 F.3d at 660 (finding declarant was employee of defendant when defendant had control over organization). Indeed, each of the employees who will testify was "answerable and directly responsible to [the defendant]." *Id.* The other members of the senior leadership team at Nikola—specifically, Mark Russell (the president), Kim Brady (the chief financial officer), Britton Worthen (the chief legal officer), and Joe Pike (chief human resource officer)—ran important facets of Nikola's business and reported directly to the defendant. *See Zaken*, 964 F.2d at 1323 (finding vice president was defendant president's employee). The other employees—specifically, engineers, vehicle designers, and employees in the marketing department—worked right under those executives, and communicated directly with the defendant to give him advice and information about their areas of expertise. *See Rioux*, 97 F.3d at 660 (holding declarants were employees of defendant when they reported to supervisor who worked directly with the defendant). In short, while Nikola was a

---

[7]     The Government also anticipates that these statements will be admissible under Rule 801(d)(1)(B) if the defendant implies through attorney argument or cross-examination that the witness is not telling the truth, is acting based on an improper motive, or said something inconsistent previously.

billion dollar corporation, it was fundamentally tight-knit, and the employees who are expected to testify answered directly to the defendant.

The types of email and text message statements that the Government expects to introduce at trial fall comfortably "within the scope" of the declarants' work for the defendant. Fed. R. Evid. 801(d)(2)(D). The statements relate to the status of development of Nikola's products, problems or delays in the development of the products, and issues concerning comments that the defendant made publicly concerning Nikola's products and reservations. Addressing these issues was the day-to-day work of Nikola employees, including the executives. *See Rioux*, 97 F.3d at 661 (holding that a statement is within the scope of a declarant's employment if the declarant is "an advisor or other significant participant" in making decisions about the subject).

Some of the statements of the employees that the Government will offer into evidence could be interpreted as critical of decisions or statements by the defendant. For example, in one text message exchange, two employees communicate about problems associated with the defendant's plan for developing a battery at Nikola. In another text message exchange, two engineers question the development schedule and overall development plan for Nikola's concept pickup truck, the Badger. In a third example, employees within the marketing department emailed about inaccuracies in a podcast interview by the defendant. All of those statements are admissible. That some of the statements at issue may have been damaging for Nikola or the defendant is of no moment. For the statements to fall within the scope of that relationship, they need only "relate[] to a matter within the scope of the agency." *Pappas*, 963 F.2d at 537. "The authority granted in the agency relationship need not include authority to make damaging statements, but simply the authority to take action about which the statements relate." *Id.* at 537. Thus, the Circuit has

explained that a nurse's statement to a patient about purging files in a doctor's office was admissible against the doctor both because helping to maintain files was within the scope of the nurse's work and because discussing such matters with patients was within the scope of her work, even if "file purging" was not. *United States v. Lauersen*, 348 F.3d 329, 340 (2d Cir. 2003). Because the statements in these emails and messages similarly relate to the scope of the employees' work for Nikola, they are similarly admissible against the defendant.

## **CONCLUSION**

For the reasons set forth above, the Court should grant the Government's motions *in limine*.

Dated: New York, New York
June 20, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York

By:    _s/_____
Jordan Estes
Matthew Podolsky
Nicolas Roos
Assistant United States Attorneys
One Saint Andrew's Plaza
New York, New York 10007
Telephone: (212) 637-2543/1947/2421