

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

September 22, 2022

**BY ECF**

The Honorable Edgardo Ramos
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

     Re:   *United States v. Trevor Milton,* **S1 21 Cr. 478 (ER)**

Dear Judge Ramos:

     The Government writes in opposition to the defendant's September 21, 2022, letter motion objecting to the testimony of individual retail investors. The eleventh-hour motion comes on the eve of testimony of a class of witnesses who have been on the Government's witness list since well prior to trial. The defendant's motion significantly misstates the law and would have the Court preclude witnesses from testifying because they did not read a prospectus or a press release—an outcome unsupported by, and in fact contrary to, legal precedent. This is all the more so here, where the witness testimony and documents in evidence demonstrate that the defendant targeted retail investors—particularly individuals who trade through online brokerage accounts and phone applications like Robinhood—which therefore makes testimony from those witnesses highly relevant to proving materiality. The motion should be denied.

    I.   Factual Background

     The evidence adduced at trial has demonstrated that after Nikola announced a business combination in March 2020 that would take the company public, the defendant made false statements on social media, during television interviews, and on podcasts in order to convince investors to buy his company's stock. Those misrepresentations were targeted at retail investors, and the evidence has been overwhelming, and not meaningfully disputed on that point. The evidence has also demonstrated that the defendant targeted this investor class in order to increase his company's share price.

     The defendant "had a large following of retail investors and individuals" that were buying the company's stock. (Tr. 1084.) He was "excited about and focused on" the retail investors. (Tr. 1086.) For instance, he bragged on a podcast that by going public, Nikola "let the retail investors

come in . . . they get to ride the ride with us and that's the advantage." (GX-425.)  He "would sometimes say the Robinhood wing of the market or the Robinhood investors" were "the kind of investor he was targeting." (Tr. 1089.)  Those are "people who tend to be retail investors or people who are investing maybe without the help of a bank or a brokerage." (Tr. 1195.)  Milton took credit for "bring[ing] the retail investors," and "would say that he was a very effective communicator and was able to utilize social media and other mediums to be able to communicate with the average investor." (Tr. 963.)  Those communications were focused "more [on] retail" than institutional investors. (Tr. 1169.)  And the defendant understood that the changes in Nikola's stock price were "coming from retail investors, individuals who were trading from their own account." (Tr. 963.)  In one email to members of the board the day before Nikola announced its business combination, Milton wrote, "We … need to make sure we are getting retail investors on our side.  That is what prevents the stock short selling.  This is super important to me." (GX-224.)

The Government also anticipates that the jury will hear additional evidence about how the defendant was targeting retail investors, and who those investors were, from Kim Brady, who will testify later this week.

The Government intends to call multiple retail investor witnesses who are expected to testify that they heard the defendant's statements on television, podcasts, and/or on social media; they purchased Nikola's stock; and that the defendant's statements were significant information in making their investment decisions.  Understandably, these witnesses would testify, if asked, that they did not review every single corporate filing, press release, website post, article, tweet, television program, or podcast in the universe about Nikola.  But they will testify that they made considered investment decisions after hearing the defendant's statements.  To be clear, none of them invested as a result of random chance, without any information, or as a result of some wholly idiosyncratic view.

II.  Retail Investor Testimony Is Relevant and Admissible

A.  Applicable Law

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401.  "To be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).  So long as evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence," it is relevant. *United States v. Quinones*, 417 Fed. Appx. 65, 68 (2d Cir. 2011).

A conviction for securities fraud pursuant to 15 U.S.C. § 78j(b), which is the offense charged in Count One of the Superseding Indictment, requires proof that, among other things, the defendant made a material misrepresentation.  "A misstatement in a securities transaction is material if there is 'a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision.'" *United States v. Gramins*, 939 F.3d 429, 444-45 (2d Cir. 2019) (quoting *United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018)).

"A misrepresentation is important to a reasonable investor, in turn, if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

The nature of a "reasonable investor" "may vary . . . with the nature of the traders involved in the particular market." *Litvak*, 889 F.3d at 64. *Litvak*, the case principally relied on by the defendant, illustrates this point. There, a broker-dealer who traded in residential mortgage-backed securities was charged with lying to his trading counterparties—large investment managers with trillions of dollars under management—about the prices at which he was purchasing bonds. *Id.* at 59-63. At trial, the government called two employees of sophisticated investment firms that testified that the defendant was in fact their agent—a "critical point" of testimony that all parties eventually conceded was not factually or legally correct. *Id.* at 63-64. The defendant was convicted but the Second Circuit vacated the judgment and remanded for a new trial. The Second Circuit rejected the defendant's categorical challenge to materiality, and held that testimony from victims about "their own point of view" was "permissible in a case like this . . . so long as the testimony about the significance of the content of a defendant's misstatement and each trader's 'point of view' is shown to be within the parameters of the thinking of reasonable investors in the particular market at issue." *Id.* at 65. In other words, the Circuit added, "there must be evidence of a nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in that market." *Id.* The problem in *Litvak*, then, was that "the lack of agency relationship [was] undisputed," so the investor's "wrong" and "incorrect" point of view were not "relevant to prove what a reasonable investor, neither confused nor incorrect, would have deemed important." *Id.* at 69. Therefore, the court concluded, "[w]hile the individual views of a counterparty trader may usually be relevant to the nature of the market involved and as to the beliefs of a reasonable investor, a reasonable investor would not misperceive the role of a broker-dealer in the RMBS market." *Id.*

Following *Litvak*, another broker defendant challenged his conviction on the ground that the counterparty witness's testimony suffered from the same relevancy problems articulated in *Litvak*. *See Gramins*, 939 F.3d at 448-50. But in *Gramins*, the counterparty witness testified about the materiality of the defendant's misrepresentations without erroneous citation to an agency relationship. Distinguishing *Litvak* based on its unusual facts, the Second Circuit held that because the point of view of the investor was not "admitted to be wrong" and therefore not "erroneous or idiosyncratic," it "did not fall within the specific category of irrelevant testimony prescribed by *Litvak*" and was relevant to the issue of materiality. *Id.* at 450.

There are three takeaways from *Litvak* and *Gramins* that direct the outcome here. First, "individual views" of investors "may usually be relevant to the nature of the market involved and as to the beliefs of a reasonable investor." *Litvak*, 889 F.3d at 69; *Gramins*, 939 F.3d at 449-50. Second, the particular market matters in assessing the reasonableness of investors. Thus, "[t]he reasonable investor in a market in which many individual investors trade will be deemed to be somewhat less schooled and sophisticated than a reasonable investor in a market," like the one in *Litvak*, "in which only institutions trade with the help of complex computer programs and professional traders." *Litvak*, 889 F.3d at 69. Third, "point of view" testimony from an investor

in a market does not "fall within the specific category of irrelevant testimony" unless it is so "erroneous or idiosyncratic" that it is "admitted to be wrong." *Gramins*, 939 F.3d at 450.

### B.   Discussion

Here, the testimony of retail investors into Nikola's stock is plainly relevant to the materiality issue at trial. Unlike in *Litvak*, the relevant market here is the public stock market, and in particular retail traders who trade on their own, and buy and sell through web platforms like Robinhood. Thus, the focus for the jury will be whether a reasonable investor in the public, retail market for Nikola's stock deemed the defendants' misstatements material. *Litvak*, 889 F.3d at 69; *Gramins*, 939 F.3d at 449-50. The Government witnesses are quintessential retail investors—there is nothing idiosyncratic about how or why they invested. They did not harbor any erroneous beliefs about investing—that is, besides believing the defendant's false statements.

The defendant argues that these witnesses should be precluded because their expected testimony does not reflect "that of the mainstream thinking of investors in [the NASDAQ] market." (Dkt. No. 181 (quoting *Litvak*, 889 F.3d at 65).) There are several problems with this argument. First, the defendant's parenthetical insertion of "the NASDAQ" before "market" in a quote from *Litvak* is telling. *Litvak* does not say mainstream thinking of everyone in the *entire* stock market. It says mainstream thinking of investors in "the particular market at issue," which here is the retail investor market. *Id.* at 65. The Second Circuit's instruction that who and how "schooled and sophisticated" a "reasonable investor" is depends on the market makes the point that a "market" is not the entire universe of all investors public and private. In other words, there is a clear nexus between the types of investors that the defendant was targeting—retail investors—and the testimony from these witnesses who are mainstream retail investors.

Second, the notion that there is some sort of sophistication or IQ test for determining whether an investor is a reasonable investor is belied by precedent and the purpose of the securities laws. The securities laws were enacted and exist to protect everyday investors from market abuses. The antithesis of that purpose is the defendant's proposed rule: that less sophisticated investors, who do not read SEC filings, are not reasonable investors and are therefore fair game for manipulation, fraud, and abuse without consequence. The law, of course, holds otherwise. If not, "the legality of a defendant's conduct would depend on his fortuitous choice of a gullible victim." *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004) (citations omitted).

Third, the defendant offers nothing other than pure *ipse dixit* for the claim—contrary to both common sense and the testimony of multiple witnesses in this trial—that an investor who does not read every SEC filing is outside the mainstream thinking of investors in a public market like the NASDAQ, and the cases cited by the defendant for the proposition that victim retail investors somehow failed by not reading Nikola's prospectus or all of Nikola's press releases is taken out of context. The decision in *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 963 (2d Cir. 1993), does not support the defendant's position—it says the opposite. There, a group of shareholders of Ames Department Stores sued the company for "disseminat[ing] 32 documents or statements into the market for Ames securities which contained false and misleading statements concerning Ames's financial health." *Id.* at 956. In addition to two prospectuses, the plaintiffs alleged that "false reports, news releases, and other statements paint[ed] quite a rosy picture of

Ames's profitability and future," which was false.  *Id.*  Focusing only on the prospectuses, the district court dismissed the class action, disregarding other statements "directed to the general investing public" that the plaintiffs alleged "independently violated Rule 10b-5."  *Id.*  The Second Circuit in *Ames* held that the district court erred by only looking at the prospectuses since such a view "would eliminate the vast majority of private Rule 10b–5 actions and subvert the 1934 Act's efforts to protect investors from deliberate fraud."  *Id.* at 963.  It was in that context that the Circuit endorsed a broader view of what types of statements could be material: "The securities markets are highly sensitive to press releases and to information contained in all sorts of publicly released corporate documents, and the investor is foolish who would ignore such releases."  *Id.*  In other words, *Ames* does not hold that investors are *per se* unreasonable for not consulting press releases.  Rather, the half-sentence quoted by the defendant—"the investor is foolish who would ignore such releases"—was plainly commentary by the court that a myopic view of what is material disregards the realities of what investors actually look at.

The two other cases cited by the defendant about prospectuses also miss the mark.  In *La Pietra v. RREEF Am., L.L.C.*, 738 F. Supp. 2d 432, 441 (S.D.N.Y. 2010), the plaintiffs invested in a close-end investment fund and then sued the funds' managers.  Notably, the case did not involve material misstatements; only omissions.  The defendant argued that the funds' prospectuses should be considered to be part of the total mix of information, and the court, given the context, unsurprisingly agreed.  *Id.* at 441.  As in *La Pietra*, the plaintiffs in *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1032 (2d Cir. 1993), were purchasers of an interest in a limited partnership, and the court found that the prospectus was an important document in the total mix of information.  In both of these cases, the prospectuses were particularly important because the plaintiffs were not investing in publicly-traded companies, for which there is a lot of information, but rather specific investment vehicles where the prospectus is the principal document containing investment information.  Even still, there is nothing in *La Pietra* or *Brown* that holds that an investor is unreasonable, idiosyncratic, or has acted erroneous by not reviewing a prospectus.  And the Government is not aware of a single case that has held that an individual purchasing stock in a publicly-traded company is not a "reasonable investor" because she or he did not review a particular SEC filing, including the prospectus.  *See, e.g.*, *S.E.C. v. Mozilo*, No. 09 Civ. 3994 (JFW), 2010 WL 3656068, at *9 (C.D. Cal. Sept. 16, 2010) ("a reasonable investor is not required to pore through all prior transcripts of earnings calls, review hundreds of prospectus supplements filed by indirect subsidiaries, or "connect the dots" in a company's various SEC filings").

If anything, based on the evidence that has come into trial to date, the more appropriate question—likely for another day—is whether voluminous SEC filings not necessarily directed at or considered by retail investors should be counted as part of the total mix of information.

Ultimately, whether a misstatement is material is a jury question, and it will be for the jury to determine whether a reasonable investor would find the defendant's misrepresentations important in making decisions to purchase Nikola's stock.  The victim investors' testimony will be relevant to the jury's determination of that question, and therefore the testimony is admissible.

Finally, the Government notes that the defendant's motion is directed only to Count One of the Superseding Indictment, which charges securities fraud under Title 15.  Even if the defendant's position were correct—and it is not—the retail investor witnesses' testimony would

still be highly relevant to the wire fraud charge.  *See United States v. Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) ("The role of the ordinary prudence and comprehension standard in the materiality element is to assure that the defendant's conduct was calculated to deceive, not to grant permission to take advantage of the stupid or careless.").

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:   s/
Jordan Estes
Matthew Podolsky
Nicolas Roos
Assistant United States Attorneys
(212) 637-2543/1947/2421

cc:      Counsel of Record (by ECF)