UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

TREVOR MILTON,

        *Defendant*.

No. 21-cr-478 (ER)

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR A NEW TRIAL AND A JUDGMENT OF ACQUITTAL ON COUNT THREE

Alexandra A.E. Shapiro
Daniel J. O'Neill
Avery D. Medjuck
SHAPIRO ARATO BACH LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880
ashapiro@shapiroarato.com
doneill@shapiroarato.com
amedjuck@shapiroarato.com

Marc L. Mukasey
Torrey K. Young
MUKASEY FRENCHMAN LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
(212) 466-6400
Marc.Mukasey@mfsllp.com
Torrey.Young@mfsllp.com

*Counsel for Defendant Trevor Milton*

# <u>TABLE OF CONTENTS</u>

**Pages**

Table of Authorities.................................................................................................... iii

PRELIMINARY STATEMENT ......................................................................................1

FACTUAL BACKGROUND ..........................................................................................2

    A.  The Indictment And Trial..................................................................................2

        1.  The Government's Allegations.................................................................2

        2.  The Government's Case And Mr. Milton's Defense...................................3

        3.  The Jury Instructions ............................................................................4

    B.  The Verdict And Post-Verdict Juror Statements ................................................7

ARGUMENT ................................................................................................................11

I.  ERRONEOUS AND CONFUSING INSTRUCTIONS ALLOWED THE JURY TO
CONVICT EVEN THOUGH IT BELIEVED MR. MILTON WAS NOT GUILTY ............11

    A.  The Court's Scienter Instructions Were Erroneous, Incomplete, And Confusing ...........11

        1.  The "Willfulness" Instruction For Count One Was Legally Erroneous.....................12

        2.  The Court Erroneously Failed To Instruct The Jury That Intent To Harm Was
An Element of Counts Three And Four ...................................................13

        3.  The Intent Headings In The Written Instructions Misled The Jury............................16

    B.  The Erroneous Instructions Were Highly Prejudicial .......................................17

II.  JUROR NO. 6'S DELIBERATE LIES AT *VOIR DIRE* DEPRIVED MR. MILTON OF
HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.........................................................21

    A.  Juror No. 6 Lied During *Voir Dire* ..............................................................22

        1.  Juror No. 6 Concealed Her Animosity Toward Corporate Executives ......................23

        2.  Juror No. 6 Intentionally Concealed Her Use Of Social Media ..................................26

    B.  Juror No. 6's Misconduct Requires A New Trial..............................................28

i

1.  Juror No. 6 Failed To Honestly Answer Material Questions At *Voir Dire*.................30

2.  Juror No. 6's Deliberate Lies Provided A Valid Basis To Strike Her For Cause....................................................................................................32

C.  At A Minimum, An Evidentiary Hearing Is Required ........................................37

III. THE GOVERNMENT FAILED TO PROVE THE "OBTAINING MONEY OR PROPERTY" ELEMENT OF COUNT THREE...............................................37

A.  Wire Fraud Requires Proof Of A Scheme To Obtain Money Or Property .......38

B.  The Government Failed To Prove That The Object Of The Alleged Count Three Scheme Was Obtaining Money Or Property ....................................................39

CONCLUSION .......................................................................................................42

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                     **Page(s)**

*Alleyne v. United States*,
   570 U.S. 99 (2013) ...................................................................................................19

*Anderson v. Miller*,
   346 F.3d 315 (2d Cir. 2003) ...................................................................................19

*Bryan v. United States*,
   524 U.S. 184 (1998) .................................................................................................12

*Burton v. Johnson*,
   948 F.2d 1150 (10th Cir. 1991) ..............................................................................35

*Carpenter v. United States*,
   484 U.S. 19 (1987) ...................................................................................................38

*Clark v. United States*,
   289 U.S. 1 (1933) .....................................................................................................35

*Conaway v. Polk*,
   453 F.3d 567 (4th Cir. 2006) ...................................................................................35

*Dyer v. Calderon*,
   151 F.3d 970 (9th Cir. 1998) ...................................................................................35

*Green v. White*,
   232 F.3d 671 (9th Cir. 2000) ...................................................................................35

*Kelly v. United States*,
   140 S. Ct. 1565 (2020) ......................................................................................37, 38

*McDonough Power Equip., Inc. v. Greenwood*,
   464 U.S. 548 (1984) ..........................................................................................*passim*

*McNally v. United States*,
   483 U.S. 350 (1987) .................................................................................................38

*In re Murchison*,
   349 U.S. 133 (1955) .................................................................................................28

*Neder v. United States*,
   527 U.S. 1 (1999) .....................................................................................................17

*Parker v. Gladden,*
    385 U.S. 363 (1966) ........................................................................................28

*Pena-Rodriguez v. Colorado,*
    137 S. Ct. 855 (2017) ....................................................................................19

*Pointer v. United States,*
    151 U.S. 396 (1894) ........................................................................................33

*Porcelli v. United States,*
    404 F.3d 157 (2d Cir. 2005) ..........................................................................38

*Safeco Ins. Co. of Am. v. Burr,*
    551 U.S. 47 (2007) ..........................................................................................12

*Salman v. United States,*
    580 U.S. 39 (2016) ..........................................................................................13

*Shillcutt v. Gagnon,*
    827 F.2d 1155 (7th Cir. 1987) ......................................................................19

*Skilling v. United States,*
    561 U.S. 358 (2010) ................................................................................38, 42

*United States v. Aiyer,*
    433 F. Supp. 3d 468 (S.D.N.Y. 2020) ..........................................................20

*United States v. Barnes,*
    604 F.2d 121 (2d Cir. 1979) ..........................................................................28

*United States v. Berkovich,*
    168 F.3d 64 (2d Cir. 1999) ............................................................................16

*United States v. Boney,*
    977 F.2d 624 (D.C. Cir. 1992) ......................................................................35

*United States v. Cassese,*
    428 F.3d 92 (2d Cir. 2005) ......................................................................12, 13

*United States v. Clark,*
    475 F.2d 240 (2d Cir. 1973) ..........................................................................15

*United States v. Colombo,*
    869 F.2d 149 (2d Cir. 1989) ......................................................29, 34, 35, 36

*United States v. Daugerdas,*
  867 F. Supp. 2d 445 (S.D.N.Y. 2012) ....................................................32, 34, 36

*United States v. Dinome,*
  86 F.3d 277 (2d Cir. 1996) ...........................................................................16

*United States v. Dioguardi,*
  492 F.2d 70 (2d Cir. 1974) ...........................................................................19

*United States v. Finazzo,*
  850 F.3d 94 (2d Cir. 2017) ...........................................................................38

*United States v. Guadagna,*
  183 F.3d 122 (2d Cir. 1999) .........................................................................14

*United States v. Ianniello,*
  866 F.2d 540 (2d Cir. 1989) .........................................................................37

*United States v. Jabar,*
  19 F.4th 66 (2d Cir. 2021) ...........................................................................14

*United States v. Kaiser,*
  609 F.3d 556 (2d Cir. 2010) .........................................................................13

*United States v. Kopstein,*
  759 F.3d 168 (2d Cir. 2014) .........................................................................12

*United States v. Kosinski,*
  976 F.3d 135 (2d Cir. 2020) ...................................................................12, 13

*United States v. Langford,*
  990 F.2d 65 (2d Cir. 1993) ...........................................................................31

*United States v. Martinez-Salazar,*
  528 U.S. 304 (2000) .....................................................................................28

*United States v. Maxwell,*
  No. 20-CR-330 (AJN), 2022 WL 986298 (S.D.N.Y. Apr. 1, 2022) ..........................31

*United States v. McCoy,*
  995 F.3d 32 (2d Cir. 2021) ...........................................................................32

*United States v. Middendorf,*
  18-CR-36 (JPO), 2019 WL 4254025 (S.D.N.Y. Sept. 9, 2019) ........................12, 13

*United States v. Moon*,
    718 F.2d 1210 (2d Cir. 1983) .................................................................. 20

*United States v. Nelson*,
    277 F.3d 164 (2d Cir. 2002) .................................................................. 28

*United States v. Newman*,
    773 F.3d 438 (2d Cir. 2014) .................................................................. 13

*United States v. Novak*,
    443 F.3d 150 (2d Cir. 2006) .................................................................. 14

*United States v. Parse*,
    789 F.3d 83 (2d Cir. 2015) ............................................................ *passim*

*United States v. Percoco*,
    13 F.4th 158 (2d Cir. 2021) .................................................................. 15

*United States v. Regent Office Supply Co.*,
    421 F.2d 1174 (2d Cir. 1970) .................................................................. 14

*United States v. Rossomando*,
    144 F.3d 197 (2d Cir. 1999) ...................................................... 14, 15, 16

*United States v. Scott*,
    854 F.2d 697 (5th Cir. 1988) .................................................................. 35

*United States v. Shaoul*,
    41 F.3d 811 (2d Cir. 1994) .................................................................. 32

*United States v. Silver*,
    864 F.3d 102 (2d Cir. 2017) .................................................................. 18

*United States v. Starr*,
    816 F.2d 94 (2d Cir. 1987) .................................................................. 14

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006) .......................................................... 30, 37

*United States v. Torres*,
    128 F.3d 38 (2d Cir. 1997) ...................................................... 29, 32, 33

*Williams v. Bagley*,
    380 F.3d 932 (6th Cir. 2004) .................................................................. 35

**Statutes, Regulations, and Rules**

15 U.S.C. § 78j ....................................................................................................2

15 U.S.C. § 78ff.............................................................................................2, 5, 12

18 U.S.C. § 1343 .................................................................................2, 37, 38, 39

18 U.S.C. § 1348 ................................................................................................2

17 C.F.R. § 240.10b–5.................................................................................2, 8, 18

Fed. R. Crim. P. 29 ...........................................................................................37

Fed. R. Crim. P. 33 ......................................................................................11, 36

Fed. R. Evid. 606.............................................................................................19

**Other Authorities**

2 Sand et al. Modern Federal Jury Instructions, Instruction 44-5 (2022)......................................14

## PRELIMINARY STATEMENT

The extraordinary facts giving rise to this motion establish a disturbing reality: Defendant Trevor Milton was found guilty on three counts even though the jury believed Mr. Milton lacked criminal intent and, if properly instructed, would have acquitted him on all counts. Recent public statements by multiple jurors demonstrate beyond cavil that misleading and erroneous jury instructions caused the jury to believe that criminal intent—an essential element of *all* four counts, and the key disputed issue at trial—was *only* required to convict on Count Two, but not on Counts One, Three, or Four.

Since the verdict was returned, multiple jurors have explained, consistent with one another, that the jury acquitted on Count Two because the government failed to prove Milton's conduct "was anything criminal." To the contrary, the jury believed Mr. Milton "didn't have an intent to harm," "had good intentions," and "did it in good faith." In short, *the jury believed that Mr. Milton was not guilty*. Nonetheless, misled by confusing and erroneous instructions, the jury mistakenly believed the law required it to return guilty verdicts on the remaining counts.

Mr. Milton's trial was also tainted by another startling irregularity involving the jury: Juror No. 6 lied to get on the jury.

The Court posed *voir dire* questions directed at whether potential jurors harbored bias against high-earning executives like Mr. Milton, as well as questions regarding jurors' social media use and media consumption. These topics were critical because the charges revolved around the government's claim that, while CEO and later Executive Chairman of Nikola Corporation, Mr. Milton became a billionaire by lying to investors on social media, in podcasts, and on television. During *voir dire*, Juror No. 6 denied in open court that she held a negative view of wealthy corporate executives and said she does not use social media and gets news solely from YouTube. Each of these responses was a deliberate lie, apparently offered to

increase her chance of getting on the jury.  In fact, Juror No. 6 is an avid social media user whose Facebook and Twitter pages are riddled with attacks on wealthy executives and show a close engagement with the news and current events.  Juror No. 6's social media activity makes clear that, contrary to her sworn *voir dire* responses, she was biased against Mr. Milton and corporate executives like him, but concealed her bias to avoid being struck for cause or by the defense.

An unbroken line of Supreme Court precedents establish that the Constitution requires a criminal conviction to rest upon a determination by an *impartial* jury that the defendant is guilty, beyond a reasonable doubt, of every element of the crime.  That didn't happen here.  In the interest of justice, a new trial is required.

Additionally, the government failed to prove that the object of the scheme alleged in Count Three was obtaining money or property, as required under the wire fraud statute, because there was no evidence that Mr. Milton made any misrepresentations to *obtain money* from any public shareholder of Nikola stock.  Accordingly, acquittal on that count is required.

## FACTUAL BACKGROUND

### A.  The Indictment And Trial

#### 1.  The Government's Allegations

The Superseding Indictment (ECF No. 123) charged Mr. Milton in four counts: securities fraud under 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b–5 (Count One); securities fraud under 18 U.S.C. § 1348 (Count Two); and wire fraud under 18 U.S.C. § 1343 (Counts Three and Four).  As to the first three counts, the government alleged that, between November 2019 and September 2020, Mr. Milton used social media as well as television, print, and podcast interviews to make false and misleading statements, primarily about Nikola's products and technology, in order "to induce retail investors to purchase Nikola stock."  (ECF No. 1 ¶ 3).  The government alleged that Mr. Milton made these statements to enrich himself by inflating the

2

value of Nikola stock (*id.* ¶ 4), even though, in connection with the reverse merger through
which Nikola went public, Mr. Milton agreed to a six-month "lock-up" period extending until
December 2020, during which he could not sell any of his Nikola shares (*id.* ¶¶ 15, 19–20).

With respect to Count Four, the government alleged that Mr. Milton engaged in "a
scheme to defraud in connection with the defendant's purchase of 4,678 acres of property in
Utah in exchange for a combination of cash and Nikola stock options, based on
misrepresentations similar and related to the misrepresentations charged in Counts One through
Three."  (ECF No. 124; *see also* ECF No. 123 ¶ 4).  The government contended that Mr. Milton
convinced a multi-millionaire real-estate investor—Peter Hicks—to sell a Utah ranch in
exchange for a combination of cash and Nikola stock options by telling Hicks "the same lies that
he had told to investors."  (Trial Transcript ("Tr.") 51).

2. <u>The Government's Case And Mr. Milton's Defense</u>

The key issue at trial was whether the government could prove intent to defraud, which
was required for each of the four counts.  The government's evidence focused on "four big
categories" of alleged lies to investors: (1) Nikola's production of hydrogen to power its
vehicles, and the company's cost to produce hydrogen; (2) the timetable for production of
Nikola's Badger pickup truck, and the extent to which Nikola was building the truck "from the
ground up"; (3) the extent to which an early prototype of the company's Nikola One model was
functional when it was unveiled in 2016; and (4) whether contracts customers had signed to pre-
order Nikola trucks were binding purchase orders.  Although there was no direct evidence that
Mr. Milton acted with fraudulent intent, the government argued that Mr. Milton "lied over and
over again" about company weaknesses and had a motive to lie because—even though the six-
month lock-up period prevented Mr. Milton from selling any shares until December 2020—

3

increases in the price of Nikola stock would, eventually, increase Mr. Milton's net worth. (Tr. 3081-83).

The defense focused on the government's failure to prove the requisite criminal state of mind: "What's critical in this case is Trevor's intent, his state of mind, whether he intended to deceive, whether he intended to commit fraud, whether he intended to harm, and not a single Nikola witness could say under oath that Trevor had a wrongful purpose." (Tr. 3095). The defense conceded some of Mr. Milton's statements were perhaps exaggerated or bragging (Tr. 3095, 3149-50) but emphasized that "the government has to prove that Trevor acted with the specific intent to defraud investors, that he had the intent to deceive, the intent to harm by depriving people of money or property, and that he acted with a wrongful purpose" (Tr. 3097).

The defense highlighted the extensive evidence that Mr. Milton did not intend to defraud anyone, including evidence that he (1) made his alleged misstatements openly in public fora, "where anybody could fact-check anything he was saying" (Tr. 3098); (2) was entirely transparent about his desire to increase the value of Nikola stock (Tr. 3100); (3) believed using social media to connect with retail investors would build long-term value for Nikola (Tr. 3102-03); (4) was focused—like everyone within the company—on Nikola's business model and intended to refer to the company's *future* plans, rather than its present achievements (Tr. 3104-05, 3118-22); (5) wasn't even sure Nikola would go public until long after many of his alleged misstatements were made (Tr. 3106-09); (6) knew investors had access to Nikola's SEC filings and pointed investors to them (Tr. 3133-34); and (7) in any case, couldn't have sold his shares until December 2020 and—even then—could only sell a portion (Tr. 3111).

### 3. The Jury Instructions

Consistent with its theory of the case, the defense requested that the Court give legal instructions that would focus the jury on the government's burden to prove Mr. Milton acted

with the necessary criminal intent in connection with each count.  The government, by contrast, repeatedly requested instructions that would lower its burden on scienter and consistently objected to Mr. Milton's proposed instructions.  Ultimately, the Court gave a charge that substantially lowered the government's burden to prove criminal intent:

      a.   *Count One*

In connection with Count One's requirement that the government prove Mr. Milton acted "willfully," *see* 15 U.S.C. § 78ff(a), Mr. Milton requested an instruction that "[a] person acts willfully if he acts intentionally and purposely and with the intent to do something the law forbids, that is, with the bad purpose to disobey or disregard the law."  (Tr. 2868; *see also* ECF No. 167 at 30).  The government requested an instruction that willfulness is proven so long as a person acts "deliberately and with a wrongful purpose."  (ECF No. 129 at 12).

Over objection (Tr. 2868-69), the Court diluted the charge beyond even what the government requested, instructing the jury that "[t]o act willfully means to act voluntarily and with a wrongful purpose."  (Tr. 3208).

      b.   *Counts Two, Three, and Four*

With respect to Counts Two, Three, and Four, Mr. Milton repeatedly asked the Court to instruct the jury that to obtain a conviction, "the government must prove that Mr. Milton had *both* an intent to deceive the alleged victims of the scheme *and* an intent to harm the alleged victims by depriving them of money or property."  (Tr. 2890; *see also* Tr. 2895-96, 2898-99, 2934, 2944-48; ECF No. 167 at 40-43, 57, 70, 73; ECF No. 204) (emphasis added).  The government objected in substantial part to Mr. Milton's proposed instructions as to wire fraud (*see*, *e.g.*, Tr. 2900, 2934, 2944) and instead proposed instructions that would obscure its burden to prove intent to harm (ECF No. 129 at 21-27).  As to Count *Two*, however, the government reluctantly accepted Mr. Milton's proposal that the instructions state, simply and clearly, that the

government was required to prove Mr. Milton intended to deceive his alleged victims *and* intended to harm them by depriving them of money or property.  (Tr. 2890-93).

The final instruction on Count Two was explicit that, "[t]o prove specific intent to defraud, the government must prove that Mr. Milton intended to deceive the alleged victims and intended to harm them by depriving them of money or property."  (Tr. 3211).  On Counts Three and Four, however, the Court declined to specifically instruct that intent to harm was required to convict (*see* Tr. 3212-18), even though the defense requested such an instruction and the government conceded "an instruction that says there must be intent to harm by depriving someone of money or property" was appropriate (Tr. 2917; *see also* Tr. 2908).

### c.  *The Good Faith Instruction*

The Court apparently concluded that the good faith instruction would obviate the need for a specific instruction on intent to harm on Counts Three and Four.  (Tr. 2895-96).  The good faith instruction, however, did not mention the intent to harm requirement of wire fraud; it only mentioned the intent to *deceive* element.  (*See* Tr. 3219).  And, to the extent the good faith instruction mentioned harm at all, it did so only in "no ultimate harm" language—given over defense objection (Tr. 2957-59)—telling the jury that a belief "that no investors would lose any money does *not* necessarily constitute good faith."  (Tr. 3219) (emphasis added).  The instruction nowhere acknowledged the government's burden to prove an intent to harm.

### d.  *The "Criminal Intent" Heading For Count Two*

In its requests to charge, the government included a section heading using the phrase "Criminal Intent" for Count Two's intent element.  (ECF No. 129 at 19).  The government's proposed instructions for the remaining counts, by contrast, did not use that phrase to describe the required scienter and instead used the terms "Knowledge, Intent, and Willfulness" for Count One (*id.* at 12) and "Knowing Participation in Scheme with Intent to Defraud" for Counts Three

and Four (*id.* at 26).  Mr. Milton's proposed instructions used the neutral term "intent to defraud" in the headings for each count.  (ECF No. 167).

The Court substantially adopted the government's approach.  The written instructions given to the jury during deliberations described Count Two's scienter requirement under the heading "**Second Element:  Criminal Intent**," whereas the headings for the scienter requirements for Counts One and Three and Four were "**Second Element:  State of Mind**," and "**Second Element:  Knowing Participation in Scheme with Intent to Defraud**."  (*See* Declaration of Torrey K. Young ("Young Decl.") Ex. A at 9, 12, 15).  These headings—which the jurors apparently relied on, as discussed below—also appeared in the table of contents to the instructions provided to the jury.  (*See id.*).

**B.  The Verdict And Post-Verdict Juror Statements**

On October 14, 2022, the jury returned a mixed verdict of not guilty on Count Two and guilty on Counts One, Three, and Four.  (Tr. 3261).  After the jury was dismissed, four jurors voluntarily (and unsolicited by the defense) gave statements discussing the verdict to the press or on social media.  (*See* Declaration of Jonathan Mansbach ("Mansbach Decl.") Exs. A-D, I, M).  In explaining the apparent inconsistency between the acquittal on Count Two (which alleged the same conduct as Counts One and Three and required essentially the same mens rea as those counts) and the verdict of guilty on the other charges, jurors consistently said that Mr. Milton lacked "criminal intent" or "intent to harm," which they believed was required on Count Two, but not on Counts One, Three, or Four.

1.  On October 27, 2022, the *Wall Street Journal* published an article based on conversations with Jurors Nos. 1, 5, and 6.  (*See* Mansbach Decl. Ex. C).  Quoting Juror No. 5, the article detailed how the jury's "big hangup" was the term "criminal intent," which was "emphasized in bold as a header [in the written instructions]" only for Count Two and which the

jury believed the government had failed to prove, causing the jury to acquit on Count Two.  The

article explained that the jury voted to convict on Count One without detailed discussion of Mr.

Milton's intent because "the jury believed it only needed to find that Mr. Milton's conduct met

one of three criteria in that count [*i.e.*, any of the three types of conduct described in Rule 10b-5],

simplifying the discussions." (*Id.* at 3).  The article quoted the three jurors as saying:

- Juror No. 5:  "*It was definitely [the phrase 'criminal intent'] that was a big hangup.*" (*Id.* at 3).

- Juror No. 1:  "*We think he had good intentions with Nikola.  It just didn't come into fruition as quickly as he wanted to.  That made him do unsavory things to get it done. But the criminal part of it?  We didn't feel it was anything criminal.*" (*Id.* at 4).

- Juror No. 6:  "*We thought that he didn't have an intent to harm.*" (*Id.*).

2. In an interview published on October 16, 2022, Juror No. 6 again discussed the jury's

thought process in reaching the inconsistent verdict.  (*See* Mansbach Decl. Ex. A).  In response

to a question about the difference between Counts One and Two, and why the jury acquitted on

Count Two, she explained:

- "*In the first one he had to meet one of the 3.  In the second he has to meet all 3... We believed he didn't intend to harm anyone.*" (*Id.* at 2).

- "*We understand people got hurt who bought his stock but we thought he did it in good faith.  We thought he was trying to get rich and build a valuation and bring everyone wealth at the same time.*" (*Id.*).

- "*Did he exaggerate?  And lie?  Yes but did he do it with the intent to say hey I'm going to screw these individuals over[?]  That wasn't in the case.*" (*Id.* at 3).

3. In a recorded interview published on November 10, 2022, Juror No. 6 confirmed that

the jury believed the government had failed to prove that Mr. Milton acted with criminal intent,

but nonetheless returned a guilty verdict on Counts One, Three, and Four because it believed that

the government did not need to prove specific intent in connection with those counts:

8

Interviewer:  "*Just so I get this right, count 1 only needed one of the three requirements to be found guilty and count 2 needed all three requirements to be found guilty.  Is that right?*"

Juror No. 6:  "*That is how we interpreted it, yeah.  It was count 2 where we just had an issue.*"

Interviewer:  "*I am assuming intent was that missing element from.*"

Juror No. 6:  "*Yeah, intent to harm, yeah*"

Interviewer:  "*So criminal intent was missing in the 4-week trial?*"

Juror No. 6:  "*Yeah.*"

Interviewer:  "*So unlike count two, intent was not required to convict in counts 1, 3 or 4?*"

Juror No. 6:  "*Yeah, because intent was not required on 1, 3, or 4*"

Interviewer:  "*Okay*"

Juror No. 6:  "*It was, you know… Did he do it?  And we are like ok he did it, yeah*"

(Mansbach Decl. Ex. D at 10).

Juror No. 6 and the interviewer also discussed the written instructions provided to the

jury:

Juror No. 6:  "*We read through it and we were like okay so, according to this, he needs to be meeting the criteria.*"

Interviewer:  "*Okay, so as far as the verdict, from what I have seen online, it seems like a lot of people are confused as to why count 1 was guilty but count 2 was not guilty.*"

Juror No. 6:  "*Criminal intent is why we found him not guilty on the second count.  The first count was like okay did he commit fraud, did he do this, did he do that, but the second one was like, did he intend to harm anyone, and that is where we were split actually, and most of us thought that he didn't intend to harm anyone.*"

Interviewer:  "*So I saw [Juror No. 9] in an interview said, if the prosecutors fell short on proving intent to harm during the trial, or actually that was the interviewer, I can't remember which one it was on, but he asked him if the prosecutors fell short on proving intent to harm during the trial, [Juror No. 9] responded, you nailed it, that was the one*"

9

> *area the jury couldn't find sufficient evidence for. Is that how you would explain it as well?*"
>
> Juror No. 6: "*Yeah, yeah that is exactly it.*"

(*Id.* at 11).

Juror No. 6's remarks in these interviews mirrored comments she posted on social media soon after the verdict. On October 14, 2022, she tweeted: "The only reason he wasn't found guilty on both securities [counts] was that he didn't intend to harm anyone." (Mansbach Decl. Ex. I at 10). Two days later, in response to a comment about the mixed verdict and a subsequent question asking what the second charge was, she tweeted "Criminal intent to harm." (*Id.* at 16).

4.   In an interview published October 17, 2022, a fourth juror—Juror No. 9—discussed the jury's thought process in reaching the inconsistent verdict:

> "*That being said on Count 2 that I've seen many questions on after looking up to see what the public thought was he was close to being convicted he reached 2/3 requirements and we began discussing the third it was then that I reread the charge and noticed that while similar to count 1 count 2 had to meet ALL requirements. When asking if anyone noticed any evidence to suggest the government had met this criteria we found they fell short.*" (Mansbach Decl. Ex. B at 2).

Writing under the Twitter handle @LitmusGaming, he tweeted the same explanation:

> "*No problem in regards to count 2 the law stated the gov had to meet all requirements to convict. They fell just short in our view therefore by law he was innocent maybe a different jury would have decided different but that was our decision.*" (Mansbach Decl. Ex. M at 3).

And in response to a tweet remarking that the prosecutor "fell short on his job to prove intent to harm," he tweeted:

> "*You nailed it that was the one area we couldn't find sufficient evidence for.*" (*Id.* at 4).

**ARGUMENT**

**I.    ERRONEOUS AND CONFUSING INSTRUCTIONS ALLOWED THE JURY TO CONVICT EVEN THOUGH IT BELIEVED MR. MILTON WAS NOT GUILTY**

It is indisputable that to obtain a conviction the government was required to prove that Mr. Milton acted with criminal intent in connection with *each* count—not just Count Two. However, the jury acquitted on Count Two because it couldn't conclude Mr. Milton's conduct "was anything criminal" and believed Mr. Milton "had good intentions," "did it in good faith," and "didn't intend to harm anyone."  (Mansbach Decl. Ex. A at 2, Ex. C at 4, Ex. D at 11, Ex. I at 10).  Those unequivocal findings were tantamount to a conclusion that Mr. Milton was *not guilty on any count* and should have resulted in verdicts of not guilty on all counts.

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Here, the instructions allowed the jury to convict without finding the mens rea required for each of the charges.  The record establishes that these instructional errors were not harmless and that the jury would have acquitted on all counts if properly instructed as to the intent elements of Counts One, Three, and Four.  Under these circumstances, the interest of justice plainly requires a new trial.

**A.  The Court's Scienter Instructions Were Erroneous, Incomplete, And Confusing**

It is unsurprising that the jury convicted Mr. Milton on Counts One, Three, and Four even though it apparently believed he acted in good faith and without intent to harm, because the jury instructions regarding intent for those counts were erroneous or, at best, highly confusing. "Instructions are erroneous if they mislead the jury as to the correct legal standard or do not adequately inform the jury of the law…. Objectionable instructions are considered in the context of the entire jury charge, and reversal is required where, based on a review of the record as a

11

whole, the error was prejudicial or the charge was highly confusing."  *United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014).  That is what happened here.

    1.  <u>The "Willfulness" Instruction For Count One Was Legally Erroneous</u>

    To establish a criminal violation of the Securities Exchange Act of 1934, the government must prove beyond a reasonable doubt that the defendant acted "willfully."  15 U.S.C. § 78ff(a); *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005).  The Supreme Court has held that "to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful."  *Bryan v. United States*, 524 U.S. 184, 191-92 (1998).  *Bryan* involved a firearms offense, but willfulness has the same meaning for securities fraud:  As the Second Circuit recently explained, *Bryan*'s "definition of willfulness is generally applicable" and requires, for securities fraud, proof of the defendant's "knowledge that the conduct is unlawful."  *United States v. Kosinski*, 976 F.3d 135, 154 (2d Cir. 2020); *accord Cassese*, 428 F.3d at 104 (Raggi, J., dissenting); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 n.9 (2007) ("[A] defendant cannot harbor [willful] criminal intent unless he acted with knowledge that his conduct was unlawful.").

    Here, Mr. Milton requested an instruction essentially identical to the one the Second Circuit approved in *Kosinski*—that "[a] person acts willfully if he acts intentionally and purposely and with the intent to do something the law forbids, that is, with the bad purpose to disobey or disregard the law."  (Tr. 2868; *see also* ECF No. 167 at 30).  But instead of giving that instruction, the Court accepted the government's argument that an unreported, pre-*Kosinski* district court case, *United States v. Middendorf*, "made clear that willfulness does not require a desire to violate the law, but merely, as your Honor points out here, with a wrongful purpose." (Tr. 2868).  The Court's instruction substantially diluted the "willfulness" requirement by

erroneously instructing the jury that "a wrongful purpose"—rather than a "purpose to disobey or disregard the law"—sufficed to prove willfulness.  (Tr. 3208).

That instruction was erroneous.  As explained, the defense's proposed instruction tracked governing law, including the charge approved in *Kosinski*.[1]  Contrary to the government's claim, *Middendorf* does not represent a "development" in the law as to the willfulness required in securities fraud cases.  In fact, *Middendorf* was a *wire fraud* case in which the court specifically observed and relied on the fact that, unlike for securities fraud, "'willfulness' is not included in the wire fraud statute itself."  *United States v. Middendorf*, 18-CR-36 (JPO), 2019 WL 4254025, at *7 (S.D.N.Y. Sept. 9, 2019).  In any event, *Middendorf* is immaterial given the Second Circuit's more recent confirmation that "willfulness" requires, at minimum, general knowledge of unlawfulness.[2]  *Kosinski*, 976 F.3d at 152-55.  The instruction here improperly eroded that requirement.

2. <u>The Court Erroneously Failed To Instruct The Jury That Intent To Harm Was An Element of Counts Three And Four</u>

The Court's failure to instruct the jury that the government had to prove Mr. Milton intended to harm his alleged victims to obtain convictions on Counts Three and Four was also legal error.  It is black letter law that for wire fraud, the government "must demonstrate that the defendant had a conscious knowing intent to defraud *and* that the defendant contemplated or

---

[1] Some courts, including *Middendorf*, had previously interpreted *United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010), as holding that willfulness does not require a showing that defendant was aware of the unlawfulness of his conduct.  However, *Kosinski* clarified that *Kaiser* merely held that willfulness does not "require a securities defendant's awareness of *more* than the general unlawfulness of his conduct."  *Kosinski*, 976 F.3d at 154 (emphasis added).

[2] Certain prior Second Circuit cases suggest an even higher standard—knowledge that conduct is unlawful specifically under the *securities laws*—for securities fraud.  *See, e.g.*, *United States v. Newman*, 773 F.3d 438, 447 (2d Cir. 2014), *abrogated on other grounds by Salman v. United States*, 580 U.S. 39 (2016); *Cassese*, 428 F.3d at 98.

intended some harm to the property rights of the victim." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (emphasis added and cleaned up); *see also United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) ("Because an intent to deceive alone is insufficient to sustain a wire fraud conviction, misrepresentations amounting only to a deceit must be coupled with a contemplated harm to the victim.") (cleaned up); *United States v. Novak*, 443 F.3d 150, 159 (2d Cir. 2006) ("Because the Government failed to carry its burden of establishing that Novak intended to harm the contractors, we find the evidence insufficient to support the jury's verdict regarding the mail fraud charge, and thus reverse Novak's conviction on that count."); *United States v. Rossomando*, 144 F.3d 197, 198 (2d Cir. 1999) ("The court's jury charge properly indicated that Rossomando had to have intended to harm the Pension Fund in order to be guilty…."); *United States v. Starr*, 816 F.2d 94, 98-99 (2d Cir. 1987) (reversing where "the government adduced no evidence of an intent to harm"); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970); 2 Sand et al. Modern Federal Jury Instructions, Instruction 44-5 (2022) ("'Intent to defraud' means to act knowingly and with the specific intent to deceive, for the purpose of causing some financial or property loss to another.").

In this case, the defense implored the Court to instruct the jury that intent to harm was required for each of Counts Two, Three, and Four.  (*E.g.*, Tr. 2890, 2895-96, 2898-99, 2934). The government even conceded that such an instruction was appropriate (Tr. 2908, 2934-35). Nonetheless, the government objected every time the defense proposed specific language incorporating the intent to harm requirement, and the Court never clearly instructed the jury that intent to harm was a necessary element of Counts Three and Four, just as it was for Count Two.[3]

---

[3] The closest the Court came was the convoluted instruction that "Mr. Milton acted with specific intent to defraud if he engaged or participated in the fraudulent scheme with some realization of

Failing to instruct the jury that wire fraud requires proof of intent to harm allowed the jury to convict without proof an essential element of the crime. This requires a new trial. *See, e.g.*, *United States v. Clark*, 475 F.2d 240, 248 (2d Cir. 1973) ("If justice is to be done in accordance with the rule of law, it is of paramount importance that the court's instructions be clear, accurate, complete and comprehensible, particularly with respect to the essential elements of the alleged crime that must be proved by the government beyond a reasonable doubt.").

The general good faith instruction did nothing to remedy the absence of a clear instruction requiring intent to harm, because the good faith instruction made no reference to intent to harm. Rather, the good faith instruction spoke only to the intent to *deceive*, stating, "if Mr. Milton honestly believed that his statements to investors were accurate and not misleading, that would be a complete defense to the securities fraud charges even if that belief ultimately proved to be inaccurate." (Tr. 3219).

If anything, the good faith instruction exacerbated the instructional error by improperly including, over Mr. Milton's objection, legally inappropriate "no ultimate harm" language that was inapplicable to the facts. A "no ultimate harm" instruction is permitted only where "there is evidence that a defendant intended an immediate cognizable harm, but he argues that there was no harm in the long run." *United States v. Percoco*, 13 F.4th 158, 177 (2d Cir. 2021), *cert. granted on other grounds sub nom. Ciminelli v. United States*, 142 S. Ct. 2901 (2022); *see also Rossomando*, 144 F.3d at 202 (vacating fraud conviction due to inadequate factual predicate for no ultimate harm instruction). Additionally, even where permitted, a no ultimate harm instruction must carefully explain that the jury must find intent to defraud to convict, to ensure

---

its fraudulent or deceptive character and with an intention to be involved in the scheme to defraud and to help it succeed with a purpose of causing harm to the victim." (Tr. 3216).

there is no possibility of jury confusion.  *See United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir. 1999).

Here, there was no factual predicate for the no ultimate harm instruction.  Mr. Milton never argued that any criminal intent was negated because he believed there would be no harm *in the long run*.  Instead, he offered a completely different defense:  that no fraud *ever* occurred because Mr. Milton did not intend to deprive his alleged victims of the full benefit of their bargain.  (*See* Tr. 2957-58; *see also* Tr. 3140-41).  Mr. Milton's "defense was not that he thought [his alleged victims] would not 'ultimately' lose money, but that he thought [they were] *never* going to lose money."[4]  *Rossomando*, 144 F.3d at 202.  Moreover, the no ultimate harm instruction did not specify that intent to harm was required for Counts Three and Four, and the jury was seriously confused as to intent, as evidenced by the inconsistent verdict and jurors' post-deliberation statements.  Thus, the no ultimate harm charge was improper, and exacerbated the erroneous suggestion that intent to harm was not required on Counts Three and Four.[5]

3.   The Intent Headings In The Written Instructions Misled The Jury

The written jury instructions, which were given to the jury (Tr. 3196), also erroneously suggested the government's burden to prove intent was less rigorous on Counts One, Three, and Four than on Count Two.  The scienter element for Count Two was prefaced with a heading that emphasized to the jury—in bold, underlined text—that the jury could not convict unless it found

---

[4] This is in stark contrast to situations in which the instruction is permitted, such as "where a defendant deliberately supplies false information to obtain a bank loan, but plans to pay back the loan and therefore believes that no harm will 'ultimately' accrue to the bank," *Rossomando*, 144 F.3d at 201; falsifies a mortgage application but plans to make mortgage payments, *United States v. Dinome*, 86 F.3d 277, 280 (2d Cir. 1996); or believes an insurer will eventually make the fraud victims whole, *Berkovich*, 168 F.3d at 67.

[5] At minimum, "the task that jurors were being asked to perform in order to reconcile this instruction with the earlier instruction requiring proof of 'specific intent to defraud' was simply too ambiguous and obscure to inspire confidence."  *Rossomando*, 144 F.3d at 202.

"**Criminal Intent**."  (Young Decl. Ex. A at 12).  The scienter elements for Counts One, Three, and Four did not contain that same language.  (*Id.* at 9, 15).  The difference between the heading used in Count Two and those for Counts One, Three, and Four suggested Count Two required criminal intent, and by negative implication, the remaining counts did not require the government to prove criminal intent.  And this false distinction between the counts was replicated at the front of the written instructions in the table of contents—a condensed but misleading reference for the jury of the elements it was required to find.

### B.  The Erroneous Instructions Were Highly Prejudicial

The government cannot demonstrate "beyond a reasonable doubt that a rational jury would have found [Mr. Milton] guilty absent the error[s]."  *Neder v. United States*, 527 U.S. 1, 18 (1999).  Indeed, given jurors' post-verdict public statements, it would be implausible to even suggest that the erroneous instructions "did not contribute to the verdict."  *Id.* at 15.

Mr. Milton's intent was the central issue at trial.  The defense conceded that, taken literally and out of context, certain of Mr. Milton's statements regarding Nikola were "a little over the top." (Tr. 3095).  The crux of the defense, therefore, was that the government had failed to prove that Mr. Milton "had a wrongful purpose or that he ran a scheme or that he tried to harm anyone."  (*Id.*).  The Court's instructional errors eviscerated the viability of that defense because they allowed the government to argue that all the jury needed to find to convict was that Mr. Milton engaged in an intentional "pattern of lying" without making *any* finding as to whether the alleged deception was intended to harm.  (Tr. 3184; *see also* Tr. 3081 (arguing, without mentioning intent to harm, that the evidence demonstrated intent to deceive)).

Similarly, the government latched on to the erroneous willfulness instruction to argue that willfulness was necessarily proven so long as deception was shown, because anyone would know that it is *wrong*, as opposed to *unlawful*, to lie:

> And you know, this idea that someone has to warn you that it's a bad thing
> to lie or else you can't have committed fraud, I mean, it's unbelievable.
> You wouldn't accept that in your everyday life.  It's not a defense here.

(Tr. 3175).  Had the Court properly instructed that Count One required proof Mr. Milton was

aware of the unlawful nature of his conduct, the government could not have made this argument.

Having taken full advantage of erroneous instructions to argue that (1) it had proven

fraud by intentional lies and (2) knowing it's a "bad thing" to lie is sufficient to show willfulness,

the government cannot carry its burden to show harmlessness.  *See*, *e.g.*, *United States v. Silver*,

864 F.3d 102, 118-23 (2d Cir. 2017) (instructional error not harmless where government relied

on instruction in its closings).

In any case, the *actual statements* of jurors demonstrate that the erroneous instructions

were not harmless.  The juror statements confirm that the jury was misled to believe that criminal

intent was required on Count Two, but "was not required on [Counts] 1, 3 or 4."  (Mansbach

Decl. Ex. D at 10).  In fact, with respect to Count One, the statements suggest the instructions

misled the jury into believing they could convict Mr. Milton without any finding of intent

whatsoever, so long as they concluded he had violated one of the three subsections of Rule 10b–

5.  (*Id.*).  And the juror statements confirm the jury was misled to believe it could convict on

Counts Three and Four without finding intent to harm.  (*Id.*).  The erroneous jury instructions

therefore allowed the jury to convict despite concluding that:

- Mr. Milton's conduct was not "anything criminal."  (Mansbach Decl. Ex. C at 4).

- He had "good intentions."  (*Id.*).

- He "didn't have an intent to harm."  (*Id.*; *see also* Mansbach Decl. Ex. M at 4).

- He "did it in good faith."  (Mansbach Decl. Ex. A at 2).

These statements, which represent, at minimum, the perspective of *one third of the jury*,

conclusively establish that the Court's instructional errors were prejudicial—particularly in light

18

of the jury's unanimous acquittal on the only count on which it was properly instructed on scienter: Count Two.

Fed. R. Evid. 606(b), which imposes certain limitations on a court's receipt of juror testimony regarding "any juror's mental processes concerning the verdict or indictment," does not alter the unavoidable conclusion that the instructional errors regarding intent were prejudicial to Mr. Milton.  Nor does it require the Court to ignore the jurors' statements, which provide compelling evidence that erroneous instructions allowed the jury to convict even though the government failed to prove all elements of Counts One, Three, and Four.  Courts have made clear that the limitations imposed by Rule 606 "cannot be applied in such an unfair manner as to deny due process." *Shillcutt v. Gagnon*, 827 F.2d 1155, 1159 (7th Cir. 1987); *United States v. Dioguardi*, 492 F.2d 70, 79 n.12 (2d Cir. 1974) (noting that general rule against inquiring into internal abnormalities in jury deliberations does not apply "in the gravest and most important cases"); *Anderson v. Miller*, 346 F.3d 315, 327 (2d Cir. 2003) (Rule 606(b) is subject to constitutional limitations); *cf. Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 870 (2017) ("the Sixth Amendment requires that the no-impeachment rule" embodied in Rule 606 "give way").

Here, allowing Mr. Milton's convictions to stand even though the jury believed the government failed to prove an essential element—criminal intent—would violate Mr. Milton's right to a fair trial.  The Sixth Amendment "right to a trial 'by an impartial jury' … in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt." *Alleyne v. United States*, 570 U.S. 99, 104 (2013).

Further, the purposes animating the "no impeachment" rule codified in 606(b)— "freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment," *see* Fed. R. Evid. 606 advisory committee note, are not

19

implicated here.  *First*, each relevant juror statement was given freely and voluntarily to the press or posted to the jurors' own social media, without involvement from Mr. Milton or his counsel. This vitiates any concern that considering the statements would promote harassment or "annoyance" of jurors by defendants, their counsel, or the press following future verdicts.  The concern over potential annoyance or burden to the jury is absent here because this motion does not request a hearing on this issue or otherwise ask the Court to "to haul jurors in after they have reached a verdict."  *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983).  Such relief is unnecessary, because the jurors' public statements to date have been entirely consistent and speak for themselves.  *Second*, considering these juror statements would not plausibly hamper the "freedom of deliberation" of future juries because—again—the jurors here *voluntarily* disclosed to multiple media outlets why they acquitted on Count Two but convicted on the other counts.  *Third*, concerns regarding finality and stability are not implicated here because the verdict was only recently returned, no judgment has been entered, and an appeal of any judgment imposed is certain to follow.

Nor is this a case where the "post hoc misgivings of a single juror" have been harnessed in an attempt to "upset a unanimous verdict solemnly arrived at," raising concerns that a "dissatisfied juror could vote with the other jurors and then" attempt to impeach the verdict. *United States v. Aiyer*, 433 F. Supp. 3d 468, 474 (S.D.N.Y. 2020).  Rather, four jurors—*one third of the jury*—have provided consistent explanations of how the jury instructions led to guilty verdicts on three of the four counts, even though the jury's *factual* conclusions should have led it to acquit on *every* count; no other juror has contradicted these accounts.

Because the erroneous instructions impacted a key issue at trial and the government relied upon them in closing, the error could not have been harmless beyond a reasonable doubt.

This is also the rare case in which the post-verdict record plainly establishes that actual prejudice of the most serious sort possible occurred.  Under the circumstances, a retrial is required.

## II.    JUROR NO. 6'S DELIBERATE LIES AT *VOIR DIRE* DEPRIVED MR. MILTON OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL

The Sixth Amendment guarantee of trial "by an impartial jury" forms the backbone of our system of criminal justice.  *Voir dire* is indispensable to secure that right because it exposes actual and potential biases before the jury is selected.  But it is corrupted when prospective jurors betray their solemn oath and paint false or incomplete portraits of who they really are.

Juror No. 6 sabotaged the *voir dire* process.  In a trial in which the very first thing the government told the jury was that Mr. Milton "repeatedly lied to investors about his company and he made a billion dollars by doing so" (Tr. 43), Juror No. 6 deliberately concealed that she harbored deep-seated hostility toward corporate executives and had a long history of using social media to complain about their outsized wealth.  She even concealed that she used social media—critical information in a trial where the government's central allegation was that Mr. Milton propagated his supposed lies over Twitter, in podcasts, and on television—thereby deterring any inquiry into her online activities that might have revealed her biases.  The Court's *voir dire* questions included questions the defense requested specifically to weed out potential biases and because the government had given notice that it intended to offer an expert witness on social media usage.  (*See* ECF No. 105 at 4; ECF No. 140 at 4).  Juror No. 6's responses to the Court's questions are so blatantly false that they compel the conclusion she deliberately manufactured a false image of herself solely to get on the jury.  Under well-settled precedent, that by itself establishes her partiality and unfitness to serve and that Mr. Milton was deprived of his fundamental rights.

In the extraordinary circumstances of this case, Mr. Milton is entitled to a new trial, by a jury that is truly fair and impartial.  Alternatively, at a minimum, the Court should hold an evidentiary hearing to confirm the falsity of, and impetus for, Juror No. 6's *voir dire* responses.

## A.   Juror No. 6 Lied During *Voir Dire*

The Court conducted *voir dire* on September 12, 2022.  The venire consisted of approximately 80 individuals; the Court initially installed 32 of them in the jury box.  (*See Voir Dire* Transcript ("VD-Tr.") 2-6).  Juror No. 6 was seated as Potential Juror No. 13.  (VD-Tr. 5).

Addressing the venire, the Court summarized the indictment's allegations and explained the purpose and mechanics of *voir dire*, and the prospective jurors' obligations.  (VD-Tr. 7-8). Among other things, the Court explained it would be asking questions about personal backgrounds, experiences, and perspectives "to make sure we have a jury of citizens who will decide the issues of this case fairly and impartially, without any bias in favor of either side or against either side and who will decide the case only on the basis of the evidence that is presented in court during the trial."  (VD-Tr. 7).

Before inquiring of prospective jurors individually, the Court distributed a written handout listing all the questions it would ask, enabling individuals to contemplate the questions and their answers in advance.  (VD-Tr. 11).  In addition, the Court instructed everyone to "pay[] attention" and "listen carefully" while the Court questioned others so they could be prepared with their own responses when the time came.  (VD-Tr. 11-12).  And to encourage candor, the Court repeatedly invited prospective jurors to come up to the sidebar for any questions they "would prefer not to answer … in public."  (*E.g.*, VD-Tr. 12-13).  The Court's Deputy Clerk administered the oath to all prospective jurors—including Juror No. 6—and all swore they would respond to the Court's questions truthfully.  (VD-Tr. 12).

22

Indeed, with the exception of Juror No. 6, the prospective jurors were engaged and forthcoming throughout *voir dire*. Many voluntarily availed themselves of the sidebar (VD-Tr. 77-79, 123-25, 145-47, 157-60, 162-64), and one even volunteered additional information after his turn for individual questioning was over (VD-Tr. 168). Based on information disclosed during *voir dire*, the Court excused 14 members of the venire for cause, including many who disclosed prior knowledge of the case, Mr. Milton, and/or Nikola. (VD-Tr. 45, 55, 62, 67-68, 79, 87-88, 106, 109, 111, 120, 130, 150, 156, 161).

    1.  Juror No. 6 Concealed Her Animosity Toward Corporate Executives

In the first part of *voir dire*—questions regarding each individual's "suitability to serve as a juror in this case" (VD-Tr. 11-12)—the Court asked if anyone felt "that senior-level corporate executives do not deserve or are not worth the money that they earn" and whether anyone disagreed with "the principle that, regardless of a person's personal wealth or lack of personal wealth, they're entitled to a fair trial, including the presumption of innocence." (VD-Tr. 22). One potential juror volunteered that "there may be some moral gray ground there in acquiring more wealth … like maybe it's not illegal, but it's ethically maybe a little gray." (VD-Tr. 73). Another, Potential Juror No. 12—who immediately preceded Juror No. 6—confessed she "do[es] feel like executives make more than they should." (VD-Tr. 69). But when the microphone passed to Juror No. 6, she stayed silent, implicitly answering "no" to both questions. (*Id.*).

In fact, unbeknownst to trial counsel, her social media pages were riddled with posts condemning corporate greed and attacking wealthy executives. On May 30, 2021, for example, she posted to Facebook a graphic denouncing Jeff Bezos and Mark Zuckerberg for their enormous wealth in comparison to the minimum wage and urging a policy of "Tax the Rich":



(Mansbach Decl. Ex. L at 16).  During one of her post-trial interviews Juror No. 6 acknowledged

(while claiming not to be certain the post was hers), "it sounds like something I would say."

(Mansbach Decl. Ex. D at 15).  Similarly, on January 24, 2021, Juror No. 6 re-posted a tweet

from former Secretary of Labor Robert Reich scolding Jeff Bezos for making "$13,000,000,000

in a single day during the pandemic."  (Mansbach Decl. Ex. L at 11).  And on September 8,

2022, just days before Mr. Milton's trial began, she tweeted: "if jeff bezos is appalled by

twitter's reaction to the death of queen elizabeth just wait till jeff bezos sees twitter's reaction to

the death of jeff bezos."  (Mansbach Decl. Ex. I at 1).

And her Facebook feed contains numerous emotional posts targeting "the billionaire

class," "Wall Streeters," "the American ruling class," "greedy Wall Street bankers," and so on.

(Mansbach Decl. Ex. L).  For example, in January 2021 she posted a graphic stating billionaires

do not "deserve all th[eir] money"—the very opinion the Court sought to ferret out in *voir dire*:



(*Id.* at 8).  That same month, she commented on another tweet by Reich, addressing the Reddit-

instigated GameStop stock manipulation that cost Wall Street billions.  *See*, *e.g.*, Andrew Ross

Sorkin, *Can Anything Stop GameStop?*, THE NEW YORK TIMES, Jan. 27, 2021, *available at*

https://www.nytimes.com/2021/01/27/business/dealbook/reddit-wallstreetbets-gamestop.html.

She wrote on her own Facebook page:  "I jumped in on this hype and I'm so happy I did.  Bleed

them dry and make them pay us."  (Mansbach Decl. Ex. L at 13).  And she admitted animus

towards an entire class of technology entrepreneurs, singling out Twitter founder Jack Dorsey as

"probably the only product of silicon valley with an actionable moral compass."  (*Id.* at 3).

These are just examples.  Juror No. 6's social media pages contain myriad other posts

attacking corporations and wealthy corporate executives.  (*See*, *e.g.*, Mansbach Decl. Ex. L at 2,

4, 9, 10 ("Corporate profits don't trickle down"; "CEOs are treated like kings and queens";

"billionaires added $1 trillion to their wealth and none of it trickled down"; "abolish the

billionaire class")).

Juror No. 6's social media activities plainly reflect her anti-corporate executive, anti-

wealth bias.  But by concealing her predilections from the Court during *voir dire*, while (as

discussed below) lying to prevent discovery of her social media posts reflecting these biases, she

snuck onto the jury and seized on her opportunity to declare a billionaire corporate executive "guilty" of defrauding ordinary investors.

### 2.   Juror No. 6 Intentionally Concealed Her Use Of Social Media

Had Juror No. 6 disclosed her social media presence, perhaps her bias would have been discovered during *voir dire*.  However, presumably to avoid exposing her true opinions, she falsely presented herself as a stranger to social media.  When the Court asked her point-blank, "What social media platforms, if any, do you use?" she blatantly lied, saying, "None."  (VD-Tr. 198-99).  She also denied "regularly read[ing]" any "publications," and when the Court asked her "From where do you get your news?" she answered, "YouTube."  (VD-Tr. 198).

These answers were manifestly false.  As discussed above, Juror No. 6 was using social media long before *voir dire*.  She started her Facebook account more than *10 years ago*, though her public page does not reflect any activity this year.  (*See* Mansbach Decl. ¶ 15 & Ex. K).  And as she conceded in one of her post-trial interviews, she first opened a Twitter account *14 years ago* and then "made a new one recently, I think last year."  (Mansbach Decl. Ex. D at 12).  Indeed, the public page for that more recent account confirms that she created it in June 2021, *15 months* before *voir dire*.  (*See* Mansbach Decl. Ex. F at 1).

Nor is Juror No. 6 a social media wallflower; her accounts contain a torrent of activity.  While her public Facebook page only makes visible certain years, it shows that she posted multiple times a week—and sometimes multiple times a day—in those periods.  (*See*, *e.g.*, Mansbach Decl. Ex. K).  Twitter does not publicly reveal every posting that the user has seen, read, or clicked on.  But as the government's "social media" expert, Professor Dina Mazlin, explained at trial, Twitter does publicly expose every time a public user herself contributed something to the platform, whether she makes her own post ("tweeting"), re-posts another's tweet on her own timeline ("retweeting"), or "likes" or "replies" to another's tweet within that

user's timeline.  (Trial Tr. 1621-25, 1629-33; *see also* Mansbach Decl. Exs. F-I).  Juror No. 6's

Twitter account reveals tweets, retweets, likes, or replies on a near-daily basis.  For example, in

just the month before *voir dire* (August 12 through September 11), Juror No. 6 engaged in *more*

*than 280* tweets, retweets, replies, and likes.[6]  (Mansbach Decl. ¶ 11).  And her Twitter activity

*increased* while she was serving as a juror, skyrocketing to *over 820* tweets, retweets, replies,

and likes over 32 days.  (*Id.* ¶ 12).  At one point she tweeted that she was "serving jury duty right

now":



(Mansbach Decl. Ex. I at 2).

Further, as soon as the trial concluded, Juror No. 6 proclaimed her endorsement of the

verdict on Twitter, explained the not-guilty verdict on Count 2, congratulated government

witnesses, and made herself available to reporters, seeming to relish the quasi-celebrity status she

had garnered by serving as Juror No. 6.  (*See id.* at 5-26).

Juror No. 6 also lied in *voir dire* when she suggested that she barely followed the news

and only watched "YouTube."  In fact, Juror No. 6 follows numerous major news outlets on

Twitter, including the Associated Press, BBC News, NPR, *New York* magazine, *The New York*

*Times*, Reuters, *Time*, and *The Washington Post*.  (Mansbach Decl. Ex. J).  And her comments to

one of her post-trial interviewers reveal her to be a far more discerning consumer of news than

the casual YouTube watcher she portrayed at *voir dire*:  "I prefer the *New York Times*, yeah, like

---

[6] Twitter displays a date for tweets and replies, but not for retweets or likes.  The date of retweets and likes can be approximated based on a user's other activity and the date of the original tweet.

if I am going to read something, and the *Post*, it's got a little more, and like honestly, the

Associated Press, BBC." (Mansbach Decl. Ex. D at 13). Juror No. 6's Twitter account confirms

that she actively reads the news on Twitter—indeed, she regularly likes, retweets, and replies to

stories from each of the news outlets she follows on Twitter, and did so even during Mr. Milton's

trial. (Mansbach Decl. Exs. F-I).

But because Juror No. 6 hid this personal information during voir dire—her contempt for

wealthy corporate executives, her desire to take from those she deems unworthy of having

wealth, her prolific Facebook and Twitter use—she failed to alert the parties and the Court of the

need to plumb these topics to identify biases she might harbor.

## B.   Juror No. 6's Misconduct Requires A New Trial

"The right of a defendant in a criminal prosecution to a trial 'by an impartial jury' is

expressly guaranteed by the Sixth Amendment to the Constitution." *United States v. Parse*, 789

F.3d 83, 110 (2d Cir. 2015). "An impartial jury is one in which all of its members, not just most

of them, are free of interest and bias." *Id.* at 111 (citing *United States v. Martinez-Salazar,* 528

U.S. 304, 316 (2000); *Parker v. Gladden*, 385 U.S. 363, 366 (1966)). A biased jury "not only

transgresses the express guarantee of the Sixth Amendment but also 'violates even the most

minimal standards of due process.'" *Id.* (quoting *United States v. Nelson*, 277 F.3d 164, 206 (2d

Cir. 2002)); *see In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a

basic requirement of due process.").

*Voir dire*—literally, "to speak the truth"—plays a critical role in protecting these rights.

*See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984). Defendants

deserve "a full and fair opportunity to expose bias or prejudice on the part of veniremen," *United*

*States v. Barnes*, 604 F.2d 121, 139, 142 (2d Cir. 1979), which is why prospective jurors take an

oath and must give thoughtful, complete, and honest answers to the Court's questions. *See*

*Parse*, 789 F.3d at 111; *United States v. Colombo*, 869 F.2d 149, 151 (2d Cir. 1989). "The necessity of truthful answers by prospective jurors … is obvious." *McDonough*, 464 U.S. at 554. *McDonough* establishes the framework for assessing juror misconduct at *voir dire*. Under *McDonough*, a new trial is mandated where a party demonstrates that (1) "a juror failed to answer honestly a material question on voir dire," and (2) "a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556; *accord Parse*, 789 F.3d at 110. A challenge for cause, in turn, can be based on juror bias that is actual, implied, or inferred.

The Second Circuit described these three forms of bias at length in *United States v. Torres*, 128 F.3d 38 (2d Cir. 1997). Actual bias, the Court explained, "is 'bias in fact'"—when the Court concludes that the individual is partial to one side "either because the juror admits partiality" or because the Court can "find[] actual partiality based upon the juror's voir dire answers." *Id.* at 43. "Implied or presumed bias is bias conclusively presumed as a matter of law" based on "the record at voir dire" and "is attributed to a prospective juror regardless of actual partiality." *Id.* at 45. "[D]isqualification on the basis of implied bias is mandatory." *Id.* Finally, "[b]ias may be inferred when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." *Id.* at 47.

Juror No. 6's behavior during *voir dire* easily satisfies both prongs of *McDonough*. As in *Parse*—where the Second Circuit held a new trial warranted and rejected claims of a defendant's waiver—she "repeatedly lied during voir dire." Had this Court and counsel known the truth about her at the time, the Court would have had a valid basis to strike her for cause in light of her actual, implied, and inferable biases. 789 F.3d at 111.

1.  Juror No. 6 Failed To Honestly Answer Material Questions At *Voir Dire*

As explained, Juror No. 6 provided numerous false and flagrantly dishonest answers in response to the Court's *voir dire* questions.  First, she denied believing "that senior-level corporate executives do not deserve or are not worth the money that they earn."  (VD-Tr. 22, 69).  But her representation to the Court is belied by the steady stream of attacks on corporate executives and the super-rich that she herself has disseminated on social media, including one public Facebook post where she declared that billionaires do not "deserve all that money." (Mansbach Decl. Ex. L at 8).  Given the strident anti-corporate executive, anti-wealth sentiment in her social media, it is inconceivable Juror No. 6 honestly believed she was giving a truthful answer in *voir dire*.  Similarly, Juror No. 6's assertions that she does not use social media and gets her news only from YouTube (VD-Tr. 198), were clearly untrue.  The sheer level of her activity on Facebook and Twitter, the number of news accounts she actively follows, and the frequency with which she likes, comments on, or retweets news stories on Twitter demonstrate that her responses to the Court were manifestly false and must have been deliberately so.

Nor could there be some other, innocent explanation for her false statements.  The Court's questions were not vague, ambiguous, or shrouded in legalese.  *Cf. McDonough*, 464 U.S. at 555 (jurors "may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges"); *United States v. Stewart*, 433 F.3d 273, 304 (2d Cir. 2006) ("ambiguities in the *voir dire* questions … made it unclear that [juror] deliberately concealed the truth").  They were clear, direct, and simple.  Not a single other prospective juror exhibited any difficulty in understanding or answering them.  And in the unlikely event Juror No. 6 was confused, any such confusion would have been dispelled by the Court's handout and hearing other prospective jurors' responses to the same questions.

Two of the other 31 prospective jurors, for example, responded to the "corporate executive" question by disclosing they hold views very similar to the ones Juror No. 6 concealed—that "executives make more than they should" and unethically "acquir[e] more wealth."  (VD-Tr. 69, 73).  Twenty-six affirmed that they use social media and listed Facebook, Twitter, or other platforms.  (VD-Tr. 172, 175, 180, 182, 185, 191, 194, 196, 203, 205, 210, 212, 215, 222, 224, 230, 232, 239).  And all but one (*i.e.*, 30 of 31) provided information about whether and how they read, watch, listen to, or click through the news.  (*See* VD-Tr. 170-239). The responses covered nearly every news source imaginable, from the *Wall Street Journal* and *The New York Times* to national and local television and radio outlets such as "Fox 5" and NPR, to online and mobile applications such as Google News and—once again—Twitter.  Juror No. 6 was present for all of these dialogues and heard copious references to her own social media platforms and the very same news outlets she follows.  Nonetheless, she kept silent.

And it was not as if the Court's questions required Juror No. 6 to recall information from her distant past; she had posted on Twitter just the day before.  (Mansbach Decl. Ex. G at 54). Nor could Juror No. 6 reasonably claim to have been "distracted" while answering the questions; she was addressing a federal judge, in a federal courtroom, using a microphone that amplified her voice so all could hear.  *Cf. United States v. Maxwell*, No. 20-CR-330 (AJN), 2022 WL 986298, at *8 (S.D.N.Y. Apr. 1, 2022) (juror plausibly "distracted by several factors" when filling out a jury questionnaire amid the "noise and bustle" of the juror assembly room).  Nor could Juror No. 6's failure to tell the truth plausibly be explained by a desire to avoid embarrassment, retribution, or condemnation.  *Cf. United States v. Langford*, 990 F.2d 65, 69 (2d Cir. 1993) (juror concealed her criminal record "only to avoid embarrassment").  There is nothing embarrassing or shameful about using Facebook or Twitter or reading the news; in fact,

31

truthful answers to those questions would have put Juror No. 6 in the company of nearly everyone else in the room.  And she could not reasonably have feared consequences from sharing her thoughts about corporate executives, because she had publicly broadcast those same thoughts all over the internet, and other prospective jurors had expressed support for such views in the courtroom.  Moreover, she could have given her answers at sidebar whenever she wished, as she saw many others do.

In short, Juror No. 6's misrepresentations to the Court cannot plausibly be dismissed as "mistaken, though honest response[s]."  *McDonough*, 464 U.S. at 555; *cf. also United States v. McCoy*, 995 F.3d 32, 45 (2d Cir. 2021) (juror didn't disclose prior crimes because "he believed convictions entered when he was younger than 21 had been expunged from his record") *vacated on other grounds*, 142 S. Ct. 2863 (2022); *United States v. Shaoul*, 41 F.3d 811, 815-16 (2d Cir. 1994) (defendant who "explicitly conceded" juror's good faith could not satisfy *McDonough*'s first requirement).  They were deliberate, intentional, and inexcusable lies.

2.  Juror No. 6's Deliberate Lies Provided A Valid Basis To Strike Her For Cause

The second part of the *McDonough* test asks "not whether the true facts would compel the Court to remove a juror for cause, but rather whether a truthful response 'would have provided a valid basis for a challenge for cause.'"  *United States v. Daugerdas*, 867 F. Supp. 2d 445, 470 (S.D.N.Y. 2012), *vacated on other grounds by Parse*.  Juror No. 6's social media feeds reveal her actual bias against wealthy executives such as Mr. Milton.  Alternatively, her lies during *voir dire* establish implied bias as a matter of law and also permit the Court to infer bias. Accordingly, this case readily satisfies the second part of the *McDonough* test.

a.  *Actual Bias*

"Actual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality."  *Torres*, 128 F.3d at 43.  Had it been known

32

at the time, Juror No. 6's contempt for wealthy executives like Mr. Milton would have provided a strong ground to conclude that she could not "act with entire impartiality" and thus a valid basis for a challenge for cause.  Particularly in a case like this one, involving allegations that a wealthy executive lied to line his own pockets, Juror No. 6's social media campaign against individuals like Mr. Milton suggests a predisposition against him and thus an inability "to decide the matter objectively."  *Id.* at 47.  This is all the more true given the government's targeted focus on Mr. Milton's status as a billionaire, which it emphasized repeatedly in its jury addresses, through its witnesses, and in summary charts.  (Tr.43, 3082; GX 1001, GX 1013). Whether Juror No. 6's concealment of her anti-corporate executive, anti-wealth bent was intentional or not, the second part of the *McDonough* test is satisfied because "a correct response would have provided a valid basis for a challenge for cause."  464 U.S. at 556.

Moreover, Juror No. 6's failure to disclose her strong negative feelings for corporate executives improperly prevented the parties from meaningfully exercising their peremptory challenges, "one of the most important of the rights secured to the accused."  *Pointer v. United States*, 151 U.S. 396, 408 (1894).  They "allow the parties to ferret out more subtle biases," even when the *voir dire* testimony does not satisfy the requirements of a for-cause challenge.  *Torres*, 128 F.3d at 43 n.4.  Here, there can be no serious question that the defense would have stricken Juror No. 6 if she had told the truth in *voir dire*.

b. *Implied Bias*

Juror No. 6 gave blatantly false information in response to straightforward and unambiguous questions seeking material information that she should have had no difficulty recalling or truthfully providing.  And she did so only after the Court explained that the case involved charges that a wealthy corporate executive took advantage of "the little guy"—*i.e.*, that Mr. Milton was on trial for having "devised a scheme to defraud" shareholders "in *his* company

33

Nikola" and a separate "scheme to obtain money and property by means of false and fraudulent pretenses." (VD-Tr. 8). Further, before Juror No. 6's turn to be questioned, she learned from other jurors' responses that this case was surrounded by publicity, and observed numerous others being struck for cause after answering some of the Court's questions in the affirmative. (VD Tr. 36-45, 52-55, 60-62, 64-68). Given that context, there is no innocent explanation for her conduct. Just as in *Parse*, the only plausible explanation is that Juror No. 6 purposely lied and concealed to avoid subjects that might disqualify her from jury service in this trial—that is, to make herself "more 'marketable' as a juror." *Parse*, 789 F.3d at 92. Juror No. 6 no doubt surmised that revealing her contempt for corporate executives—or her social media postings pronouncing that contempt—could jeopardize her ability to get seated on the jury. To preclude any inquiry on those topics, Juror No. 6 deliberately chose to conceal them.

Under well settled Second Circuit precedent, therefore, Juror No. 6 was impliedly biased as a matter of law. "Few, if any, prospective jurors would willfully violate their oath, and knowingly subject themselves to prosecution for perjury, without a strong personal interest in the outcome of the case." *Parse*, 789 F.3d at 100 (quoting *Daugerdas*, 867 F. Supp. 2d at 473). That is, when a prospective juror "has lied for the purpose of securing a seat on the jury—a mission apparently 'so powerful as to cause the juror to commit a serious crime'—it 'reflect[s] an impermissible partiality on the juror's part." *Parse*, 789 F.3d at 111 (quoting *Colombo*, 869 F.2d at 151). Moreover, it indicates that the prospective juror's "answers concerning her or his ability to weigh the evidence fairly and obey the instructions of the court" are unreliable. *Id*. In the words of Justice Cardozo: "If the answers to the questions [during *voir dire*] are willfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only. His relation

to the court and to the parties is tainted in its origin; it is a mere pretense and sham." *Clark v. United States*, 289 U.S. 1, 11 (1933).

For purposes of the *McDonough* test, therefore, "'bias' is to be 'presume[d]'" when a prospective juror deliberately lies to get seated on the jury. *Parse*, 789 F.3d at 111 (quoting *Colombo*, 869 F.2d at 152). Had the "implied bias" been revealed during *voir dire*, the prospective juror's disqualification would have been "mandatory." *Id.* at 100. Where, however, the implied bias is not revealed until after a guilty verdict, "the result is deprivation of the defendant's rights to a fair trial," *id.* at 111, and the conviction "cannot stand." *Colombo*, 869 F.2d at 151.

Courts throughout the country are in accord, holding that a "juror … who lies materially and repeatedly" to the court is presumed to be biased, because "[t]he individual who lies in order to improve his chances of serving has too much of a stake in the matter to be considered indifferent." *Dyer v. Calderon*, 151 F.3d 970, 982-83 (9th Cir. 1998) (en banc) (Kozinski, J.). *See also*, *e.g.*, *Green v. White*, 232 F.3d 671, 676 (9th Cir. 2000) ("[W]e must presume bias" where juror's "pattern of lies, inappropriate behavior, and attempts to cover up his behavior introduced 'destructive uncertainties' into the fact-finding process."); *Williams v. Bagley*, 380 F.3d 932, 950 (6th Cir. 2004) (court may "presume bias if a juror deliberately conceals material information"); *United States v. Boney*, 977 F.2d 624, 634 (D.C. Cir. 1992) ("[L]ying or failing to disclose relevant information during voir dire itself raises substantial questions about the juror's possible bias."); *Burton v. Johnson*, 948 F.2d 1150, 1159 (10th Cir. 1991) (juror "dishonesty, of itself, is evidence of bias"); *Conaway v. Polk*, 453 F.3d 567, 588 (4th Cir. 2006) (same); *United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988) (same).

Juror No. 6 deliberately lied about her attitudes toward wealthy corporate executives and concealed her use of social media—all to secure a seat on the jury in this trial.  Had this Court known at the time of Juror No. 6's deceit and the lengths she was willing to go to get seated, the Court would have been required to find implied bias and strike her from the jury.  In the present posture, in which her lies went undiscovered and allowed her to deliberate and pass judgment on Mr. Milton, Mr. Milton's conviction "cannot stand."  *Colombo*, 869 F.2d at 151.

      c.  *Inferred Bias*

Juror No. 6's lies and concealment also permit this Court to infer bias.  Just as in *Parse*, her brazen dishonesty at *voir dire* and willingness to defy both her oath and the Court's instructions demonstrate that "[s]he was manifestly incapable of performing the central functions of a juror—evaluating witness credibility and making a fair assessment of the evidence."  789 F.3d at 101 (quoting *Daugerdas*, 867 F.Supp.2d at 475).  "Solely on the basis of her false voir dire testimony, the Court could easily infer that she is inherently unable to perform the crucial function of ascertaining the truth."  *Id.*; *see also Colombo*, 869 F.2d at 151-52 (juror's willingness to commit perjury to sit on a jury is "inconsistent with an expectation that a prospective juror will give truthful answers concerning her or his ability to weigh the evidence fairly and obey the instructions of the court").

\*   \*   \*

Juror No. 6's deception and bias deprived Mr. Milton of a fair trial.  It is irrefutable that she gave false answers at *voir dire*, and her public post-trial concessions confirm that she must have done so deliberately.  On those facts and all the evidence presented with this motion, Mr. Milton is entitled to a new trial under Rule 33(a).

### C.   At A Minimum, An Evidentiary Hearing Is Required

Alternatively, if the Court believes additional information is needed, it should hold an evidentiary hearing to confirm the falsity of Juror No. 6's misrepresentations and her motivation for making them.   At the very least, Mr. Milton has come forward with "clear, strong, substantial and incontrovertible evidence that a specific, non-speculative impropriety has occurred."   *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (cleaned up).   As the Second Circuit made a point to "caution district courts" in *Stewart*, "if any significant doubt as to a juror's impartiality remains in the wake of objective evidence of false *voir dire* responses, an evidentiary hearing generally should be held."   433 F.3d at 306.

## III.   THE GOVERNMENT FAILED TO PROVE THE "OBTAINING MONEY OR PROPERTY" ELEMENT OF COUNT THREE[7]

Wire fraud requires proof of a scheme for "obtaining money or property" from some victim.   18 U.S.C. § 1343; *see Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020).   Mere deceit is insufficient.   The government must prove that the defendant made false statements to *obtain money or property* from the alleged victims—for purposes of Count Three, investors in Nikola's publicly-traded stock.   It failed to do so.   Even if the proof was sufficient to show that Mr. Milton made material false statements to inflate the price of Nikola stock, it was insufficient on Count Three because there was no evidence that Mr. Milton made any misrepresentations to *obtain money* from any public shareholder.   On the contrary, at the time of the alleged misstatements,

---

[7] At trial, Mr. Milton moved under Rule 29(a) for a judgment of acquittal on all counts after the government rested (Tr. 2476-80) and after the close of all the evidence (Tr. 2986-99, 3025).   The Court initially reserved and then denied the motions.   To avoid wasting the Court's time, we will not seek reconsideration of arguments the Court already rejected after extensive argument and instead reserve further litigation of those issues for any appeal.   Here, we merely elaborate on one of the several reasons the evidence was insufficient as to Count Three—the government's failure to prove the "obtaining money or property" element of wire fraud.

either Mr. Milton was legally barred from selling his Nikola shares on the public market or there

were no public shareholders anyway.  Consequently, he is entitled to acquittal on Count Three.

### A.   Wire Fraud Requires Proof Of A Scheme To Obtain Money Or Property

To sustain a wire-fraud conviction, the government must prove a "scheme or artifice to

defraud, or for obtaining money or property" using interstate wires.  18 U.S.C. § 1343.  Supreme

Court caselaw teaches that, despite the statute's disjunctive language, the "money-or-property

requirement" applies to any "scheme" prohibited by the mail or wire fraud statutes.  *See*, *e.g.*,

*McNally v. United States*, 483 U.S. 350, 358-59 (1987) (interpreting identical language in mail-

fraud statute).[8]  Thus, defendants "violate those laws only if an object of their dishonesty was to

obtain the [victim's] money or property."  *Kelly*, 140 S. Ct. at 1568.  And property fraud requires

that "the victim's loss of money or property supplied the defendant's gain, with one the mirror

image of the other."  *Skilling v. United States*, 561 U.S. 358, 400 (2010).  In other words, the

government must prove not only a deprivation of the victim's property, but the defendant's gain

of (or attempt to gain) that same property.  And the money or property deprivation "must play

more than some bit part in a scheme:  It must be an 'object of the fraud,'" rather than "an

incidental byproduct of the scheme."  *Kelly*, 140 S. Ct. at 1573.

Prior to *Kelly*, despite the plain text of § 1343 and Supreme Court precedents interpreting

the phrase "obtaining money or property," the Second Circuit had said that "the mail and wire

fraud statutes do not require a defendant to obtain or seek to obtain money or property."  *United

States v. Finazzo*, 850 F.3d 94, 106 (2d Cir. 2017) (citing *Porcelli v. United States*, 404 F.3d 157

(2d Cir. 2005)).  However, those pronouncements plainly cannot survive *Kelly*.  Indeed, the

Solicitor General recently conceded to the Supreme Court that "obtaining money or property" is

---

[8] The mail and wire fraud statutes are interpreted *in pari materia*.  *See*, *e.g.*, *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987).

an essential element of wire fraud.  In its merits brief in a pending Supreme Court case
presenting a related § 1343 question, the government undermined the *Finazzo* line of cases and
admitted that "[t]he wire-fraud statute requires the government to show that a fraudulent scheme
was designed to obtain money or property."  *Ciminelli v. United States*, No. 21-1170, U.S. Br.
("U.S. *Ciminelli* Br.") at 16; *see also id.* ("[T]o sustain a conviction for property fraud, money or
property 'must be an 'object of the fraud.'").  The government explained that the "plain meaning
of 'obtain[],'" under § 1343 "includes the acquisition or retention of property that would
otherwise be in someone else's hands."  *Id.* at 16-17.

**B.  The Government Failed To Prove That The Object Of The Alleged Count Three Scheme Was Obtaining Money Or Property**

Count Three fails that essential requirement.  In Count Three, the government alleged
that from approximately November 2019 through September 2020, Mr. Milton "engaged in a
scheme to defraud investors in Nikola through false and misleading statements regarding the
company's product, technology, and business development, including through interstate wires."
(ECF No. 123 ¶ 3).  Specifically, the government claimed that Mr. Milton made false and
misleading statements "to induce retail investors to purchase Nikola stock" so as to "enrich
himself" by inflating the value of the stock.  (ECF No. 1 ¶¶ 3-4).  Even assuming the government
proved any material misrepresentations or deceptive conduct, it failed to demonstrate that Mr.
Milton's aim was to obtain money or property from investors in Nikola's publicly-traded
securities.

*First*, the alleged misrepresentations all occurred before or during September 2020, but in
that time period Mr. Milton could not sell his NKLA shares, because he had entered a lock-up
agreement which prohibited him from selling those shares before December 2020.  (DX732 at
116).  Since Mr. Milton was legally barred from selling his shares to NKLA shareholders during

the entire period covered by the indictment, he could not possibly have been seeking to "obtain" those shareholders' money by selling his supposedly inflated NKLA securities to them.[9]

*Second*, when the scheme allegedly began in November 2019, Mr. Milton didn't even know whether Nikola would ever become a public company, or what type of transaction might enable it to go public, or when (if ever) that might occur. All of that was speculative and uncertain until at least January 2020 (Tr. 1913-15), and the merger with VectoIQ was not announced until March 2020 or finalized until June 2020 (Tr. 1721-22). Indeed, for most of the charged timeframe, there were not even any public NKLA shareholders. How could Mr. Milton have obtained money from shareholders who did not exist?

*Third*, much of the government's evidence involved alleged deceit that took place before the public listing of NKLA.[10] For instance, the government made much of the marketing demonstrations in which the Nikola One truck was rolled down a hill, suggesting it was running on its own power when in fact it was not a working vehicle. (*E.g.*, Tr. 45, 3028). But that truck was merely a prototype, and the events at issue occurred in 2016 and 2018—years before June 2020, when Nikola went public and listed publicly-traded shares on the NASDAQ. (*E.g.*, Tr. 72, 2383). And by then, the Nikola One "wasn't relevant" because the company was focused on its Nikola Two trucks, which were running on their own power using hydrogen. (*E.g.*, Tr. 1134-35). Many of the other alleged misrepresentations were also made before Nikola went public.

---

[9] Mr. Milton's private sales before Nikola went public are irrelevant because the sales were not public stock trades, and there was no evidence any of his public statements affected the pricing of those transactions. Nor has the government alleged that the purchasers of private Nikola securities were victims of a fraud. Those purchasers—many of whom were company insiders— had access to a vast array of non-public due diligence materials. (*See* Tr. 986, 988, 1936-37).

[10] While the government also argued Mr. Milton told potential investors that buying VectoIQ shares pre-merger would result in owning NKLA shares after the merger was complete (*e.g.*, Tr. 2015), the government conceded that Mr. Milton *never* bought or sold VectoIQ stock (Tr. 2112).

For instance, the government pointed to alleged misstatements about the Badger made in November 2019, and February, April, and May 2020 (GX1005), and statements about hydrogen in January and March 2020 (GX1007).

To be sure, the government introduced some evidence of misstatements made between the public listing in June 2020 and September 2020. But the last of these was made three months before the lockup ended, and no juror could reasonably conclude that misstatements in September were made to further contemplated stock sales three months later—especially given the extreme volatility of NKLA stock. (Tr. 2571-72; DX955 at 5).

At most, the government proved that after Nikola went public, Mr. Milton was focused on the stock price. But even if a jury could reasonably infer that he made misrepresentations during that timeframe to try to maintain a high NKLA stock price, that is not enough to prove the wire fraud scheme targeting public investors charged in Count Three. More is required to convict—there must be evidence that Mr. Milton's object was not merely maintaining or elevating the price of the stock on the NASDAQ market, but also doing so to obtain someone else's money. Notably, the government admits that such evidence is needed in this type of case in its recent merits brief to the Supreme Court in *Ciminelli*; it suggests that if a public company executive engages in deceit to inflate the price of his company stock, that is not enough, by itself, to prove a wire fraud scheme. Specifically, the government concedes that a defendant's scheme "to increase the value of his own portfolio by deceptively inflating his employer's stock price" is insufficient to prove wire fraud. U.S. *Ciminelli* Br. at 47. As the government's *Ciminelli* brief explains, the defendant in *Skilling* engaged in such a scheme—in other words, a scheme like the one charged here—but that cannot satisfy the wire fraud statute's requirement that "'the victim's

loss of money or property supplied the defendant's gain, with one the mirror image of the other.'"  *Id.* (quoting *Skilling*, 561 U.S. at 400).  The same is true here.

The Court should therefore grant a judgment of acquittal as to Count Three.

## **CONCLUSION**

For the foregoing reasons, the Court should order a new trial and enter a judgment of acquittal on Count Three.

Dated: December 14, 2022
        New York, New York

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Daniel J. O'Neill
Avery D. Medjuck
SHAPIRO ARATO BACH LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880
ashapiro@shapiroarato.com
doneill@shapiroarato.com
amedjuck@shapiroarato.com

Marc L. Mukasey
Torrey K. Young
MUKASEY FRENCHMAN LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
(212) 466-6400
Marc.Mukasey@mfsllp.com
Torrey.Young@mfsllp.com

*Counsel for Defendant Trevor Milton*