UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
UNITED STATES OF AMERICA                      :
                                              :
    - v. -                     :           S1 21 Cr. 478 (ER)
                                              :
TREVOR MILTON,                                :
                                              :
              Defendant.     :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO THE DEFENDANT'S POST-TRIAL MOTIONS**


                        DAMIAN WILLIAMS
                        United States Attorney
                        Southern District of New York
                        One St. Andrew's Plaza
                        New York, New York 10007


Jordan Estes
Matthew Podolsky
Nicolas Roos
Assistant United States Attorneys
- Of Counsel -

## **CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ..................................................................................................... 1

   I.  THE EVIDENCE AT TRIAL ............................................................................. 1

  II.  JURY SELECTION ....................................................................................... 3

 III.  THE VERDICT AND POST-VERDICT COMMENTARY ......................................... 4

ARGUMENT ......................................................................................................... 5

   I.  THE DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON THE JURY INSTRUCTIONS
     SHOULD BE DENIED ................................................................................... 5

   A.  Applicable Law ................................................................................ 5

   B.  Discussion ...................................................................................... 6

      1.  The "Willfulness" Instruction for Count One Was Correct and Any Claimed Error
          Was Harmless ........................................................................ 6

      2.  The Defendant Has Identified No Omission in the "Intent to Defraud" Instruction for
          Counts Three and Four ........................................................... 12

      3.  There Was Nothing Erroneous About the Headings in the Written Jury Instructions
          ........................................................................................... 13

      4.  Post-Verdict Commentary by Jurors Is Irrelevant and Inadmissible, and Does Not
          Support the Defendant .............................................................. 15

  II.  THE DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON PURPORTED JUROR
     MISCONDUCT SHOULD BE DENIED ............................................................. 18

   A.  Applicable Law .............................................................................. 18

   B.  Discussion .................................................................................... 19

      1.  The Defendant Cannot Satisfy the First McDonough Prong ................... 20

      2.  The Defendant Cannot Satisfy the Second McDonough Prong................. 23

 III.  THE DEFENDANT'S MOTION FOR ACQUITTAL ON COUNT THREE SHOULD BE DENIED ...... 25

CONCLUSION ...................................................................................................... 28

## PRELIMINARY STATEMENT

On October 14, 2022, the defendant, Trevor Milton, was convicted after trial of one count of securities fraud and two counts of wire fraud. The defendant has now moved for a new trial on each count pursuant to Rule 33 of the Federal Rules of Criminal Procedure, and for a judgment of acquittal as to one of the wire fraud counts pursuant to Rule 29 of the Federal Rules of Criminal Procedure. (Dkt. No. 257 ("Def. Mot.")). The defendant seeks to cast blame for his conviction on, among other things, the headings in the written jury instruction and on the jurors themselves, who consistent with the responsibility thrust upon them, rendered a just—if lenient—verdict. In fact, the defendant received a fair trial, and was convicted by an impartial jury upon overwhelming evidence. The defendant's motions should be denied.

## BACKGROUND

### I.      The Evidence at Trial

The evidence admitted at trial proved that Trevor Milton engaged in two overlapping criminal schemes—one to defraud retail investors in the stock of Nikola, the company Milton founded, led, and in substantial part owned, and the other specifically to defraud the seller of a large property, both accomplished through false, misleading, and fraudulent statements relating to Nikola's business. Milton does not contest the sufficiency of the evidence demonstrating that he engaged in these schemes to defraud and did so intentionally.

Indeed, the evidence at this trial, including the evidence of the defendant's intent, was unusually direct and strong for a fraud case. In addition to offering into evidence hundreds of tweets, video- and audio-recordings, text messages, emails, and corporate documents, the Government called thirteen witnesses over twelve trial days. These witnesses included multiple

current and former Nikola employees and business partners who testified unequivocally—and indeed without any genuine dispute from the defense—that the defendant issued dozens if not hundreds of false statements about Nikola's business and technology through, among other things, tweets and other social media posts, and television, print media, and podcast interviews. The two highest ranking executives—other than the defendant himself—at Nikola testified, each over two days. Both the Chief Executive Officer and Chief Financial Officer of the company testified that the defendant was obsessed with maintaining and increasing the stock price and made repeated false and misleading statements to the market. They both testified that the defendant was well-aware of what he was doing: both executives, often together and with other employees, had frequently warned the defendant that the statements he was making were not accurate and that he needed to cease his conduct. They testified that the defendant nonetheless persisted in lying to investors. As the evidence showed, and the Government argued in summation, the defendant engaged in this scheme to induce retail investors to purchase Nikola stock to inflate his own net worth and to keep the stock price high so that he could replenish and expand his liquid wealth when his stock lock-up ended—although his scheme was largely revealed before the lock-up expired. (*See* Trial Tr. 3026, 3082-83).

Finally, Peter Hicks, whom the defendant tricked into parting with property in exchange for Nikola shares, testified regarding the false and misleading statements that the defendant made to him directly. Those lies were captured on a recording, entered into evidence, of a phone call during which the defendant, in response to direct questioning, lied about Nikola's business development. As a result of those misrepresentations, Hicks sold a substantial investment property

to the defendant in exchange for Nikola stock options, which became effectively worthless after the defendant's scheme came to light.

## II.      Jury Selection

Prior to the commencement of trial, on September 12, 2022, the Court conducted jury selection. In order to qualify a sufficient number of jurors for the parties to exercise peremptory strikes and be left with twelve jurors and four alternates, the Court began by reading to the entire venire a list of questions devised to elicit responses that would assist in determine whether any for-cause strikes would be warranted. (*See* Voir Dire Tr. 11-12). As relevant to the claims now advanced by the defendant, the Court asked the following questions relating to the defendant's wealth:

- "Do you think that there may be some relationship between how wealthy an individual is and how likely they are to break the law?"

- "Do you feel that senior-level corporate executives do not deserve or are not worth the money that they earn?"

- "Would you have any problem accepting the principle that, regardless of a person's personal wealth or lack of personal wealth, they're entitled to a fair trial, including the presumption of innocence?"

(Voir Dire Tr. 22). The juror who would eventually be seated as Juror Six did not answer affirmatively to those three questions. (Voir Dire Tr. 69-70).

After jurors were qualified, the Court asked each potential juror a second set of questions, this time in order to provide the parties with information to assist their preemptory strikes. (*See* Voir Dire Tr. 11-12, 170). Among other things, Juror Six provided the following information:

THE COURT: From where do you get your news?

JUROR: YouTube.

3

THE COURT: What social media platforms, if any, do you use?

JUROR: None.

THE COURT: What about radio stations, TV shows, or podcasts?

JUROR: I listen to podcasts on Spotify.

(Voir Dire Tr. 198-99).

## III.   The Verdict and Post-Verdict Commentary

On October 14, 2022, the jury reached a verdict as to each count, finding the defendant guilty of one count of securities fraud under Title 15 (Count One) and two counts of wire fraud (one count relating to his scheme to defraud retail investors and one count relating to his scheme to defraud Peter Hicks, which were Counts Three and Four, respectively). (Trial Tr. 3261). The jury found the defendant not guilty of securities fraud under Title 18 (Count Two). (Trial Tr. 3261).

Following the verdict, it appears that several jurors commented on the trial, either on social media or during the course of being interviewed for newspaper articles or blog posts. None of these hearsay statements are admissible or relevant for any purpose here. Nonetheless, accepting these comments as the statements of the jurors, it is worth observing that several broad themes emerge from these statements. First, the jurors believed that the defendant received a fair trial and was guilty under the law. (*See* Mansbach Decl. Exs. A, B, C). Second, some jurors questioned whether the defendant ultimately wished the victims harm in the colloquial sense, but did not doubt that the defendant intended to defraud. (*See* Mansbach Decl. Exs. A, C, D at ECF p. 10-12). Third, the jurors carefully followed the Court's instructions. (*See* Mansbach Decl. Ex. C). Additionally, Juror Six appears to have remarked, in substance, that the jury showed leniency toward the defendant in its not-guilty verdict on Count Two. (*See* Mansbach Decl. Ex. G-1 at ECF p. 11-12 ("TM is lucky

we found him innocent on one count. He shouldn't fight anymore because honestly we were kind to him. . . . We were very kind to him")).

## **ARGUMENT**

### I.     **The Defendant's Motion for a New Trial Based on the Jury Instructions Should Be Denied**

#### A.     **Applicable Law**

Rule 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). Because motions for a new trial are strongly disfavored, "the standard for granting such a motion is strict," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and it should be granted only in "extraordinary circumstances," *McCourty*, 562 F.3d at 475 (internal quotation marks omitted); *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993); *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir. 1993).  The "ultimate test [in deciding a Rule 33 motion] is whether letting a guilty verdict stand would be a manifest injustice . . . .  There must be a real concern that an innocent person may have been convicted."  *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotation marks omitted); *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). In short, a new trial should not be granted where "[i]t . . . cannot be said . . . that the evidence preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Sanchez*, 969 F.2d at 1415 (internal quotation marks omitted) (reversing grant of new trial based on trial court's determination that government witnesses gave perjured testimony).

5

A challenge to a jury instruction faces a heavy burden. The defendant must demonstrate that: (1) he requested a charge that "accurately represented the law in every respect"; and (2) the charge actually delivered, when viewed as a whole, was erroneous and prejudicial. *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004); *see also United States v. White*, 552 F.3d 240, 246 (2d Cir. 2009) ("To secure reversal on a flawed jury instruction, a defendant must demonstrate both error and ensuing prejudice."). A reviewing court does not look only to the particular words or phrases challenged by the defendant, but must "review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *United States v. Carr*, 880 F.2d 1550, 1555 (2d Cir. 1989); *see also United States v. Mulder*, 273 F.3d 91, 105 (2d Cir. 2001). An "instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015).

Moreover, a defendant claiming error in a jury instruction must demonstrate that the error was not harmless. A conviction should not be overturned despite instructional error if it "appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Neder v. United States*, 527 U.S. 1, 15 (1999).

### B.   Discussion

#### 1.   The "Willfulness" Instruction for Count One Was Correct and Any Claimed Error Was Harmless

The defendant contends that the Court should have instructed that to prove willfulness as to Count One, the Government had to prove beyond a reasonable doubt that the defendant knew his conduct was unlawful. (Def. Mot. 12). As an initial matter, this concept was conveyed in the jury instructions. It is true that the Court instructed the jury that "[t]o act willfully means to act voluntarily and with a wrongful purpose." (Trial Tr. 3208:5-6). But immediately afterward, when

6

explaining the concepts of direct and circumstantial evidence as applied to the element of *mens rea*, the Court stated:

> you have before you evidence of certain actions and statements by Mr. Milton. The government contends that these actions and statements show beyond a reasonable doubt Mr. Milton's knowledge of the unlawful purposes of his actions. On the other hand, Mr. Milton denies either that these acts and statements occurred or that they show that he had such knowledge, intent, and purpose.
>
> It is for you to determine whether the government has established beyond a reasonable doubt that Mr. Milton had such knowledge, intent, and purpose.
>
> Please note that if Mr. Milton honestly believed that his statements and actions were proper and not in furtherance of any unlawful scheme, then such good faith would be a complete defense to all of the charges here.

(Trial Tr. 3208-09). Thus, the Court did in fact tell the jury that the Government contended that the defendant "knew of the unlawful purposes of his actions," while the defense argued the opposite, and that it would be a "complete defense" if the defendant "honestly believed that his statements were . . . not in furtherance of any unlawful scheme." (Trial Tr. 3208-09). It is entirely unclear what basis the defendant has to claim that he was not permitted to make such an argument.

In any case, the defendant is wrong that willfulness requires knowledge that the defendant knew his conduct was unlawful. The Court correctly instructed the jury as to Count One that "To act willfully means to act voluntarily and with a wrongful purpose." (Trial Tr. 3208). In fact, the Second Circuit has rejected the precise argument now advanced by the defendant, and approved of instructions indistinguishable from the one given here. *United States v. Petit*, Nos. 21-543, 21-559, 2022 WL 3581648, at *4 (2d Cir. Aug. 22, 2022) (rejecting the argument that the defendant "could not have acted willfully because he" did not know the law violated and approving an

instruction, for a Title 15 securities fraud case, that the defendants "acted willfully if they 'act[ed] deliberately and with a bad purpose, rather than innocently'"); *see also See United States v. Petit*, No. 19 Cr. 850 (JSR), Trial Tr. 2490, Nov. 16, 2020 (declining to instruct the jury that willfulness under Section 78ff requires knowledge that the conduct is unlawful).

This ruling was consonant with an extensive body of law making clear that a defendant need not know that his conduct violates the law to act willfully. "The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *Cheek v. United States*, 498 U.S. 192, 200 (1991). Section 32(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78ff, criminalizes the "willful" violation of various provisions of the Act, as well as rules and regulations promulgated under the Act. The law of the Second Circuit has long been clear that a conviction under Section 78ff does not require proof that a defendant knew he was acting unlawfully. *See, e.g.*, *United States v. Kaiser*, 609 F.3d 556, 569 (2d Cir. 2010) (holding that willfulness under Section 32(a) "do[es] not require a showing that a defendant had an awareness of the general unlawfulness of his conduct, but rather, that he had an awareness of the general wrongfulness of his conduct"); *United States v. Dixon,* 536 F.2d 1388, 1395 (2d Cir. 1976) ("'A person can willfully violate an SEC rule even if he does not know of its existence.'" (quoting *United States v. Peltz,* 433 F.2d 48, 54 (2d Cir. 1970))); *accord United States v. Tarallo,* 380 F.3d 1174, 1188 (9th Cir. 2004) ("Under our jurisprudence, . . . 'willfully' as it is used in § 78ff(a) means intentionally undertaking an act that one knows to be wrongful; 'willfully' in this context does *not* require that the actor know specifically that the conduct was unlawful."); *United States v. O'Hagan,* 139 F.3d 641, 647 (8th Cir. 1998) ("Courts that have interpreted 'willfully' in § [78ff] have reached the same conclusion that we reach in this case: 'willfully'

simply requires the intentional doing of the wrongful acts—no knowledge of the rule or regulation is required.").

These decisions are entirely consistent with how explicit statutory willfulness requirements have been interpreted in the context of other statutory regimes. *See generally United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2019 WL 4254025, at *7 (S.D.N.Y. Sept. 9, 2019) (discussing *Kaiser* and rejecting Sand model instruction on willfulness in wire fraud case). For example, statutory willfulness is often defined in terms of voluntariness. *See Temple*, 447 F.3d at 137 ("'Willful' repeatedly has been defined in the criminal context as intentional, purposeful, and voluntary, as distinguished from accidental or negligent."). Similarly, statutory willfulness is often defined with respect to conduct that is "wrongful," rather than "unlawful." *See United States v. George*, 386 F.3d 383, 393-94 (2d Cir. 2004) (explaining that "the criminal statutory *mens rea* term 'willful'" is interpreted "to require only the minimum *mens rea* necessary to separate innocent from wrongful conduct").

Ignoring these precedents and the controlling decision in *Kaiser*, the defendant instead relies on *United States v. Kosinski*, 976 F.3d 135 (2d Cir. 2020), for the proposition that securities fraud requires proof of the defendant's knowledge that the conduct is unlawful. (Def. Mot. 12). But *Kosinski* follows a line of insider-trading cases in which this Court has "seemed to endorse a higher standard for willfulness." *Kaiser*, 609 F.3d at 569. And as *Kaiser* observed, the need for a stricter willfulness standard in insider-trading cases does not extend to the securities fraud charges relevant here:

> Unlike securities fraud, insider trading does not necessarily involve deception, and it is easy to imagine an insider trader who receives a tip and is unaware that his conduct was illegal and therefore

9

> wrongful. The same cannot be said of one who deliberately misleads
> investors about a security.

*Id.* Whether or not the defendant's brief accurately states the standard for insider-trading cases, the

Second Circuit has been clear that the standard of willfulness articulated in *Peltz* and reaffirmed

in *Kaiser* applies where, as here, the defendant is charged with "deliberately mislead[ing] investors

about a security." *Kaiser*, 609 F.3d at 569.[1] In fact, in *Petit*, the Second Circuit rejected the

argument the defendant now advances in reliance on *Kosinski*, noting that "[t]he more heightened

standard for showing willfulness through knowledge of the specific law that one is violating' has

'been required only where a highly technical statute—such as a provision of the Internal Revenue

Code—prohibits apparently innocent conduct." 2022 WL 3581648, at *4 (quoting *United States

v. Henry*, 888 F.3d 589, 599 (2d Cir. 2018)). As the Second Circuit concluded, that heightened

standard does not apply here. *Id.*

In any event, declining to give the defendant his preferred formulation did not prejudice

him, particularly given, as noted above, that the Court did state that a belief that the conduct was

not in furtherance of an unlawful purpose would provide a defense. (Trial Tr. 3208-09). It is not

possible in this case for a juror to find that the defendant acted "intentionally" and "wrongfully"

when making false and misleading statements about Nikola's business and technology, let alone

---

[1]    The defendant's reliance (Def. Mot. 12) on *Bryan v. United States*, 524 U.S. 184 (1998),
is also misplaced. It was undisputed in *Bryan*, which involved a statute that prohibited dealing in
firearms without a license, that the relevant offense required proof the defendant knew his conduct
was unlawful. The only issue was whether the statute also required proof that the defendant knew
of a federal licensing requirement. The Supreme Court held that it did not. *See* 524 U.S. at 196. In
reviewing legal definitions of willfulness, *Bryan* observed that, "As a general matter, when used
in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.'" *Id.* at 191; *see also
id.* at 191-92 n.13 (quoting cases using the "bad purpose" formulation without referring to any
knowledge-of-unlawfulness requirement).

that he did so with a belief that the statements furthered an "unlawful scheme" (Trial Tr. 3208-09), and yet also to find that the defendant did not act "with the bad purpose to disobey or disregard the law," which is the formulation preferred by the defendant (Def. Mot. 12).

Indeed, it is not clear that there is even a basis in the record to argue that the defendant did not know that it was unlawful to induce investors into purchasing stock based on false and misleading statements. Certainly, the defendant points to nothing from which any juror could make such an inference. (Def. Mot. 17-18). The record, to the contrary, contains extensive evidence supporting the common sense conclusion that the defendant, the executive chairman of a public company who lied to investors, knew that that conduct was unlawful. For example, both the CEO and CFO of Nikola repeatedly warned the defendant that the public statements of a company executive had to be accurate and vetted by lawyers just like the company's public filings were. (*See, e.g.*, Trial Tr. 957-61, 1716-17, 1797-98, 1802, 1814). The CFO even emailed the defendant in 2018 specifically to warn him that falsely inflating the company's accomplishments could lead to legal exposure for false representations. (Trial Tr. 1788-89; GX 212).

The defendant's entire argument as to prejudice for the purported failure to instruct the jury that the defendant needed to know his conduct was unlawful for conviction on Count One appears to be that the Government argued—in its rebuttal summation and in response to defense arguments that no one warned the defendant not to make false and misleading statements—that it is common sense that such conduct is wrongful, and that, according to the defendant, with his chosen jury instruction, "the government could not have made this argument." (Def. Mot. 17-18 (citing Trial Tr. 3175)). It is left entirely to the imagination why the Government could not and would not have made this very same argument whatever the willfulness instruction was, and the defendant makes

11

no genuine, and certainly no coherent attempt to explain how this argument improperly prejudiced the defendant.

In short, the Court did provide the substance of the willfulness instruction the defendant requested, even though it was not required to under the law, and any putative error was certainly harmless.

### 2.      The Defendant Has Identified No Omission in the "Intent to Defraud" Instruction for Counts Three and Four

The defendant argues that "[t]he Court's failure to instruct the jury that the government had to prove Mr. Milton intended to harm his alleged victims to obtain convictions on Counts Three and Four was also legal error." (Def. Mot. 13). The argument is easily rejected, because the Court provided precisely such an instruction:

> Mr. Milton acted with specific intent to defraud if he engaged or participated in the fraudulent scheme with some realization of its fraudulent or deceptive character and with an intention to be involved in the scheme to defraud and to help it succeed with a purpose of causing harm to the victim. The government need not prove that the intended victim or victims was or were actually harmed; only that such harm was contemplated.

(Trial Tr. 3216). The defendant addresses the first sentence in this paragraph—which required that the defendant engage in the scheme "with a purpose of causing harm to the victim" (Trial Tr. 3216)—in a footnote only, characterizing this sentence as "[t]he closest the Court came" to instructing the jury that it must find an intent to harm and dismissing it as "convoluted" (Def. Mot. 14 n.3). The Government observes no basis for the claim that this sentence is convoluted, and, in any event, the defendant has provided no authority for the notion that a "convoluted" instruction is legally erroneous. Nor does the defendant address or in any way engage with the second sentence of this paragraph, which instructed that "[t]he government need . . . [prove] only that such harm

was contemplated." (Trial Tr. 3216). Simply put, the Court did provide, and in broader fashion

than necessary, an instruction requiring a finding of intent to harm as to Counts Three and Four.

The defendant also argues briefly that there was an insufficient predicate for a no-ultimate-

harm instruction. (Def. Mot. 16). The defendant is wrong. Indeed, the defendant argued both

through cross-examination and in summation that investors were not harmed because they received

valuable stock, and that Peter Hicks was not harmed because he ultimately profited from his

transaction with the defendant, and that therefore the defendant was not guilty. (*See, e.g.*, Trial Tr.

3140-41, 3145). Much as in *United States v. Lange*, "there was a factual predicate for the

instruction, because there was evidence that [the defendant] intended to immediately deprive

investors of their capital through fraud, even if [he] truly believed that in the long-term [the

company] would ultimately succeed, deriving profits for the defrauded investors." 834 F.3d 58, 79

(2d Cir. 2016).

### 3. There Was Nothing Erroneous About the Headings in the Written Jury Instructions

The defendant argues that his conviction should be vacated because the written version of

the jury instructions used different language in the section headings for the *mens rea* element of

the various counts. (Def. Mot. 16-17). Specifically, the defendant points to the fact that the second

element of Count One was titled "State of Mind," whereas for Count Two the heading of the

section was "Criminal Intent," and for Count Three the heading was "Knowing Participation in

Scheme with Intent to Defraud." The defendant cites no authority that would support the claim

that variable section headings for correct instructions constitute prejudicial legal error and there is

none.

13

Notably, the defendant did not object to the headings at the time. To preserve any objection to jury instructions, a defendant must "direct the trial court's attention to the contention that is to be raised on appeal." *United States v. Masotto*, 73 F.3d 1233, 1237 (2d Cir. 1996); *see also* Fed. R. Crim. P. 30(d). Where the defendant fails to properly object, the alleged instructional failure is reviewed for plain error. *United States v. Skelly*, 442 F.3d 94, 99 (2d Cir. 2006). To establish plain error, the defendant must demonstrate that "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; [and] (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010). Where those elements are met, a reviewing court may exercise its discretion to correct the error if "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* Reversal for plain error should "be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982).

The defendant identifies no error, let alone error that is clear or obvious, in the written instruction's headings. None of the headings are incorrect in any way, and the defendant does not argue as much. Moreover, the defendant's claim that the headings "suggested Count Two required criminal intent, and by negative implication, the remaining counts did not require the government to prove criminal intent" (Def. Mot. 17) rests on a specious suggestion—that there is some self-executing concept of "criminal intent." To the contrary, whether titled "state of mind," "criminal intent," "*mens rea*," or any other term, the meaning of the mental state required for the given count is defined and explained in the jury instructions themselves. There is no greater or lesser or other requirement imposed by the heading of the section. And, of course, there is no reason to think that

the headings prejudiced anyone, let alone that prejudice flowing from the headings fell to the defendant rather than the Government.

### 4.   Post-Verdict Commentary by Jurors Is Irrelevant and Inadmissible, and Does Not Support the Defendant

The defendant's entire basis for arguing that any purported error in the jury instructions—of which there was none—prejudiced him rests on apparent comments by jurors in post-verdict media interviews or on social media. (Def. Mot. 18-21). The defendant contends that the commentary by certain jurors suggest that the jury believed that the evidence was insufficient to show "criminal intent" (whatever that might mean) (Def. Mot. 19) as to Count Two, and that the jury necessarily must have been confused by the jury instructions, or they would have returned the same verdicts as to Counts One, Three, and Four. Of course, it is a fundamental principle that the law presumes "that juries follow the instructions they are given," *United States v. Agrawal*, 726 F.3d 235, 258 (2d Cir. 2013), and any even putative inconsistency in verdicts is not a basis for relief, *United States v. Acosta*, 17 F.3d 538, 544-45 (2d Cir. 1994).

The defendant nonetheless insists that the hearsay statements of certain jurors should be considered in assessing the prejudice flowing from the purported instructional errors he identifies. Apparently conscious of the fact that the law absolutely would not permit a hearing into the jurors' understanding of the legal instructions in the case (and that such a hearing would undoubtedly not in fact favor the defendant), the defendant seeks no hearing. (Def. Mot. 20). Remarkably, the defendant instead proposes that the Court should vacate his convictions based purely upon the partially reported hearsay statements apparently made by jurors during various media interviews. (*See* Def. Mot. 19-20).

Post-verdict juror statements are not the subject of any proper inquiry, however. *See United States v. Aiyer*, 433 F. Supp. 3d 468, 474 (S.D.N.Y. 2020) ("matters pertain[ing] to the jurors' mental processes . . . should not become the subject of inquiry absent extraordinary circumstances not present in this case" (citing *Yeager v. United States*, 557 U.S. 110, 122 (2009), for the rule that "Courts properly avoid such explorations into the jury's sovereign space[.]")); Fed. R. Evid. 606(b) (precluding for the purpose of undermining a verdict a juror's testimony regarding "any juror's mental processes concerning the verdict"); *see also United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2022 WL 576306, at *3 (S.D.N.Y. Feb. 25, 2022) (unsworn statements to media outlets and statements regarding jury deliberation may not be considered in a motion for a new trial). Similar circumstances arose in *Tatum v. Jackson*, where a defendant in a civil suit contended, based on post-deliberation remarks from several jurors, that the jury misunderstood the legal instructions. 668 F. Supp. 2d 584, 594 (S.D.N.Y. 2009). That court concluded that a "hearsay report of jurors' post-deliberation remarks cannot be considered by the Court in deciding" a motion for a new trial. *Id.*

Even if it were proper to consider the hearsay statements of these jurors, they still would not support the conclusion that any error in the jury instructions prejudiced the defendant. If anything, the post-verdict juror comments reveal that the jurors misunderstood the meaning of the notion of "intent to harm" and incorrectly added an additional burden to the Government—a misunderstanding invited by the defendant's summation in repeated general reference to harm and lack of harm equating to lack of guilt. As the quotes of the post-verdict juror commentary selected by the defendant suggest, the jurors applied a common sense, but incorrect, understanding to the notion of "harm" in this case, believing that it was a defense if the defendant did not intend his

16

victims to suffer an ultimate loss or if the victims did not ultimately suffer a loss. (*See* Def. Mot. 8). In fact, the "harm" required under the fraud statutes is merely the deprivation of a property interest, not an actual financial loss. *United States v. Muratov*, 849 F. App'x 301, 306 (2d Cir. 2021) ("Under the classic mail fraud theory, the harm involved in the scheme is the deprivation of money or tangible property."); *see also Shaw v. United States*, 580 U.S. 63, 67 (2016) (bank fraud statute, "while insisting upon 'a scheme to defraud,' demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss"); *United States v. Males*, 459 F.3d 154, 158-59 (2d Cir. 2007) ("harm" satisfied by scheme to temporarily deprive another of use of property); *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) ("the proof must demonstrate that the defendant had a conscious knowing intent to defraud and that the defendant contemplated or intended some harm to the property rights of the victim" (internal quotation marks, ellipses, and brackets omitted)); *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932) (Hand, J.) ("A man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value."). Particularly given that it appears that the jury decided to show leniency toward the defendant on Count Two, if the post-deliberation commentary by the jurors means anything, it is that the defendant was incorrectly acquitted of Count Two—a circumstance for which the defendant can hardly claim prejudice.

Of course, none of these post-verdict comments—apparently delivered to journalists and lifestyle bloggers—has any practical or legal bearing on this case. The defendant was convicted upon ample evidence and correct jury instructions, and therefore the convictions should not be vacated.

17

## II.   The Defendant's Motion for a New Trial Based on Purported Juror Misconduct Should Be Denied

### A.   Applicable Law

As noted above, "[t]he defendant bears the burden of proving that he is entitled to a new trial under Rule 33." *McCourty*, 562 F.3d at 475. Because motions for a new trial are strongly disfavored, "the standard for granting such a motion is strict," *Gambino*, 59 F.3d at 364, and it should be granted only in "extraordinary circumstances," *McCourty*, 562 F.3d at 475 (internal quotation marks omitted).

Courts strongly disfavor post-verdict inquiries into juror conduct. As the Supreme Court explained: "Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time . . . after the verdict, seriously disrupt the finality of the process. Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of post-verdict scrutiny of juror conduct." *Tanner v. United States*, 483 U.S. 107, 120-21 (1987) (citations omitted). The Second Circuit has cautioned that "post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989).

A defendant seeking Rule 33 relief based on alleged juror misrepresentations during voir dire must satisfy a two-part test: "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). The Second Circuit has held that these two requirements are

conjunctive: "in order to obtain a new trial, a defendant must show *both* that a juror gave a dishonest answer, *and* that the correct answer would have provided a basis for the defendant to challenge the juror for cause." *United States v. Shaoul*, 41 F.3d 811, 816 (2d Cir. 1994) (emphasis in original). The first prong requires a deliberate misconduct, not an honest mistake. *See id.* The second prong requires the Court to determine whether, if the juror had answered truthfully, it would have granted a hypothetical strike for cause. *See United States v. Stewart*, 433 F.3d 273, 304 (2d Cir. 2006). The *McDonough* test is "an exacting hurdle" because "motions to set aside a jury verdict are disfavored." *United States v. Ventura*, No. 09 Cr. 1015 (JGK), 2014 WL 259655, at *3 (S.D.N.Y. Jan. 21, 2014). Indeed, the Second Circuit "has only on rare occasions overturned a verdict or remanded for an evidentiary hearing" based on the failure of a juror to disclose information during jury selection. *United States v. Teman*, 465 F. Supp. 3d 277, 330 (S.D.N.Y. 2020); *see also United States v. Sattar*, 395 F. Supp. 2d 66, 72 (S.D.N.Y. 2005) (describing the "difficulty" of meeting both prongs of the test).

"Because of the importance of finality of judgments, the threshold for conducting a post-verdict inquiry is high." *Maxwell*, 2022 WL 576306, at *3. "A post-verdict inquiry into juror misconduct is conducted only 'when there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant.'" *Id.* (quoting *United States v. Baker*, 899 F.3d 123, 130 (2d Cir. 2018) (alterations in *Maxwell*)).

### B.    Discussion

The defendant asserts that Juror Six intentionally lied during voir dire by falsely denying bias against wealthy corporate executives and use of social media. These claims are unsupported

by the record, internally inconsistent with the rest of the defendant's motions, and should be rejected.

### 1.      The Defendant Cannot Satisfy the First *McDonough* Prong

The defendant has failed to point to "clear, strong, substantial and incontrovertible evidence," *Baker*, 899 F.3d at 130, that Juror Six deliberately failed to answer a voir dire inquiry honestly, and therefore his request for a hearing or new trial must be denied.

To support his claim of deliberative misconduct, the defendant points first to Juror Six's failure to respond affirmatively to the following questions:

- "Do you think that there may be some relationship between how wealthy an individual is and how likely they are to break the law?"

- "Do you feel that senior-level corporate executives do not deserve or are not worth the money that they earn?"

- "Would you have any problem accepting the principle that, regardless of a person's personal wealth or lack of personal wealth, they're entitled to a fair trial, including the presumption of innocence?"

(Voir Dire Tr. 22, 69-70). The defendant compares these questions to a number of social media posts, apparently made by Juror Six, that the defendant claims evidence "deep-seated hostility toward corporate executives." (Def. Mot. 21). The social media posts offered by the defendant do not demonstrate, let alone provide incontrovertible evidence, that Juror Six maintains that form of bias or that Juror Six's non-responses during voir dire were deliberately misleading.

Rather, the social media posts paraded by the defendant suggest nothing more than that Juror Six believes that wealth inequality is a problem in society—a perfectly rational view, held by many, that does not call into question the veracity of Juror Six's non-responses. For example, the defendant points to a graphic purportedly posted by the juror demonstrating the gap between

20

the wealth of Jeff Bezos and Mark Zuckerberg on the one hand, and the minimum wage on the other, with the conclusion "tax the rich." (Def. Mot. 23-24). A call for redistributive taxation does not indicate that this juror felt generally that high-level corporate executives do not deserve their income, let alone that corporate executives are more likely to break the law or are not entitled to a fair trial or the presumption of innocence. The defendant cites another graphic purportedly posted by Juror Six that the defendant claims demonstrates the juror's belief that corporate executives do not deserve their income. (Def. Mot. 24-25). But the graphic raises a different issue—whether billionaires deserve money because they are a job creators, and goes on to compare the rapid increase in wealth held by billionaires with a recent increase in the loss of jobs. (Def. Mot. 25). It certainly does appear that Juror Six is critical of wealth inequality, an issue of widespread concern, but not one that suggests she lied when asked, in substance, whether she believed that corporate executives deserve a fair trial.

The defendant also emphasizes that the potential juror questioned immediately before Juror Six "confessed she 'do[es] feel like executives make more than they should.'" (Def. Mot. 23 (quoting Voir Dire Tr. 69)). The defendant appears to intimate that the fact that this potential juror answered the question affirmatively implies that Juror Six must have deliberately chosen not to provide an affirmative answer. The rational inference is the opposite, because what the defendant omits in his brief is that after that juror confirmed that "in [her] view, some corporate executives make more money than they should, but that would not affect [her] ability to be fair and impartial in this case," the Court qualified the juror without a motion to strike for cause (or even comment at all) from either party. (Voir Dire Tr. 69). To the extent that the defendant now suggests that Juror Six hid her true feeling that corporate executives are overpaid in order to avoid being struck

for cause, that claim is wholly inconsistent with the fact that Juror Six had just observed a juror
not be struck when giving that answer.

The defendant next claims that Juror Six deliberately lied to conceal her use of social
media. (Def. Mot. 26-28). This false statement purportedly occurred during this exchange:

> THE COURT: From where do you get your news?
>
> JUROR: YouTube.
>
> THE COURT: What social media platforms, if any, do you use?
>
> JUROR: None.
>
> THE COURT: What about radio stations, TV shows, or podcasts?
>
> JUROR: I listen to podcasts on Spotify.

(Voir Dire Tr. 198-99). The notion that Juror Six deliberately lied—as opposed to misunderstood
or misheard or simply answered carelessly—when she responded "none" to the question of "What
social media platforms, if any, do you use?" is wholly implausible, and certainly the evidence is
far from substantial and incontrovertible. Notably, the juror answered the immediately preceding
question by pointing to her use of the social media website, YouTube, and answered the
immediately succeeding question by pointing to her interest in podcasts. Moreover, as an avid
social media user (at least as described by the defendant), Juror Six would well know that her
social media accounts are publicly accessible, and lying to the Court about her use of social media
would be absurd.

But the defendant's claim that Juror Six intentionally lied to hide her biases suffers from
another flaw: it is wholly inconsistent with the other arguments the defendant advances. Indeed, it
is almost entirely based on the post-verdict statements (which the defendant apparently accepts as

true) of Juror Six that the defendant now claims that the jurors did not believe that he was guilty or intended to harm his victims. (*See* Def. Mot. 7-10). As noted above, Juror Six has even stated that the jury (including Juror 6) decided to show leniency toward the defendant in delivering a not-guilty verdict on Count Two. The defendant cannot now plausible argue that Juror Six both harbored deeply held biases against him and deliberately hid them from the Court through internal omissions and falsehoods, and yet also on social media touted that the defendant did not intend to harm others and was deserving of leniency. Indeed, the very fact that Juror Six voted to acquit on Count Two renders hollow his argument of bias and prejudice.

In short, the defendant has failed to demonstrate that Juror Six would subject herself to the penalty of perjury by lying about her views of corporate executives or use of social media. *United States v. Ruggiero*, No. 97 Civ. 2925 (HB), 2001 WL 286751, at *3 (S.D.N.Y. Mar. 22, 2001) (rejecting claim of juror misconduct in voir dire, concluding "it is not clear that [the juror's] failure to respond to the Court's question was a deliberate attempt at dishonesty, as she only failed to answer the court's question").

### 2.    The Defendant Cannot Satisfy the Second *McDonough* Prong

The defendant cannot make a substantial showing that, if Juror Six had answered in the manner that the defendant now claims would have been truthful, the Court would have granted a hypothetical strike for cause. A belief that wealth in our society is unfairly distributed is not only widely held and amply supported, it is not a basis to strike a juror for cause, even where the defendant is wealthy.

One can be confident that a strike for cause would not have been successful if Juror Six had stated that she believed that executives make too much money because two other jurors answered that question affirmatively and neither was struck for cause—the defendant did not even

23

raise an objection to either. (Voir Dire Tr. 69, 73-74). In one case, the potential juror agreed that "some corporate executives, although they may not break the law, sometimes do things that are ethically questionable," and yet still there was no motion to strike for cause after the potential juror agreed that she could follow the Court's instructions on the law. (Voir Dire Tr. 73).

Nor would a strike for cause have been made if Juror Six had stated that she uses Twitter or Facebook or any other form of social media. Indeed, those questions were asked after potential jurors had been qualified. Nothing that the defendant has offered suggests that Juror Six has actual bias that would lead to a strike for cause.

The defendant argues that Juror Six was impliedly biased. Implied bias, also called "presumed bias," is "'bias conclusively presumed as a matter of law.'" *United States v. Torres*, 128 F.3d 38, 45 (2d Cir. 1997) (quoting *United States v. Wood*, 299 U.S. 123, 133 (1936)). That is, a finding of implied bias does not turn on the juror's answers to questions during voir dire, but rather whether an "average man" in a similar situation would be biased. *Id.* at 45-46. The Second Circuit has emphasized that this category is "narrow," and "reserved for 'exceptional situations.'" *Id.* at 46. Generally, it is limited to circumstances in which there is a relationship between the juror and the parties or the crime itself. *See id.* at 45 ("[A]utomatically presumed bias deals mainly with jurors who are related to the parties or who were victims of the alleged crime itself."); *United States v. Greer*, 285 F.3d 158, 172 (2d Cir. 2002) ("[T]he District Court refused to find implied bias because it found the issues affecting juror Baker to be insufficiently 'drastic.' Juror Baker was, after all, neither related to a party nor a victim of the defendants' crimes."). Juror Six has no personal relation to the case and the defendant has pointed to nothing that places Juror Six in the narrow category of implied bias.

Finally, there is no basis to find inferred bias. While the category of cases in which bias *must* be implied or presumed is limited to "exceptional" or "extreme situations," the district court retains discretion to dismiss a juror for cause when "a juror discloses a fact that bespeaks a risk of partiality sufficiently significant to warrant granting the trial judge discretion to excuse the juror for cause, but not so great as to make mandatory a presumption of bias." *Torres*, 128 F.3d at 46-47. This doctrine of "inferred bias" is "closely linked" to the "traditional categories" of actual and implied bias, and a finding of inferred bias is permitted "only after having received responses from the juror that permit an inference that the juror in question would not be able to decide the matter objectively." *Id.* at 47. "[A] finding of inferred bias is, by definition, within the discretion of the trial court." *Greer*, 285 F.3d at 172. And, as with actual bias, "a district court's evaluation of the juror's impartiality is accorded deference." *Id.*; *see also id.* ("There are few aspects of a jury trial where we would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause in the empanelling of a jury." (quoting *United States v. Ploof*, 464 F.2d 116, 118-19 n.4 (2d Cir. 1972))). For the reasons outlined above, there is no substantial and incontrovertible basis to think that Juror Six could not decide the case impartially; in fact, all evidence is to the contrary.

Accordingly, the defendant's motion for a new trial based on the voir dire responses of Juror Six should be denied without a hearing.

## III. The Defendant's Motion for Acquittal on Count Three Should Be Denied

The defendant argues that he is entitled to a judgment of acquittal on Count Three because the Government failed to prove that the defendant intended to obtain money or property through his scheme to defraud retail investors. (Def. Mot. 37-42). This argument may be swiftly rejected as it is squarely foreclosed by the law and wrong on the facts.

25

First, the law in this Circuit is unambiguous: a defendant need not seek to obtain the money or property at issue to be guilty of wire fraud. *United States v. Gatto*, 986 F.3d 104, 124 (2d Cir. 2021) (defendant need not "personally obtain property from the victim to be convicted of wire fraud"); *Males*, 459 F.3d at 158-59 (rejecting defendant's argument "that the jury should have been instructed that it could only convict him if it found that he intended to 'obtain' his victim's money" and holding that a temporary deprivation of a victim's use of money or property is sufficient); *Porcelli v. United States*, 404 F.3d 157, 162 (2d Cir. 2005) ("the defendant does not need to literally 'obtain' money or property to violate the statute"). Accordingly the defendant is simply incorrect that the Government must prove that he intended to obtain money property. It is sufficient if, as the Government amply proved here, the defendant engaged in a scheme to defraud victims into parting with money or property to purchase stock.

Second, even if a requirement that the defendant engage in scheme in which he would personally obtain money or property did exist, the Government adduced sufficient evidence of that as well. A defendant challenging the sufficiency of the evidence bears a "heavy burden," *United States v. Gaskin*, 364 F.3d 438, 459 (2d Cir. 2004), as the standard of review is "exceedingly deferential," *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). Courts "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (citations, brackets, and internal quotation marks omitted), *abrogated on other grounds by Dean v. United States*, 137 S. Ct. 1170 (2017). Ultimately, "the task of choosing among

competing, permissible inferences is for the [jury], not for the reviewing court." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001).

A conviction must therefore be affirmed if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also Guadagna*, 183 F.3d at 130 (a jury's verdict may be overturned only if the evidence supporting it is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt" (internal quotation marks omitted)). In addition, in assessing the proof at trial, the Court must analyze each piece of evidence "not in isolation but in conjunction," *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *Guadagna*, 183 F.3d at 130.

The Government argued in summation, based upon evidence of, among other things, the defendant's spending, the defendant's desire to end his stock lock-up as quickly as possible, statements he made to other executives, and the nature of his scheme, that the defendant intended to obtain money through his fraudulent scheme by selling his stock at inflated prices after his lock-up ended. (*See* Trial Tr. 3083). The fact that the defendant's scheme was stopped before the lock-up expired is wholly irrelevant. *See United States v. Greenberg*, 835 F.3d 295, 305-06 (2d Cir. 2016) (because "the gravamen of the offense is the scheme to defraud," "the Government need not prove that the victims of the fraud were *actually* injured, but only that defendants *contemplated* some actual harm or injury to their victims" (quotation marks and brackets omitted)). Thus, even under the defendant's erroneous view of the law, the evidence was sufficient.

## <u>CONCLUSION</u>

For the reasons set forth above, the defendant's motions should be denied.

Dated: New York, New York
       January 20, 2023

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney
                              for the Southern District of New York

                    By:    _s/_____
                              Jordan Estes
                              Matthew Podolsky
                              Nicolas Roos
                              Assistant United States Attorneys
                              One Saint Andrew's Plaza
                              New York, New York 10007
                              Telephone: (212) 637-2543/1947/2421