UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>TREVOR MILTON,<br><br>       *Defendant*. | No. 21-cr-478 (ER) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR
A NEW TRIAL AND A JUDGMENT OF ACQUITTAL ON COUNT THREE**

Alexandra A.E. Shapiro
Daniel J. O'Neill
Avery D. Medjuck
SHAPIRO ARATO BACH LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880
ashapiro@shapiroarato.com
doneill@shapiroarato.com
amedjuck@shapiroarato.com

Marc L. Mukasey
Torrey K. Young
MUKASEY FRENCHMAN LLP
570 Lexington Avenue, Suite 3500
New York, NY 10022
(212) 466-6400
Marc.Mukasey@mfsllp.com
Torrey.Young@mfsllp.com

*Counsel for Defendant Trevor Milton*

# **TABLE OF CONTENTS**

**Pages**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ..............................................................................................................1

ARGUMENT ......................................................................................................................2

I. THE INSTRUCTIONS REGARDING SCIENTER ERRONEOUSLY LOWERED THE GOVERNMENT'S BURDEN OF PROOF AND ALLOWED THE JURY TO CONVICT EVEN THOUGH IT DID NOT FIND CRIMINAL INTENT .................................................2

    A.  The Willfulness Instruction Was Legally Erroneous .........................................................2

    B.  The Instructions On Counts Three And Four Erroneously Failed To Require Proof Of Intent To Harm And Were Confusing ...................................................................................4

    C.  The Instructional Errors Were Prejudicial ...........................................................................7

II. JUROR NO. 6 DEPRIVED MR. MILTON OF A FAIR TRIAL ............................9

III. THE GOVERNMENT IS UNABLE TO SAVE COUNT THREE .......................13

CONCLUSION ................................................................................................................15

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                     Page(s)

*Alleyne v. United States*,
   570 U.S. 99 (2013) ...........................................................................................................9

*Bryan v. United States*,
   524 U.S. 184 (1998) ......................................................................................................2, 3

*Dyer v. Calderon*,
   151 F.3d 970 (9th Cir. 1998) .........................................................................................12

*Kelly v. United States*,
   140 S. Ct. 1565 (2020) ...................................................................................................13

*McDonough Power Equip., Inc. v. Greenwood*,
   464 U.S. 548 (1984) .......................................................................................................12

*Neder v. United States*,
   527 U.S. 1 (1999) .............................................................................................................7

*Offutt v. United States*,
   348 U.S. 11 (1954) .........................................................................................................12

*Safeco Ins. Co. of Am. v. Burr*,
   551 U.S. 47 (2007) ......................................................................................................2, 3

*United States v. Cassese*,
   428 F.3d 92 (2d Cir. 2005) ..............................................................................................3

*United States v. Clark*,
   475 F.2d 240 (2d Cir. 1973) ........................................................................................5, 7

*United States v. Kopstein*,
   759 F.3d 168 (2d Cir. 2014) ........................................................................................4, 7

*United States v. Kosinski*,
   976 F.3d 135 (2d Cir. 2020) ............................................................................................3

*United States v. Lange*,
   834 F.3d 58 (2d Cir. 2016) ..............................................................................................6

*United States v. Maxwell*,
   No. 20-CR-330 (AJN), 2022 WL 576306 (S.D.N.Y. Feb. 25, 2022) ............................13

*United States v. Nieves*,
   ---F.4th---, No. 21-1901, 2023 WL 405354 (2d Cir. Jan. 26, 2023) ........................1, 13

*United States v. Parse*,
   789 F.3d 83 (2d Cir. 2015) ...............................................................................................1, 11, 12

*United States v. Petit*,
   Nos. 21-543, 21-559, 2022 WL 3581648 (2d Cir. Aug. 22, 2022) ..............................................4

*United States v. Rossomando*,
   144 F.3d 197 (2d Cir. 1999) ..........................................................................................................6, 7

*United States v. Silver*,
   864 F.3d 102 (2d Cir. 2017) .............................................................................................................7

**Statutes and Rules**

15 U.S.C. § 78ff...................................................................................................................................2

Fed. R. Evid. 606(b) .........................................................................................................................9

## **INTRODUCTION**

Just last week, the Second Circuit underscored the importance of open and fulsome *voir dire*. Reversing a criminal conviction due to errors in jury selection, the Court reaffirmed that *voir dire* is "critical" to "assuring the criminal defendant … his Sixth Amendment right to an impartial jury," and that a new trial is required when a defendant is deprived of "a full and fair opportunity to expose bias or prejudice." *United States v. Nieves*, ---F.4th---, No. 21-1901, 2023 WL 405354, at *5-6 (2d Cir. Jan. 26, 2023). That is exactly what transpired here. Juror No. 6's brazen dishonesty over a personal bias bearing directly on the trial—her strident animosity towards, and indeed, desire to "abolish the billionaire class"—subverted the *voir dire* process and violated the Sixth Amendment.

Juror No. 6 concealed her hostility towards Mr. Milton's "class" and the social media activities that would have exposed it, despite clear questions the Court posed to ferret out exactly this type of bias. Imagine that instead of the word "billionaire," a juror had endorsed abolishing a specific religious or racial group. Had such a bias been exposed, it is indisputable that the juror would have been struck for cause. Yet the government tries to downplay Juror No. 6's misconduct. Its arguments belie both common sense and the controlling authorities. It dismisses Juror No. 6's lies and claims she "misunderstood" or was "careless[]." But that suggestion is, to use the government's words, "wholly implausible." Other jurors understood the questions, and Juror No. 6 heard their answers, leaving no room for doubt or confusion about what was being asked. The government's legal arguments are equally spurious. The governing law clearly establishes that significant juror dishonesty, in itself, establishes bias sufficient to require a new trial. *See*, *e.g.*, *United States v. Parse*, 789 F.3d 83 (2d Cir. 2015). The government has no answer, so it simply ignores this caselaw, which is fatal to its attempts to defend the conviction.

The government's opposition to Mr. Milton's other claims fares no better. Its attempts to defend the scienter instructions conflict with governing Supreme Court and Second Circuit precedents. It distorts those authorities through misleading selective quotation or other sleight of hand and simply ignores cases that undermine its arguments. Its claim of harmless error is conclusory, devoid of record support, and irreconcilable with the acquittal on Count Two and the statements indicating the jurors did not believe Mr. Milton acted with criminal intent. And the government's defense of Count Three conflicts with its own legal position in the Supreme Court in *Ciminelli* and the inconvenient facts that most of the alleged deception occurred before Nikola had any public shareholders, and all of it occurred months before Mr. Milton had any ability to sell his shares of the highly volatile stock.

Mr. Milton's convictions should be reversed.

## ARGUMENT

**I.   THE INSTRUCTIONS REGARDING SCIENTER ERRONEOUSLY LOWERED THE GOVERNMENT'S BURDEN OF PROOF AND ALLOWED THE JURY TO CONVICT EVEN THOUGH IT DID NOT FIND CRIMINAL INTENT**

**A.   The Willfulness Instruction Was Legally Erroneous**

The government claims 15 U.S.C. § 78ff's willfulness requirement "does not require proof that a defendant knew he was acting unlawfully," and that there was consequently no error in the Court's instruction that willfulness requires only "a wrongful purpose." (Opp. 8). This argument is contrary to binding precedent.

In *Bryan* and *Safeco*, the Supreme Court was explicit that "willfulness" requires proof of a defendant's knowledge that his conduct was not merely wrongful, but *unlawful*. *See Bryan v. United States*, 524 U.S. 184, 191-92 (1998); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 n.9 (2007). The government buries *Bryan* in a footnote and uses selective quotation to misrepresent its holding. The government claims *Bryan* "observed that, '[a]s a general matter, when used in

2

the criminal context, a 'willful' act is one undertaken with a 'bad purpose.'" (Opp. 10 (quoting *Bryan*)). But the government omits the very next sentence, in which the Court wrote: "In other words, in order to establish a 'willful' violation of a statute, '*the Government must prove that the defendant acted with knowledge that his conduct was unlawful.*'" 524 U.S. at 191-92 (emphasis added). And the government completely ignores *Safeco*, which, citing *Bryan*, emphasized that "a defendant cannot harbor such [willful] criminal intent unless he 'acted with knowledge that his conduct was unlawful.'" *Safeco*, 551 U.S. at 57 n.9. These precedents are fatal to the government's position.

The government's effort to dismiss *United States v. Kosinski*, 976 F.3d 135 (2d Cir. 2020)—the Second Circuit's most recent precedential decision defining "willfulness" in securities fraud—is similarly unavailing. Contrary to the government's argument (Opp. 9-10), *Kosinski* is not part of a separate line of insider-trading cases involving a stricter standard for willfulness. *Kosinski* put an end to any such dual standard. Citing *Kaiser*, the *Kosinski* court held that "willfully" has the same meaning for both insider-trading cases and securities fraud cases: it requires "a securities defendant's awareness" of "the general unlawfulness of his conduct." 976 F.3d at 154. The government ignores that holding.[1]

Nor did *United States v. Petit* (a non-precedential summary order) "reject[] the precise argument now advanced by the defendant," as the government asserts. (Opp. 7). *Petit* cited *Kosinski* and *Bryan* approvingly and held only that, counter to an earlier line of cases suggesting "willfulness" in the securities fraud context requires knowledge that conduct is unlawful *specifically under the securities laws* (*see* Mem. 13 n.2), "[t]he more heightened standard for

---

[1] The government also ignores Judge Raggi's dissent in *United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005), which was approved by *Kosinski* and cited in Mr. Milton's opening brief.

3

showing willfulness through knowledge of *the specific law* that one is violating has been required only where a highly technical statute—such as a provision of the Internal Revenue Code—prohibits apparently innocent conduct." *United States v. Petit*, Nos. 21-543, 21-559, 2022 WL 3581648, at *4 (2d Cir. Aug. 22, 2022) (cleaned up) (emphasis added).

The good faith instruction given here did not convey that willfulness requires a defendant's knowledge of the unlawfulness of his conduct. (*See* Opp. 6-7). That instruction merely stated that the government *contended* Mr. Milton was aware his actions were unlawful, not that such awareness was an element of the crime. (Tr. 3208). The government claims the Court instructed "that it would be a 'complete defense' if the defendant 'honestly believed that his statements were ... not in furtherance of any unlawful scheme,'" (Opp. 7), but it uses the ellipsis to excise key language in the instruction, which actually stated that it would be a complete defense "if Mr. Milton honestly believed that his statements and actions were *proper and* not in furtherance of any unlawful scheme." (Tr. 3209 (emphasis added)). The sleight of hand fails, and in any case, the Second Circuit has "rejected the notion that incorrect statements are necessarily cured so long as the charge contains the correct standard elsewhere." *United States v. Kopstein*, 759 F.3d 168, 182 (2d Cir. 2014) (cleaned up).

Thus, the government's efforts to defend the erroneous willfulness instruction fails.

### B. The Instructions On Counts Three And Four Erroneously Failed To Require Proof Of Intent To Harm And Were Confusing

The government appears to concede that Counts Three and Four, like Count Two, required proof that Mr. Milton acted with intent to harm his alleged victims (Opp. 12-13), even though it repeatedly objected at trial to proposed instructions that would have clearly required such intent (*see* Mem. 5). Instead, the government defends the Court's refusal to give Mr. Milton's proposed instructions on intent to harm by pointing to language elsewhere in the

4

charge. This argument fails, because the language the government relies on—in the context of the charge as a whole—did little or nothing to explain that intent to harm was a required element of Counts Three and Four.

    1. The government argues that language buried on the fourth page of the wire fraud instruction, at the end of a more than fifty-word long run-on sentence primarily focused on the requirement that Mr. Milton knowingly participated in the alleged deceptive scheme (*see* Young Decl. Ex. A at 16), sufficiently conveyed that intent to harm is an element of wire fraud. (Opp. 12). But as the jurors' post-verdict statements clearly establish, this highly confusing sentence was insufficient to apprise the jury that intent to harm was an essential element of the offense. (*See* Mem. 8-10, 19). The convoluted language the government relies on was no substitute for a straightforward, simple instruction that intent to harm is an element of wire fraud. *See United States v. Clark*, 475 F.2d 240, 248 (2d Cir. 1973) (court's instructions must be "clear, accurate, complete and comprehensible, particularly with respect to the essential elements of the alleged crime"). Mr. Milton requested such an instruction, but the government objected, and the Court declined to include the requested language in the charge.

    Moreover, the instruction that "[t]he government need not prove that the intended victim or victims was or were actually harmed; only that such harm was contemplated" could not remedy the lack of a clear indication that intent to harm was required. (*See* Opp. 12). Indeed, it defies common sense to suggest that an instruction regarding what the government is *not* required to prove is sufficient to inform the jury of an essential element of a crime.

    2. The government's defense of the "no ultimate harm" instruction, which further obscured the intent to harm requirement, is based on the false premise that Mr. Milton argued at trial that he expected his alleged victims would be made whole *in the long run*. (Opp. 13). But

5

Mr. Milton made no such argument; the defense argued that investors and Hicks *contemporaneously* received the benefit of the bargain because Mr. Milton's statements did not affect the price of Nikola securities. (*See*, *e.g.*, Tr. 3140-41).

The distinction between intending *no harm* and intending no *ultimate* harm was critical to the Second Circuit's decision to vacate in *United States v. Rossomando*. *See* 144 F.3d 197, 202 (2d Cir. 1999). The government ignores *Rossomando* entirely and relies on *United States v. Lange*, 834 F.3d 58 (2d Cir. 2016). (Opp. 13). But *Lange* is inapposite—there, the defendants argued that even if their victims were initially deprived of the right to control their assets (which were siphoned into undisclosed investments), the *ultimate* success of the investments would ameliorate any harm. *Lange*, 834 F.3d at 79. Mr. Milton made no such argument. There was consequently an insufficient factual predicate for the instruction.

3. The government's only answer to the evidence that the misleading headings in the written charge exacerbated the jury's confusion regarding the intent required for wire fraud is the highly circular argument that there was no error because "the meaning of the mental state required for the given count is defined and explained in the jury instructions themselves." (Opp. 14). As noted, however, the intent to harm requirement—a key aspect of "the mental state required"—was included in the charge for Count Two, but *not* Three or Four; the misleading headings (which were derived from the government's proposed charge and were not included in Mr. Milton's proposal) thus reinforced the existing suggestion that the scienter requirement for the wire fraud counts was different, and less strict, than the one for Count Two.[2]

---

[2] While it is true that the legal concept of "criminal intent" is defined by reference to the substance of the charged crime (Opp. 14), it takes little imagination to realize that a lay juror will believe a crime requiring "criminal intent" demands different proof than crimes for which the written instructions suggest something other than "criminal intent" is required. *Cf. Kopstein*, 759

6

4. The government's glib suggestion that a highly confusing or "convoluted" instruction on an essential element is not legally erroneous (Opp. 12) is flat wrong. The Second Circuit has repeatedly reversed criminal convictions because of such "highly confusing" charges. *See*, *e.g.*, *Kopstein*, 759 F.3d at 172 ("A charge that appears likely to have left the jury 'highly confused' may, on that ground alone, be reversed."); *Rossomando*, 144 F.3d at 202 (charge requiring jury to reconcile "ambiguous and obscure" instructions is plain error); *Clark*, 475 F.2d at 248. Once again, the government simply ignores these controlling authorities.

C. **The Instructional Errors Were Prejudicial**

The government's claim that any instructional error was harmless rests on a series of specious and circular arguments.

*First*, the government repeatedly suggests that it is *Mr. Milton* who must prove the erroneous instructions were prejudicial. (*See* Opp. 6, 11-12, 14-15). That argument flips the burden on its head—an instructional error is not harmless unless the *government* demonstrates that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999); *see also United States v. Silver*, 864 F.3d 102, 122 (2d Cir. 2017) (courts must reverse if it is "conceivable that a properly instructed rational jury" would not have convicted). The government does not meet that standard here.

*Second*, the government contends that the erroneous willfulness instruction was harmless, but rests that contention largely on the false assertion that the instructions conveyed that willfulness requires knowledge of unlawfulness, and that the jury therefore necessarily

---

F.3d at 183 ("[A] jury composed of laypersons cannot be expected to perform … grammatical parsing, subtle exegesis, rhetorical deconstruction, and editing for harmlessness.").

determined Mr. Milton acted with such knowledge (Opp. 10-11).  As explained (*supra* at 4), that claim relies on the government's *rewriting* of the jury charge, not the instructions as given.[3]

*Third*, the government argues (without citation to the record) that the verdict was "amply supported" by "overwhelming" evidence.  (Opp. 1, 23).  That argument, of course, ignores the jury's *acquittal verdict* on Count Two, which was premised on the same evidence, and had substantially the same elements, as Counts One and Three.  That fact alone shows the jury viewed this as a close case.  The government speculates that the jury's post-deliberation statements (which it simultaneously argues cannot be considered) establish that the jury acquitted on Count Two due to an incorrect belief "that it was a defense if the defendant did not intend his victims to suffer an ultimate loss or if the victims did not ultimately suffer a loss."  (Opp. 16-17). The government cites no actual juror statements in support of this conjecture because none support it.  Nor does this speculation make any logical sense:  The jury was specifically (and erroneously) instructed that "no ultimate harm" was no defense (Tr. 3219), and that proof of actual harm was not required to convict (Tr. 3216).[4]  The government ignores these instructions (which it elsewhere defends or holds up as evidence that the charge was legally correct) in order to shore up its bizarre reading of the juror statements.

---

[3] The government's contention that it would have argued that lying is wrongful no matter how the instructions defined "willfully" is irrelevant (Opp. 11-12); the point is that the argument would have been gutted of legal significance if the jury had been properly instructed, not that the government would have literally been prevented from making its argument.

[4] In passing, the government argues that the jury may have failed to understand that "the 'harm' required under the fraud statutes is merely the deprivation of a property interest, not an actual financial loss," but it once again fails to support that speculation with reference to any actual juror statement.  (Opp. 17).  Nor does the government elaborate on how a person could intend to harm someone's property interest without intending to cause financial loss in the context of this case.

Equally perplexing is the government's suggestion that the acquittal on Count Two was due to "leniency." (Opp. 4, 17, 23). *All* the jurors who have made public statements to date have explained that the jury acquitted because the government failed to prove the requisite intent (*see* Mem. 7-10) not because of "leniency," compromise, or juror nullification. The government's spurious argument to the contrary is completely contradicted by the jurors' actual statements.

*Fourth*, the government seeks to evade the jury's post-verdict statements—which establish the serious prejudice caused by the erroneous instructions (*see* Mem. 18)—by claiming that inquiry into the juror's deliberation process is *per se* barred by Fed. R. Evid. 606(b). The government has no answer, however, for the binding authority cited in our opening brief (at 19) establishing that the general rule against inquiry into juror mental processes is trumped by violation of a criminal defendant's right to due process, which occurs when the defendant is convicted in the absence of proof beyond a reasonable doubt on *each element* of the charged offense, *see*, *e.g.*, *Alleyne v. United States*, 570 U.S. 99, 104 (2013). That is what happened here. Similarly, the government does not even attempt to dispute that the purposes animating Rule 606 are not implicated in the unique circumstances of this case. (*See* Mem. 19-20).

In short, the erroneous instructions impacted the central disputed issue at trial—Mr. Milton's intent. The post-trial record and the mixed verdict itself readily establish that the jury's decision to convict was influenced by the errors, which could not therefore have been harmless beyond a reasonable doubt. Accordingly, Mr. Milton is entitled to a new trial.

## II. JUROR NO. 6 DEPRIVED MR. MILTON OF A FAIR TRIAL

The government's attempt to avoid a new trial—or even a hearing—based on Juror No. 6's lies to the Court defy common sense and the controlling authorities.

1. Juror No. 6's repeated lack of candor with this Court is indisputable. Yet the government implores the Court to look past it, elevating expediency and certainty over

constitutional fairness. The government insists, for example, that the object of Juror No. 6's enmity is not wealthy individuals but "wealth inequality," justifying her silence when asked about "senior-level corporate executives … not deserv[ing] … the money that they earn." (Opp. 20-21). But the government grossly distorts Juror No. 6's Facebook and Twitter persona. She is not simply a champion of progressive tax policy; in pointed and vitriolic terms, she has voiced hostility towards the wealthy "ruling class" *personally*, chastising them as "greedy," undeserving, lacking "moral compass," manipulative, and exploitive, and rallying her followers to "[b]leed them dry." (Mansbach Decl. Ex. L at 3, 8, 13, 15). These views were directly responsive to the Court's questions intended to ferret out such bias against wealthy executives (VD-Tr. 22, 69-70). It is inconceivable that Juror No. 6 could have believed an honest answer to these questions was "no," yet she concealed her views and deceived the Court and the parties.

As explained in Mr. Milton's opening brief, Juror No. 6 could not have misunderstood the question, because she heard other prospective jurors respond with their own, relatively benign misgivings about wealthy executives. (Mem. 23). The government surmises that because another juror was allowed to remain after attesting that her view that some corporate executives made too much money would not affect her "ability to be fair and impartial," Juror No. 6 would not have concealed her own views to avoid being struck. (Opp. 21-22). But that ignores that the views Juror No. 6 had expressed on social media were far more belligerent—and far more likely to get her struck for cause—than anything others had said.

The government's attempt to dismiss Juror No. 6's deceit about social media and the news as "wholly implausible" (Opp. 22) defies common sense. The government asserts she might have simply "misunderstood or misheard or simply answered carelessly." But her post-trial interviews—including one given recently about Mr. Milton's motion—demonstrate she

understands perfectly well that the "news" is not just YouTube and that "social media" includes Facebook and Twitter. (Mansbach Decl. Ex. D at 13; Declaration of Avery D. Medjuck ("Medjuck Decl.") Ex. A at 1-2). And "carelessness" or lack of use cannot reasonably explain the omission: She tweeted at least five times the day before *voir dire*. (Mansbach Decl. Ex. G at 54-55). How could anyone who did that honestly tell a federal judge, under oath, the very next day, that she did not use *any* social media platforms? The government also praises Juror No. 6 for volunteering that she watches YouTube and listens to podcasts. But that just proves she heard and understood the questions and chose to disclose only the platforms that would not have revealed her bias against wealthy corporate executives.

      2. As for the second *McDonough* prong, the government tellingly omits any mention of controlling caselaw holding that such dishonesty by a prospective juror in itself establishes bias. As we highlighted in the opening brief, *United States v. Parse*, 789 F.3d 83 (2d Cir. 2015), held—in line with many other Courts of Appeals (Mem. 34-36)—that deliberate lies to get on a jury *ipso facto* establish "an impermissible partiality" and the presumption of bias. In this unique scenario, that is the end of the inquiry. The government's generalized discussion of implied and inferred biases (Opp. 24-25) is irrelevant in this case.

      The government's arguments against Juror No. 6's actual bias are equally misplaced. The government sugarcoats her social media postings as expressing views that are "widely held and amply supported." (Opp. 23-24). But the issue is not whether a juror aligns with mainstream sentiment, but whether she harbors a bias—popular or not—against the defendant. Juror No. 6 urged her Facebook followers prior to Mr. Milton's trial to "Abolish the billionaire class." (Mansbach Decl. L at 9). Substitute a different term—"Blacks," "cops," "Muslims"— and no one could seriously dispute a disqualifying bias if the case involved such a defendant.

11

The serious impairment of Juror No. 6's ability to be fair and impartial was no less substantial just because she directs her venom at Mr. Milton and his peers rather than a protected class.

The government also contends Juror No. 6's vote to acquit on Count Two proves she lacked bias. (Opp. 22-23). But as discussed above, the erroneous jury instructions made it easier to secure a conviction on the other counts, and Juror No. 6 helped push through convictions on those counts even though—as she has since conceded—she believed Mr. Milton intended no harm. In any event, the *McDonough* test does not undertake to determine whether the mendacious juror actually contributed to the verdict. *See McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). "[J]ustice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 13 (1954). "[A] juror who tells major lies creates a serious conundrum for the fact-finding process" and by her mere presence in the jury room corrupts the entire trial. *Dyer v. Calderon*, 151 F.3d 970, 983 (9th Cir. 1998).

Nor—contrary to the government's suggestion (Opp. 23-24)—does *McDonough* require courts to hypothesize a truthful *voir dire* and ask whether a challenge for cause would have been granted or even made. The question is simply whether a truthful answer "would have provided a valid *basis* for a challenge for cause." *McDonough*, 464 U.S. at 556 (emphasis added). Juror No. 6 provided a valid basis twice over, by her actual bias against wealthy executives like Mr. Milton and because, once she deliberately lied to the Court, her "bias is to be presumed." *Parse*, 789 F.3d at 111.

Finally, the government protests that Juror No. 6's lies about social media and the news are irrelevant because by that point jurors had already been qualified. (Opp. 24). But if she had revealed the truth, she could have been struck for cause at any time. It is indisputable that a juror's social media usage could affect her ability to be fair and impartial in this case, and *voir*

12

*dire* questions on that topic were essential to rooting out potential biases—a point the defense stressed to the Court in its pre-trial submissions. (ECF No. 140 at 4; Medjuck Decl. Ex. B at 1-2). Moreover, the Court had given the defense team permission to research potential jurors' social media profiles in real time as the Court questioned them. (*See* Sept. 8, 2022 Tr. at 100-01). Had Juror No. 6 been candid with the Court, the defense could have uncovered her social media posts and moved to strike for cause—or requested that she be re-questioned—before the jury was impaneled. Or the defense could have exercised a peremptory challenge. *See Nieves*, 2023 WL 405354, at *6 (*voir dire* must elicit "sufficient information … to permit a defendant to intelligently exercise both for-cause and peremptory challenges"). But because Juror No. 6 concealed her Twitter and Facebook use—which would have revealed her bias against wealthy executives—Mr. Milton was deprived of those opportunities.

At a minimum, the Court should hold a hearing so that Juror No. 6 can be questioned under oath about these issues directly. Her "public statements made to media outlets after the trial" are "direct, unambiguous," and plainly contradict her *voir dire* responses, and thus in and of themselves establish the requisite "clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred." *United States v. Maxwell*, No. 20-CR-330 (AJN), 2022 WL 576306, at *4 (S.D.N.Y. Feb. 25, 2022).

### III. THE GOVERNMENT IS UNABLE TO SAVE COUNT THREE

The government's position on the "obtaining property" element of wire fraud contradicts controlling Supreme Court precedent and its own position in a pending Supreme Court case, argued in November 2022, about the scope of wire fraud. As the Supreme Court held in *Kelly v. United States*, defendants only violate the wire fraud statute "if an object of their dishonesty was to obtain the [victim's] money or property." 140 S. Ct. 1565, 1568 (2020). That holding flowed from the plain text of the statute, as well as precedents dating back to *McNally*. (*See* Mem. 38).

13

Unsurprisingly, then, as our opening brief explained, the Solicitor General told the Supreme Court in *Ciminelli*, in several different ways, that wire fraud "requires the government to show that a fraudulent scheme was designed to obtain money or property." (Mem. 38-39 (quoting U.S. *Ciminelli* Br. at 16, as well as several other passages in *id.* at 16-17)). Remarkably, here the government insists that "the law … is unambiguous [that] a defendant need not seek to obtain the money or property at issue to be guilty of wire fraud," and makes no effort to reconcile its position with the position it just took in the Supreme Court. (Opp. 26). The Solicitor General is right, and the U.S. Attorney's Office prosecuting this case is wrong. Any support for its argument in prior Second Circuit cases is irreconcilable with the statutory text, *Kelly*, and many other Supreme Court decisions. A wire fraud conviction cannot stand without proof that the defendant sought to obtain the victim's property through deceit.

   There was no such proof here. The government's factual argument fares no better than its spurious legal argument. It relies on what it "argued in summation" (Opp. 27) rather than any actual evidence, and once again simply ignores Mr. Milton's arguments. As explained in our opening brief, much of the government's proof focused on alleged deceit that occurred when Nikola was a private company, at which time there were no public shareholders to victimize. (Mem. 39-41). How could Milton possibly have "intended to obtain money … by selling his stock at inflated prices after his lockup ended" (Opp. 27), through actions taken and statements made before he had any public shares or any lockup agreement? The government has no answer to this question, so it simply dodges the issue and instead serves up two paragraphs of irrelevant boilerplate and a conclusory reference to its closing. (Opp. 26-27). Nor does the government address the Solicitor General's concession to the Supreme Court in *Ciminelli* that a scheme "to increase the value of [a defendant's] own portfolio by deceptively inflating his employer's stock

price" is insufficient to prove wire fraud. (Mem. 41 (quoting U.S.'s brief)). The government's silence speaks volumes. No reasonable juror could find beyond a reasonable doubt that allegedly false statements made years before there were any public shareholders, or months before Mr. Milton could sell his public shares, were in furtherance of a scheme to obtain money from public shareholders.

## CONCLUSION

For the foregoing reasons and those in Mr. Milton's opening brief, the Court should reverse his convictions and grant a new trial on Counts One and Four, and enter a judgment of acquittal on Count Three.

Dated: February 2, 2023
New York, New York

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Daniel J. O'Neill
Avery D. Medjuck
SHAPIRO ARATO BACH LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880
ashapiro@shapiroarato.com
doneill@shapiroarato.com
amedjuck@shapiroarato.com

Marc L. Mukasey
Torrey K. Young
MUKASEY FRENCHMAN LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
(212) 466-6400
Marc.Mukasey@mfsllp.com
Torrey.Young@mfsllp.com

*Counsel for Defendant Trevor Milton*