UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                              Plaintiff,

          – against –

TREVOR MILTON,

                              Defendant.

**OPINION AND ORDER**

21-cr-478 (ER)

RAMOS, D.J.:

          The Government filed the initial indictment in this matter on July 28, 2021.  Doc. 1.

Following pre-trial motion practice, Milton proceeded to trial and was found guilty on three of

the four counts of the superseding indictment[1] charging him with securities fraud and wire fraud.

*See* Docs. 123, 213.  Milton was found not guilty on the remaining count, which charged him

with securities fraud.  Doc. 213.

          Before the Court is Milton's motion for a new trial on the three counts of conviction

pursuant to Federal Rule of Criminal Procedure 33, and a motion for a judgment of acquittal on

Count Three, which charged wire fraud, pursuant to Federal Rule of Criminal Procedure 29.

Doc. 256.  In short, Milton argues that a new trial is required because the jury was improperly

instructed on the applicable law, and because Juror No. 6 was biased against him.  Doc. 257 at 9–

10.  He also contends that acquittal is required on Count Three because the Government failed to

prove that the object of the scheme at issue was obtaining money or property, as required by the

wire fraud statute.  *Id.* at 10.

---

[1] Count One of the superseding indictment charged Milton with securities fraud, in violation of 15 U.S.C. §§ 78j(b),
78ff, and 17 C.F.R. § 240.10b–5; Count Two charged him with securities fraud, in violation of 18 U.S.C. § 1348; and
Counts Three and Four charged him with wire fraud, in violation of 18 U.S.C. § 1343.  Doc. 123.

For the reasons set forth below, the motions are DENIED.

## I.  BACKGROUND

The Court assumes familiarity with the facts underlying this case, including its prior opinion denying Milton's motion to dismiss the indictment, Doc. 32.  *See United States v. Milton*, No. 21 Cr. 478 (ER), 2021 WL 5304328 (S.D.N.Y. Nov. 15, 2021).  It discusses only those facts relevant to the instant motions.

Milton is the founder and former chief executive officer ("CEO") of Nikola, an electric- and hydrogen-powered vehicle and energy company; the company went public in June 2020, and Milton became its executive chairman and largest shareholder.  *See* Trial Tr., Sept. 23, 2022, Doc. 232 at 45:21–46:2.  The Government alleged that between the years of 2019 and 2021, Milton participated in two separate schemes to defraud investors in Nikola.  Doc. 123. Specifically, the indictment charged Milton with "engag[ing] in a scheme to defraud investors in Nikola through false and misleading statements regarding the company's product, technology, and business development" between November 2019 and September 2020.  *Id.* ¶ 1; *see id.* ¶¶ 2, 3.  It further charged Milton with engaging in a scheme to defraud the sellers of a property in Utah known as Wasatch Creeks Ranch, which he sought to purchase in part with Nikola stock, through false and misleading statements regarding Nikola's product, technology, and business development.  *See id.* ¶ 4.

Count One of the superseding indictment charged Milton with securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b–5, and Count Two charged him with securities fraud, in violation of 18 U.S.C. § 1348.  Doc. 123 ¶¶ 1–2. Counts Three and Four charged him with wire fraud, in violation of 18 U.S.C. § 1343.  *Id.* ¶¶ 3–4.

In summary, the Government alleged that Milton made untrue statements and omissions regarding the technology produced by Nikola to improperly inflate the value of his company—all in an effort to enrich himself at the expense of his investors.  The Government based its allegations on Milton's assertions about the technology, which he made through social media, in interviews, and at public events.  *See generally* Doc. 123; *see also* Trial Tr., Sept. 13, 2022, Doc. 216 (containing the Government's opening statement).  Specifically, the Government alleged that Milton's public statements misrepresented the progress Nikola had made in the development of its hydrogen-powered, zero-emission vehicles, as well as related technology and power infrastructures.[2]  *See generally* Trial Tr., Sept. 13, 2023, Doc. 216 at 29:4–29:13; *see also id.* at 29–33.  In other words, the Government accused Milton of lying about Nikola's progress and advances to increase the value of Nikola's shares, in anticipation of selling of those shares at inflated prices and defrauding Nikola's investors.

### *i.* **Jury Selection**

July selection took place on Monday, September 12, 2022.  *See* Min. Entry dated Sept. 12, 2022.  As the parties note in their briefs, the Court began by reading to the venire from a form that contained two sets of questions.  The first set of questions was "devised to elicit responses that would assist in determining whether any for-cause strikes would be warranted."[3]  Doc. 263 at 5.  Among other things, the Court asked the potential jurors a series of questions

---

[2] For example, the Government alleged that Milton represented that Nikola had developed fully-functioning trucks that ran on hydrogen, despite the fact that its trucks did not, in fact, work.  Trial Tr., Sept. 13, 2023, Doc. 216 at 30:1–30:9.  He further posted video footage that suggested that one of his trucks was traveling under hydrogen power; however, in truth, it was rolling down a hill and not being powered by hydrogen.  *Id.* at 30:10–30:23.  And, according to the Government, he continued to lie about "all the important parts of the business" over multiple years, including its trucks, its fuel, and its sales.  *Id.* at 31:15–32:4.

[3] The Court made clear that affirmative answers to the questions would not "necessarily mean that [any given potential juror] would not be an appropriate juror for th[e] case."  Voir Dire Tr. at 13:8–13:10.

regarding their opinions about wealthy individuals and corporate executives like Milton.  In relevant part, the Court asked the potential jurors as follows:

> Do you think that there may be some relationship between how wealthy an individual is and how likely they are to break the law?
>
> Do you feel that senior-level corporate executives do not deserve or are not worth the amount that they earn?
>
> Would you have any problem accepting the principle that regardless of a person's personal wealth or lack of personal wealth, they're entitled to a fair trial, including the presumption of innocence?

Voir Dire Tr. at 22:10–22:21.  During the course of *voir dire*, several potential jurors were dismissed for cause.  *See, e.g.*, Voir Dire Tr. 111:19–111:24.  The juror that would ultimately be empaneled as Juror No. 6 did not respond affirmatively to these questions.[4]  *Id.* at 69:18–70:16.

The Court then proceeded to ask the potential jurors a second set of questions to elicit more personal information about each of them so that the parties could determine which potential jurors they would strike preemptively.[5]  Among other things, the Court asked each potential juror to answer the following questions, among others:

> What publications, including online media, do you regularly read?  From what sources do you receive your daily news?
>
> What social media platforms, if any, do you use?  [ . . . ]  And how do you use [them]?

---

[4] Juror No. 6 did, however, respond affirmatively to a question regarding any familiarity with the company Nikola. Voir Dire Tr. at 15:4, 69:21–70:16.  She stated that she had "heard of [Nikola] as a car company," *id.* at 69:25, then indicated that she had not developed any opinion about the company, *id.* at 70:8–70:10.  When the Court asked her whether her familiarity with Nikola would affect her ability to be fair and impartial in the case, she stated that it would not.  *Id.* at 70:11–70:14.

[5] Milton states in his briefs that the Court gave the defense team "permission to research potential jurors' social media profiles in real time as the Court questioned them" during this portion of the *voir dire* process.  Doc. 266 at 17 (citing Trial Tr., Sept. 8, 2022, at 100–101).  To be sure, during the final pretrial conference, counsel for Milton asked if the Court had any "rules" concerning "jury research," and specifically whether the defense team could "do research."  Trial Tr., Sept. 8, 2022, at 100:24–101:5.  The Court stated that it did not have a rule about that.  *Id.* at 101:6–1017.

> To which radio stations, television shows, and podcasts do you regularly tune
> into?

Voir Dire Tr. at 172:13–172:25.  As relevant here, the juror that would eventually be seated as

Juror No. 6[6] answered the questions as follows:

> The Court:  From where do you get your news?
>
> Juror:  YouTube.
>
> The Court:  What social media platforms, if any, do you use?
>
> Juror:  None.
>
> The Court:  What about radio stations, TV shows, or podcasts?
>
> Juror:  I listen to podcasts on Spotify.

Voir Dire Tr. at 198:22–199:4.

### ii.  Trial

The trial of this case began on September 13, 2022, and lasted until October 14, 2022.  At

trial, the Government introduced evidence pertaining to both of the alleged fraud schemes

outlined above.  In regard to the scheme to defraud investors, as noted by Milton, the

Government's evidence focused on "'four big categories' of alleged lies:"  (1) Nikola's

production of hydrogen to power its vehicles, and the company's cost to produce hydrogen; (2)

the extent to which an early prototype of the company's Nikola One model truck was functional

when it was unveiled in 2016; (3) whether contracts customers had signed to pre-order Nikola

trucks were binding purchase orders; and (4) the timetable for production of Nikola's pickup

truck, the Badger, and the extent to which Nikola was building the Badger "from the ground up."

Doc. 257 at 11.  Milton also presented evidence regarding, among other things, his statements

---

[6] The Court notes that the parties were in possession of the names of each of the potential jurors, including Juror No. 6, as the Court asked these questions.  *See* Voir Dire Tr. at 5:6–5:7.  Indeed, the Deputy Clerk identified Juror No. 6 by first and last name, as she did every potential juror, before asking the first set of questions.  *Id.*

about Nikola, his social media use, and his intentions when interacting with the public in regard to Nikola.

### iii. The Court's Jury Instructions

Milton challenges several aspects of the Court's instructions in his post-trial briefing, all of which relate to the scienter element of Counts One, Three and Four, as well as the Court's good faith instruction.[7]  In relevant part, the Court instructed the jury as set forth below.

With regard to the scienter element of Count One, the Court instructed the jury that:

> The second element of the Title 15 securities fraud charge in Count One relates to Mr. Milton's state of mind.  If you find that the government has met its burden of proving the first element—that is the element I just explained—the government must then prove beyond a reasonable doubt that Mr. Milton engaged in the scheme knowingly, willfully, and with an intent to defraud.  To act knowingly means to act intentionally, deliberately and voluntarily, rather than by mistake, accident, ignorance, or carless[ness].  To act willfully means to act voluntarily and with a wrongful purpose.

Charge Tr., Doc. 248 at 17:22–18:6.

With regard to the scienter element of Counts Three and Four, the Court instructed the jury that:

> As I have previously noted, before the defendant may be convicted on the fraud charged here, he must also be shown to have acted knowingly and willfully and with a specific intent to defraud.
>
> To act "knowingly" means to act voluntarily and deliberately, and not because of ignorance, mistake, accident or carelessness.
>
> To act "willfully" means to act voluntarily and with a wrongful purpose.
>
> Mr. Milton acted with specific intent to defraud *if he was engaged or participated in the fraudulent scheme with some realization of its fraudulent or deceptive character and with an intention to be involved in the scheme to defraud and to help it succeed with a purpose of causing harm to the victim.  The government need not prove that the intended victim or victims was or were actually harmed; only that such harm was contemplated.*

---

[7] As set forth below, only some of Milton's arguments stem from objections made at the charge conference before the jury received the Court's instructions.

Charge Tr., Doc. 248 at 26:1–26:17 (emphasis added).

The Court also provided the jury with a "good faith" instruction after outlining the

elements of each of the counts charged.  In relevant part, the instruction stated that:

> Good faith on the part of Mr. Milton is a complete defense to each and every one
> of the charges in this case.  If Mr. Milton, in good faith, believed . . . that he was
> acting properly[,] even if he was mistaken in that belief, and even if others were
> injured by his conduct, he cannot be found guilty.  An honest mistake, or even
> carelessness, does not give rise to the level of criminal conduct.  By way of
> example, if Mr. Milton honestly believed that his statements to investors were
> accurate and not misleading, that would be a complete defense to the securities
> fraud charges[,] even if that belief ultimately proved to be inaccurate.

*Id.* at 29:1–29:17.  The Court also provided the jury with a "no ultimate harm" instruction,

indicating that even a belief that "ultimately everything would work out so that no investors

would lose money" did not necessarily constitute good faith.  *Id.* at 29:18–29:22.

### iv.  Milton's Objections and Related Arguments

First, Milton makes a number of arguments regarding the instruction concerning the

definition of the word "willfully" in Count One.  *See* Doc. 257 at 13.  He notes that, before trial,

he proposed an instruction that "would focus the jury on the government's burden to prove [that

he] acted with the necessary criminal intent in connection with each count," and specifically

suggested an instruction stating that a person "acts willfully if he acts intentionally and purposely

and with the intent to do something the law forbids, that is, with the bad purpose to disobey or

disregard the law."  Doc. 257 at 12–13.  In other words, he objected to the Court's instruction on

the basis that it failed to state that to act willfully, a defendant must act with intent to do

something that the law forbids.

Regarding Counts Three and Four, Milton argues that the Court improperly failed to

instruct that "intent to harm was required to convict" as to Counts Three and Four, even though

he "implored" the Court to do so.  Doc. 257 at 14, 22.  Relatedly, Milton argues that the Court's good faith instruction "did nothing to remedy this" alleged omission, and there was also no factual predicate for the no ultimate harm instruction.  *Id.* at 23.

Finally, Milton's post-trial briefs raise arguments regarding the written jury instructions that the Court provided to the jury so that the jury could read along, as the Court read the document.  The jury was also allowed to keep the copy of the instructions as they deliberated.  Milton notes that the written instructions for the scienter requirement in Count Two is provided under the heading "**Second Element:  Criminal Intent**," whereas the heading for the scienter requirements for Count One was provided under the heading "**Second Element:  State of Mind**," and for Counts Three and Four under the heading "**Second Element:  Knowing Participation in Scheme with Intent to Defraud**."  Doc. 257 at 15.  In other words, Milton emphasizes that the phrase "criminal intent" was only included in the heading for Count Two of the instructions (on which Milton was acquitted).  The headings also appeared in this manner in the table of contents of the written jury instructions.  Importantly, as the Government notes, Milton did not object to the contents of, or the difference between, these headings before they were provided to the jury.  Doc. 263 at 16.

### a.  Deliberations and Verdict

The jury began its deliberations on October 14, 2022, following a one-week recess due to counsel for Milton's illness.[8]  *See* Min. Entries dated Oct. 7, 2022, and Oct. 14, 2022.  It rendered a verdict after several hours of deliberation that same day, finding Milton guilty on Counts One, Three and Four, and not guilty on Count Two.  *See* Doc. 213.  The Court polled the jury, and each juror affirmed that this was their verdict.  Charge Tr., Doc. 248 at 71:21–72:19.

---

[8] Although Milton was represented by multiple attorneys, the Court permitted the recess pursuant to Milton's request that the attorney who fell ill be allowed to present closing arguments.

### *v.* **Juror Statements After Trial**

After the verdict, four jurors spoke about the trial to the press or on social media.  Doc. 257 at 15–18.  Among other things, Milton cites to a number of sources, including:  (1) an Inner City Press post published on October 16, 2022, wherein an unidentified juror[9] discussed the trial, Doc. 259-1; (2) an Inner City Press post published on October 17, 2022, wherein Juror No. 9 discussed the jury's deliberations as to Count Two, Doc. 259-2; (3) a Wall Street Journal article published on October 27, 2022, which was based on conversations with Jurors Nos. 1, 5, and 6, Doc. 259-3; (4) an interview with Juror No. 6,[10] published on November 10, 2022, on a Substack site by an individual named Jessica Reed Kraus, Doc. 259-4 at 10–20; and (5) several tweets[11]

---

[9] While the post does not identify the juror, Milton's briefs identify the individual as Juror No. 6.  Doc. 257 at 16.  The post includes several quotes from the juror, including a response to a question regarding why the jury did not convict Milton on Count Two.  Doc. 259-1 at 3.  In relevant part, it states as follows:

> We believed he didn't intend to harm anyone[.]  Now I regret thinking better of him after watching American [G]reed[, a program about Milton].  Clout chasing idiot who wanted to be loved and praised like Elon.  We understand people got hurt who bought this stock[,] but we thought he did it in good faith.  We thought he was trying to get rich and build a valuation and bring everyone wealth at the same time[.]

*Id.*

[10] Among other things, Juror No. 6 spoke about the jury's acquittal on Count Two of the superseding indictment and its deliberations as to Milton's state of mind.  Doc. 259-4 at 10–11.  Specifically, when asked whether "criminal intent was missing in the 4-week trial," she answered in the affirmative, and went on to say that "intent was not required" on Counts One, Three, or Four.  *Id.* at 11.  She further stated as follows:

> Criminal intent is why we found him not guilty on the second count.  The first count was like okay did he commit fraud, did he do this, did he do that, but the second one was like, did he intend to harm anyone, and that is where we were split actually, and most of us thought he didn't intend to harm anyone.

*Id.* at 12.

[11] Juror No. 6 published several posts on Twitter in the months of September and October 2022, including while the trial was ongoing, using her account @BurnsBurnt, most of which did not pertain to Milton's case.  On September 17, 2022, during Milton's trial, she tweeted that "[her] face can't hide shit" and she was "serving jury duty right now[,] and when some key evidence is presented[,] I can't hide it."  Doc. 259-19 at 3.  The rest of her posts during Milton's trial, which were published between October 1 and October 14, 2022, included commentary about miscellaneous and unrelated matters.  *See* Doc. 259-7.  On October 15, 2022, after the jury returned its verdict, she posted about Milton's convictions.  *Id.* at 13.  As relevant here, Juror No. 6 stated that "he was charged on 2 securities fraud but was found guilty on one.  And 2 wires and found guilty on both.  The only reason he wasn't

and other social media posts published by Juror No. 6 before and after the trial, Doc. 259-7; *see also* Doc. 259-6–259-22.[12]  In summary, the post-verdict news sources provided commentary from several jurors regarding the Government's case, the strength of the evidence, the jury's deliberations, and the juror's individual opinions regarding Milton's conduct.

According to the Government, "[n]one of [the] hearsay statements [contained within these sources] are admissible or relevant for any purpose here."  Doc. 263 at 6.  It also argues that the post-verdict commentary shows that "the jurors believed that the defendant received a fair trial and was guilty under the law."  *Id.* (citing Docs. 259-2, 259-3, and 259-4).  The

---

found guilty on both securities was that he didn't intend to harm anyone."  *Id.* at 13.  She also commented on the fact that she had served on the jury, and called Milton's trial a "long an[d] interesting case."  *Id.* at 12.  Since these posts were published, Twitter changed its name to "X."  The account from which the posts were published is now an "X" account.

[12] The social media posts from Juror No. 6 include the following:  (1) the first three pages of her public twitter page, @BurnsBurnt, Doc. 259-6; (2) tweet and reply activity for her account, Docs. 259-7–259-10; (3) "likes" activity for her account, Docs. 259-11–259-18; (4) a selection of tweets, retweets, and replies posted by her account from the period of September 8, 2022, through October 27, 2022, Doc. 259-19; (5) a list of the Twitter accounts she followed, Doc. 259-20; the first 19 pages of her public Facebook page, listing her name as "Jenni Dee," Doc. 259-21; and (6) a selection of posts from her public Facebook page, which were published between 2020 and 2021, Doc. 259-22.  The Government does not challenge that these accounts belong to Juror No. 6.  *See generally* Doc. 263.

As relevant here, prior to trial, on September 8, 2022, Juror No. 6 retweeted a post regarding Jeff Bezos, the founder and executive chairman of Amazon.  *See* Doc. 257 at 32.  The post stated that "if jeff bezos is appalled by twitter's reaction to the death of queen elizabeth just wait till jeff bezos sees twitter's reaction to the death of jeff bezos."  Doc. 259-19 at 2.  Milton also highlights that Juror No. 6's Facebook page also featured posts regarding wealthy executives.  For example, he notes in his briefing that on May 30, 2021, the account re-posted a graphic denouncing Jeff Bezos and Mark Zuckerberg "for their enormous wealth in comparison to the minimum wage and urging a policy of 'Tax the Rich[.]'"  Doc. 257 at 31–32; Doc. 259-22 at 17.  He also points out that the Facebook feed contains "numerous emotional posts targeting 'the billionaire class,' 'Wall Streeters,' 'the American ruling class,' 'greedy Wall Street bankers,' and so on."  Doc. 257 at 32.  In support of that assertion, Milton includes a January 2021 post from Juror No. 6's Facebook account, which includes statements made on Twitter by an individual named Dan Price.  *Id.* at 33.  The post states as follows:

> You always hear:  "Billionaires deserve all that money because they're job creators."
>
> Last 9 months:
> *Billionaires gained a record $1 trillion in wealth
> *More people lost jobs than at any point in almost 100 years
>
> It might be time to consider whether our system works.

Doc. 259-22 at 9.

Government further points out that while "some jurors questioned whether the defendant ultimately wished the victims harm in the colloquial sense," the jury nevertheless "did not doubt that the defendant intended to defraud." *Id.* (citing Docs. 259-2, 259-4, 259-5). It also underscores that Juror No. 6 suggested that the jury "showed leniency toward the defendant in its not-guilty verdict on Count Two." *Id.* (citing Doc. 259-7 at 11–12).

## II.   DISCUSSION

### A.  Rule 33 Motion for a New Trial

Milton moves for a new trial for two reasons: *first*, he argues that "erroneous and confusing instructions allowed the jury to convict even though it believed Mr. Milton was not guilty." Doc. 257 at 19–29. *Second*, Milton contends that purported lies by Juror No. 6 at *voir dire* deprived him of a fair trial, *id.* at 29–44, and "at minimum," an evidentiary hearing regarding the falsity of the representations made by Juror No. 6 during jury selection is required, *id.* at 45. The Court takes the arguments in turn.

### *i.*  Legal Standard

Federal Rule of Criminal Procedure 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[M]otions for a new trial are disfavored in this Circuit," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and are granted "sparingly and in only the most extraordinary circumstances," *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citation and internal quotation marks omitted).

"The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is 'a real concern that an innocent person may have been convicted.'" *United States v. McCourty*, 562

F.3d 458, 475 (2d Cir. 2009) (quoting *Ferguson*, 246 F.3d at 134, and *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). The Second Circuit has observed that to order a new trial under Rule 33, courts must be satisfied that "it would be a manifest injustice to let the guilty verdict stand." *Sanchez*, 969 F.2d at 1414 (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989)).

In evaluating a Rule 33 motion, "[t]he district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation," of whether the defendant has met these onerous burdens. *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). Ultimately, "[Rule 33] motions are granted only in 'extraordinary circumstances,' and are committed to the trial court's discretion." *United States v. Torres*, 128 F.3d 38, 48 (2d Cir. 1997) (quoting *United States v. Moore*, 54 F.3d 92, 99 (2d Cir. 1995)).

In order for such a motion to have merit, the district court must conclude, considering all of the facts and circumstances of the case, that there is "a real concern that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1414. A new trial should not be granted when the court is "'satisfied that competent, satisfactory, and sufficient evidence in the record supports the jury verdict.'" *United States v. Henry*, No. 13 Cr. 91, 2015 WL 861743, at *2 (E.D.N.Y. Feb. 27, 2015) (quoting *Ferguson*, 246 F.3d at 134).

### *ii.* The Jury Instructions

Milton first argues that the Court's jury instructions "allowed the jury to convict without finding the mens rea required for each of the charges." Doc. 257 at 19. He contends that the Court's scienter instructions were "erroneous, incomplete, and confusing," *id.*, and the headings within the Court's written instructions "misled" the jury, *id.* at 24. *See also id.* at 25–29 (arguing that the jury instructions "were highly prejudicial").

12

In response, the Government asserts that there was nothing erroneous about the instructions, and any claimed error was harmless.  Doc. 263 at 15–17.  It further contends that Milton's "entire basis" for arguing that he was prejudiced by the jury instructions "rests on apparent comments by jurors in post-verdict media interviews or on social media," all of which—it argues—is irrelevant and inadmissible.  *Id.* at 17.  Where it addresses the substance of Milton's arguments regarding the juror's post-verdict statements, the Government asserts that "the jurors misunderstood the notion of 'intent to harm' and incorrectly added an *additional* burden to the Government" due to the defense's summation, which made "general reference to harm and lack of harm."  *Id.* at 18.  In other words, it is the Government's position that, "if anything," the jurors "applied a common sense, but incorrect, understanding [of] the notion of 'harm' in this case," which caused them to incorrectly acquit Milton as to Count Two.  *Id.* at 18– 19.

As a preliminary matter, the Court underscores that courts "properly avoid" considerations of "what transpired in the jury room," given that "[t]he jury's deliberations are secret and not subject to outside examination," and for good reason.  *Yeager v. United States*, 557 U.S. 110, 122 (2009).  In that regard, Federal Rule of Evidence 606(b) provides as follows:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1); *see also United States v. Stewart*, 433 F.3d 273, 307 (2d Cir. 2006) (asserting that Rule 606(b) precludes testimony about deliberations and jurors' mental processes).  Courts in this Circuit have made clear on numerous occasions that the "hearsay report of jurors' post-deliberation remarks cannot be considered by the Court" in adjudicating a

motion for a new trial.  *Tatum v. Jackson*, 668 F. Supp. 2d 584, 594 (S.D.N.Y. 2009); *see also United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2022 WL 576306, at *3 (S.D.N.Y. Feb. 25, 2022) (concluding that unsworn statements made to media outlets regarding deliberations may not be considered).

Given the weight of these authorities, the Court does not here engage in the task of parsing the post-verdict statements made by the jurors—days and weeks after their deliberations—in considering Milton's motion.  *See generally* Doc. 259.  Nevertheless, the Court will assess Milton's arguments regarding the contents and alleged prejudicial effects of the instructions provided to the jury in this case.  In conducting this analysis, the Court notes that a jury instruction is considered erroneous if it "misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."  *United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017) (quoting *United States v. Finazzo*, 850 F.3d 94, 105 (2d Cir. 2017)).

The Court first considers Milton's arguments regarding the willfulness and intent instructions in Counts One, Three, and Four.   Doc. 257 at 20–29.  As to Count One, the Court concludes that there was no error in the instruction, and any purported error articulated by Milton was harmless.  As noted by the parties, the Court instructed the jury that "[t]o act willfully means to act voluntarily and with a wrongful purpose," and thereafter articulated that the Government's position was that actions and statements by Milton "show[ed] beyond a reasonable doubt Mr. Milton's knowledge of the unlawful purposes of his actions."  Charge Tr., Doc. 248 at 18:5–18:6, 18:18–18:20.  It also stated that "[o]n the other hand, Mr. Milton denies either that these acts and statements occurred or that they show he had such knowledge, intent, and purpose."  *Id.* at 18:21–18:23.  The Court then stated that "if Mr. Milton honestly believed that his statements and actions were proper and *not in furtherance of any unlawful scheme*, then such good faith

would be a complete defense to all of the charges here." *Id.* at 19:2–19:5 (emphasis added).  In

other words, the Court's instructed the jury that, to convict Mr. Milton, it was required to

conclude that he acted "with a wrongful purpose," and in explaining how the jurors might

evaluate the evidence in this regard, it articulated that if Milton acted with an "unlawful

purpose," it could conclude that Milton acted willfully.  *See generally id.* at 19–20.

Critically here, the last time that the Second Circuit directly addressed the meaning and

effect of the word "willful" in the securities fraud context, it stated that "whatever 'willful' might

mean for the purposes of other statutes, for the purposes of Section 32(a), it *does not encompass*

*the requirement that a defendant knew he was violating the law*."  *United States v. Kaiser*, 609

F.3d 556, 568 (2d Cir. 2010) (emphasis added) (citing *United States v. Dixon*, 536 F.2d 1388,

1395 (2d Cir. 1976) (additional citations omitted).  Milton attempts to muddy this clear statement

of law by pulling generously from caselaw that is not applicable, and which did not change the

Second Circuit's pronouncement in *Kaiser*.  *First*, he refers to *Bryan v. United States*, 524 U.S.

184, 191–92 (1998) and *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 n.9 (2007), Supreme

Court cases exploring the meaning of the word "willful" in other contexts, both of which

predated the Second Circuit's statement in *Kaiser*.  *See* Doc. 257 at 20–21; Doc. 266 at 6–8.[13]

*Second*, he relies on dicta from *United States v. Kosinski*, 976 F.3d 135 (2d Cir. 2020), a case

that *did not* squarely address or expand on the meaning of the word "willful" in this context,

characterizing it as "the Second Circuit's most recent precedential decision defining 'willfulness'

---

[13] As the Government points out, *Bryan* discussed "a statute that prohibited dealing in firearms without a license." Doc. 263 at 12 n.1 (citing *Bryan*, 524 U.S. at 186).  Similarly, *Safeco* was a civil action that briefly discussed the term "willful" or "willfully" in a footnote that generally compared the use of the term in civil and criminal cases. *Safeco*, 551 U.S. at 57 n.9 (referring to the meaning of "willful" in *Bryan* and two other cases outside of the securities fraud context).

in securities fraud." Doc. 257 at 21; Doc. 266 at 7.[14]  But none of these authorities overrule or otherwise affect the Second Circuit's pronouncement in *Kaiser*. *Kaiser*, 609 F.3d at 568 (holding that willfulness in the securities law context "does not encompass the requirement that a defendant knew he was violating the law").

Additionally, as the Government points out, in the last year, the Second Circuit has affirmed its holding in *Kaiser* regarding the meaning of "willfulness" in this context.  *See* Doc. 263 at 9–10.  Indeed, in *United States v. Petit*, Nos. 21-543, 21-559, 2022 WL 3581648, at *4 (2d Cir. Aug. 22, 2022), the Second Circuit upheld a securities fraud conviction based on a district court's instruction that defendants acted willfully if they acted "deliberately and with a bad purpose, rather than innocently."   In rejecting arguments mirroring the ones that Milton makes here, the Second Circuit noted:

> Petit insists that he could not have acted willfully because he [did not know] the
> specific securities laws he violated . . . .   We disagree.  Conduct such as arranging

---

[14] In *Kosinski*, the Second Circuit assessed a jury instruction that stated that "[t]o act willfully means to act knowingly and purposefully with the intent to do something that the law forbids, that is, with bad purpose either to disobey or to disregard the law . . . ." *Kosinski*, 976 F.3d at 153.  The defendant in that case argued that the instruction "failed to adequately convey that Kosinski's guilt required that he knew that his conduct was unlawful under the securities laws." *Id.* The Second Circuit held that the instruction did not constitute error. *Id.* at 153–154.

The Court then explained that none of the cases raised by the defendant required an awareness of "the specific law or rule" that the defendant violated, and further stated that there are no exceptions to the "traditional rule that ignorance of the law is no excuse." *Id.* (quoting *Bryan*, 524 U.S. at 195–96).  The Court emphasized that "[a] heightened standard of willfulness" that requires knowledge of the "specific law that one is violating" has been required only where "a highly technical statute," including a provision of the internal revenue code, "prohibits apparently innocent conduct." *Id.* (quoting *United States v. Henry*, 888 F.3d 589, 599 (2d Cir. 2018) (internal quotation marks omitted). The panel noted that any heightened requirement in the securities law context, including in *United States v. Cassese*, 428 F.3d 92 (2d Cir. 2005), "did not depart from precedent to require a securities defendant's awareness of more than the *general unlawfulness of his conduct*." *Id.* (citing *Kaiser*, 609 F.3d at 569) (emphasis added).

Milton relies on this language to assert that the Second Circuit has held that the law now *requires*, for a securities fraud conviction to stand, proof of the defendant's "knowledge that the conduct is unlawful." Doc. 257 at 20 (citing *Kosinski*, 976 F.3d at 154; *Cassese*, 429 F.3d at 104; *Safeco*, 441 U.S. at 57 n.9) (internal quotation marks omitted). But a review of the cases shows that the Second Circuit has done no such thing.  The statement in *Kosinski* merely sought to emphasize that the requirement concerning the defendant's knowledge of the wrongful nature of his conduct is "general," and need not be grounded in his understanding of the relevant law. *Kosinski*, 976 F.3d at 154; *see also United States v. Kukushkin*, 61 F.4th 327, 332 (2d Cir. 2023) (same).  And in any event, as set forth above, the panel's brief statement regarding the meaning of the word "willfulness" in this context was not necessary to its decision and thus amounted to dicta.  *See In re Bean*, 252 F.3d 113, 118 (2d Cir. 2001) (characterizing dicta as statements that are "not necessary to decide the issue" before a court).

secret loans or modifying contracts with surreptitious emails is enough to infer willfulness. A reasonable jury could conclude that [the defendants] knew they were engaging in wrongful conduct, *even if they did not know the specific standards that they violated.*

*Id.* at *4 (emphasis added). Here too, it was not error to instruct the jury that Milton acted willfully if he acted with a wrongful purpose by lying to investors in order to inflate the price of the stock of his company.

To be sure, as Milton points out, the Second Circuit's order in *Petit* was a "non-precedential summary order." Doc. 266 at 7. But that is of no consequence where, as set forth above, the Second Circuit merely reiterated the standard set forth in a published opinion (*Kaiser*)—a decision that it has not since overruled or otherwise re-examined. And, in any event, the Court instructed the jury that, in its assessment of this element of Count One, it was to consider whether Milton acted for an "unlawful purpose." Charge Tr., Doc. 248 at 19–20.

The Court also rejects Milton's argument that it failed "to instruct the jury that the government had to prove Mr. Milton intended to harm his alleged victims to obtain convictions on Counts Three and Four." Doc. 257 at 21. As set forth above, and as emphasized by the Government, the Court did in fact instruct the jury on intent to harm as to Counts Three and Four. Charge Tr., Doc. 248 at 26:1–26:17 (setting forth that "Milton acted with specific intent to defraud *if he was engaged or participated in the fraudulent scheme with some realization of its fraudulent or deceptive character and with an intention to be involved in the scheme to defraud and to help it succeed with a purpose of causing harm to the victim*") (emphasis added); *see also* Doc. 263 at 14 (noting that the Court did indeed provide the jury with a fulsome "intent to defraud" instruction as to Counts Three and Four).

Recognizing that the instruction was indeed provided to the jury, Milton asserts in his reply brief that the language was situated "in the context of the charge as a whole," and it "did

little or nothing to explain that intent to harm was a required element of Counts Three and Four." Doc. 266 at 9.  Not so.  The Court's instruction was given during its discussion of the second element of Counts Three and Four.  *See generally* Charge Tr., Doc. 248 at 25:6–26:24 (discussing the second element of Counts Three and Four).  Indeed, following the Court's instructions in this regard, the Court then went on to discuss "[t]he third and final element that the government must establish beyond a reasonable doubt to sustain its burden under Counts Three and Four, the wire fraud charges[.]"  *Id.* at 28:7–28:13.  The record here makes clear that, contrary to Milton's contentions, the Court provided a proper instruction that the jury was required to find intent to harm as to Counts Three and Four.  The Court thus rejects his arguments to the contrary.[15]

Milton's arguments regarding the effects of the headings in the written instructions provided to the jury are similarly unavailing.  First, as the Government underscores and the record otherwise makes clear, Milton did not object to the headings included within the Court's written jury instructions.  Doc. 263 at 16.  But the law is clear that a defendant must make an objection before the jury retires to deliberate in order to preserve the objection for subsequent review.  Fed. R. Crim P. 30(d); *see also United States v. Masotto*, 73 F.3d 1233, 1237 (2d Cir. 1996) (noting that "the purpose of this provision is to provide the trial court with an opportunity to correct any error in the jury instructions before the jury begins deliberating").  In any event, the instructions were neither erroneous nor prejudicial in the ways suggested by Milton here.  As

---

[15] The Court also rejects Milton's arguments concerning the good faith instruction.  *See* Doc. 257 at 23–24.  Milton contends that it was improper for the Court to include "no ultimate harm" language because it was "inapplicable to the facts" of his case.  *Id.*  According to Milton, the defense "never argued that any criminal intent was negated because he believed there would be no harm *in the long run*."  *Id.* at 24 (emphasis in original).  But as the Government points out, "the defendant argued both through cross-examination and in summation that investors were not harmed because they received valuable stock, and [the seller of Wasatch Creeks Ranch] was not harmed because he ultimately profited from his transaction with the defendant."  Doc. 263 at 15 (citation omitted).

the Government points out, he "cites no authority that would support the claim that variable section headings for correct instructions constitute prejudicial legal error."  Doc. 263 at 15.  And importantly, none of the written headings were legally incorrect or otherwise erroneous. Accordingly, the Court rejects Milton's arguments regarding the headings to the scienter element of Counts One, Three and Four.

### *iii.* Arguments Regarding Representations by Juror No. 6 During Jury Selection

In his Rule 33 motion, Milton also argues that he was denied a fair trial because Juror No. 6 lied during the *voir dire* process.  Doc. 257 at 29–45.  According to Milton, Juror No. 6 painted a "false or incomplete portrait[] of who [she] really [is]," and therefore "sabotaged the *voir dire* process" by "deliberately conceal[ing] that she harbored deep-seated hostility toward corporate executives and had a long history of using social media to complain about their outsized wealth." *Id.* at 29.  Milton's argument breaks down into two interrelated complaints:  Juror No. 6 lied to hide her bias against Milton and "manufactured a false image of herself solely to get on the jury," and her lies prevented the defense from pursuing an inquiry into her online activities that might have revealed her biases.  *Id.*  Accordingly, Milton contends that he did not receive a trial by an impartial jury, and a new trial is required.  *Id.*  In the alternative, Milton contends that an evidentiary hearing should be held "to confirm the falsity of, and impetus for, Juror No. 6's *voir dire* responses."  *Id.* at 30.

In response, the Government contends that Milton has failed to sufficiently show that Juror No. 6 "failed to answer a voir dire inquiry honestly, and therefore his request for a hearing or new trial must be denied."  Doc. 263 at 22; *see also id.* at 23–25.  It also argues that he cannot show that the Court would have stricken Juror No. 6 for cause if she "had answered in the

manner that the defendant now claims would have been truthful[.]"  *Id.* at 25; *see also id.* at 26–27.

In order to obtain a new trial under these circumstances, a defendant must show "that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause.  The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).  As the Government points out, the first prong of the inquiry "requires deliberate misconduct, not an honest mistake."  Doc. 263 at 21 (citing *United States v. Shaoul*, 41 F.3d 811, 816 (2d Cir. 1994)).  And under the second prong of the inquiry, the Court is tasked with assessing whether it would have granted a hypothetical strike for cause if the juror had answered truthfully.  *United States v. Stewart*, 433 F.3d 273, 304 (2d Cir. 2006) (concluding that the second prong of the *McDonough* test "requires the party seeking a new trial to demonstrate that the correct answer at jury selection would have provided a valid basis to challenge the prospective juror for cause," and, to do so, the district court must "determine if it would have granted the hypothetical challenge") (citing *United States v. Greer*, 285 F.3d 158, 171 (2d Cir. 2002)).

The Second Circuit has "only on rare occasions overturned a verdict or remanded for an evidentiary hearing" on the basis of a juror's failure to disclose information during jury selection.[16]  *United States v. Teman*, 465 F. Supp. 3d 277, 330 (S.D.N.Y. 2020); Doc. 263 at 21.  Indeed, the Supreme Court has made clear that "[a]llegations of juror misconduct, incompetency,

---

[16] And where the Second Circuit has chosen to overturn a verdict on this basis, the juror's disclosure failures have been significant.  For example, in *United States v. Parse*, 789 F.3d 83, 88–90 (2d Cir. 2015), the Court found that a juror had lied in *voir dire* about her background as a lawyer, the suspension of her law license, and her criminal history.

or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously

disrupt the finality of the process." *Tanner v. United States*, 483 U.S. 107, 120 (1987) (citation

omitted). "[P]robing jurors for 'potential instances of bias, misconduct or extraneous influences'

after they have reached a verdict is justified 'only when reasonable grounds for investigation

exist,' in other words, where there is 'clear, strong, substantial and incontrovertible evidence that

a specific, nonspeculative impropriety has occurred which could have prejudiced the trial.'"

*Stewart*, 433 F.3d at 302–393 (quoting *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir.

1983)).

Here, the Court concludes that Milton has failed to meet his burden under *McDonough*.

464 U.S. 548 at 556. As to the first prong, the Court rejects the assumption that the social media

posts highlighted by Milton show that Juror No. 6 necessarily lied when she answered the

Court's *voir dire* questions regarding wealthy corporate executives. As set forth above, the

Court asked the following specific questions:

> Do you think that there may be some relationship between how wealthy an
> individual is and how likely they are to break the law?

> Do you feel that senior-level corporate executives do not deserve or are not worth
> the amount that they earn?

> Would you have any problem accepting the principle that regardless of a person's
> personal wealth or lack of personal wealth, they're entitled to a fair trial,
> including the presumption of innocence?

Voir Dire Tr. at 22:10–22:25. To be sure, Juror No. 6 did not respond "yes" to any of these

questions. *Id.* at 69:21–70:16. Milton takes that fact and, as the Government notes, "compares

the[] questions to a number of social media posts, apparently made by Juror Six [before Milton's

trial], that the defendant claims evince 'deep-seated hostility toward corporate executives'" in

order to argue that Juror No. 6 lied during *voir dire*. Doc. 263 at 22 (quoting Doc. 257 at 29)).

But that conclusion does not follow from the record.  At best, the posts attributed to Juror No. 6 show that she objected to wealth disparities between corporate executives and average Americans—particularly at the peak of the COVID-19 pandemic.  *See* Doc. 257 at 31–32 (highlighting Juror No. 6's posts about income made by corporate executives during the pandemic).  As the Government notes, this is "a perfectly rational view, held by many, that does not call into question the veracity of Juror Six's non-responses."  Doc. 263 at 22.  Indeed, one can simultaneously lament wealth inequality and believe that corporate executives are not more inclined than others to break the law, are "worth" the amount that they earn, and are otherwise entitled to a fair trial.[17]  *See generally* Voir Dire Tr. at 22:10–22:25.

Importantly, an affirmative response to the question regarding the earnings of corporate executives would not have necessarily led to the dismissal of Juror No. 6.  Indeed, as Milton points out in his opening brief, "[t]wo of the other 31 prospective jurors responded to [this] question by disclosing they hold views very similar to the ones Juror No. 6 concealed," Doc. 257 at 39 (citing Voir Dire Tr. at 69, 73), namely, that they "feel like executives make more money than they should," Voir Dire Tr. at 69, and that such acquisition of wealth might be ethically questionable, *id.* at 73.  Yet the Court concluded that this did not inhibit their capacity to be fair and impartial jurors in the case against Milton.  *Id.* at 69, 73–74; *see also* Doc. 263 at 25–26 ("One can be confident that a strike for cause would not have been successful if Juror Six had stated that she believed that executives make too much money because two other jurors answered that question affirmatively and neither was struck for cause—the defendant did not even raise an

---

[17] As the Government puts it, "[a] call for redistributive taxation does not indicate that this juror felt generally that high-level corporate executives do not deserve their income, let alone that corporate executives are more likely to break the law or are not entitled to a fair trial or the presumption of innocence."  Doc. 263 at 23.

objection to either.") (citation omitted).  The Court qualified the two jurors that raised these

concerns *without objection from either party*.  Voir Dire Tr. at 69, 73–74.

Nor does the Court conclude that there is force to Milton's argument regarding Juror No.

6's response to the question about social media usage.  While the record shows that Juror No. 6

stated that she did not use social media platforms, and the posts found by the defense show that

she did indeed use several platforms, this answer came immediately after she stated that she

regularly obtained her news from YouTube.  Voir Dire Tr. at 198:22–199:1; *see generally* Doc.

259.  In other words, given that YouTube is a social media platform, the record suggests that

Juror No. 6 was not deliberately lying or covering up a material aspect of her identity in order to

be seated on the jury.  Additionally, as the defense points out, the various social media accounts

attributable to Juror No. 6 were publicly available, and she identified herself on those platforms

as a juror in this case.  Doc. 257 at 34–36; *see also* Doc. 263 at 24 ("Moreover, as an avid social

media user (at least as described by the defendant), Juror Six would well know that her social

media accounts are publicly accessible, and lying to the Court about her use of social media

would be absurd."); Doc. 259-8 at 11 (including tweet from username @BurnsBurnt stating that

the user was "serving jury duty" on September 18, 2022).  This context supports the conclusion

that Juror No. 6 did not intentionally lie about the Court's question regarding social media in an

effort to be selected for the jury.

Milton insists that due to Juror No. 6's failure to inform the parties about her social media

usage during *voir dire*, the defense was unable to "uncover[] her social media posts and move[]

to strike for cause . . . ."  Doc. 266 at 17 ("Moreover, the Court had given the defense team

permission to research potential jurors' social media profiles in real time as the Court questioned

them.").  But the defense team had access to the full name of Juror No. 6 throughout the *voir dire*

process and were free to research her and her online presence, at the time she was being questioned, or at any time during the trial.  *See* Voir Dire Tr. at 5:7.  At no point did the Court prevent Milton from engaging in a comprehensive search in this regard.  And as Milton himself recognizes, Juror No. 6—and any one of the other jurors—"could have been struck for cause at any time."[18]  Doc. 266 at 16; *see generally* Fed. R. Crim. P. 23(b)(2)(B) ("[A] jury of fewer than 12 persons may return a verdict if the court finds it necessary to excuse a juror for good cause after the trial begins.").

Finally, the Court underscores that none of the revelations about Juror No. 6—nor any other fact in the record—indicate that she "deliberately lied about her attitudes toward wealthy corporate executives and concealed her use of social media—all to secure a seat on the jury in this trial."  Doc. 257 at 44.  And the Court disagrees with the notions that (1) Juror No. 6 went through significant "lengths" to get seated on the jury and (2) "the Court would have been required to find implied bias and strike her from the jury" had it known about her omissions.  *Id.* In fact, during *voir dire*, Juror No. 6 volunteered that she had heard about Nikola when answering the Court's questions about her suitability to serve as a juror in the case.  Doc. 69:18–70:14.  Milton's arguments about Juror No. 6's alleged implied or inferred bias are unavailing.

For all of the reasons set forth above, Milton's Rule 33 motion for a new trial is denied in its entirety.

### B.  Rule 29 Motion for Acquittal as to Count Three

Finally, Milton moves for acquittal as to Count Three on the basis that the Government failed to prove that he "deceptively obtained or sought to obtain *anything at all* from investors in Nikola's publicly traded stock," Doc. 274 at 1 (emphasis in original), much less money or

---

[18] Critically, most of the public posts that Milton highlights in his briefs were published in 2021, and would have been viewable to the defense throughout the jury selection process and during trial.  *See* Doc. 257 at 31–36.

property, as required by the statute, Doc. 257 at 45 ("Even if the proof was sufficient to show that

Mr. Milton made material false statements to inflate the price of Nikola stock, it was insufficient

on Count Three because there was no evidence that Mr. Milton made any misrepresentation to

*obtain money* from any public shareholder.") (emphasis in original).  The Government

characterizes Milton's argument as "squarely foreclosed by the law and wrong on the facts."

Doc. 263 at 27.

> ### *i.* **Legal Standard**

Federal Rule of Criminal Procedure 29(a) directs the Court to "enter a judgment of

acquittal of any offense for which the evidence is insufficient to sustain a conviction."  To

succeed on a Rule 29(a) motion, the defendant must show, "considering all of the evidence,

direct and circumstantial, that 'no rational trier of fact could have found the defendant guilty

beyond a reasonable doubt.'"  *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (quoting

*United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)).  Where "either of the two results, a

reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the

matter."  *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation omitted).

It is not the trial court's role to "substitute its own determination of . . . the weight of the

evidence and the reasonable inferences to be drawn for that of the jury."  *United States v.

Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (quoting *Curley v. United States*, 160 F.2d 229, 232

(D.C. Cir. 1947)).  Accordingly, a "court may enter a judgment of acquittal only if the evidence

that the defendant committed the crime alleged is nonexistent or so meager that no reasonable

jury could find guilt beyond a reasonable doubt."  *United States v. Espaillet*, 380 F.3d 713, 718

(2d Cir. 2004) (quoting *Guadagna*, 183 F.3d at 130).  In assessing the sufficiency of the evidence

supporting a guilty verdict, the Court "must view the evidence in the light most favorable to the

government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008), *abrogated on other grounds by Dean v. United States*, 137 S. Ct. 1170 (2017)).  Therefore, a defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial "bears a heavy burden" when bringing a Rule 29(a) motion.  *Id.* (quoting *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010)).  The jury's verdict "may be based entirely on circumstantial evidence." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

As relevant here, the elements of wire fraud are:  (1) that there was a scheme to defraud or to obtain money or property by false or fraudulent pretenses (2) the defendant's knowing and willful participation in the scheme or artifice to defraud with knowledge of its fraudulent nature and with specific intent to defraud; and (3) the use of interstate wires.  *See Autuori*, 212 F.3d at 115; 18 U.S.C. § 1343.  "In order to prove the existence of a scheme to defraud, the government must also prove that the misrepresentations were material, and that the defendant acted with fraudulent intent." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (internal citation and quotation marks omitted).  "A statement is material if the misinformation or omission would naturally tend to lead or is capable of leading a reasonable [person] to change [his] conduct." *Id.* (internal quotation marks omitted) (alterations in original).  The Second Circuit has made clear that § 1343 does not require proof that the defendant "personally obtain[ed] property from the victim to be convicted of wire fraud." *United States v. Gatto*, 986 F.3d 104, 124 (2d Cir. 2021).  Rather, the Government must prove that money or property *was an object* of the fraud. *Ciminelli v. United States*, 143 S. Ct. 1121, 1126 (2023).

### *ii.* **Application**

The Court denies Milton's renewed motion for a judgment of acquittal as to Count Three. The evidence in this case amply showed that an object of Milton's scheme was to falsely inflate Nikola's stock price and then sell his stock in Nikola to deprive investors of their money and obtain the profits for himself. As the Government underscores, "[t]he fact that the defendant's scheme was stopped before [he was able to do so] is wholly irrelevant," because it is the contemplated object of the scheme that matters here. Doc. 263 at 29.

It is of no moment that the evidence showed that Milton's false statements were "made before he had any public shares or any lockup agreement."[19] Doc. 266 at 18. Indeed, the evidence also showed that Milton made the statements while also attempting to fraudulently increase the value of his company in an anticipation of an inflated *future* sale of his stock. *See, e.g.*, Trial Tr., Sept. 15, 2022, Doc. 220 at 163:18–166:13 (discussing Milton's public statements and several interpretations regarding their effect on the stock price); Gov't Exs. 25, 27; Doc. 280 at 2 n.2 ("At the risk of belaboring the obvious, inflating the stock price on Monday will naturally lead to sales at the inflated price on Tuesday. Indeed, such a scheme can only succeed if the perpetrator inflates the stock price prior to his sales."). And the evidence also amply showed that Milton sought to reduce the length of his lockup period in order to sell his stock as soon as he was able to do so. *See* Trial Tr., Sept. 23, 2022, Doc. 232 at 53:4–65:7 (discussing negotiations between Nikola executives and a director of Morgan Stanley's investment banking

---

[19] During trial, the chief financial officer of Nikola testified that a "lockup" is "a typical provision when the company goes public so that insiders, meaning management members who had a significant ownership in the company, do not sell for [a period of time] after going public." Trial Tr., Sept. 23, 2022, Doc. 232 at 63:16–63:19. He added that lockups are typical when companies go public because "[i]t's important to show and build confidence with investors that management is committed for the long-term value creation. And if management was allowed to sell quickly, that would show that somehow management may not have confidence in the company's future and the stock price." *Id.* at 63:20–63:25.

division and noting that Milton opposed "any type of lockup, even though it was quite standard" because he felt "it was important that he was able to sell some stock" when the company went public), Gov't Ex. 222.

In short, Milton has failed to meet the high burden before him.  The Court simply cannot here conclude that "the evidence that the defendant committed the crime alleged [was] nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Espaillet*, 380 F.3d at 718.  Accordingly, his Rule 29 motion is denied.[20]

## III.     CONCLUSION

For the foregoing reasons, Milton's motions are DENIED.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 256.

IT IS SO ORDERED.

Dated:    August 30, 2023
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.

---

[20] As noted, the parties dispute whether the wire fraud statute requires proof that the defendant sought to obtain the money or property of the victims.  *Compare* Doc. 257 at 46–50 *with* Doc. 263 at 28; *see also* Docs. 274, 280, 281. Because the Court finds that there was sufficient evidence for the jury to render a guilty verdict as to Count III using Milton's interpretation of the statute, the Court will not attempt to reconcile the parties views here, as doing so is not necessary to the resolution of the application before the Court.