**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————

UNITED STATES OF AMERICA

v.

TREVOR MILTON,

Defendant.

————————————————————

)
)
)
)
)
)
)
)
)
)

Case No. S1 21-cr-478 (ER)

**TREVOR MILTON'S SENTENCING MEMORANDUM**

This Sentencing Memorandum is respectfully submitted on behalf of defendant Trevor Milton, scheduled to be sentenced on November 28, 2023. For the reasons set forth below, the Court should impose a sentence of probation.

**PRELIMINARY STATEMENT**

Trevor Milton sees the world differently than most other people. Where others see darkness, Trevor sees light. Where others see despair, Trevor sees hope. Where others see impossibility, Trevor sees possibility. Where others see problems, Trevor sees solutions.

In 2015, Trevor founded Nikola Motor Corporation ("Nikola") while working out of his basement. He sought to revolutionize the trucking industry by doing something that no one had ever done before—create a low or zero emissions truck. The company began with just a few employees. Much of the seed money was provided by Trevor and his father, Bill Milton, who borrowed substantial amounts of money to fund the company. Trevor and Bill did so by taking "hard money" loans against their own homes with high rates of interest. From the very beginning, Trevor and his father took enormous risks with their own money because they believed in Nikola, and they believed in Trevor's vision.

Within a few years, Trevor built Nikola into a groundbreaking, innovative, and pioneering company that is transforming the transportation industry. Thrust forward by Trevor's infectious energy, optimism, and work ethic, and guided by a team of experienced industry professionals, Nikola broke boundaries in the semi-truck industry and drove the battery- and hydrogen-electric trucking world to new heights. Trevor devised the "bundled offering" concept, in which Nikola presented its customers with a combination of solutions: the class 8 truck, the hydrogen fuel, and the maintenance, all in one package.

It is undisputed that Trevor and his team delivered a cutting-edge company that developed track-tested trucks and a hydrogen station infrastructure. Nikola's revolutionary accomplishments were supported by a *bona fide* business model, proven technology, and sophisticated engineering. The company was fully vetted by some of the nation's premier auto executives. Nikola drew early investment from world-class business and manufacturing entities, some of the transportation industry's most well-regarded companies, and numerous sophisticated investors and investment firms.

In 2020, Nikola offered its shares to the public on the NASDAQ stock exchange. **When the company went public, Nikola fully and accurately disclosed all the material facts about its plans, products and finances on its own website and in its SEC filings.** Those disclosures made abundantly clear that Nikola was a pre-revenue company, still in the process of developing its trucks and still working on its hydrogen infrastructure plans. Those disclosures made equally clear all the risks of investing in such a company.

Today, the company that Trevor started in his basement still trades on the NASDAQ stock exchange and still employs hundreds of people. Nikola is the first original equipment manufacturer to produce a hydrogen fuel-cell semi-truck, a remarkable feat considering that

Trevor competed against the most sophisticated and best financed manufacturers in the world. Nikola is currently producing advanced, zero-emission semi-trucks and describes itself as a company that is pushing the "boundaries of possibility."

Trevor's accomplishments are all the more remarkable given that he was not cut from traditional CEO cloth. He suffered tragic losses early in his life, he lacks a college education, and he has no formal training as an engineer or designer. But Mark Russell, the former CEO of Nikola, described Trevor as a "gifted," "creative thinking" person, and a "visionary" with an "entrepreneurial spirit" that was "extraordinary." (Tr. 1136:21-1137:11). Trevor's style was instinctive, hands-on and considerate: for example, he visited truck stops in the Dakotas on Thanksgiving to interview truckers in contemplation of building Nikola. (Tr. 1139:6-23). Trevor is kinetic, overflowing with energy, design ideas, and enthusiasm—a "dreamer who comes up with new ideas" (Ex. B-22), and who can "inspire transformative change on a grand scale." (Exh. B-4).

Mark Russell also viewed Trevor as "extraordinarily courageous." (Tr. 1137:3). Russell testified candidly: he did not know "anybody else who would have founded Nikola in their basement at that time with that business model." (Tr. 1137:3-5). Russell joined Nikola because "[i]t was the best business idea [he'd] come across in [his] career[,]" (Tr. 976:17-20), which explains why Russell, an experienced lawyer and business executive, wanted "as much stock in Nikola as [he] could possibly get." (Tr. 1067:11).

Despite his creative talents, Trevor was untrained as a corporate executive and a novice when it came to public markets and finance. He needed help "understand[ing] what it means to be an executive of a public company" (GX 20) and how the NASDAQ market worked. (Tr. 1861:3-1862:17). He knew nothing of securities laws or regulation, but he had the self-

3

awareness to recognize as much, and he asked Nikola to provide him with "a good SEC attorney" (Tr. 1929:19-1934:2; DX 1497), an unlikely request from someone who intended to mislead investors.

Putting Trevor out in public to promote Nikola was a strategy conceived and endorsed by two of the most sophisticated and esteemed members of the company's board, Jeff Ubben and Steve Girsky. (Tr. 1928:13-1929:6). And Trevor's public statements were largely consistent with the Nikola business model.

It is unsurprising that the government's case focused on Trevor's public statements; Trevor's enthusiasm, his optimism, his spontaneity, and his "deep emotional connection" to Nikola inspired many of his statements. (Tr. 1141:20-22). And there is no doubt that Trevor is an "ambitious dreamer" (Exh. B-7) who "sometimes gets ahead of himself." (Exh. B-8). Those who know Trevor best explain that he is "child-like in his passions for what he gets excited about and because of this, his words may come off at times, differently than he intends." (Exh. B-10).

Most importantly, **there is not a shred of evidence from trial or from Trevor's personal life that he was ever motivated by spite, nastiness, ill will, or cruelty.** To the contrary, as set forth below, Trevor is a decent, guileless, hard-working, kind-hearted, generous and caring person. He is a "good person," who had "good intentions." (Exhs. B-25 and B-5). **And he never did anything to hide what he was doing or saying. He did not create phony documents, lie to his accountants, auditors or lawyers, mislead Nikola's Board of Directors about the company's activities, or direct anyone to file false documents with the SEC or other government regulators.** We respectfully submit that any misstatements Trevor made were the product of his deeply-held optimism and belief in Nikola, rather than any sinister motive or intent to harm retail investors.

4

"Trevor has his faults, but if he is made aware of them, he will make the effort to correct them."  (Exh. B-19).  Trevor's life goal is simple: He wants to provide the best care that he can for his wife, who suffers from rare medical conditions; he wants to be a supportive member of his family; and he wants to make a positive difference in the lives of others.

For these reasons, and for the reasons set forth below, **we respectfully ask the Court to impose a sentence of probation**, which will allow Trevor to stay home with his family and serve his community.  Such a sentence, we submit, is consistent with applicable law and does justice to the facts of the case and the characteristics of the defendant.

## PROCEDURAL HISTORY

On July 21, 2021, a grand jury in the Southern District of New York returned a three-count indictment against Trevor.  Count One charged securities fraud in violation of Title 18 U.S.C. § 1348.  Count Two charged securities fraud in violation of Title 15 U.S.C. § 77.  Count Three charged wire fraud, in violation of Title 18 U.S.C. § 1343.  On June 22, 2022, a superseding indictment added Count Four, another charge of wire fraud.

Trial commenced on September 13, 2022.  After the defense rested, a one-week adjournment ensued, due to issues related to COVID-19.

On October 14, 2022, the jury returned a mixed verdict.  The jury found Trevor guilty on Counts One, Three and Four, and not guilty on Count Two.

On December 14, 2022, Trevor moved, pursuant to Fed. R. Cr. P. 29 and 33, for a new trial and for a judgment of acquittal on Count Three.  The motions contended that (1) the jury found Trevor guilty on three counts, even though the jury believed that Trevor lacked criminal intent, and the jury, if correctly instructed, would have acquitted him on all counts; and (2) Juror No. 6's social media activity clearly showed, contrary to her sworn *voir dire* responses, that she

5

was biased against Trevor and corporate executives like him, but she concealed her bias to avoid being struck for cause or by the defense.

On August 30, 2023, the Court denied the motions.  Trevor acknowledges the service of the jurors in this matter, but he respectfully maintains his innocence and the contentions set forth in his Rule 29 and 33 motions.

## THE OFFENSE CONDUCT

This case has been plagued by many erroneous assumptions about Trevor Milton and Nikola.  To be clear:

- Nikola, under Trevor, was a *bona fide* company, and it remains so today.  Nikola has successfully designed, developed and produced electric trucks.  Its products, production facilities and solutions are not "vaporware."  On the contrary, the "technology is now a reality."  (Exh. B-2).  The [semi-] trucks are in production, and they are on the road. "[T]he trucks are all real[.]"  (Exh. B-16).

- Nikola went public through a merger with VectoIQ Acquisition Corp. ("VectoIQ"). VectoIQ's CEO, Steve Girsky, and its COO, Mary Chan, each had extensive experience at General Motors, including "responsibility for global corporate strategy, new business development, global project planning, and program management"[1] as well as "building the next generation of connected vehicle products and services."[2]  VectoIQ conducted robust due diligence, assembling "a number of industry experts to advise with respect to vehicle development, electrification, fuel cells, software, connectivity and manufacturing in connection with its due diligence efforts."[3]

- From the start, Trevor partnered Nikola with global leaders in the field, each of which also performed extensive diligence of Nikola and made meaningful contributions toward its progress.  These partners, many of whom had invested in Nikola before it went public, included such industry stalwarts as: (1) Robert Bosch GmbH, a Germany-based, multinational engineering and technology company; (2) Nel ASA, a Norway-based global expert in hydrogen production, storage and distribution; (3) Hanwha Techwin, a Korean technology company and the world's leader in annual solar cell production capacity; (4) Pratt & Miller Engineering, an engineering and product development company with extensive motorsports experience; (5) Meritor, Inc., a global supplier of commercial drivetrain, mobility, braking, and electric powertrain solutions; and (6) ZF

---

[1] *See* DX 732 at 196.
[2] *See* DX 732 at 196.
[3] DX 732 at 79.

WABCO, a global provider of electronic braking, stability, suspension and transmission systems.

- Trevor assembled a top-flight leadership team at Nikola, surrounding himself with seasoned professionals, all of whom had subject matter expertise.  The team included, among others: (1) Mark Russell, a highly experienced manufacturing executive with experience sourcing low-priced electricity, as President in 2019 and as CEO in 2020;[4] (2) Kim Brady, the CFO, a former investment banker with decades of experience; (3) Britton Worthen, a securities lawyer and Nikola's General Counsel from its inception; (4) and a group of engineers experienced in software, technology, control systems and commercial vehicle electrification.

- Trevor did not "target retail investors" so that he could enrich himself at their expense.  On the contrary, as the government's witnesses acknowledged, Trevor's focus on retail investors reflected "a difference in philosophy. . . . He believed that . . . we were seeing . . . a major change in capital market structure and it was a good thing[,] and it would be the democratization of the capital markets, individuals could invest [by] themselves directly and they wouldn't have to go through fund managers and intermediaries to do so."  (Tr. 1085:20-1086:7).  Trevor "belie[ved] that teaching people about the company through social media would create actual value[,]" both long term and short term.  (Tr. 1170:3-11).  As Trevor expressed it to Kim Brady, referring to retail investors, "that's how you build a foundation, love it."  (Tr. 1955:10-20).

- This was not a "pump and dump" case.  In early 2020, Trevor and the so-called PIPE Investors entered into a lock-up agreement, which barred Trevor from selling any of his public shares until December 3, 2020.  The government introduced no evidence whatsoever that Trevor intended to sell all, or a substantial portion, of his shares upon the expiration of the lock-up period.  In fact, to this day, Trevor remains the single largest shareholder of Nikola, the company that he conceived, built and still loves.

I.      **THE ADVISORY GUIDELINES ANALYSIS**

A.      **The Guidelines Calculations Set Forth In The PSR**

With a total offense level of 37, and a Criminal History Category of I, the Sentencing Table yields a range of 210-262 months, placing this case in Zone D.  PSR ¶¶ 43-64.

Using U.S.S.G. § 2B1.1, the PSR calculates the Guidelines range as follows:

Base Offense Level (2B1.1(a)(1))                                                7

---

[4] Trevor personally contributed approximately 21 million shares of Nikola common stock, and approximately 13 million shares of Nikola preferred stock, to T&M Residual LLC ("T&M Residual"), a jointly owned limited liability company, to recruit Russell.  DX 732 at 88.

| | |
|---|---|
| Loss Amount Enhancement (2B1.1(b)(1)(M)) | +24 |
| Enhancement for 10 or more victims (2B1.1(b)(2)(A)(i)) | +2 |
| Public Company Director Enhancement (2B1.1(b)(20)(A)(i)) | +4 |
| Total Offense Level | 37 |

The advisory Guidelines sentence here—between 17-1/2 years and nearly 22 years—actually reveals fundamental flaws that lie at the heart of the entire Guidelines regime.  Here, as shown below: (1) the PSR's loss calculation is incorrect; and (2) in any event, the offense level substantially overstates the seriousness of Trevor's offense, which warrants a downward departure.  "The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense."  *United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012) (Rakoff, J.).

**B.     The PSR's Loss Calculation Is Incorrect**

**1.     The PSR's Loss Amount Of $125 Million Is Based On A Third-Party Settlement Unrelated To Trevor's Conduct**

Trevor objects to the PSR's loss amount enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(M), which increases the adjusted offense level by 24 points.  In general, a "reasonable estimate" may suffice to establish loss.  Information on which a sentencing court relies, however, must have "sufficient indicia of reliability to support its probable accuracy."  U.S.S.G. § 6A1.3(a).  The PSR's loss amount is unreliable.

Here, the PSR has incorrectly chosen a number—$125,000,000—as the loss amount.  That number does not relate to the charges brought against Trevor or to the evidence introduced at trial.  Rather, the $125,000,000 number is based upon a settlement made in 2021 by *Nikola*

with the Securities and Exchange Commission ("SEC"), relating to *Nikola's* decision to settle. Trevor was not a party to the settlement.  (*See* ECF No. 271 at ¶ 47, n.1).

Civil "settlements[,]" furthermore, "often reflect considerations beyond the actual value of the underlying claim[.]" *United States v. Porat*, Crim. No. 21-170, 2022 WL 802158 at *4 (E.D. Pa. March 16, 2022).  Courts have therefore rejected the use of a civil settlement to determine the amount of loss attributable to a defendant's crimes.  *Id*.

Accordingly, Nikola's settlement with the SEC is not a reliable indicator of loss.  Neither the Court nor the parties can know how or why Nikola and the SEC arrived at the $125,000,000 amount, or whether they based the settlement on factors that have anything to do with the criminal case against Trevor.  Nikola was likely motivated by, among other things, the costs of continuing to litigate against the SEC, the uncertainty of litigation with the SEC, Nikola's reputation with the government and the investing public, shareholder pressure, and Nikola's desire to focus on its business rather than litigation.  None of these factors is relevant to the loss calculation here.

Consequently, Nikola's settlement with the SEC cannot serve as a reasonable estimate of the loss amount in this case.  And because the PSR provides no other basis for making a reasonable estimate of the loss amount, no enhancement pursuant to U.S.S.G. § 2B1.1(b)(1) should be applied.

### 2.    The Government's Loss Calculation and Methodology Are Erroneous; The Most Reasonable Estimate of Loss Is Zero

According to a chart submitted to counsel by the government, the "Scaled Up" Retail Investor Damages are over $650 million. As shown in the report of Jonathan I. Arnold (Exh. A), the government's loss calculation and methodology are erroneous, and flawed in numerous,

consequential respects.  As a result, the government's loss calculations are unreasonable and unreliable.  The most reasonable estimate of loss is zero.  Exh. A at 1.

**The government does not apply a scientifically sound methodology to quantify loss to retail investors.**  The government fails to properly apply the "event study" methodology.  Rather, the government quantifies investor loss based on Nikola's net-of-market stock price returns on three days—September 10, 2020, the day that the Hindenburg Report became public; September 11, 2020, the day following the Hindenburg Report; and September 21, 2020, the day Nikola announced Trevor's resignation.[5]  Exh. A at 1-2.

The government, however, offers no reliable basis to include either September 11 or September 21 in its computations.  Specifically, the government offers no basis to believe that information that became public on September 11, 2020, or September 21, 2020, comprised or included new, unanticipated information that constituted corrective disclosures of Trevor's misstatements for which he has been found guilty.  Exh. A at 2.  From an economic perspective, and in the absence of a "corrective" connection between the information disclosed on these dates and the misstatements, investor losses, if any, on these dates cannot be attributed to Trevor.  *Id.*

Event-study methodology, furthermore, presumes that markets operate efficiently.  For publicly traded companies, this presumption means that news is considered incorporated into stock prices swiftly—that is, during one trading day.[6]  *Id.*  And, even if the market took two days to incorporate material information, meaning that an event study for September 10 incorporates September 11, the government's methodology is inconsistent, as it does not apply a two-day

---

[5] Nikola's "net-of-market stock price returns" means the difference between the predicted stock price return using an event study model, and Nikola's actual stock price return on the same trading day.
[6] *See, e.g., Ramirez v. Exxon Mobil Corp.*, No. 3:16-CV-03111-K, 2023 WL 5415315, at *14 (N.D. Tex. Aug. 21, 2023) (stating that "[i]n this case, a two-day window is unsuitable for measuring price impact in an efficient market. A two-day window could include extraneous market noise, making it more difficult to understand the effect of the alleged Corrective Disclosures on Exxon Mobil's stock price.") (internal citations omitted).

window around the purported corrective disclosure on September 21, 2020. *Id*. at 2-3. These
failures violate standard practice for use of event studies to measure price impacts and to
calculate investor loss. *Id*. at 3.

The government claims to use "the" event-study model produced by defense expert,
Allen Ferrell. Professor Ferrell, however, produced four event-study models. The government
does not consider the results of its analysis as applied to all four models. If the government had
done so, it would have found that all other models produce investor loss materially lower than
those urged by the government here. *Id*.

**Putting the above criticisms aside, the government overstates retail investor losses in
two important ways.**

**First, the government failed to test for statistical significance.** That failure violates
the purpose and function of an event study. Stock prices move up and down regularly. In
general, they track the overall market, with variation. *Id*. That variation means that many stock
price movements (within a range, which is a function of something known as "standard
deviation") occur even in the absence of material information flowing into the marketplace. A
change in Nikola's stock price does not mean that there is a material change in response to
particular information. *Id*.

A proper event study uses a scientific method—known as a "statistical significance
test"—to determine whether there is (or is not) a material price effect from new information
flowing into the market. This new information could be a corrective disclosure, or some other
(i.e., confounding) disclosure. *Id*. In order to connect a material change to the disclosure of
particular information, the stock price movement must at a minimum be statistically

significant—that is, it must be statistically distinguishable from random variation.  The government's calculations ignore this factor.  *Id.*

Because the government ignores that certain price returns are statistically indistinguishable from price movements driven by random chance**,** the government overstates the level of inflation which, in turn, overstates retail investor losses.  *Id.* at 3-4.

**Second, the government's so-called "scale-up factor" is not supported by the data and relies on speculation to inflate the government's loss calculations by 250 percent.**  The government's scale-up factor purports to extrapolate the (government's estimate of) retail losses from trading at three brokerage firms to the universe of retail investors.  The government, however, bases its analysis on purely speculative assumptions that (i) 50 percent of all Nikola trading volume was retail trading volume, and (ii) losses increase linearly with trading volume.  These assumptions are not supported by the evidence, and they lack the necessary rigor to support a reasonable determination of investor loss.  There is no reliable basis to apply a scale-up factor in this case.  *Id.* at 4.

**Even under Professor Arnold's analysis of the event study framework adopted by the government, a reasonable conclusion is a total retail investor loss of $0.**  If September 10, 2020, the day of the Hindenburg Report, is treated as the only corrective disclosure event, then, when appropriately applying each of the four event-study specifications, retail investor loss is $0.0 across all four models.  *Id.*  If both September 10, 2020, and September 21, 2020, are treated as corrective disclosure events, then, when appropriately applying the four event-study specifications, retail investor loss is $0.0 for two of the four models.  For the other two models, the estimated loss is $108 million and $110.0 million, still far less than the government's estimate.  *Id.*

In total, six of the eight event-study estimates yield a $0.0 loss.  *See* Exh. A at 37.

Therefore, the Court can reasonably reject the government's estimate and conclude that the total

retail investor loss is $0.0.  *See id.* at 37.

### 3.    Gain Is Not an Appropriate Substitute for Loss

Application Note 3(B) to U.S.S.G. § 2B1.1 provides: "The court shall use the gain that

resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably

cannot be determined."  In this case, however, the Court cannot use gain, for two reasons.

First, the gain "resulting from the offense" shall be used as a substitute measure of loss

only if "there is a loss but it reasonably cannot be determined."  *Id.*  Here, as explained above

and in the attached expert report of Jonathan Arnold (*see* Exh. A), the most reasonable estimate

of the loss resulting from Trevor's alleged misstatements is $0.  Because the "loss" reasonably

*can* be determined (and has been estimated as $0), the Court cannot rely on "gain" as "an

alternative measure of loss."  *United States v. Romano*, 794 F.3d 317, 339 (2d Cir. 2015)

(explaining that a sentencing court is "authoriz[ed]" to use a gain calculation instead of a loss

calculation "only if *there is a loss...*" (quoting U.S.S.G. § 2B1.1 Application Note 3(b))).

Second, even if "gain" were an appropriate substitute measure of loss, the gain to Trevor

"resulting from the offense" is $0.  During the trial, the government presented a chart that

showed several of Trevor's stock transactions in early 2020. Each of these transactions, however,

involved arms-length negotiations with private parties and took place before Nikola's stock

began to trade on NASDAQ.  Trevor, furthermore, did not sell any publicly-traded Nikola stock

until after his lock-up period expired on December 3, 2020.  By then, even according to the

government's loss calculation, any inflation in Nikola's stock price as a result of Trevor's

misstatements had been corrected.  Thus, when Trevor began to sell publicly-traded shares of Nikola, there was no gain to him "resulting from the offense."

### C.  The Offense Level Substantially Overstates the Seriousness of the Offense

Application Note 21(C) to § 2B1.1, entitled "Downward Departure Consideration," provides, in pertinent part: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward departure may be warranted."  This is such a case.  For the reasons set forth below, a downward departure is warranted.

\*       \*       \*

In fraud cases, "the amount of the loss [has] become the principal determinant of the adjusted offense level and hence the corresponding sentencing range."  *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).  "This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider."  *Id.*

Many cases, furthermore, recognize that the Guidelines go too far in fraud cases: The Guidelines place "inordinate emphasis . . . on the amount of actual or intended financial loss." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006); *cf. United States v. Thompson*, 19 Cr. 698 (ER) (S.D.N.Y. Feb. 4, 2021), Sentencing Tr. at 28:25-29:7 (Ramos, J; "perhaps the fraud guidelines put entirely too much emphasis on the amount of the fraud, the money that's involved in the fraud. . . . I take the point that the amount of money does not necessarily get at the crux of the conduct that we are trying to prevent."); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) ("The guidelines place undue weight on the amount of loss involved in the fraud.").

14

The Guidelines do not "explain[] why it is appropriate to accord such huge weight to such factors." *Adelson*, 441 F. Supp. 2d at 509.  Certainly, "the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment best fits the crime, nor any approximation of the moral seriousness of the crime." *United States v. Johnson*, 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. April 27, 2018).  Rather, "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice." *Gupta*, 904 F. Supp. 2d at 351; *see Johnson*, 2018 WL 1997975, at *4 (noting "the rigidity of the loss amount overriding the diverse reality of complex financial crimes [and] the lack of any consideration of danger to society[]").

For such reasons, one District Judge summarized—accurately, we submit—as follows: "The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring).  This failure to apply an empirical, reasonable approach yields "[t]he widespread perception that the loss guideline is broken[,]" *id*. at 378, and "fundamentally flawed, especially as loss amounts climb.  The higher the loss amount, the more distorted is the guidelines advice to sentencing judges." *Id*. at 380.  Therefore, "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *Id*. at 379.

Cases involving public companies exacerbate the problem.  "Since successful public companies typically issue millions of . . . shares[,]" a decline in stock price "that typically accompanies a revelation of fraud generates a multiplier effect that may lead to guideline offense levels that are, quite literally, off the chart." *Adelson*, 441 F. Supp. 2d at 509.

15

Other Specific Offense Characteristics, finally, yield even more overstatement.  Section 2B1.1 directs a court to add offense levels based on the amount of loss—but also to add still more levels based on factors such as the number of victims, the defendant's use of mass-marketing and the defendant's status as an officer or director of a publicly traded company.  *See* U.S.S.G. § 2B1.1(b)(2)(A) and (b)(20)(A)(i).  This accumulation of offense levels "has a significant effect upon the applicable sentencing range[,]" *United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003), and "represents . . . the kind of 'piling-on' of points for which the guidelines have frequently been criticized."  *Adelson*, 441 F. Supp. 2d at 510.

In short, "the guidelines' fetish with abstract arithmetic" can result in a "travesty of justice" and in "harm . . . visit[ed] on human beings[,] if not cabined by common sense."  *Id*. at 512.  *See United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (describing "another example where the guidelines in a securities-fraud [case] 'have so run amok that they are patently absurd on their face[]'") (cleaned up).

*      *      *

Here, as demonstrated below, Trevor's offense level, determined under § 2B1.1, substantially overstates the seriousness of the offense.  A downward departure is therefore warranted, for the following reasons.

*First*, in this case, the loss calculation—standing alone—substantially overstates the seriousness of the offense.  If the government is correct, then Trevor's offense level, although not quite off the chart, would reach the highest level on the chart, which amounts to almost the remainder of Trevor's life in prison—an absurd result and indeed the "travesty of justice" to which *Adelson* refers.  *See* 441 F. Supp. 2d at 512.  "[I]t is difficult for a sentencing judge to

place much stock in a guidelines range that does not provide realistic guidance." *Parris*, 573 F. Supp. 2d at 751.

*Second*, in this case, the loss calculation by no means stands alone.  On the contrary, the PSR calculation included four additional levels based on Trevor's status as a director of Nikola. *See* § 2B1.1(b)(20)(A)(i); PSR ¶ 50.  Here, however, the addition of those four levels does not serve the core purpose of § 2B1.1(b)(20)(A)(i).

Trevor was a director of a public company, Nikola, for only three months.  He had no prior experience as a director or an officer of a publicly-traded company.  And, as even the government concedes, Nikola's SEC filings made accurate disclosures.  The Court should therefore discount, if not ignore, this enhancement, which contributes heavily to the overstatement of the seriousness of the offense.  *See Parris*, 573 F. Supp. 2d at 754 ("We now have an advisory guidelines regime where, as reflected in this case, any officer or director of virtually any public corporation who has committed securities fraud will be confronted with a guidelines calculation either calling for or approaching lifetime imprisonment.").

*Third*, the PSR piles-on still further, adding two more levels because the offense involved ten or more victims.  *See* § 2B1.1(b)(2)(A); PSR ¶ 48.  When Trevor objected to this portion of the PSR, the government sought to retain those two levels on the alternative ground that the offense involved mass-marketing.

These specific offense characteristics, however, merely demonstrate more overstatement. A case involving publicly-traded stock will *always* involve ten or more victims, and will *nearly always* involve, as this case does, appearances on television and the internet ("mass-marketing"). Surely, this enhancement should flow from unusual, aggravating criminal characteristics, not— as it does here—from commonplace, garden-variety characteristics of an offense related to a

public company.  *See United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("Under the Guidelines, it may well be that all but the most trivial frauds in publicly traded companies may trigger sentences amounting to life imprisonment[]"); *Parris*, 573 F.Supp.2d at 755 (criticizing the "'one-shoe-fits-all' approach" to specific offense characteristics of the kind at issue here).

*Fourth*, courts consider the cumulative effect of enhancements, which, like those imposed here, dramatically increase the sentencing range.  The *Lauersen* case, although decided before *Booker*, remains a good example.  There, the defendant's "offense level ha[d] already been increased by 13 levels because of the large amount of money involved in his fraud."  *Lauersen,* 348 F.3d at 343.  The government, nevertheless, on a cross-appeal, sought an additional four levels, on the ground that the offense affected a financial institution.

The Second Circuit agreed with the government but then tempered its holding because "the cumulative effect of [the] enhancements has a significant effect upon the applicable sentencing range."  *Id*. at 344.  "[T]he four-level enhancement . . . increase[d] the minimum of [the defendant's] sentencing range by four years . . . . [W]e think that the cumulation of such substantially overlapping enhancements, when imposed upon a defendant whose adjusted offense level translates to a high sentencing range . . . . permits a sentencing judge to make a downward departure."  *Id*.

Here, for similar reasons, the Court should depart downward.  The PSR already increases the offense level, from 7 to 31, based on the amount of the loss.  The accumulation of six more levels increases the PSR's adjusted offense level from 31 to 37, which, in turn, increases the minimum sentencing range by eight and one-half years (102 months), and increases the maximum sentencing range by ten and one-half years (127 months).  The government's position here would increase the sentencing ranges far more than the four years at issue in *Lauersen*.

18

*Fifth*, courts examine the proportionality between the base offense level and the "adjusted offense level, driven by the monetary loss amount." *Algahaim*, 842 F.3d at 800. In *Algahaim*, the loss amount led to "a three-fold increase[]" in the base offense level. The Court concluded: "Where the Commission has assigned a rather low base offense level . . . and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id*.

Here, the PSR, based on the loss amount, more than tripled the base offense level (from 7 to 24). The government's position on loss would more than quadruple the base offense level (from 7 to 30). *A fortiori*, under *Algahaim*, the Court is entitled to consider a non-Guidelines sentence, either by downward departure, as urged here, or under § 3553, as urged below in this memorandum.

\*       \*       \*

"[T]he Sentencing Guidelines for white-collar crimes" should not "be a black stain on common sense." *Parris*, 573 F. Supp. 2d at 754. "The notion that th[e] complicated analysis, and moral responsibility," required at sentencing, "can be reduced to the mechanical adding-up of a small set of numbers[,] artificially assigned to a few arbitrarily selected variables[,] wars with common sense." *Gupta*, 904 F.Supp.2d at 350. Accordingly, the Court here—applying common sense—should depart downward from the Guidelines calculations and the resulting sentencing range.

### D.       The Correct Guidelines Range

The correct Guidelines range is set forth below:

Base Offense Level (§ 2B1.1(a)(1))                                        7

Loss Amount Enhancement (§ 2B1.1(b)(1)(A))                      +0

19

| Mass-Marketing Enhancement (§ 2B1.1(b)(2)(A)(ii)) | +2[7] |
| Public Company Director Enhancement (§ 2B1.1(b)(20)(A)(i)) | +4 |
| Total Offense Level | 13 |

With a total offense level of 13, and a Criminal History Category of I, the Sentencing Table yields a range of 12-18 months, placing this case in Zone C.[8]

## II.  FACTORS UNDER TITLE 18 U.S.C. SECTION 3553(a)

The Sentencing Guidelines mark only the "starting point and initial benchmark" at sentencing.  *Kimbrough v. United States*, 552 U.S. 85, 108 (2007), citing *Gall v. United States*, 552 U.S. 38, 49 (2007).  Ultimately, sentencing is governed by 18 U.S.C. § 3553(a), which provides, in pertinent part: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a)(2), discussed below.  Accordingly, after the Court considers the advisory Guidelines calculation, the Court must proceed to an individualized assessment of the case-specific factors, set forth in § 3553(a), to determine whether, "in [this] particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing."  *Kimbrough*, 552 U.S. at 91, quoting 18 U.S.C. § 3553(a).

Title 18 U.S.C. § 3553(a) provides:

> The court, in determining the particular sentence to be imposed, shall consider—
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

---

[7] If there is no loss, then there are no victims, much less the 10 or more victims for which the PSR increased the offense level by two levels pursuant to § 2B1.1(b)(2)(A)(i).  *See* § 2B1.1 Application Note 1 (defining "victim" as "any person who sustained any part of the actual loss determined under sub-section (b)(1)").  Nevertheless, Trevor's calculation retains that two-level increase on the government's alternative ground that the offense was committed through mass-marketing.  *See* § 2B1.1(b)(2)(A)(ii).

[8] The PSR reports Trevor's financial condition based on a financial affidavit dated March 13, 2023.  PSR at 19-23.  We are informed that, in the interim, there have been significant fluctuations in value, purchases and sales, other litigation matters, costs, and other events that affect his overall financial condition.  We intend to offer revised financial information in advance of sentencing.

(2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.
(3) the kinds of sentences available;
(4) the kinds of sentences and the sentencing range established [under the Sentencing Guidelines] subject to any amendments made to such guidelines by act of Congress…;
(5) any pertinent policy statement . . . issued by the Sentencing Commission . . . subject to any amendments made to such policy statement by an act of Congress…;
(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to the victims of the offense.

We address below each of the statutory factors.

**Title 18, Section 3553, Subsection (a)(1)**

18 U.S.C. § 3553(a)(1) requires the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant[.]"  As part of this analysis, a sentencing court must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50 (2007).  "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'"  *Pepper v. United States*, 562 U.S. 476, 488 (2011) (citing *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

### TREVOR MILTON'S PERSONAL HISTORY AND CHARACTERISTICS

Trevor is much more than the two-dimensional character portrayed at trial.  He is a 41-year-old husband, son, brother, friend, ally, philanthropist, and caretaker.  He is a complicated, sensitive, spiritual and humane person.  He is not a product of elite schools or universities.  He has no significant higher education.  He has never used drugs, drunk alcohol, or had any

involvement with the criminal justice system before this case. He is a man with "zero intent to hurt anyone." (Exh. B-14).

### A.    Trevor's Early Life

Trevor was raised in the American West, more comfortable in the great outdoors than the office, and more skilled with cattle and horses than with regulators and investors. Before this case began, he had been to New York City for no more than a few days in his entire life.

A true appreciation of Trevor must start with his family. The Court will recall that Trevor's family attended his trial, *en masse*, every day. They remain close-knit and unconditionally supportive.

Trevor's family "taught him resilience, compassion, hard work and love." (Exh. B-3). Kasey Matthews Johnson, a retired police officer and a close family friend, tells of how Trevor and his siblings "were raised with strong solid values and with a love for others and service to others." (Exh. B-14). As Ms. Johnson also describes: "There is a quiet humbleness, an intense integrity compass, and a genuineness about all of the Miltons, including Trevor." *Id.*

Trevor was born in Layton, Utah. He has four siblings—three sisters and a brother; he is the next-to-youngest child. Trevor's early years in Utah were stable and comfortable, marked by a very close relationship with his parents, Bill and Sally (known as "Cissy"). Bill Milton worked in the railroad business and would take young Trevor to the railroad yards, where Trevor became "enamored with diesel locomotives" and later with clean-energy alternatives. (Exh. B-19). Cissy took Trevor to community food kitchens and pantries to serve the hungry. Cissy taught "generosity and kindness to all [her] children and those they served," and Trevor has "internalized" those values." *Id.*

Trevor was close to his siblings as well. They observe that he possessed a "larger-than-life charisma that [was] infectious," and that he knew only two speeds, "90mph or asleep." (Exh. B-5).  Trevor's eldest sister recalls that he had "plans to change the world," was full of optimism, and "always had a plan for making things better for everyone."  *Id.*

Between his family and the spiritual faith with which he was raised, Trevor learned to focus on service to others, giving, generosity, and the "betterment of society." (Exhs. B-4 and B-25).

When Trevor was about ten years old, Cissy ███████████████████—and so began enormously difficult formative years for the adolescent Trevor.  Trevor was devastated by the notion that he might lose his mother.  He was forced to face questions and fears, and to watch his mother in agony for two years, until Cissy ████████████████████.  When Trevor was twelve, and it appeared that Cissy had turned a corner, Trevor's father, Bill, left his job at the Union Pacific railroad, and moved the family to Kanab, Utah.

Being a new kid in a small town was hard for Trevor.  He had difficulty in school, and his interest in technology, combined with his energy and curiosity, made him "an outsider" and "an odd man out" in a very rural area. (Exhs. B-26 and B-19).  According to his father, "Trevor demonstrated extraordinary mental capacity and had extraordinary ideas and energy and exhibited other characteristics and traits, which today would be diagnosed as Asperger's" (Exh. B-19).  Trevor was bullied for his excitement and big ideas. (Exhs. B-26 and B-28).  In short, life as a boy was not easy for Trevor.

To make matters worse, Cissy's ██████████████████████ (Exh. B-19). This time, ███████████████████████████████ ██████████████████████.  Trevor watched his mother ██████

██████████████████████████—an excruciating experience for the adolescent Trevor.

His family nevertheless needed Trevor to work hard and to be relentlessly optimistic for the sake of his mother and the rest of the family—values that would be imprinted on Trevor's psyche forever.  He got part-time jobs to help ease the family's financial burden, and he gave his mother foot rubs and back rubs to help ease the pain.  He was called upon to care for and watch over his four-year-old sister, Jessica, as his mother suffered, and his father tried to make ends meet. Jessica describes how Trevor "stepped up and helped my dad more than any 14-year-old can be expected to."  (Exh. B-24).

For a long time, according to Bill Milton, the family prayed ████████████████



██████. Cissy ████████████████████████. Bill Milton remembers Trevor standing with his finger on his mother's casket, "shaking like a leaf." (Exh. B-19).

Cissy's death devastated Trevor.  Her kind spirit and big heart, however, left a permanent—and positive—mark on Trevor:  The experience made him "sensitive to the struggles of others and [unable to] remain idle . . . particularly when faced with someone else's suffering." (Exh. B-26).  The experience also fueled his desire to build something good for the world— something that would endure and benefit people. Trevor became a man of "optimism[,]" (Exh. B-20), who would "inspire[]" others, providing "opportunity" and "inspir[ing] courage when [others] often need it[.]"  (Exh. B-29).

Cissy's death, in short, would be the spark that lit the flame that later ignited the founding of Nikola.

When Trevor was 16 years old, his father remarried and the family moved to St. George, Utah. Trevor again had a difficult time with new surroundings. Trevor and the family were having "a very hard time adjusting to life without" Cissy. (Exh. B-11). The loss of his mother and the uprooting of the family amidst financial hardship made it unsurprising that Trevor never succeeded in high school or in his one semester of college. He is extremely intelligent and a voracious consumer of technology and science, but academics and studying were never his strong suit. Instead, roll-up-your-sleeves hard work would prove to be Trevor's calling. "If there is a way, [Trevor] will find it. What he may not know, he will learn, ask, seek the answers." (Exh. B-9).

Trevor's friend Jason McCrea observes:

Trevor is a kinesthetic learner: someone who needs to be actively engaged in their learning by having their hands on the thing they are learning. In short, the traditional classroom environment is not the most effective for him. Therefore, he sought out and hired what he perceived to be the best in an area of expertise to show him how to do the task. His expectation is that this person would teach, counsel, and take actions appropriately to arrive at the desired result. In business he hired attorneys, accountants, engineers, and tradesmen. In his personal life, if he wanted to learn how to snow mobile or hunt, he hired top guides to show him the best way to do so. He hired me and other pilots to teach him how to fly. Trevor, naturally curious, always asked questions.

(Exh. B-18).

Before Trevor was ready to enter the working world, he chose to undertake a service mission for the Church of Jesus Christ of Latter Day Saints. Sent to São Paulo, Brazil, Trevor learned Portuguese and taught English to Brazilians, a valuable language-skill for those seeking to raise their stations in life. During his 18 months in Brazil, Trevor made no money, lived in *favelas*, and often slept on dirt floors.

Trevor also endured physical hardship on his mission: ███████████████

████████████████████████████████████

███ (Exh. B-19).  Despite fears that Trevor ████████████████████████████████

████████████  Trevor would soon put his hands—and his ever-curious, expanding mind—

to work in revolutionary ways.

When Trevor returned home from his mission to Brazil, he faced a second heartbreaking

loss: His stepmother ████████████████████████████.  By the time Trevor was

ready to start his adult, working life, he had endured pain, suffering, sadness, and loss.  But, in

typical Trevor fashion, he channeled his grief in a positive direction, learning that "he could do

hard things."  (Exh. B-19).  "He believed anything could be accomplished, and that there was

nothing he couldn't do."  (Exh. B-11).

Trevor's oldest friend, Ryan Nelson, knows the real man, not the person portrayed at trial

or in the media:

> I strongly believe Trevor is misunderstood and unfairly miscategorized by those
> who don't truly know him.  Because he is passionate, he is portrayed as egotistical.
> That is not true of the Trevor I know so well. Because he is eager to share, he is
> portrayed as irresponsible.  That is not true of the Trevor I know. Because he loves
> his ideas and his work, he is portrayed as a liar or a manipulator. That is not Trevor.
>
> Trevor is a good man.  He is a devoted husband.  He is God fearing and seeks to
> treat others as he would like to be treated.  I know this to be true.  He puts his trust
> fully in those with whom he works, and he is often let down because others do not
> have the same drive and vision that he possesses.  It is true he has plenty of quirks
> and faults, which we all do.  But unfortunately for him, those faults have been blown
> out of proportion by media and others who are looking for a large personality to
> report on.  I know the real Trevor. He is a good guy.

(Exh. B-28).

Trevor's personal history and characteristics, summarized above, and set forth at length

in the outpouring of letters submitted by friends, family, business colleagues and others, strongly

support a lenient sentence, with no imprisonment.

### B.      The Founding of Nikola

Being an entrepreneur "requires you to take a leap of faith, not knowing what is on the other side."  (Exh. B-13).  Regardless of one's view of Trevor's behavior, it is impossible not to be awestruck by his development of Nikola.

Dane Davis was Nikola's Chief Technology Officer and one of its earliest employees. Davis "provided the technical information to investors as they did due diligence" and "helped bring Trevor's vision to market."  (Exh. B-7).  He describes the early days of Nikola as follows:

> When we started there were no real solutions that we could build from, so we often had to open doors to create what we needed.  Trevor was excellent at opening doors so we could take the next step.  Once the door was open Trevor did what he could to empower us to succeed.  In this Trevor was always learning.  Even though he did not hold any type of Engineering degree he would study and research on his own to provide ideas that we could evaluate and sometimes use.  As an educated Mechanical Engineer with a fair amount of product development experience I had the advantage of knowing how development is done and what it takes to bring products to market, but Trevor had to learn that as he went.  Trevor was always eager to learn and challenge the status quo.  He knew the potential of what we were doing was huge and that it would take a special kind of leadership to put aside the many reasons why not to find the how.  That leadership was inspiring for me and the Nikola team.  This type of leadership is why I believe almost the entire company relocated to Phoenix from Salt Lake City.  Most of us, including me, left our entire family and network to work alongside Trevor.

(Exh. B-7).

Trevor believed in the upstart company with "passion and vision."  (Exh. B-2). He was "an innovator" (Exh. B-5); and an "ambitious dreamer[.]"  (Exh. B-7).

Trevor knew, however, that he was "not cut out for the corporate life."  (Tr. 967:2-8). "[H]is style didn't exactly match the typical style of a public company corporate executive."  (Tr. 1138:21-1139:1).  Trevor, the Founder, CEO, and later Chairman of Nikola, actually felt most comfortable as part of the team.  Every employee knew him because he would "roam the

building[,]" meeting with people.  (Exh. B-25).  Trevor cooked hot dogs and hamburgers at company outings, and made sure to meet everyone's family at Christmas time.

Nothing captures Trevor's lack of corporate and financial sophistication better than his exchange with Nikola CFO, Kim Brady, on the day Nikola went public.  On that day, Nikola's stock price dropped by five points.  A "worried" Trevor contacted Brady, and asked Brady to call NASDAQ, because Trevor thought that NASDAQ was "broken."  Brady, of course, assured Trevor that the NASDAQ market was not broken.  *See* Tr. 1861:3-1862:17.  This was a new world for Trevor.

### C.    Trevor's Generosity and Care For Others

Trevor has "a heart of Gold[;]" he is "salt of the earth[.]"

Those are the words of Dane Davis, a close friend of Trevor and a longtime employee of Nikola. That sentiment is shared by all those who know the *real* Trevor Milton. Nearly every letter submitted on his behalf focuses on his selflessness and generosity:

- "[A] very kind heart."  (Exh. B-8).

- "[A] very loving and caring person."  (Exh. B-9).

- "[O]ne of the biggest hearts we have seen."  (Exh. B-10).

- "He has the biggest heart[.]"  (Exh. B-15).

- "Trevor . . . [is] the most charitable human being I know."  (Exh. B-13).

- "[O]ne of the most generous people I know."  (Exh. B-21).

- "I have witnessed moments of generosity that have changed the trajectory" of lives.  (Exh. B-20).

- He "has a kind heart and will help anyone in need[.]"  (Exh. B-14).

- "Trevor has a good heart[.]"  (Exh. B-11).

- "I can wholeheartedly attest to the goodness of his core character."  (Exh. B-12).

28

- "I see him as a genuinely decent person;" a man of "inherent goodness."  (Exh. B-6).

- "People like Trevor are truly gems . . . such pure heart[]!"  (Exh. B-16).

Trevor is generous with his money, in both large and small ways.  Trevor's aunt and uncle, Belle and Dave Milton, and his wife Chelsey's parents, Duane and Holly Gustafson, recount how Trevor, during the pandemic, paid the "utility bills owed by those struggling financially" in their area.  (Exh. B-22).  Trevor did this "quietly," as just one of "many . . . acts of kindness."  (Exh. B-10).

Trevor has been known to surprise a fast-food employee with a $100 tip, and to slip a $100 bill into the pocket of a person sleeping on the street.  During the pandemic, Trevor made sure that local food banks were stocked.  (Exh. B-29).  Concerned about the survival of local businesses, Trevor bought large numbers of gift cards and handed them out to employees.  *Id*. Similarly, Trevor gave $10,000 to the Town of Alpine for its emergency services, a gift that made a big difference in a small town, and kept the volunteer fire department open.  Trevor also regularly donates tens of thousands of dollars to several animal shelters.  *Id*.  He once bought numerous pieces of Native American art and furniture, which "[h]e didn't need . . . but he wanted to help and encourage the vendors [at a] small town event."  (Exh. B-31).  He sought no credit or recognition.

Trevor, furthermore, is a "caring and sincere" leader (Exh. B-7), a generous and loyal employer, "looking out for all of his employees, and always willing to help in any way" he can. (Exh. B-32). "He inspires employees to work hard, believe in the importance of their role, and [he] strengthens their desire to grow and develop their skill."  (Exh. B-20).

The examples abound: giving "Christmas bonuses, paid time off, encouraging [employees] to spend time with their families[;]" (Exh. B-2); giving one-off bonuses to employees who needed help with car repairs (*Id.*); making sure to select a health insurance plan

that covered an employee's ███████████████ (Exh. B-32); remembering to reimburse an employee for air fare to visit family in India (Exh. B-16).  In fact, Trevor's generosity inspired others to generosity.  *Id.*  "The example he has set inspires me to do the same."  (Exh. B-20).  Finally, Trevor "is always considerate and friendly. . . " to all.  (Exh. B-6).

As Nikola announced in an August 2020 press release, Trevor gave a group of early Nikola employees options for over six million shares of *Trevor's own* Nikola stock.  These were not options awarded by a company as part of an employee's compensation; they were awarded by Trevor personally and were exercisable against Trevor's personal shares.  Thus, any gain earned by an employee in exercising these options was a gain that, but for his generous gift, Trevor could have earned for himself.  It is rare for a company founder to exercise such generosity to employees, especially at an early-stage company.  Trevor "made several of [the original employees] millionaires."  (Exh. B-25).

On December 30, 2020, after his stock lockup expired, Trevor donated 1.5 million Nikola shares to his church.  At the time of the gift, the shares had a market value of approximately $20 million (Exh. C).  Trevor made this very large donation at a time when he was no longer receiving compensation from Nikola, and when Nikola's share price was down considerably.

Of course, it is easy for successful people to be generous with money, though not all are. But Trevor's sister Cynthia is clear: "[T]his is how he has always been!"  (Exh. B-21).  Jessica Milton concurs: Trevor stepped up for her at a "time he didn't have much."  (Exh. B-24). Trevor's father recalls, "I have never seen Trevor walk past someone in need without helping[.]" (Exh. B-19).  Childhood friend Ryan Nelson remembers: "Trevor is a very giving and generous person.  He always has been, even as a youth[.]"  (Exh. B-28).

These observations about Trevor are echoed by Matthew Peterson, who has known

Trevor personally and professionally for over 15 years:

> Trevor constantly provides opportunities to those he meets. On dozens of occasions,
> he would be chatting with an [U]ber driver, his waitress, or a stranger at the airport
> and after spending some time getting to know them and their circumstances, he
> would offer to have them come see him at the office and many times offer them
> jobs.   He saw potential to help them do something different, possibly more
> meaningful, to gain a skill, and better provide for themselves. I have first-hand
> knowledge of these instances and offers.  There are so many people that work for
> him currently or did in the past, that are doing something meaningfully different
> and providing better for their families than they were before he bumped into them
> and took an interest in their lives.

(Exh. B-29).

James Anderson, a long-time friend and a cattle rancher who leases pastureland from

Trevor, describes an incident in which a few dozen cattle "had escaped our pasture into a

neighbor's high mountain range" in below-freezing weather, in the middle of a snowstorm.

Immediately upon learning of the situation, Trevor "insisted that he would join me and would

continue looking until we had all the animals safely off the mountain."  (Exh. B-1).  Anderson

also describes how Trevor later provided critical assistance that saved his herd when disease

broke out and he was forced to quarantine his cattle.  *Id*.  As Anderson concludes, Trevor "has

always been a very generous and giving landlord. . . . a genuine, caring person with a big heart."

*Id*.

In early September 2023, local news reported that Steve Keller, a 76-year-old dentist

from Palo Alto, California, vanished while hiking with a group, not far from a campsite in the

Wind River Mountains of Wyoming.  https://buckrail.com/still-no-sign-of-missing-winds-hiker-

fcso-says/.  After several hours of searching on their own, the party reached out for help by

pressing an SOS on a satellite communication device.  *Id*.  News reports noted that "the

remoteness of the area, the high elevation, and the extremely rugged terrain . . . made searching

extremely difficult." *Id.* "Steamboat Lake is about 10,000 feet elevation and 17 miles in from the trailhead," one person said. https://www.sfgate.com/bayarea/article/palo-alto-man-missing-in-wyoming-wilderness-18352247.php. "Winter comes fast, this is not for the beginner backpacker." https://www.sacbee.com/news/california/article279081569.html. Tribal Game and Fish officials entered the area to search, along with aerial and ground search teams. *See* https://county10.com/no-sign-of-missing-76-year-old-hiker-in-wind-river-range-as-search-continues/.

Prompted by nothing other than concern for a fellow outdoorsman, Trevor joined the search and rescue effort. Trevor recounts that he and a fellow pilot went up in Trevor's helicopter and searched the Wind River area for hours, amid dangerous conditions and rugged terrain. This is the account of Niels Christiansen, Trevor's co-pilot, reproduced in full at Exh. B-35:

> On Thursday Sep 7, 2023, Trevor Milton was asked by a friend of a friend to help with a search and rescue effort looking for a missing hiker. The hiker and his family had gone into the Wind River wilderness in Wyoming for a family fishing trip and the elderly father went missing during a hike . . .
>
> We put together a flight plan, weather briefing, and performance calculations before determining it was safe to go help. We flew out within an hour heading to the last known location of the missing father. We picked up the lost man's son and nephew to guide in the search.
>
> Trevor paid for the entire operation and never asked for anything in return monetarily or otherwise. . . . He also bought food and provisions for us during the two day search. Winds were not favorable and made the ride uncomfortable. It was hard work flying to safely operate the aircraft while not exceeding its limitations. We were operating the helicopter at the top of its capabilities due to the amount of weight we were carrying and the altitude we were searching at . . . We also searched off trail for many square miles . . .
>
> Unfortunately, nothing lead [sic] us to the person we were searching for. We coordinated our efforts with local tribal leaders, a local ground based search and rescue operation, and another helicopter that was transporting volunteers to and from the site.

The following weekend I was asked by Trevor to fly an additional search crew with cadaver dogs up to the area again. Another two days of searching and transporting personnel to and from the site unfortunately did not lead to finding this person.

The missing man's son, Chris Keller, deeply moved by Trevor's efforts, recounts how Trevor "dropped all his plans and flew his helicopter out to the Wind River Indian Reservation . . . to help find my father without asking for anything in return." (Exh. B-17). Keller describes how Trevor and his co-pilot "took turns expertly flying overhead" in challenging conditions. *Id.* According to Keller, Trevor spent "over 20 hours flying . . . in the most extreme conditions" and then facilitated a group search on foot, using his helicopter to shuttle 12 searchers in and out of the wilderness.  *Id.*  And even with a relative stranger like Keller, Trevor provided not only resources, but also emotional support: "Trevor comforted me and my family when we stood in need.  He mourned with me as I mourned.  He became my brother with his kindness and generosity, and his counsel that helped me when I hit rock bottom." *Id.*  There are no better words to describe Trevor and his big, big heart.

Perhaps, in New York City, and other urban parts of the Northeast, these would be atypical examples of philanthropy, generosity, and care for others.  In the West, they are heroic and vital acts of selflessness.

In sum, Trevor "is a person who has made a difference in the lives of countless people[.]" (Exh. B-29).  He gives money and property to friends, family and strangers, but he is generous with more than money: He gives his heart, his attention and his encouragement to others.  "He gives them his [t]ime[.]"  *Id.*  He "cares about [them]—even those he doesn't know" (Exh. B-31).  He cares enough to give a private, COVID-driven "commencement speech" to the sons of a friend/employee.  (Exh. B-7).  He cares enough to give employees "second chances[.]"  (Exh. B-

3).  He and his wife care enough to "have changed the trajectory of people's lives around them."

(Exh. B-15).

### D.      Trevor's Love and Care for Chelsey Milton

Trevor married Chelsey Bergmann in 2017.  When they met, Chelsey saw how Trevor's

"optimism lived in every part of his being.  I wanted to understand how he lived with such

compassion and ambition."  (Exh. B-20).  She soon found out.

Since they married, Chelsey has been "the most important part of [Trevor's] life." (Exh.

B-10).  Chelsey enthusiastically supported Trevor's Nikola journey; as she told her father:

"Trevor mortgaged all the equity in the [marital] house . . . to keep the Nikola dream alive[.]"

She assured her father that "if they had to start over they would be fine."  (Exh. B-3).  In a

heartfelt letter to the Court, Chelsey's father, Gene Bergmann, describes a dinner at which Trevor

spoke about Chelsey:

> Trevor spoke up and expressed his gratitude for his marriage and shared several
> poignant feelings for my daughter in his life etc.  Those heartfelt words put an
> absolute lump in my throat and moistened this father's eyes.  You wonder
> sometimes the depth of the relationship your children have in their marriages and
> that day I saw and felt something I wished for all my children and couples.  I
> thanked Trevor for being such a good husband.

(Exh. B-3).

Unfortunately, Trevor and Chelsey's union has been filled with a number of

extraordinary challenges.  In the spring of 2018, Chesley



(Exh. B-2).

*Id.*

.

Shortly thereafter, Chelsey ███████████████████████████████████████

███████████████████████████████████████████████████████████████

████ (Exhs. B-2 and B-3). In 2019, her ████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████.

(Exh. B-2).

Chelsey ██████████████████████████████. ███████████████████████

Chelsey ██████████████████████████████████████████████████

███████████████████████████████████████████████

█████. (Exh. B-30). ███████████████████  ██████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████ *Id.* As

a result, Chelsey █████████████████████████████████

███████████████████████████████████ *Id.* Her ██████████████████████

███████████████████████████████████ *Id*. Chelsey's █████████

███████████████████████████████████████████████

███████████████████████ *Id*.

██████████████████████████████████████████

██████████████████████ *Id.* ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████ *Id.* Collectively, ████████

███████████████████████████████████████████████████████████

███████████████████████.

Chelsey has become ever more dependent on Trevor.  Indeed, Trevor provides the kind of intimate care that only a loving spouse can provide.  ████████████████████████

█████████████████████  As explained by a close friend of Chelsey:

> I have been at the bedside of Chelsey at her very worst. It's painful to even speak of.  The suffering she has and continues to endure is painful to watch. I watch Trevor as he is the one that is there every night next to her.  In the long days and even longer nights tending to her health and physical needs. For example, the other night he████████████████████████████████████████████████,
> ██████████████████████████████████████ he watched his mother and stepmother go through ████████████████████████.  I see the [effect] that her health has on Trevor.

(Exh. B-15).

Trevor and Chelsey can only meet these challenges together, and their relationship has only grown stronger.  As Chelsey writes, Trevor, at first, "was in [a] panic.  He was being pulled to my side in intense worry, yet [remained] responsible for the continuation of hundreds of peoples' livelihoods."  (Exh. B-20).  Chelsey required "a life that gives [her] consistency on a day to day basis."  *Id*.  Trevor showed his "compassion, patience, and unconditional love.  He . . . developed into a wonderful husband, as well as a caretaker."  *Id*.

Chelsey's parents document Trevor's "love and care" for their daughter amid what they recognize ████████████.  (Exh. B-10).  Trevor's father eloquently summarizes Trevor's attention to Chelsey: "Through all this Trevor has had to reach very deep to muster enough strength and energy to comfort and strengthen her.  He has been a tender champion in his care of her." (Exh. B-19).

These sentiments are expressed, again and again, in the letters submitted by friends and family.  Trevor is invaluable to Chelsey's health and well-being.  As Chelsey herself concludes, "Trevor is the most important person in my life" and "my love continues to deepen for him amidst our darkest moments."  (Exh. B-20).

The need to care for Chelsey, in a way that only a husband can, provides a most compelling reason for the Court to impose a sentence of probation.

**Title 18, Section 3553, Subsection (a)(2)(A)**

18 U.S.C. § 3553(a)(2)(A) provides that the court shall consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

Trevor's punishment will not begin when the Court imposes its sentence.  On the contrary, Trevor's punishment began a long time ago.  Thus:

The prosecution itself has already resulted in significant punishment of Trevor and reverberated upon those he loves.  News of Trevor's arrest and conviction spread nationwide.  It appeared throughout the mainstream media, including but not limited to The Associated Press, Reuters, *The New York Times*, *The Los Angeles Times*, *The Financial Times*, CNBC, CNN, NPR and Bloomberg. In addition, in the middle of a stressful trial, Trevor was the subject of an episode of the CNBC television series "American Greed." (S15E8: "Chasing Tesla").  The show lives on in (seeming) perpetuity on streaming services.  Trevor was also the focus of *The Wall Street Journal* podcast entitled "The Unraveling of Trevor Milton."  These sensationalized portrayals of Trevor have caused him and his family enormous pain and will punish Trevor for the rest of his life.

Trevor and his family were also subjected to shocking and unspeakable harassment online. Two examples:

> "There's an A1 white scammer called Trevor Milton that scammed corporate America close to $35 by creating a lie that he had found a solution to hydrogen powered trucks. Top lad that one, Tinder Scammer ain't got nothing on him." @mokayah, February 14, 2022

> "Russia is the $NKLA of countries and Putin is its Trevor Milton!" @SteveHamel16, March 8, 2022

> A video entitled "How to Lie Your Way to $34 Billion," amassed over five million views

on YouTube. ColdFusion, October 25, 2021. These and similar posts will live forever on the internet.

Trevor has also lost some of his closest friends and colleagues, including some of the people with whom he started Nikola and many of the people he hired. Nikola was their common bond and Trevor's life's work. Not only has Trevor been cast out of the company he built with his own sweat and blood, but many of his old colleagues became scared or reluctant to speak with him. And those friends who may have been willing to risk their jobs were perhaps unwilling to insert themselves into a federal criminal investigation. Trevor has been ousted from the very community he created. His reputation is in tatters. The result has been depression and loss for Trevor.

Michael Fleming, a close friend of Trevor's, writes about how the charges and the trial "have destroyed Trevor" and how he is "a shell of who he once was." (Exh. B-8). Mr. Fleming also notes how "the stress of these charges have taken a severe toll on both Trevor and his dear wife Chelsey." *Id.*

Many cases take factors like these into account at sentencing.[9]

For Trevor, furthermore, a conviction by itself imposes serious punishment. Trevor has no prior criminal history. The very status of "convicted felon" therefore delivers a significant blow, and inflicts a major punishment in this case—more than sufficient to satisfy the statutory requirements.

Trevor will also suffer the harsh "collateral consequences" of a felony conviction, under both state and federal law. He will likely lose the right to own a firearm—a serious deprivation for a lifelong hunter/outdoorsman—to vote, to hold office, to sit on a jury and perhaps to obtain professional licenses. The csgjusticecenter.org puts it as follows:

> Collateral consequences remain obscure and are increasingly complex. Because collateral consequences are civil in nature—and not part of a person's criminal punishment—they are generally imposed without the involvement of sentencing courts and are not referenced alongside the state and federal laws that govern criminal offenses or procedure. Instead, they are scattered throughout various portions of state statutory and regulatory codes, making it difficult for a person to identify all of the consequences that may stem from a conviction for a particular

---

[9] *See, e.g.*, *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (upholding below-Guidelines sentence in part because district court found that "defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming a below-Guidelines sentence in part because defendant lost his job and income); *United States v. Jasen*, 15-CR-00214 (M.D. Fla. Jan. 28, 2016), ECF No. 86 at 53-54 (imposing probation because, in part, "one who makes a mistake in judgment...should be, in my judgment, absent other aggravating circumstances, be able to go on with their life and suffer the humiliating and devastating effects of being prosecuted...which will... harm your reputation, your social status..."); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming a below-Guidelines sentence in part because the defendant "was punished by the reputational harm he suffered as a result of the criminal action"); *United States v. Redemann*, 295 F.Supp.2d 887, 894–97 (E.D. Wis. 2003) (downward departure warranted where defendant suffered serious collateral consequences from conviction); *United States v. Samaras*, 390 F.Supp.2d 805, 809 (E.D. Wis. 2005) (imposing below-Guideline sentence in part because, "as a consequence of his conviction and sentence, defendant lost a good public-sector job, a factor not considered by the Guidelines."); *United States v. Anghaie*, 09-CR-0037 (N.D. Fla. Nov. 29, 2011), ECF No. 238 (imposing below-Guidelines sentence and noting that defendants "received significant punishment through financial loss, loss to reputation and career opportunities."); *United States v. Vigil*, 476 F.Supp.2d 1231, 1315 (D.N.M. 2007) (observing that, in considering justness of sentence, "it is important to consider all other forms of punishment [defendant] has already suffered," including loss of job and damage to his personal and professional reputation); *United States v. Olis*, Criminal No. H-03-217-01, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (finding a substantial variance warranted in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct").

crime in a particular jurisdiction. In a single state, employment barriers may be embedded in a state's civil service code, trade and occupations code, and any other place that regulates business practices. And because collateral consequences are not criminal, they are generally implemented by state agencies through obscure and often complex administrative policies and internal practices that may drastically alter their operation and impact.

"In many states, a criminal record is a stain you can't wash off."  Steven Slivinksi, Economist, Center For the Study of Economic Liberty, Arizona State University. csgjusticecenter.org.  Put simply, a host of sanctions and disqualifications will continue to accompany Trevor for the rest of his life.

**Title 18, Section 3553, Subsection (a)(2)(B)**

According to 18 U.S.C. § 3553(a)(2)(B), an appropriate sentence should "afford adequate deterrence to criminal conduct[.]"

Here, the government, through its investigation and highly publicized prosecution of Trevor, has surely achieved adequate general deterrence of the conduct of conviction.  In the wake of Trevor's conviction, the Court can reasonably conclude that CEOs or executive chairpersons of public companies will only engage in direct social-media exchanges with members of the general public with extreme caution.  And public company boards, lawyers, and executives are on notice that they need to police *all* public statements of executives and directors regarding the company.  In sum, the public is undoubtedly aware, taking action and more than adequately deterred.

This prosecution has also already achieved specific deterrence.  Unsurprisingly, neither the PSR nor the government suggests that Trevor will commit further crimes.

Trevor is a first-time, non-violent offender.  There has been no complaint about his pre-trial or post-trial supervision.  He has already suffered tremendously throughout this prosecution.  It has cost him – and will continue to cost him - financially.  It has cost him close relationships.

It has cost him his company and livelihood.  And, most importantly, it has exacerbated his wife's

████████████████████ .

      Trevor, in sum, is not a risk of committing further crimes.

      This conclusion finds support in data on which the Sentencing Commission relied in

promulgating recent amendments to the Guidelines, effective November 1, 2023.  Trevor is a so-

called zero-point offender—that is, he has no criminal history points.  The Commission's data

shows that zero-point offenders "have considerably lower recidivism rates than other offenders,

including lower recidivism rates than the offenders in Criminal History Category I with one

criminal history point."  U.S.S.G. Manual, Amendment 821 (eff. 11/1/2023), at "Reason for

Amendment" (*available at* https://www.ussc.gov/guidelines/amendment/821) (citation omitted).

In short, the criminal justice system generally has no need or reason to imprison the zero-point

offender because he or she—like Trevor—is so unlikely to reoffend.  A term of incarceration is

therefore unnecessary to achieve specific deterrence.

**Title 18, Section 3553, Subsection (a)(2)(C)**

      18 U.S.C. § 3553(a)(2)(C) sets forth that an appropriate sentence shall "protect the public

from further crimes of the defendant[.]"  Neither the PSR nor the government suggests that the

public needs protection from Trevor Milton.  He will never again have the opportunity to repeat

the offense of conviction.  He will never again be in the position of speaking to the public on

behalf of a public company.  And it is highly unlikely that he will ever again be in a position to

raise money from investors.

      The letters of support confirm that the public needs no protection from Trevor.  Indeed,

the record shows not merely that Trevor has been a law-abiding citizen who minds his own

business, but that he has been a model for others, who has in fact improved the lives of family,

friends, business colleagues and even strangers.  And, indisputably, Trevor has improved the

trucking industry and contributed to cleaner roads and greener vehicles.  Trevor, in short,

presents the very opposite of the potential recidivist for whom prison is necessary.

**Title 18, Section 3553, Subsection (a)(2)(D)**

18 U.S.C. § 3553(a)(2)(D) provides that the court shall consider "the need for the

sentence imposed to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner[.]"  Trevor needs no

further education or training.  He has no history of health issues or substance abuse.  He does not

need rehabilitation or correctional treatment.

**Title 18, Section 3553, Subsection (a)(3)**

18 U.S.C. § 3553(a)(3) provides that the court shall consider "the kinds of sentences

available[.]"  Here, the PSR sets forth in detail the kinds of sentences available in this case.  *See*

PSR ¶¶ 97 – 117.  Trevor respectfully directs the Court's attention to that discussion.

**Title 18, Section 3553, Subsection (a)(4)**

18 U.S.C. § 3553(a)(4)(A) provides that the court shall consider "the kinds of sentences

and the sentencing range established for . . . the applicable category of offense committed by the

applicable category of defendant as set forth in the guidelines[.]"  This memorandum discusses

above the issues arising under the advisory Guidelines.  Trevor respectfully directs the Court's

attention to that discussion.

**Title 18, Section 3553, Subsection (a)(5)**

18 U.S.C. § 3353(a)(5) provides that the court shall consider any "pertinent policy

statement . . . issued by the Sentencing Commission[.]"  This memorandum, again, discusses

above the policy statements and issues arising under the advisory Guidelines. Trevor, again, respectfully directs the Court's attention to that discussion.

**Title 18, Section 3553, Subsection(a)(6)**

18 U.S.C. § 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" On this issue, the PSR sets forth certain Judiciary Sentencing Information ("JSIN") obtained from the Sentencing Commission's database. Specifically, the PSR—using its Total Offense Level of 37—provides as follows:

> During the last five fiscal years (FY2017-2021), there were 30 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 37 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 30 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 146 month(s) and the median length of imprisonment imposed was 128 month(s).

*See* ECF No. 273 at 28.

More recent JSIN, covering the period of FY 2018-2022, and currently available on the Sentencing Commission's database, shows decreases in the foregoing average and median sentences:

> During the last five fiscal years (FY2018-2022), there were 29 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 37 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 29 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 132 month(s) and the median length of imprisonment imposed was 120 month(s).

*See* https://jsin.ussc.gov/analytics/saw.dll?Dashboard.

As shown above, however, the PSR's loss enhancement, 24 levels, is incorrect. The most reasonable estimate of the loss resulting from Trevor's alleged misstatements is $0, which reduces the Total Offense Level to 13.[10]  Currently available JSIN for level 13 is as follows:

> During the last five fiscal years (FY2018-2022), there were 1088 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 13 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 683 defendants (63%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 8 month(s) and the median length of imprisonment imposed was 6 month(s).

On the issue of sentencing disparities, furthermore, the court may also consider cases that are helpful not by *similarity* but by *contrast*. We discuss two such cases below.

*United States v. Greenwood*, S16 17 Cr. 630 (ER), involved what this Court said "has been described nefariously as the largest international fraud known at least to this district." (Sept. 12, 2023 Greenwood Sentencing Tr. at 35:25-36:1). As the Court stressed at Greenwood's sentencing, Greenwood's OneCoin cryptocurrency scheme was "massive in many respects." (*Id.* at 36:2). The scheme was international in scope, resulted in millions of victims losing at least $4 billion, and, perhaps most importantly, was designed from the outset as a fraud. There was never any chance that Greenwood's victims would get any return on their investments. Indeed, the Court described the case as involving "Greenwood and his co-conspirator simply putting their hands in the . . . victims' pockets . . . and . . . taking out the money that they found in there." (*Id.* at 37:3-6). And Greenwood targeted his victims—whom he described as "idiots"—precisely because they were "easy marks." (*Id.* at 37-38). In short, Greenwood acted with avarice and with a calculated and willful malevolence. The Court sentenced Greenwood to a term of 20 years' imprisonment.

---

[10] As discussed above, *see* n.7, Trevor's calculation retains the two-level increase on the alternative ground that the offense was committed through mass-marketing. *See* § 2B1.1(b)(2)(A)(ii).

**Trevor, by contrast, and as discussed in other sections of this memorandum, did not act in a greedy or mean-spirited way.  He did not actively seek to hurt anyone.  He did not misdirect any funds into his own pocket.**  Indeed, in voluntary statements discussing the verdict with the press or on social media, jurors consistently said that Mr. Milton lacked "criminal intent" or "intent to harm," which they believed was required only on Count Two (the acquitted count).  Juror No. 1: "We think he had good intentions with Nikola.  It just didn't come into fruition as quickly as he wanted to[;]" Juror No. 6: "We thought that he didn't have any intent to harm."  ECF No. 257 at 8.  And of course, unlike OneCoin, Nikola was a real company from the very beginning, and it continues to operate now.

At trial, the government claimed that Trevor targeted unsophisticated retail investors, but that was a mischaracterization and an oversimplification. Trevor certainly sought to speak directly to retail investors, but not because he thought retail investors were "idiots" or "easy marks."  Rather, Trevor wanted to get retail investors interested in Nikola because he thought they were more loyal, and that loyalty would help see Nikola through the challenging early days of a pre-revenue company.  As Trevor expressed it to Kim Brady, referring to retail investors, "that's how you build a foundation, love it."  (Tr. 1955:10-20).  Trevor had a *different* philosophy regarding retail investors, not an *evil* one.

Finally, the Court should also resist any temptation to compare this case to *United States v. Holmes*, Case No. 18-CR-00258 (EJD) (N.D. Cal.), in which the court sentenced Elizabeth Holmes to 135 months in prison following her conviction on wire fraud and conspiracy charges.  True, both Trevor and Elizabeth Holmes were young entrepreneurs, each at the head of a start-up company looking to change the world for the better.  The differences between the two

individuals, however, are far more striking than the similarities.  In short, Trevor's conduct does not begin to approach that of Holmes.

First, unlike Holmes's company, Theranos, Nikola was—and remains—a real company with real products that employ proven technologies.  Today, three years after Trevor left the company, Nikola employs hundreds of people.  Second, unlike Holmes, Trevor never put Nikola's customers at risk, whereas Holmes touted and used blood-testing technology that she knew to be unreliable, thus putting human beings at medical risk.  Finally, Holmes not only lied to her investors, she also duped her own board of directors.  And when a reporter started to investigate her lies, Holmes personally appealed to the owner of *The Wall Street Journal*, an investor in Theranos, to quash the story and threatened those she perceived to be the reporter's sources.

In contrast, whatever Trevor may have done, he did it openly and with the full knowledge of Nikola's executives and board of directors.  There were no fake documents or financial shenanigans, and there were no threats to anyone to keep quiet.

**Title 18, Section 3553, Subsection (a)(7)**

18 U.S.C. § 3553(a)(7) provides that the court shall consider "the need to provide restitution to any victims of the offense."  The MVRA applies only when "an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B).  Here, the loss amount, as set forth above, can reasonably be estimated at $0.00.  No restitution is warranted.

Moreover, the Court may decline to order restitution if it finds that determining restitution in a case is too complex or if the victims have not been identified.  *See* 18 U.S.C. § 3663A(c)(3).  The government has not provided any Victim Impact Statements and has made no

46

effort to identify specific victims or to quantify the loss of any alleged "victim." Identification of victims is a statutory prerequisite to the application of the MVRA. *See United States v. Catoggio*, 326 F.3d 323, 328 (2d Cir. 2003). Absent the identification of any victims or amounts, it would be premature to order restitution. Additionally, identifying victims prior to imposing restitution ensures that those victims receive the pro-rata share of the restitution funds to which they are entitled. *Id.*[11]

\*      \*      \*

As noted, Trevor Milton respectfully objects to the PSR. The Court, for the reasons set forth herein and in the memorandum, dated April 12, 2023, should sustain those objections in determining the applicable Guidelines.

The Sentencing Commission, furthermore, promulgated a new Guideline, § 4C1.1, effective November 1, 2023. *See* Adopted Amendments (Effective November 1, 2023), UNITED STATES SENTENCING COMMISSION, https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023. That new Guideline addresses the case of the so-called "zero-point offender," who—like Trevor—has no criminal history points. Subsection (a) of that new Guideline provides:

ADJUSTMENT.—If the defendant meets all of the following criteria:

(1) the defendant did not receive any criminal history points from Chapter Four, Part A;
(2) the defendant did not receive an adjustment under § 3A1.4 (Terrorism);
(3) the defendant did not use violence or credible threats of violence in connection with the offense;
(4) the offense did not result in death or serious bodily injury;
(5) the instant offense of conviction is not a sex offense;

---

[11] As to Peter Hicks, the government did not identify him as a victim, presumably because he suffered no loss. He received $8.5 million in cash for a property for which he paid $6.85 million a few months' prior. (Tr. 2076:22-2077:8; Tr. 2150:18-20; Tr. 2032:23-2033:2; Tr. 2150:11-12). He also sold his Nikola stock for an additional $1.6 million. (Tr. 2150:6-16). Additionally, restitution is not warranted because Hicks has filed his own civil action seeking treble damages (Tr. 2145:21-2146:16; Tr. 2149:3-9).

(6) the defendant did not personally cause substantial financial hardship;

(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(8) the instant offense of conviction is not covered by § 2H1.1 (Offenses Involving Individual Rights);

(9) the defendant did not receive an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or § 3A1.5 (Serious Human Rights Offense); and

(10) the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

decrease the offense level determined under Chapters Two and Three by 2 levels.

Proposed amended Commentary—specifically, a new Application Note 4(A) to § 5C1.1—drives home the Commission's view that zero-point offenders, who would qualify for an adjustment under § 4C1.1(a), generally should not go to prison.  That new Application Note provides: "If the defendant received an adjustment under § 4C1.1 . . . and the defendant's applicable guideline range is in Zone A or B . . . a sentence other than a sentence of imprisonment, in accordance with subsection . . . (c)(3), is generally appropriate."

Trevor clearly meets nine of the ten requirements for the § 4C1.1 adjustment.  As to subsection (6), the present record does not reflect substantial financial hardship personally caused by Trevor. In fact, the government has not identified any specific victims.  Accordingly, Trevor warrants a measure of consideration under this new Guideline.

**TREVOR MILTON'S**
**NON-GUIDELINES SENTENCE REQUEST FOR A TERM OF PROBATION**

Trevor Milton appreciates the Court's consideration of this memorandum and all the § 3553(a) factors in fashioning an appropriate sentence.  He respectfully submits that a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing is a term of probation.

Accordingly, and for the foregoing reasons, Trevor Milton respectfully requests that the

Court impose a term of probation.

Dated: New York, New York          Respectfully submitted,
      November 14, 2023

By:   /s/ Marc L. Mukasey
      Marc L. Mukasey
      Robert S. Frenchman
      Torrey K. Young
      Kenneth A. Caruso

      MUKASEY FRENCHMAN LLP
      570 Lexington Avenue, Suite 3500
      New York, New York 10022
      (212) 466-6400

      *Attorneys for Defendant Trevor Milton*

**CERTIFICATE OF SERVICE**

I, Marc L. Mukasey, hereby certify that on November 14, 2023, this document was filed

electronically and served by mail on anyone unable to accept electronic filing. Notice of this

filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or

by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic

Filing. Parties may access this filing through the Court's CM/ECF System.


Dated:  New York, New York                          /s/ Marc L. Muksaey
            November 14, 2023                            Marc L. Mukasey