# PAUL HASTINGS

1 (202) 551-1701
bradbondi@paulhastings.com

December 15, 2023

The Honorable Edgardo Ramos
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re:   United States v. Milton, Case No. 21-cr-478 (ER)

Dear Judge Ramos:

We write in response to the government's sentencing memorandum, filed on December 12, 2023, Dk. No. 315, (the "Government's Submission"), specifically with respect to the government's position on loss amount, which the government calculates as between $660.8 million and $673.6 million. *See id*. at 10-11. As we indicated in our submission, filed on November 14, 2023, Dk. No. 299, (the "Submission"), the loss amount is zero. *See id*. at 10. The most the government demonstrates through its resort to unconventional economics and unreliable methodologies is that the loss amount cannot reasonably be determined.

Significantly, although the government purportedly commissioned an "analysis" by the economic consulting firm Compass Lexecon (although notably unsigned), what the government contends is *ipse dixit* and is not affirmed or endorsed by any economist or the economic literature. Indeed, by way of one example, a report submitted in this Court by Compass Lexecon's own chairman, Daniel Fischel, directly contradicts and refutes the government's purported methodology regarding the proper statistical significance threshold. *See* Report of Daniel R. Fischel, *In re: January 2021 Short Squeeze Trading Litigation*, Case No. 21-2989-MDL-ALTONAGA/Damian (Feb. 16, 2023). The Government's Submission contains <u>four</u> fundamental errors:

1.  **The government now alleges three, instead of two, corrective disclosure events**. In a November 9, 2023 letter from the government to undersigned counsel in response to our request for additional information regarding the government's methodology for calculating losses, attached as Exhibit A, the government identified two events as corrective disclosures: the September 10, 2020 Hindenburg Report and the September 21, 2023 announcement of Mr. Milton's resignation. *See id*. at 1; *see also* Exhibit A to the Submission (Expert Report of Jonathan I. Arnold) at 14 ("[T]he Government only identifies two alleged corrective disclosure events."). In order to defend the government's flawed

December 15, 2023
Page 2

    two-day trading window theory, as discussed below, the government now alleges that there was a third corrective disclosure, the September 11, 2020 press release Nikola issued responding to the Hindenburg Report. Government Submission at 16. The government now alleges that the "absence of a specific, detailed refutation [of the Hindenburg Report] in Nikola's response," makes the press release a standalone corrective disclosure event. For the reasons set forth in our Submission, *see id*. at 10, the September 11, 2020 press release was not a corrective disclosure.

2. **The defense expert never has taken the flawed position that a two-day trading window is appropriate in this case, and the government has mischaracterized his testimony**. The government continues to defend its position that analyzing a two-day trading window, for certain events, is appropriate for the loss calculation. The government states that Professor Ferrell testified "that it can be appropriate to use a multi-day event study window when news trickles out over a series of days, as it did with the Hindenburg report." Government Submission at 17. That is simply untrue. Neither the defense, nor the government (before its most recent submission), ever has argued that news regarding the Hindenburg Report "trickled out." Moreover, we consistently have maintained that a one-day trading window is the appropriate window to analyze the impact of statements on a publicly traded company's stock, in this case Nikola, because news is considered incorporated into stock prices swiftly—that is, during one trading day. *See* Ferrell Tr. at 2505:9-11 ("[A] day is very standard because, in the academic literature, it's normally thought of as enough time for the market, the market consensus, to react to information."); *see also* Tr. at 2505:1, 2693:13-14, and 2727:2-4; Submission at 10-11. In fact, the government's position is, at best, inconsistent because the government uses a *one-day window* surrounding the September 21, 2020 corrective disclosure. *See* Expert Report of Jonathan I. Arnold at 18-19. Mixing and matching' methodologies within the same analysis is unsound economic practice and unsupported in the academic literature.

3. **The Government has misconstrued the applicability of a 10% statistical significance threshold. The 5% standard used by the defense is the appropriate standard under the economic literature and a report by the government's own "consulting" firm, Compass Lexecon.** The government provides absolutely no support for its position that a 10% level of statistical significance is appropriate. Instead, the government argues that defense expert Jonathan Arnold "selected" an "arbitrarily restrictive . . . 5% cutoff." Government Submission at 18. To the contrary, a 5% statistical significance threshold is the standard used in the industry, economic literature, and landmark civil cases to calculate the impact of an event on a public company's stock price. *See Erica P. John Fund, Inc. v. Halliburton Co*., 309 F.R.D. 251, 262 (N.D. Tex. 2015) ("To show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard,

December 15, 2023
Page 3

which means one can reject with 95% confidence the null hypothesis that the corrective disclosure had no impact on price.") (quotations and citations omitted); Fisch, Jill E.; Gelbach, Jonah B.; and Klick, Jonathan, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553 (2018) ("Typically courts and experts have treated an event-date effect as statistically significant if the event-date's excess return is among the 5% most extreme values one would expect to observe in the absence of any fraudulent activity.").

Indeed, Daniel Fischel, the chairman of Compass Lexecon, the government's economic consultant, authored a report opining that the 5% threshold is the correct standard to use in event studies such as this one. *See* Report of Daniel R. Fischel, *In re: January 2021 Short Squeeze Trading Litigation*, Case No. 21-2989-MDL-ALTONAGA/Damian (Feb. 16, 2023), at ¶35 ("In an event study analysis, residual returns are typically considered statistically significant if they fall outside a 95 percent confidence interval…"). Defense counsel is aware of scores of examples where Compass Lexecon economists have testified under oath applying the 5% threshold, yet, we have been unable to locate any example using a 10% threshold. Perhaps this is why the Government Submission is not signed or attributed to any economist.

Applying a 10% threshold implies that the standard of legal harm is *lower* in criminal cases than in civil cases. This is a perverse result. As set forth in Dr. Arnold's initial submission, which uses the proper 5% statistical significance threshold, **it is abundantly clear that none of Mr. Milton's statements caused an impact on stock price, and accordingly did not cause investors to lose money**. *See* Expert Report of Jonathan I. Arnold at 25; *see also* testimony of Professor Ferrell Tr. 2528:19-25.

4. **Using change in market capitalization as an alternative measure of damages has no economic validity whatsoever**. In a desperate, last minute attempt to remedy the flaws in their methodology, the government now, for the first time, suggests that the "Court could determine loss amount based on the change in Nikola's market capitalization following the disclosure of the fraud in the Hindenburg report." Government Submission at 20. This is an overly simplistic methodology, which presumes that the entirety of any stock price decline is attributable to Mr. Milton. In reality, an abundance of factors, circumstances, and events affected the price of Nikola stock on any given day. This included, among many other things, information about the company, general market conditions, and other industry factors. The cases the government cites in the Government Submission do not suggest that the Court may ignore factors other than a defendant's actions in calculating the decline in a stock price. *See, e.g., United States v. Kumar*, 617 F.3d 612, 634 (2d Cir. 2010) (affirming the government's loss amount where its expert—who testified—"took other causes for [the] stock decline into account by comparing the earnings misses of [the

December 15, 2023
Page 4

company] to those of thirty other similarly situated companies, and 'perform[ing] a comprehensive regression analysis in an effort to isolate the event-specific impact of the given firm's earnings-miss disclosure on its stock price, while controlling for market-wide or industry-wide factors.'"); *United States v. Ebbers*, 458 F.3d 110, 127-28 (2d Cir. 2006) (with respect to the market capitalization test, stating that "[t]here is a problem, however, with this simplistic analysis" because "[l]osses from causes other than the fraud must be excluded from the loss calculation.").[1]

We respectfully request that the Court find that the government's loss calculations are erroneous and unreliable, and, as stated in our Submission, *see id*. at 9-14, the appropriate loss amount in this case is zero.

Respectfully submitted,

/s/ Bradley J. Bondi
Bradley J. Bondi
Robert S. Frenchman

---

[1] Unlike here, in *Ebbers*, the defense's own economic expert estimated that other market factors might have been responsible for "35% or more of the stock decline," and that even crediting the defense expert's methodology, the loss amount attributable to the defendant's fraud was "still well above $1 billion." *Id*. at 128.