UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

TREVOR MILTON,

        *Defendant*.

No. 21-cr-478 (ER)

---

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR A NEW TRIAL ON COUNT FOUR**

Alexandra A.E. Shapiro
Daniel J. O'Neill
Avery D. Medjuck
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880
ashapiro@shapiroarato.com
doneill@shapiroarato.com
amedjuck@shapiroarato.com

*Counsel for Defendant Trevor Milton*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 2

FACTUAL BACKGROUND ................................................................................................ 3

    A. The Superseding Indictment And Count Four ....................................................... 3

    B. Peter Hicks Withheld Critical Documents Responsive To Milton's
       Rule 17 Subpoenas .............................................................................................. 5

    C. Hicks's Perjury At The Criminal Trial .................................................................. 7

       1. The Government Relied On Hicks's Perjured Testimony To Prove
          Materiality .................................................................................................. 7

       2. The Government Relied On Hicks's Perjured Testimony To Prove
          Venue ...................................................................................................... 12

ARGUMENT .................................................................................................................. 16

  I. THE NEWLY DISCOVERED HICKS EVIDENCE REQUIRES A NEW TRIAL
     ON COUNT FOUR ............................................................................................... 16

    A. Legal Standard ................................................................................................. 16

    B. Milton Satisfies All Five Elements For A New Trial Pursuant To Rule 33 ............... 17

       1. Elements 1 & 2: The Hicks Evidence Was Discovered After The
          Criminal Trial Despite Milton's Diligent Efforts To Obtain It ........................... 17

       2. Elements 3, 4, & 5: The Newly Discovered Evidence Is Material,
          Non-Cumulative, And Would Have Resulted In Milton's Acquittal ................. 19

CONCLUSION .............................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*United States v. Aguiar,*
   737 F.3d 251 (2d Cir. 2013) ................................................................................. 17

*United States v. Diaz,*
   176 F.3d 52 (2d Cir. 1999) ................................................................................... 19

*United States v. Ferguson,*
   246 F.3d 129 (2d Cir. 2001) ................................................................................. 17

*United States v. Katsougrakis,*
   715 F.2d 769 (2d Cir. 1983) ................................................................................... 1

*United States v. Owen,*
   500 F.3d 83 (2d Cir. 2007) ................................................................................... 16

*United States v. Parkes,*
   497 F.3d 220 (2d Cir. 2007) ................................................................................. 17

*United States v. Siddiqi,*
   959 F.2d 1167 (2d Cir. 1992) ................................................................... 16, 20, 21

*United States v. Stewart,*
   433 F.3d 273 (2d Cir. 2006) ................................................................................. 17

*United States v. Wallach,*
   935 F.2d 445 (2d Cir. 1991) ........................................................................... 17, 21

**Rules**

Fed. R. Crim. P. 33 ................................................................................................ passim

Fed. R. Crim. P. 37 ..................................................................................................... 1

On October 14, 2022, Trevor Milton was convicted on Counts One, Three, and Four and acquitted on Count Two of the Superseding Indictment in this case. This is a timely motion for a new trial on Count Four pursuant to Federal Rule of Criminal Procedure 33 based on "newly discovered evidence"—namely, evidence that the key witness on Count Four withheld in response to a defense subpoena. As explained below, that evidence is material, non-cumulative, and would likely have led to an acquittal on Count Four.

Milton's appeal of his convictions and sentence is fully briefed and currently pending in the Second Circuit. *See* No. 24-259 (2d Cir.). The filing of a notice of appeal from a final judgment typically divests the district court of jurisdiction. *See, e.g.*, *United States v. Katsougrakis*, 715 F.2d 769, 776 (2d Cir. 1983). However, "[i]f a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending," the court may issue an indicative ruling stating "that it would grant the motion if the court of appeals remands for that purpose." Fed. R. Crim. P. 37(a). Rule 37(a) also permits a district court to deny the motion or defer consideration.

Milton respectfully requests that the Court decide this Motion on the merits now rather than deferring consideration until after the Second Circuit decides Milton's appeal. A decision now will promote judicial efficiency by allowing any appeal of this Court's ruling on this Motion to be heard and adjudicated as part of the currently pending appeal of Milton's convictions, and by potentially narrowing the issues to be decided by the Second Circuit.

## INTRODUCTION

The government obtained a wire fraud conviction against Trevor Milton based on the testimony of Peter Hicks, a wealthy real-estate investor from whom Milton bought a Utah ranch. But the defense has now learned that Hicks intentionally withheld evidence prior to Milton's criminal trial, and the suppressed evidence reveals Hicks's trial testimony was replete with lies and distortions.

Hicks's perjured testimony was critical, because the notion of a fraud with Hicks as its victim was dubious on its face: Hicks made a multi-million-dollar profit by selling the ranch to Milton, and he could have made over a million more if he had exercised the stock options Milton granted him in connection with the deal. Then, after short sellers published a report questioning the accuracy of certain of Milton's public statements, Hicks leveraged the report and ensuing federal investigations to extract millions more from Milton. When Milton stood his ground and refused further extortion attempts, Hicks sued. In short, Peter Hicks was no victim.

Hicks shored up the government's paper-thin proof of materiality and venue. But it is now clear that much of his testimony was false. After the criminal trial concluded, the federal court overseeing Hicks's civil case against Milton ordered Hicks to submit to a forensic examination of his electronic devices. That examination revealed thousands of undisclosed, relevant documents, and suggested that Hicks had affirmatively tried to *destroy* relevant text messages. Those documents and others produced in the civil case were intentionally withheld in response to Milton's Rule 17 subpoenas, no doubt because Hicks knew the documents would make it difficult or impossible for the government to obtain a conviction.

In light of this newly discovered evidence, the Court should grant a new trial on Count Four.

## FACTUAL BACKGROUND

### A.    The Superseding Indictment And Count Four

Trevor Milton founded Nikola, a company focused on creating low or zero-emission heavy-duty trucks.  On September 10, 2020, roughly three months after Nikola went public via a SPAC merger, Hindenburg Research published a report (the Hindenburg Report) claiming Milton had made deceptive statements regarding Nikola's products and technology.  This led to a sharp drop in the price of Nikola stock.

The government initially charged Milton with two counts of securities fraud and one count of wire fraud.  It alleged that between November 2019 and September 2020, Milton made misleading statements about the status of Nikola's products and technology in social media and television, print, and podcast interviews, supposedly "to induce retail investors to purchase Nikola stock."  Dkt. 1 ¶ 3.

On June 22, 2022, the government filed a Superseding Indictment adding an additional wire fraud count (Count Four), which is the subject of this motion.  Dkt. 123.  Count Four alleged that in 2020, Milton made misleading statements about Nikola to persuade Peter Hicks to sell him a Utah ranch (the "Ranch") for a combination of cash and Nikola stock options.

Hicks bought the Ranch for roughly $6.85 million in March 2020.  Tr. 2149.  Three months later, he agreed to sell Milton the Ranch for $8.5 million in cash and options to purchase $8.5 million in Nikola stock at the share price prevailing at the time of contracting.  Tr. 2068-73; GX1405.  The options could be exercised between six and seven months later.  Thus, if the stock price was above the option price any time in the exercise period, the options would be "in the money."  Otherwise, they would be worthless, as options often are.  *Id.*

The allegedly misleading statements to Hicks were primarily made in an April 10, 2020 conference call between Milton, Peter Hicks, Peter's college-aged son Lucas Hicks, and a real-

estate broker.  Unbeknownst to Milton, Lucas illegally recorded parts of the call.  The first half

of the call was either deleted or not recorded.  Tr. 2046-47, 2159; *see also* DX9000-T.  On the

call, Milton discussed the status of Nikola's technology.  The government presented evidence

that some of the statements did not accurately describe the *current* state of Nikola's business,

even if they accurately described Nikola's plans and business model, as set forth in official

company documents and public SEC filings by Nikola and VectoIQ (the SPAC that took Nikola

public) referenced by Milton.

     Milton's purchase of the Ranch closed in August 2020.  Hicks netted approximately $1.6

million cash, plus the stock options, only five months after he bought the Ranch.  Tr. 2155-56;

*see also* Tr. 2169.  Hicks's stock options were also "in the money" on multiple days during the

exercise period—even after the Hindenburg Report was released.  Hicks could have made at

least $1.25 million more if he exercised and then immediately sold the shares.  Tr. 2189-93;

DX6001.

     But Hicks chose not to exercise.  Instead, he threatened Milton with a lawsuit unless he

agreed to new transactions even more favorable to Hicks.  Tr. 2151-52, 2127-28.  In March

2021, Milton agreed to sell Hicks up to $10 million in Nikola stock at a 20% discount.  Tr. 2131-

37; GX1424.  Hicks netted roughly another $1.6 million when he sold that stock.  Tr. 2156.

Later, Hicks pushed Milton to sell him even more discounted stock, which Milton refused.  Tr.

2144-45.  After the criminal charges were filed, Hicks attempted to extract another $36 million

in profit from Milton by offering to sell him land that Hicks had bought for $3 million for $39

million, *i.e.*, a more than 1000% markup.  Tr. 2154.  When Milton declined, Hicks sued him in

Utah federal district court, demanding $45 million in damages.  *See* Complaint, *Hicks v. Milton*,

No. 2:22-cv-00166-HCN (D. Utah) (Dkt. 2) (the "Civil Case").

### B.    Peter Hicks Withheld Critical Documents Responsive To Milton's Rule 17 Subpoenas

1.    On August 29 and 30, 2022, shortly after the government filed the Superseding Indictment, Milton served Rule 17 subpoenas on Peter and Lucas Hicks.  *See* Young Decl. Exs. A and B.  The subpoenas sought, *inter alia*:

- Communications between Peter Hicks and Lucas Hicks concerning Nikola, Trevor Milton, and potential transactions with Milton (including the sale of the Ranch).

- Documents related to research and analysis of Nikola.

- Documentation of valuations of the Ranch.

- Emails to or from Hicks relating to Nikola, Milton, and the sale of the Ranch.

In response, Peter Hicks produced a trivial number of documents—under 500 pages total—mere days before trial began.  Similarly, Lucas Hicks produced only a handful of documents.[1]

2.    After the criminal trial, Milton sought similar discovery from Peter and Lucas Hicks in the Civil Case.  Ultimately, discovery there proved that Peter Hicks withheld from Milton's criminal counsel (or destroyed) critical documents plainly responsive to the Rule 17 subpoena directed to him.

Peter Hicks initially resisted producing relevant discovery, and the documents he *did* produce made it clear he had not performed an appropriate search or collection.  For example, Milton again requested communications between Lucas and Peter Hicks relating to Milton, Nikola, or the Ranch.  Although Peter eventually agreed to search and produce texts, he

---

[1] Peter and Lucas also each produced a small number of documents in response to grand jury subpoenas from the government.

produced very few documents, and no text messages from the key period between April 2020 and March 2021.  Milton also sought the same information through a subpoena to Lucas Hicks, who refused production and forced Milton to move to compel.  Eventually, Lucas produced text messages between himself and Peter that had *not* been produced by Peter.  Peter then claimed he could not produce text messages between himself and Lucas sent before July 2021 because they had been "inadvertently" deleted.  *See* Civil Case Dkt. 51 at 3; Civil Case Dkt. 51-1 at 30.  Hicks testified in a deposition that the texts were lost when he dropped his phone in sand and could not be recovered on his new phone.  Tuttle Decl. Ex. A at 99-100.  Milton has retained an information technology expert who is prepared to testify that, in his opinion, the sand explanation is fanciful, and the messages most likely "became lost or missing because they were deleted selectively by intentional user action."  Civil Case Dkt. 111-34 at 14.

Milton moved to compel and sought a forensic examination of Hicks's electronic devices and email accounts.  Civil Case Dkt. 51.  The Utah district court held that a "forensic examination is warranted based on discrepancies between the documents produced by Peter Hicks and Lucas Hicks, as well as Plaintiffs' claim that certain responsive text messages are no longer available on Peter Hicks' phone."  Civil Case Dkt. 65 at 5.  Search terms applied to the data extracted from Hicks's devices revealed almost 20,000 potentially relevant documents, including 6,000 documents housed in cloud-based storage Hicks claimed to have "discovered" only after the forensic examination.  Civil Case Dkt. 98 at 2, Civil Case Dkt. 100 at 2.  None of these documents were available to Milton during his criminal trial, because neither Peter nor Lucas Hicks produced them.

### C.    Hicks's Perjury At The Criminal Trial

    1.    <u>The Government Relied On Hicks's Perjured Testimony To Prove Materiality</u>

Materiality was hotly contested at the criminal trial.  Nikola was no fraud—it was a real company developing real zero-emission trucks.  Before it went public, sophisticated corporations that performed thorough diligence invested in the company and valued it in the billions.  *See, e.g.*, GX802.  The defense also called a Harvard economist who testified as an expert and demonstrated that Milton's supposedly false public statements—which were substantially similar to his statements to Hicks on the April 10 recorded phone call—did not influence the price of Nikola stock.  Tr. 2528-35, 2562-2602; *see also* DX955.  And it was undisputed that Nikola's public SEC filings and official company press releases discussed—accurately—the exact same topics as Milton's alleged lies.  In light of Nikola's SEC filings, the defense argued that Milton's statements were not material because (1) they wouldn't alter the overall mix of publicly available information about the company, and (2) any reasonable listener would understand Milton's statements were, at worst, overly enthusiastic descriptions of Nikola's plans for the *future*, *i.e.*, the sort of "puffing" most founders and executives do.  *See*, *e.g.*, Tr. 3104-05.

Milton's statements to Hicks on the April 10 call were even *less* likely to be material than Milton's public statements regarding Nikola.  Peter Hicks was a sophisticated professional real estate investor with a law degree (Tr. 2029, 2156, 2164), and Lucas Hicks had worked at an investment bank while studying mathematics at Yale.  Moreover, Milton specifically directed Hicks to Nikola's SEC filings during the April 10 call.  GX1400-T at 30-31; Tr. 2167-69.  Hicks understood that Nikola was a pre-revenue company that had not yet sold any vehicles, that its stock would be volatile, and that the company's value was speculative.  Tr. 2164, 2156, 2191. The purchase agreement for the Ranch contained a merger provision under which Hicks

disclaimed any reliance on extrinsic agreements or understandings.  GX1405 ¶ 8.7.  And Hicks was more focused on the cash component of the deal (Tr. 2045) and made a huge cash profit on the sale of the Ranch, after owning it for only a few months:  He got $8.5 million *plus* the stock options, after he had set $8.45 million as a target sale price.  Tr. 2169.

The April 10 phone call also plainly didn't induce Hicks to leap at the opportunity to accept Milton's offer to buy the Ranch—after the call, Hicks *rejected* Milton's offer.  He only changed his mind months later, when Milton increased the cash component above Hicks's cash target.  Tr. 2073.  Thus, the evidence suggested that the stock options were simply "gravy" on the deal, and that Nikola securities weren't material to Hicks's decision to sell the Ranch.  Tr. 3145.

So the government's proof of materiality turned substantially on Hicks's testimony.  He claimed Milton's statements during the April 10 phone call were critical to his decision to sell the Ranch because they convinced him of the value of the stock options, which Hicks said he would have otherwise believed lacked value.  Tr. 2031.  Hicks claimed he would have never agreed to the deal if not for his belief in the value of the options.  *Id.*  Hicks also claimed during the criminal trial that he never read any of Nikola's SEC filings before the Ranch sale closed in August 2020.  Tr. 2081.  When the defense asked Peter if Lucas had emailed him a link to a Nikola SEC filing, Hicks testified, "If he did, I didn't read it," and claimed to "know nothing about the SEC and how to access its information."  Tr. 2168.

That testimony was all false.

Newly discovered evidence from the Civil Case proves both Peter and Lucas Hicks accessed Nikola/VectoIQ SEC filings.  For example, on August 4, 2020, before the Ranch deal closed, Peter sent Lucas a text message asking him to ███████████████████████

8

█████ Lucas then sent ████████████████████████████████ Peter responded with ████████████████████████ :



Declaration of Curtis M. Tuttle ("Tuttle Decl.") Ex. B at LH_00000289.

On August 6, 2020, Lucas again text messaged Peter another ████████████ :



*Id.* at LH_00000291.

In addition, the forensic examination of Hicks's devices uncovered a short memo, created on August 12, 2020, analyzing Hicks's option agreement with Milton.  Tuttle Decl. Ex. C at 2. During his deposition in the Civil Case, Peter Hicks admitted he was likely the author of the memo (Tuttle Decl. Ex. A at 202-204), which included a link[2] to an SEC filing containing a prospectus which made clear that Milton's statements during the April 10 call described company *plans* rather than Nikola's current status.  For instance, the prospectus disclosed that (1) Nikola's truck reservations were "subject to cancellation by the customer" (at 38), (2) Nikola would not rollout any hydrogen fueling stations until 2022-2023 (at 151), (3) Nikola might not be able to buy electricity at the prices necessary to achieve profitability (at 37-38), and (4)

---

[2] https://www.sec.gov/Archives/edgar/data/1731289/000104746920002928/a2241585z424b3.htm.

competitors could enter the market before Nikola, and might also build hydrogen fueling stations (at 40).

These documents—which neither Lucas nor Peter Hicks produced in response to Milton's Rule 17 subpoenas prior to the criminal trial—make clear that Peter Hicks lied about the SEC filings at the criminal trial.  Indeed, during his civil deposition, Hicks was initially evasive (Tuttle Decl. Ex. A at 124, 129, 192-93, 199), but ultimately, when confronted with the withheld documents, conceded he might have read Nikola's SEC filings (*id.* at 199).

The withheld text messages also demonstrate that Peter and Lucas both understood the SEC filings contained information critical to valuing the stock options.  On April 10, 2020—the day of the recorded call—Lucas texted Peter ███████████████████████████ ████████████████████████████████. But in a subsequent text that same day, ████████████████████████████ ████████████████████████████:



Tuttle Decl. Ex. B, at LH_00000276.

The new evidence also shows that even after the Ranch deal closed in August 2020, Peter Hicks understood the value of the options was extremely volatile and could easily fall to zero.  In a September 2020 email to a business associate, Hicks characterized the value of the options as

11

"fools gold" and quipped about how their value would "Probably go[] away tomorrow."  Tuttle

Decl. Ex. D:

```
To:        frank.celeste@sothebysrealty.com[frank.celeste@sothebysrealty.com]
From:      Peter Hicks[hicksmgt@aol.com]
Sent:      Tue 9/8/2020 11:52:37 AM (UTC)
Subject:   1031

Frank
Realized over the weekend that I need to target this friday as day to get deal done. Hope you can give me something to focus on no
later than tomorrow or wednesday.

Nikola just did deal with GM so good news.  All fools gold until I can exercise options in december, but on paper I made $6.7m in 15
minutes!  Probably goes away tomorrow........

Peter
```

That contemporaneous email is consistent with the defense's argument that the stock options

were speculative "gravy" (Tr. 3145) and utterly inconsistent with Hicks's suggestion that he

wouldn't have done the deal if Milton hadn't convinced him the Nikola options were valuable.

        2.    <u>The Government Relied On Hicks's Perjured Testimony To Prove Venue</u>

The government's evidence of venue on Count Four also turned on Hicks's false

testimony.

The only states implicated by Milton's purchase of the Utah Ranch were Utah, Arizona,

and Massachusetts.  The parties to the contract and the attached option agreement were Hicks's

Utah-based LLCs and Milton's Arizona-based LLCs.  GX1405.  During the April 10, 2020 call,

Milton was in Utah and Peter and Lucas Hicks were in Massachusetts.  Tr. 2158.  Neither Hicks

nor Milton ever set foot in the Southern District in connection with the deal.

The government seemed to base venue on wire transfers Milton used to pay for the

Ranch, which may—without Milton's direction or even knowledge—have been routed through

Manhattan by J.P. Morgan ("JPM").  Tr. 3080.  But as the defense repeatedly noted (Tr. 2299-

2300, 2959-64) and the government conceded at trial (Tr. 2300-01, 2961), under controlling law only *foreseeable* conduct touching the SDNY can confer venue. On appeal, the government has again conceded foreseeability is required. *See* Brief for the United States at 43, 47, *United States v. Milton*, No. 24-259 (2d Cir. Sept. 13, 2024) ECF No. 34 ("G.Br.").[3]

So the government pursued an alternative theory of venue that turned on Hicks's testimony. Hicks claimed that even after the Hindenburg Report was released, he didn't sue Milton because he didn't yet know if Milton's April 10 statements were accurate or inaccurate, and because Milton continued negotiations with him even after the Hindenburg Report was released. Tr. 2130-31. Based on Hicks's testimony, the government claimed the later discussions—including negotiations over a stock purchase agreement ("SPA") in which Milton sold Hicks Nikola stock at a discount—was all part of a continued scheme by Milton to "lull" Hicks out of learning he had been defrauded and exposing the fraud through a public lawsuit. Tr. 2128-29, 3074; *see also* Dkt. 123 ¶ 4. The SPA was signed roughly six months after the Hindenburg Report was released, and nearly a year after the April 10, 2020 call. Tr. 2135. Nonetheless, the government used Hicks's testimony to argue the SPA was part of the alleged scheme, and that venue was proper because one of Milton's transactional lawyers was in the SDNY when she sent a few ministerial emails regarding the SPA paperwork. Tr. 2134-35, 3080-81.[4]

---

[3] The government claims in its appellate brief that Milton's JPM account had a Manhattan address. G.Br. at 18, 44. But that is demonstrably false. The mailing address connected to each of Milton's accounts was in Arizona, and the routing numbers listed on Milton's JPM-issued checks were associated with Arizona and Utah, respectively. GX1509, GX1511, GX1520.

[4] The government has relied on the same arguments on appeal to claim that the evidence of venue on Count Four was sufficient (G.Br. at 45-46) and that the Court's erroneous venue instructions were harmless (*id.* at 46-47).

But newly discovered documents from the Civil Case prove Hicks lied when he suggested Milton "lulled" him out of suing.  Rather, as soon as the Hindenburg Report came out, Hicks saw "not a financial blow for me but a benefit."  Tuttle Decl. Ex. E.  The withheld documents completely contradict Hicks's claim that he waited to sue because he hadn't yet formed a belief whether Milton had lied to him during the April 10 call, and that Milton "lulled" him with continued negotiations.  Tr. 2128-31.

For example, on September 12, 2020, two days after the Hindenburg Report was released, Peter texted Lucas, ███████████████████████████████████:



Tuttle Decl. Ex. B at LH_00000298.

That same day, Peter emailed Lucas ideas for obtaining more money from Milton in light of "this Nikola-under-investigation climate."  Tuttle Decl. Ex. E.  Peter noted there was an opportunity because Milton might "move quickly/impetuously to solve the problem."  Even at that early date, Hicks referenced the likelihood of a lawsuit, noting that if Milton did not agree to

14

amend the stock option agreement by either buying the stock options at an inflated price or selling Hicks $1/share options, "we have alternatives he will not like." *Id.* The subject line of the email was "Nikola…opportunity not financial blow."

These emails undercut the notion that the post-Hindenburg negotiations between the parties were part of a scheme by Milton. The documents prove Hicks knew he would sue Milton, but Hicks schemed to extract as much money as he could before he did so.

Hicks testified that the reason he didn't sue even after the options expired in December 2020 was because, even at that late stage, he still "did not know whether any or all of [Milton's] representations were accurate or inaccurate." Tr. 2130-31. But contrary to that fanciful claim, by the end of December 2020, Peter and Lucas were openly strategizing about the anticipated lawsuit.[5] In a December 31, 2020 email to Lucas, Peter suggested trying to convince Milton to "convey[] to me 1/4 of the option stock at no cost to me." Tuttle Decl. Ex. F at 2. An advantage of that plan, he observed, was that it would "neutralize[] any later claim that I was offered an opportunity to reduce damages and failed to do so." After Lucas responded that the plan wasn't a good idea, Peter wrote back, "Still might be an important offer to make to undercut argument that I had a chance to mitigate damages and I did not do so." *Id.* at 1. In January 2021, Hicks and his counsel held a conference call. The subject line of the calendar entry for the call was "Hicks Milton Securities Fraud Litigation." Tuttle Decl. Ex. G.

By February 2021—before the execution of the SPA that the government claimed was a continuation of a scheme by Milton—Hicks knew full well that Nikola and Milton were being

---

[5] Indeed, as early as November 2020—more than three months before the SPA was executed— Hicks was blind-copying his litigation counsel on communications with Milton. Tuttle Decl. Exs. H, I. Hicks produced these emails in response to the government's grand jury subpoenas, but he omitted the BCC line showing that the emails were being sent to his litigation counsel.

investigated for fraud.  In fact, on February 29, 2021, Hicks's wife emailed him a link to an

article titled "Nikola admits ousted chairman misled investors as legal costs mount."  Tuttle

Decl. Ex. J.  That article referenced a February 25, 2021 SEC filing in which Nikola admitted

certain of Milton's public statements, including statements that mirrored Milton's statements on

the April 10 recorded phone call, were—taken literally—untrue.  Hicks withheld the email

containing that link from Milton's criminal counsel, and then falsely testified at trial that as of

March 2021, he "still didn't know whether the representations made by Mr. Milton were accurate

or inaccurate."  Tr. 2137.

## ARGUMENT

### I.    THE NEWLY DISCOVERED HICKS EVIDENCE REQUIRES A NEW TRIAL ON COUNT FOUR

#### A.    Legal Standard

"Rule 33 of the Federal Rules of Criminal Procedure states that the district court may

grant a new trial 'if required in the interest of justice', and it specifically contemplates that such

motions may be made based on newly-discovered evidence."  *United States v. Siddiqi*, 959 F.2d

1167, 1172 (2d Cir. 1992).  "Relief is justified under rule 33 if the defendant makes a showing

that the evidence is in fact 'new', *i.e.*, it could not have been discovered, exercising due

diligence, before or during trial, and that the evidence is so material and non-cumulative that its

admission would probably lead to an acquittal.'"  *Id.* (cleaned up).  Thus, a Rule 33 motion based

on new evidence must establish five elements:  "(1) the evidence [is] newly discovered after

trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant

to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or

impeaching; and (5) the evidence would likely result in an acquittal."  *United States v. Owen*,

500 F.3d 83, 88 (2d Cir. 2007).  Where newly discovered evidence establishes perjury by a

16

witness, a defendant is entitled to a new trial if "but for the perjured testimony, the defendant would most likely not have been convicted." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (granting new trial based on witness perjury).  If the prosecution knew or should have known of the perjury prior to the conclusion of trial, reversal is "virtually automatic." *Id.*

In deciding a Rule 33 motion, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013).  As to the determinative factor—"whether newly discovered evidence would have influenced the jury"—the trial court has broad discretion. *United States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006).

**B.    Milton Satisfies All Five Elements For A New Trial Pursuant To Rule 33**

Even assuming the government was not aware of Hicks's lies at the criminal trial, Milton easily satisfies the five elements for a new trial on Count Four, and allowing his conviction to stand "would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).

1.    <u>Elements 1 & 2:  The Hicks Evidence Was Discovered After The Criminal Trial Despite Milton's Diligent Efforts To Obtain It</u>

There can be little dispute that the evidence newly revealed in the Civil Case "could not have been discovered through the exercise of due diligence before or during trial." *United States v. Parkes*, 497 F.3d 220, 233 (2d Cir. 2007).

a.    *The Evidence Was Discovered After The Criminal Trial.*

Milton only learned of the existence of the documents and communications highlighted in this Motion through discovery in the Civil Case, years after the criminal trial concluded in October 2022.  Neither Lucas nor Peter Hicks produced these documents to Milton (or, apparently, the government) in advance of the criminal trial, despite document subpoenas that

17

unambiguously encompassed them.  Nor did Milton have any independent way to know the substance of, for instance, text messages and emails exchanged between Peter and Lucas Hicks.

Indeed, Peter and Lucas Hicks tried at every turn to stymie Milton's efforts to obtain relevant evidence.  For example, after Lucas Hicks was served with a Rule 45 subpoena in the Civil Case on May 15, 2023, he refused to produce *any* documents he had not already produced in the criminal case.  Milton was only able to obtain any additional documents from Lucas by bringing a motion to compel through a miscellaneous proceeding in the SDNY.  *See In re Motion to Compel Compliance with Subpoena Directed to Lucas Hicks*, No. 23-mc-195 (JHR) (S.D.N.Y.).  And, as noted *supra* at 6, Milton was forced to obtain a court order directing a forensic examination of Peter Hicks's devices after he made the farfetched claim that documents were lost when he dropped his phone in the sand.

Hicks's admissions in the Civil Case also constitute newly discovered evidence.  Hicks testified *unequivocally* in the criminal trial that he never read SEC filings relating to Nikola.  Tr. 2081.  That claim was highly dubious under the circumstances, but Hicks stubbornly stuck to it.  *E.g.*, Tr. 2168, 2199.  Similarly, Hicks played along with the government's "lulling" theory by claiming that at the time of the SPA he still hadn't formed a belief about whether Milton's April 2020 statements were true or false and was undecided about whether to sue Milton.  Tr. 2121, 2130-31.  But in the Civil Case, Hicks admitted all that testimony wasn't true.  He conceded he might have reviewed Nikola's SEC filings.  *E.g.*, Tuttle Ex. A at 199.  And he conceded that he engaged counsel in anticipation of suing Milton almost *immediately* after the Hindenburg Report was published.  Civil Case Dkt. 49 at 3.  There can be no serious question that the evidence is newly discovered, as it flatly contradicts Hicks's criminal trial testimony.

18

b.  *Milton Exercised Due Diligence.*

With trial fast approaching after the government superseded to add Count Four, Milton served both Peter and Lucas Hicks with Rule 17 subpoenas that would have covered the documents at issue in this Motion.  Peter purported to satisfy his obligation by producing documents in response to the subpoena.  Milton had no way to know that the production was incomplete, much less that critical evidence had been intentionally withheld.  And he had no time to further investigate, given that Peter made his production mere days before the beginning of trial, and Lucas produced his documents after the trial had already begun.

2.    Elements 3, 4, & 5:  The Newly Discovered Evidence Is Material, Non-Cumulative, And Would Have Resulted In Milton's Acquittal

a.  *The New Evidence Is Material.*

The newly discovered evidence is directly relevant to key disputed issues: whether Milton's statements on April 10, 2020 were material to Hicks's sale of the Ranch and whether the SPA was an effort to "lull" Hicks.  Thus, the newly discovered evidence easily satisfies the materiality prong, which merely requires that the evidence is "relevant to the merits of the case." *United States v. Diaz*, 176 F.3d 52, 106 (2d Cir. 1999).

Indeed, the new evidence directly contradicts testimony the government elicited during Hicks's direct examination.  Hicks testified on direct that the stock options—and thus Milton's statements on the April 10 call—were critical to his decision to sell the Ranch, even though the cash he was receiving earned him a massive profit on the sale.  *E.g.*, Tr. 2031-32.  His contemporaneous admission that the stock options were "fool's gold," the value of which would "Probably go[] away tomorrow," stands in stark contrast to that testimony.  Tuttle Decl. Ex. D. And the government directly asked Hicks whether his research into Nikola "include[d] looking at SEC filings."  Tr. 2081.  He said no.  That Q&A was integral to the government's novel trial

19

theme: It didn't matter that Nikola's SEC filings disclosed the truth about the company's business and technology, because even sophisticated businessmen like Hicks don't read SEC filings. The government also elicited the details of the SPA and asked Hicks questions about his supposed disinclination to sue Milton after the Hindenburg Report in an attempt to establish the SPA as part of the alleged fraud. Tr. 2127-31, 2135-40.

Having obtained this testimony to try to prove the elements of Count Four, the government cannot now claim that the new evidence—which goes to the same issues but directly contradicts Hicks's testimony—is immaterial.

> b. *The New Evidence Is Not Cumulative Or Merely Impeaching.*

The newly discovered evidence is not "merely cumulative" of other evidence. *Siddiqi*, 959 F.2d at 1173. Hicks lied about key issues, but the documents available at trial were insufficient to bring his deception to light.

At trial, the defense attempted to cross examine Hicks on whether he or Lucas had read Nikola's SEC filings, but Hicks was evasive: He claimed he didn't "recall that" Milton had directed Hicks to the filings during the April 10 phone call, didn't know whether Lucas had read them, and wouldn't say whether Lucas had sent him a link to them. Tr. 2167-68. The newly discovered texts between Peter and Lucas Hicks, coupled with the newly discovered memo which includes a link to an SEC filing, would have definitively established that Peter and Lucas Hicks had in fact read the SEC filings. Similarly, the defense focused on whether the stock options had actually mattered to Hicks in light of the cash he received in the deal, but Hicks insisted the options, and Milton's statements, were critical. *E.g.*, Tr. 2031. The newly discovered "fool's gold" email would have powerfully undermined Hicks's testimony. And with respect to Hicks's contemplated lawsuit against Milton, Hicks claimed that even as of March 2021, he hadn't formed a belief about whether Milton had lied. Tr. 2137; *see* Tr. 2128. Hicks's

testimony was a stretch, but the defense had no way to show the jury he was lying because he had withheld documents. Those documents reflected Hicks's actual thinking in the months after the Hindenburg report was published and would have been highly potent on cross-examination.

Nor is the newly discovered evidence "merely impeaching." To be sure, the new evidence would have been devastating to Hicks's credibility, because it establishes that he is willing to lie when it suits him. Hicks not only lied on the stand, but to cover his lies he (1) affirmatively withheld evidence when responding to the Rule 17 subpoena, (2) forced Milton's civil counsel to compel a forensic examination in order to obtain documents, and (3) likely deleted relevant text messages, later claiming they had inadvertently been lost.[6] But, as discussed, the new evidence also goes squarely to "the guilt or innocence of the defendant[]," and is thus substantively significant as well. *Wallach*, 935 F.2d at 457.

c. *The New Evidence Would Likely Have Changed The Outcome.*

If defense counsel had been able to undermine Hicks's testimony with the newly discovered evidence, it "would probably have led the jury to acquit" on Count Four because the issues in dispute were critical to a conviction. *Siddiqi*, 959 F.2d at 1174. At a minimum, "there [i]s a significant chance that…counsel could have induced a reasonable doubt in the minds of enough of the jurors to avoid a conviction." *Wallach*, 935 F.2d at 456 (cleaned up). That is enough to mandate a new trial in the "interest of justice" under Rule 33.

The evidence on Count Four was hardly overwhelming. Hicks was essentially the only witness who could provide testimony relevant to that count. But the jury had ample reason to question the veracity of his story. By the time of the criminal trial, he had already sued Milton

---

[6] Hicks's obstructive approach to document discovery also raises the question whether additional exculpatory documents have been withheld or destroyed.

for $45 million and had every reason to help the government secure a conviction.  *See* Tr. 2149.

And it was undisputed that Lucas Hicks had, without Milton's knowledge or permission,

illegally recorded the April 10 phone call.  Tr. 2149.  That recording, which was the key

evidence on Count Four, was inexplicably incomplete insofar as it only preserved about half the

call.  Tr. 2163.  Aspects of Hicks's testimony were also farfetched on their face.  For instance, he

claimed Milton's statements about Nikola were critical to his decision to sell the Ranch, but even

without the stock option consideration Hicks still turned an enormous profit on the sale—more

than $1.5 million in cash—after owning the land for less than six months.

And as discussed, it was undisputed that Nikola's SEC filings *accurately* detailed the

state of the business on the subjects Hicks claimed Milton lied about, including (1) whether

Nikola's truck reservations could be cancelled, (2) the status of Nikola's electricity contracts and

production of hydrogen, and (3) the status of Nikola's hydrogen production infrastructure.  *See,*

*e.g.*, DX734 at 734-20-21, 734-24, 734-87-88.  It was therefore critical that the government

establish Hicks never looked at the SEC filings, because, by accurately describing the material

facts, those filings rendered Milton's supposed misstatements on the April 10 call immaterial in

the context of the "total mix" of information affecting Nikola's stock price.  Those filings also

demonstrated that Milton's statements on the call were clearly just optimistic statements about

Nikola's plans for the *future*, and thus not material.  Hicks testified that he "never thought" to

look at the SEC filings.  Tr. 2081-82.  But the new evidence shows Peter Hicks *did* look at the

SEC filings, as did Lucas Hicks.  And, contrary to Peter's trial testimony, they understood

Nikola's public filings were significant.  *See supra* at 11.

The supposed basis for venue in this Court was also razor thin.  The sale of the Ranch

had no obvious connection to the SDNY:  The buyer lived in Utah and Arizona, the seller was in

Massachusetts, and neither of the parties ever set foot in New York in connection with the deal. Although the government suggested—without any direct evidence—that JPM may have routed some of the cash Milton used to buy the Ranch through Manhattan (Tr. 3080, 2422; GX937), a properly instructed jury would have easily rejected this theory of venue, because it was not foreseeable to Milton that the wire transfer from Utah or Arizona to Massachusetts would touch Manhattan.[7]

So the government relied heavily on Hicks's false testimony suggesting the SPA was an effort to "lull" him from discovering the fraud. It claimed the SPA "was all part of the [fraud] scheme" and that SPA-related emails to and from Milton's transactional lawyer, who was in the SDNY, were independently sufficient to establish venue.[8] Tr. 3074, 3080-81. But the newly discovered evidence shows that Hicks planned to sue as soon as the Hindenburg Report was released—there's no truth to the claim that Milton "lulled" him out of anything. To the contrary, the new evidence shows it was *Hicks* who schemed, post-Hindenburg, to leverage the "Nikola-under-investigation climate" to get more money from Milton. The jury never saw the evidence that Hicks was executing what he called ████████████████████████ That evidence fatally undermines the theory that the March 2021 SPA was a continuation of a scheme in which Hicks was the victim, because it proves that the SPA only happened because *Hicks*

---

[7] The Court erroneously omitted the foreseeability requirement from its jury instructions on venue. Tr. 3220-21. Milton is challenging that error on appeal, and as noted above, the government has conceded that the instructions were erroneous. G.Br. at 43.

[8] On appeal, the government argues there were other SPA-related wires that supported venue in the SDNY. G.Br. at 20-21, 45-46. Those arguments rely on a misportrayal of the record. *See* Reply Brief at 27-28, *United States v. Milton*, No. 24-259 (2d Cir. Oct. 4, 2024) ECF No. 43. But even putting aside the factual errors, the government's arguments *all* turn on the false notion that the SPA was an effort by Milton to "lull" Hicks.

wanted to take advantage of Milton.  A jury presented with that evidence would have rejected the government's alternative venue argument.

Similarly, the "fool's gold" email was completely consistent Milton's defense to Count Four, and utterly inconsistent with Hicks's claim that Milton's statements made him believe in the value of the stock options and sell the Ranch as a result.  The email would have substantially bolstered the defense argument that the stock options were merely "gravy" that wouldn't have moved the needle.  Tr. 3145.

In short, the evidence in connection with Count Four was already marginal at best.  The introduction of the newly discovered evidence would have tipped the balance and led to an acquittal.

## CONCLUSION

For the foregoing reasons, the Court should issue an indicative ruling stating it would grant a new trial on Count Four pursuant to Rule 33.

Dated: November 11, 2024
        New York, New York

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Daniel J. O'Neill
Avery D. Medjuck
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880
ashapiro@shapiroarato.com
doneill@shapiroarato.com
amedjuck@shapiroarato.com

*Counsel for Defendant Trevor Milton*

24