# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

-ooOoo-

PETER HICKS, HICKS, LLC        )
and WASATCH HICKS, LLC,        )
                               )
              Plaintiffs,      )   Case No. 2:22-cv-00166
                               )
v.                             )   Judge Howard C. Nielson, Jr.
                               )
TREVOR R. MILTON, M&M          )   Magistrate Judge
RESIDUAL, LLC and T&M          )   Daphne A. Oberg
RESIDUAL, LLC,                 )
                               )
              Defendants.      )
                               )

_____

30(b)(6) AND PERSONAL DEPOSITION OF PETER HICKS
FOR HICKS, LLC AND WASATCH HICKS, LLC
Volume 1


Taken on Monday, April 22, 2024
9:36 a.m. to 5:02 p.m.


At HATCH LAW GROUP PC
22 East 100 South, Suite 400
Salt Lake City, Utah 84111



Reported by:  Abigail D.W. Johnson, RPR, CRR, CRC
CA CSR #14598

Page 1

using your phone together; correct?

A.    Correct.

Q.    Okay.  And how was the call initiated?
Like, who called who?

A.    David set it up.  David -- I think he put
Trevor on the phone first and then patched me in.  It
could have been the other way around, but I think
that's how he did it.

Q.    And if I understand right, the participants
on the call were yourself, Lucas, David Anderson,
Trevor Milton; is that right?

A.    Correct.

Q.    Nobody else?

A.    Correct.

Q.    And do you still have the phone that you
were using when you were on that call that day or have
you gotten rid of it sense?

A.    I don't have it.

Q.    What happened to it?

A.    I exchanged it for a new phone.

Q.    Okay.  How many times did you exchange for
a few phone since the phone that you had at that time?

A.    Once.

Q.    Once?  So the phone you have today is your
newer phone?

A.    Correct.

Q.    All right.  And it is also an iPhone; correct?

A.    Correct.

Q.    Okay.  Were you, I guess, communicating at all with Lucas during the call other than, I guess, separate and apart from what was being said on the phone call?  By that I mean, like, a separate, like -- texting or chatting somehow, anything like that?

A.    No.

Q.    When did you change phones?

A.    Two or three years ago.

Q.    If you could, please, just to the best of your memory, help me pin that down to a year and a month?

A.    It would have been the winter of two to three years ago.  I just don't know which.

Q.    Well, that's -- right now, it's 2024.  So you're saying it could have been in the winter of 2022 or the winter of 2021?

A.    Yes.

Q.    And how -- how would you find -- be able to find out when you -- when you switched phones?

A.    There has got to be some transaction information someplace.  I assume I bought it on a

Page 91

credit card.

Q.    Did you have anyone help you when you upgraded your phone, or is that something you do yourself?

A.    I do myself?  I don't think so.

Q.    Do you have someone help you?

A.    Yeah, I went to an Apple store.  Is that what you mean?

Q.    Yeah, I'm just trying to figure out -- some people just do it themselves, people go to the store. How did you do it?

A.    I'm really incapable of doing it myself.

Q.    Okay.  So you took your old phone to an Apple store where?

A.    Stewart, Florida.

Q.    Okay.  And do you recall the address or location of where that was?

A.    It was probably Route 1.

Q.    And you walked in and said, Give me a new iPhone or --

A.    Yeah, effectively, yes.

Q.    Okay.  And did they give it to you on the spot?

A.    I believe it was all done in one transaction.  I sat there probably -- the way that

Page 92

works with those folks, at least an hour.

Q.   And they transferred all the data from your old phone on to the new phone?

A.   I say, Here it is.  I need a new phone.  Can you do it?  And you guys can transfer it and all of that for me?  And they said yes.

Q.   And why did you need a new phone?

A.   Because I dropped my phone in the sand and it started malfunctioning.  I kept trying to use it, and it kept malfunctioning more and more and more to the point where I realized I got to pay the bill and buy a new phone.

Q.   Can you describe what you mean by "malfunctioning"?

A.   Yeah, I don't really remember anymore.  All I know is that certain things wouldn't work.  And then more things wouldn't work.  And then more things wouldn't work.

Q.   Okay.

A.   And so finally, I realized they weren't going to solve themselves, and I had to get a new -- a new phone.

Q.   Tell me, what didn't work?  Are you saying that, like, you couldn't get -- you couldn't make phone calls on the phone?

Page 93

A.    I just don't remember anymore.

Q.    Did emails work?

A.    All I remember is different things.  It wasn't just one category.  Different things weren't working.  And pretty soon, I couldn't use the thing -- that's all I remember.

Q.    Well, can you give me any details at all about what the things are that weren't working on the phone?

A.    No.

Q.    And you said you dropped it on the sand?

A.    Well, in the sand, yeah.  I dropped it --

Q.    Did it shatter or break?

A.    No, no.  What happened was the sand got all up in here.

Q.    And you are pointing to where the charging cable appears?

A.    Yeah, all of this stuff right here.  It might have got in here.  That's the only place I could think where it could breach.  It got all in here.  And I couldn't get the -- I tried to blow-dry the sand out. I tried everything I could, figuring that would potentially solve it, and nothing solved it.  And it just got progressively worse and worse.  So I couldn't use it anymore.

Page  94

Q.    There was no, like, cracks or breaks on the screen or anything like that?

A.    No, it was in the sand.

Q.    How much time passed between when you dropped it and when you upgraded the phone to a new phone?

A.    Less than a week.

Q.    Okay.  Were you unable to text on the phone?  Did that stop working?

A.    I wish I could remember the specifics.  All I know is that some things would work, other things wouldn't work, and then more and more things wouldn't work.  That's all I remember.

Q.    Okay.  And if I understood your testimony correctly, then, you didn't do anything personally to transfer data from your old phone to your new phone?  That was all done at the Apple store?

A.    Yeah, it's way beyond me to be able to do that kind of stuff.  So I give it to those guys.  I said, Guys, give me a new phone and make everything happen.

Q.    Okay.  And so after the -- the transfer, like, took place, did you notice that anything was missing on your phone that should have been on there that you took note of?

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

A.    No.

Q.    What are the issues -- you know, I was going to cover this later, but we might as well just talk about it now, one of the issues in the case that has arisen are the certain text messages between you and Lucas were lost, as we understand it, on your phone.

Can you tell me what happened there?

MR. ROBERTSON:  I'm going to object to that, just the foundation.

Go ahead.

THE WITNESS:  All I know is what I told you.  I mean, I don't know anything that was missing.  All I know is this is -- this is what happened.  And that's -- that's a fact.  I don't know what else to say.

BY MR. PACE:

Q.    So in the -- we have supplemental response to a request for production and discovery requests in this case.  I'm just going to read to you what was written in there by you or your lawyers, whoever wrote it.

It says, [reading] Plaintiffs cannot produce any text messages between Peter Hicks and Lucas Hicks exchanged prior to 2021 because plaintiffs do not

possess those text messages.  After a thorough search of his phone, Plaintiffs have confirmed that no texts between Plaintiffs and Lucas Hicks exist prior to July 2021.

Is that a true statement?

A.    It sounds accurate.  I know it's -- that sounds like the right date.

Q.    So is it your testimony that after your phone was upgraded to the new phone, that all text messages between you and Lucas Hicks were no longer on the phone?

A.    Well, that says otherwise.

Q.    It looks like prior to July 2021.

A.    My testimony is I dropped the phone in the sand.  It got mucked up.  It got worse and worse.  I got a new phone.  And I don't have any answers or explanations beyond that.  That's all I know.

Q.    Well, this is the question:  Are there text messages on your phone right now between you and Lucas Hicks that are dated prior to July 2021?

A.    You photocopied my phone.  You would know that more than I would.

Q.    I want you to answer the question, please. It was represented to us that there were none.

So I want you to confirm whether that is an

Page 97

accurate statement or you know it to be inaccurate.

A.    I think it's accurate.

Q.    Okay.  Is it your testimony under oath that there are no text messages between you and Lucas Hicks prior to July 2021 on your phone?

MR. ROBERTSON:  Objection.  Asked and answered.

BY MR. PACE:

Q.    You can answer the question.  Well, we didn't cover this, but with objections, they are for the record.  There is not the judge here to rule on them.

MR. ROBERTSON:  You can answer.

THE WITNESS:  Could you repeat it, please?

BY MR. PACE:

Q.    Yeah, is it your testimony under oath that there are no text messages on your phone right now that you have between you and Lucas Hicks that are dated prior to July of 2021?

A.    I think that is accurate.  But you folks would know better than I, because you photocopied my phone.  You know what is in it.

Q.    Well, I want to know:  Are all text messages with everyone missing on your phone prior to July of 2021 or is it just between you and Lucas?

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

A.    I don't know the answer to that question.

Q.    Have you ever noted that any text messages with anyone else other than Lucas were missing?

A.    No.

Q.    So you have all the text messages with everyone, all of your other contacts, and the only ones that were lost were between you and Lucas?

A.    I don't know the answer to that.  There may be others that are missing.  I don't know the answer because I haven't looked.

Q.    Did you delete text messages between you and Lucas?

A.    No.

Q.    Do you have any explanation for how they disappeared from your phone?

A.    I have no explanation other than dropping the phone in the sand.

Q.    In -- in one of the court filings in this case, it is Docket 52, this is what your counsel wrote, they said -- I'm going to quote from page 4 Note 16 [reading] Plaintiff Peter Hicks has since changed his phone and in the process lost text messages exchanged with Lucas Hicks.

Is that an accurate statement?

A.    So I'm told.

Page 99

Q.    Well, I don't want to have it be based on what you have been told.  I want it based on your knowledge.

Is that accurate?

A.    I think it is.

Q.    Okay.  All right.  Let's get back to --

Tell me where the beach is where you dropped your phone at.  This is really important; right?

A.    Do you want the answer?

Q.    I do want it.  I want to know.  Because I want to test your memory on this and see what the --

A.    Okay.

Q.    You know, you are telling me this -- your testimony about what happened here.  I would like some details to see how well you remember it.  So tell me where the beach is.

A.    Well, I don't know what they call the beach, but if you take a highway over the two bridges to get to the outside island, there's a Marriott resort right there.  It's on a beach there.  It was a beach there.  I don't know which grain of sand, but it was the beach there.

Q.    Were you there alone or with anyone else?

A.    With my wife.

Page 100

not what I'm saying.  But the equivalent of an employee giving -- producing -- periodically producing some data.

Q.    Okay.  Had you ever looked at anything in any of Nikola's SEC filings?

A.    No.

Q.    Nothing at all?

A.    No.

Q.    Are you certain of that?

A.    I am.

Q.    Okay.  And I guess --

A.    I guess maybe I should say I'm relatively certain --

(Clarification by the reporter.)

THE WITNESS:  I have no memory of looking at any of the -- their SEC filings.

BY MR. PACE:

Q.    Do you think it is possible you did and you just don't remember?

A.    It's unlikely.

Q.    But possible?

A.    Okay.  It's possible.

Q.    All right.

A.    Possible.

Q.    But you know your own mind, I guess.  It's

Page 124

(Exhibit No. 1A was marked

for identification.)

BY MR. PACE:

Q.    I will just represent to you Exhibit 1A

is -- this is retrieved as an archived internet website

archiving, which goes back in time to show us what a

website looked like on a certain day, of the Nikola

website that you've linked in Exhibit 1.  And attached

to it is what that looked like at the time when you

clicked on that link back then.

Do you see the pages that follow the cover

page on Exhibit 1A?

A.    I do.

Q.    Do you recognize this at all?

A.    No.

Q.    Do you have any reason to dispute that this

is what the website looked like that you accessed?

A.    No.

Q.    It has several different categories of

information available on this website that are listed,

as we can see on the menus.  There's stock information,

news events and presentations, SEC filings and

financials, corporate governance and resources.

Do you recall where you went to go find the

information that's in your email about it being 60 days

Page 128

to IPO?

A.    No.

Q.    Would you agree that it's reasonable for us to say that you would have gone somewhere on this website to find that information?

A.    I have no recollection of that email, so it's hard for me to say.

Q.    Okay.  Would you deny that you did that or would you say you just don't remember or what?

A.    I don't remember.

Q.    Okay.  Did you ever go into the SEC filing and financial section of this website?

A.    The answer is no.

Q.    Why not?

A.    Because it's the sort of thing that I -- Trevor Milton was the CEO and the founder of the company -- of a company that, for at least a moment in time, was bigger than -- a higher cap than Ford Motor Company.

I had no reason to think the guy was lying to me, not somebody at that level.  And so I didn't feel that I needed to go do research.

Q.    Did you understand at the time that -- when stock is sold publicly, that companies have requirements to report certain information in SEC

Page 129

filings?

A.    I knew that they reported stuff.

Q.    Okay.  That wasn't a foreign concept to you?  That's something you understood?

A.    By this point in time, I probably knew it. I probably did not know it prior to this because I paid no attention to the stock market at all.

Q.    Well, I was a little confused by the timeframes you were just talking about.  When are you saying that you knew about it and when are you saying you didn't know about it?

A.    Sometime before or after going to contract in June, somebody must have told me that there were SEC filings.

Q.    You know, I mean, I understand from your background, I mean, you are well educated, you did law school, experienced investor, a lot of, you know, experience in these kind of things.  You didn't -- are you telling me that you didn't understand that there is publicly available information you could look up on companies when you were investing in them?

A.    Different people are expert in different things.  I'm expert in only a couple of things, not so good in everything else.  And I knew nothing about public companies, and had no interest in public

Page 130

companies.

Q.   Okay.  So this stuff was available -- you know, going back to the website, Exhibit 1A, this information was available to you, but you didn't look into it; is that fair to say?

A.   I had absolutely no recollection of looking at SEC filings or financials.

Q.   Okay.

A.   I think that's your question.

Q.   I'm just talking about stock information, the things that are available on Nikola's investor information website.

A.   Yeah.  No -- no recollection of anything.

Q.   Okay.  All right.  Do you recall that if Teed Welch -- if you had talked to Teed Welch about this website at all?

A.   No recollection of that.

Q.   You could have, you just don't remember?

A.   I have no recollection, that's for sure.

Q.   Okay.  I -- it's part of our job to drill down on this a little bit.

A.   I understand that.

Q.   I'm just trying to understand the difference between, I -- you know, emphatically, it didn't happen, or I just don't remember.  It could have

Page 131

Do you see that?

A.    Oh, yeah, I do.

Q.    And do you recall why you were asking him to send that to you?

A.    No, I don't.

Q.    Okay.  Well, do you see down below he responds about an hour and a half later and sends you a link to sec.gov and says "page 5."

Do you see that response?

A.    Yeah.

Q.    That was a link to the SEC filings, was it not?

A.    That's what it seems to say.

Q.    And then down below your response, "Is that what actually happened because internet says June 2."

Do you see that?

A.    I do.

Q.    Does that seem to indicate you read what he sent you, page 5?

A.    No, it seems to indicate that I got impatient with him.  Don't send me links, answer my question.

Q.    Did you read what he sent you on page 5?  He says, "page 5" in his text to you.  He sends you a link and says, "page 5."  Did you read what he sent to

Page 192

you?

A.    I can only say more likely than not I did not.

Q.    Why do you say you didn't?

A.    Because I know the way I react.  I want the answer to my question.  I don't want to be doing the research.  Give me the answer.

Q.    So did Lucas communicate to you an answer other than what we see in the text here?

A.    Well, he says -- I'm sorry.  What was your question?

Q.    Yeah, you seem to be indicating that you didn't read this and you wouldn't have read it.  But what other answer did Lucas give you other than what we see on the page?

A.    I don't know, because I don't know what the next thing says, "You need to explain to me the 1.9.  I might have a theory."  I'm not sure what that is.

Q.    And then he says down below, "yes, that is what it says"; right?  Does that appear to be a reference to what he sent you above?

A.    Again, I read this to say, Give me an answer to my question.  I don't want to be reading any documents.

Q.    Okay.  Is it your testimony under oath that

Page 193

to you?

A.    I'm getting a little tired.  The bottom line is I don't -- maybe, maybe not.

Q.    Do you need a break?

A.    No, I'm just trying to remember whether we have already looked at some documents when we were talking about the $70 million.  I mean, if we were talking about it, it is more than likely that I might have asked him that.  If we weren't talking about it, no, I wouldn't have asked him that.

Q.    Okay.

A.    Or, again, it's a matter of likelihood, one case is more likely, the other case less likely.

(Clarification by the reporter.)

BY MR. PACE:

Q.    So, you know, we have gone over several of these.  I don't want to keep doing it ad nauseam here, but would you agree with me at this point that it is possible you did read some SEC filings?

A.    Unlikely.

Q.    But possible?

A.    I suppose it's possible.

Q.    Okay.  Let's look at Exhibit 68.

(Exhibit No. 68 was marked
for identification.)

Page 199

BY MR. PACE:

Q.   All right.  This is -- this is an email that Lucas sent to you on August 11th, 2020, the subject is "PSA and Option Agreement Summary and Document."  And there's attachments to it.  The following page is the -- the first attachment, which is a Word document, "WBR PSA and Option Agreement."

Do you see that page?

A.   I was reading the second page.

MR. ROBERTSON:  So all he was asking is in this email there's a link, and does that link look to be what this is?

THE WITNESS:  Okay.  Yes.  That's what it looks like.

BY MR. PACE:

Q.   Who authored this document, the summary?

A.   Well, it refers to me in the third person at least twice, so maybe it wasn't me, three times, four times.

Q.   It's coming from Lucas.  So do you think Lucas wrote it?

A.   Well --

Q.   Can I try a different question?  Did you write this?

A.   When I read it, it's more likely that I

Veritext Legal Solutions
calendar-utah@veritext.com 801-746-5080

did.  I'm just finishing it off.

Q.    I didn't mean --

A.    It does look like I wrote it.

Q.    Okay.  If you need a few more minutes or however long to review it, just let me know.

A.    Just a minute.  Very likely I wrote it.

Q.    Okay.  And I -- it appears from the document that at this time, you had a concern that Trevor might have a lock up on his shares after the merger between Nikola and the SPAC due to SEC regulations.  Is that fair to say?

A.    It looks to me like the thrust of the memo is that the option agreement screwed up the exercise period.

Q.    Because he had a lockout period that was --

A.    Which would pertain to the stock I had under option as well.

Q.    Right.  If I'm understanding what you wrote here, under the terms as an option agreement as written, your exercise period would have began in November, I believe, 1st, and ended -- it was ended in November, but at that time period, due to SEC regulations, Trevor Milton's stock would still be locked up so he wouldn't be able to deliver it to you?  Was that the concern?

Page 201

A.    Correct.

Q.    Okay.  And is that the reason why Lucas was investigating those questions and sending you SEC filings that we have looked at previous to this, was to help figure this problem out?

A.    Well, it's just how much -- how much dollars and stock he had -- didn't that number more relate to -- you can't answer questions.

I wonder whether those numbers that were alluded to earlier are about the stock he retained and when he could sell it for his own account.  I don't know if that related to what he put under option to me.  Maybe it didn't.

Q.    I thought I recalled one about a lockup area in there, but we can move past it here.  In any event, at this point, I mean, we are leading up to the fact that there was an amendment of the option agreement to address this problem.

A.    Sure.

Q.    That's what we are getting at here.  So -- but you had some concerns about that, is that fair to say, before you amended the option agreement?

A.    Yeah, the option agreement was defective in multiple ways.

Q.    Okay.  And so -- and at this time, you were

contemplating using that to gain negotiating leverage

against Trevor and put him in a difficult position;

right?

A.    There is a possibility of leverage, yes.

Q.    Okay.  Let's go to the next one, which is

69.

(Exhibit No. 69 was marked

for identification.)

BY MR. PACE:

Q.    Do you recognize this document?

A.    Well, I guess I will after I read it.

Okay, I read it.

Q.    Are you the author of this document?

A.    Likely.

Q.    Okay.  And the general topic is the same as

the last one we looked at as concerns over the exercise

period and then whether Trevor's stock was locked.

Would that be a fair characterization of it?

A.    Say that again, please.

Q.    Yeah.  I mean, the topic of this analysis

is similar to what we looked at in the last exhibit,

this concern or the option agreement as written, you

know, the exercise period coming before his lock up

expired?

A.    That was a problem.

Page 203

Q.    Okay.  And that's what you're analyzing here in the memo on Exhibit 69; correct?

A.    Yep.

Q.    And you have got a "How to proceed" section where you have got, I guess, some ideas on what to do about it where you talk about having Utah counsel write a letter to the paralegal, which I presume is Mark Gale, is that who you understand Trevor's paralegal to be?

A.    Yes.

Q.    Okay.  Indicating -- the plan was -- or the thought was to indicate that the "1031 exchange agent is asking some questions to understand the option agreement.  We could ask a series of 3-5 questions all of which you know the answers to and then bury in there this question:  Per the option agreement and merger what are the minimum and maximum number of shares."

Do you see that?

A.    Yes, I do.

Q.    And that -- so that was, I guess, a strategy you had thought up at the time and how to ask that question?

A.    Yep.

Q.    And the next page of the document you have included in the memo actually some links here, one of

Page 204

30(B)(6) Peter Hicks - April 22, 2024

them is to an SEC filing and the other is to a

Twitter -- I guess a Twitter post.  Do you see those?

        A.    I do.

        Q.    So you put this SEC filing link in your own

memo?

        A.    I don't know.  I mean, I probably lifted it

from a link that somebody else sent me.

        Q.    Would you have clicked on that and read

what's in it?

        A.    I couldn't tell you what's in it.

        Q.    No, I'm just asking -- I'm not asking you

what is in it, I'm asking did you -- would you have

clicked on it and seen what is in it?  Do you

understand the distinction?

        A.    Yeah, sure.  I don't know how -- I don't

know how they got there.  I mean, those are not --

those -- I don't have Twitter.  So if you clicked on

Twitter, I don't know whether I could even read it.

        Q.    All right, but whoever -- I mean, this is a

Word document that's all one document.

        A.    Yeah.

        Q.    It's two pages.  And you're the author of

the document, we established that; correct?

        A.    I certainly wrote the text.  I don't know

who created the links.

Page 205

Q.    All right.  And so you -- let's look at the next exhibit, which is Exhibit 70.

(Exhibit No. 70 was marked for identification.)

BY MR. PACE:

Q.    Do you recognize this email?

A.    I do.

Q.    All right.  So the -- it's -- let's just start down at the bottom.  There's an email that is from Mark Gale.  That's a paralegal assisting Trevor; correct?

A.    Correct.

Q.    And it's to Matthew Anderson.  That was your counsel here in Utah; correct?

A.    Yes.

Q.    And copied to some Nikola entitled people.  And then there's Mark Gale in this email that is providing some responses to questions that were posed to him; correct?

A.    Correct.

Q.    And the questions that were posed to him were framed as being questions posed by the 1031 exchange company; correct?

A.    Correct.

Q.    These are the four questions that you

Page 206