UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
UNITED STATES OF AMERICA :
:
   - v. - :    S1 21 Cr. 478 (ER)
:
TREVOR MILTON, :
:
               Defendant. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S MOTION FOR A NEW TRIAL ON COUNT FOUR

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
26 Federal Plaza
New York, New York 10278

Matthew Podolsky
Nicolas Roos
Assistant United States Attorneys
- Of Counsel -

---
---

# CONTENTS

PRELIMINARY STATEMENT ......................................................................................................... 1

BACKGROUND ................................................................................................................................. 1

   I.   THE WASATCH CREEKS RANCH SCHEME ........................................................................... 1

   II.   THE PURPORTED NEWLY DISCOVERED EVIDENCE ............................................................. 4

ARGUMENT ...................................................................................................................................... 6

   I.   APPLICABLE LAW ................................................................................................................. 6

   II.   DISCUSSION .......................................................................................................................... 7

      A.   The Defendant Has Not Demonstrated Due Diligence ................................................. 7

      B.   The Purported Newly Discovered Evidence Relating to Materiality Does Not Provide a Basis for a New Trial ................................................................................................... 10

         1.   The Purported Newly Discovered Evidence Relating to Materiality Is Not Material 10

         2.   The Purported Newly Discovered Evidence Relating to Materiality Was Impeaching and Cumulative ................................................................................................. 13

         3.   The Purported Newly Discovered Evidence Regarding Materiality Does Not Show Manifest Injustice .................................................................................................. 14

      C.   The Purported Newly Discovered Evidence Relating to Venue Does Not Provide a Basis for a New Trial ................................................................................................... 14

         1.   The Purported Newly Discovered Evidence Relating to Venue Is Not Material ..... 14

         2.   The Purported Newly Discovered Evidence Regarding Materiality Does Not Show Manifest Injustice .................................................................................................. 16

CONCLUSION .................................................................................................................................. 18

**PRELIMINARY STATEMENT**

On October 14, 2022, the defendant, Trevor Milton, was convicted after trial of one count of securities fraud and two counts of wire fraud. Milton has now moved for a new trial on one of the wire fraud counts—Count Four—pursuant to Rule 33 of the Federal Rules of Criminal Procedure. (Dkt. No. 345 ("Def. Mot.")). In this most recent attempt to escape the consequences of his actions, Milton argues that various emails and text messages that he has obtained in the civil suit he continues to litigate against the victim of Count Four undermine (1) the materiality of misrepresentations he made directly—on a recorded call—to his victim in order to obtain the victim's property, and (2) venue in this District over the offense. Milton's arguments misconstrue the law and, even on their own terms, find no support in the records themselves—indeed, as discussed below, the purported evidence offered by Milton only corroborates his guilt. Perhaps most importantly, though, these records in no way suggest that there has been a miscarriage of justice and that an innocent person has been convicted, as required to prevail in a Rule 33 motion; if anything, the records show the opposite. The motion should be denied.[1]

**BACKGROUND**

**I.    The Wasatch Creeks Ranch Scheme**

The evidence admitted at trial proved that Trevor Milton engaged in two overlapping criminal schemes—one to defraud retail investors in the stock of Nikola, the company Milton founded, led, and in substantial part owned, and the other specifically to defraud the seller of a

---

[1]    On December 4, 2024, the Court of Appeals granted Milton's motion to hold his otherwise fully briefed appeal in abeyance pending resolution of this motion.

1

large property, both accomplished through false, misleading, and fraudulent statements relating to Nikola's business.

Milton's pending motion specifically concerns his conviction on Count Four for defrauding Peter Hicks, the owner of a large ranch that Milton wished to obtain. (Trial Tr. 2030-148 (Hicks); GX 1400-T). After Nikola became publicly listed in 2020, Milton was subject to a lockup that prevented him from selling his Nikola stock. (Trial Tr. 1734-35 (Brady)). In order to use his Nikola stock to make purchases, even during the lockup, Milton made false and misleading statements about Nikola's business and technology to Hicks in an effort to induce Hicks to accept options to purchase Nikola stock (the value of which had already been inflated by Milton's scheme to defraud retail investors) for the purchase of a substantial ranch, the Wasatch Creeks Ranch, in Utah. (Trial Tr. 2030-32 (Hicks)). Specifically, Milton proposed to purchase the ranch by paying half the price in cash and half in the form of Nikola stock options that Hicks could exercise after Milton's stock lockup expired. (Trial Tr. 2045 (Hicks)).

Hicks was hesitant to accept stock options in a pre-revenue company as payment for real property, so Milton arranged a call with Hicks in April 2020, in order to convince Hicks to accept the Nikola stock options. (Trial Tr. 2045-46 (Hicks)). During the call, a portion of which was recorded by Hicks' son, Lucas Hicks, Milton made a number of false and misleading statements that went directly to Nikola's value as a business, similar to the exaggerations and falsehoods Milton had made to the investing public to inflate the stock price. (Trial Tr. 2046-62 (Hicks); GX 1400-T). For example, Milton falsely claimed that he could, at his election, immediately convert 80% of reservations for Nikola trucks into "hard orders," which is to say, binding contracts. (Trial Tr. 2049-50 (Hicks)). Milton also made false and misleading claims regarding the status of

2

Nikola's hydrogen production and fueling program, representing that Nikola had already begun procuring power on long-term contracts at rates that permitted hydrogen to be produced profitably. (Trial Tr. 2054-62 (Hicks)). Much like the representations he made publicly, Milton told Hicks that "we've already begun procuring power and planning stations and gobbling up the rates and taking energy from the grid, and we're already in that process right now. That's why we're going public. I mean, you can't go public on a hope and a dream, we have the largest hydrogen station in the Western world in our facility, fully operationa[l] you know, operating every day." (GX 1400-T at 22-23). As the evidence at trial demonstrated, none of these claims were true.

Ultimately, Hicks agreed to sell the ranch for $8.5 million in cash, and stock options which could be exercised after Milton's stock lockup expired, but which were valued, based on the market price for the stock, at $8.5 million. (Trial Tr. 2031-32, 2068-79 (Hicks); GX 1404, GX 1405). The transaction closed on August 14, 2020. (Trial Tr. 291 (Hicks)). Milton wired the payment from his account at J.P. Morgan Chase Bank in Manhattan. (Trial Tr. 2417-22 (Penland); GX 937, GX 1013, GX 1523). The Manhattan address associated with Milton's J.P. Morgan account was included, among other places, in documents in Milton's email account and on a later contract with Hicks directly below Milton's signature. (GX 64, GX 937, GX 938, GX 1424).

In September 2020, a group of individuals who submitted a whistleblower complaint about Milton to the Securities and Exchange Commission also published a report online alleging that "Trevor Milton and Nikola made deceptive and misleading public statements about the functionality of the Nikola One, Nikola's production of in-house parts, Nikola's production of hydrogen, and reservations for Nikola's trucks." (Trial Tr. 192-93 (Lackey); GX S-4). Following this public revelation of Milton's misrepresentations, Nikola's stock price dropped. (Trial Tr. 2121

3

(Hicks)). By this time, Milton's acquisition of Wasatch Creeks Ranch had closed, but Hicks had not yet been able to exercise his Nikola stock options because Milton's lockup had not yet ended. (Trial Tr. 2090-91 (Hicks)). Hicks was concerned that his stock options would become valueless, and contacted Milton to discuss a settlement. (Trial Tr. 2121-22 (Hicks)). Ultimately, to avoid a public lawsuit while Milton was under investigation for misleading investors, Milton agreed to pay Hicks through a circuitous route: he would sell Nikola stock to Hicks at a price 20% below the prevailing market price, so that Hicks could then sell the stock in the market for a profit. (Trial Tr. 2122-47 (Hicks)). During these negotiations, Milton communicated with his attorney and with Hicks' attorney, who were both located in the Southern District of New York, and transferred stock to Hicks' broker, who was also located in the Southern District of New York. The email correspondence included the addresses of both attorneys, and Hicks' attorney also emailed the contact card for Hicks' broker, which included the broker's address, to Milton. (Trial Tr. 2140-43 (Hicks); GX 1424; GX S-7).

## II.     The Purported Newly Discovered Evidence

With little if any relevance to the question presented by Milton's motion—which is whether he has identified any new evidence that he could not have obtained earlier with due diligence and that is material and would lead to an acquittal—Milton's motion spends much of its energy on accusing the victim of the fraud for which he was convicted in Count Four of committing perjury and intentionally withholding or destroying evidence. Milton offers no genuine factual basis for these accusations. The actual facts relevant to the purported newly discovered evidence are as follows:

- On June 6, 2022, the Government began producing discovery to the defendant concerning the Wasatch Creeks Ranch Scheme, including 3500 material for Peter Hicks. (*See* Dkt. No. 128 at 2).

4

- On June 22, 2022, the grand jury returned a Superseding Indictment, charging the defendant with wire fraud arising from the Wasatch Creeks Ranch Scheme. (Dkt. No. 123).

- On June 29, 2022, at the defendant's request, the Court adjourned the pending trial date to September 12, 2022. (June 29, 2022 Tr. 23).

- On August 29, 2022, which was more than two months after the grand jury returned the Superseding Indictment and approximately two weeks prior to the commencement of trial, the defendant served Rule 17 subpoenas on Peter and Lucas Hicks. (Young Decl. ¶¶ 2-3 & Exs. A-B).

- Following receipt of the subpoena directed to him, Peter Hicks conducted additional searches and produced additional documents to the Government, which the Government produced to the defendant. As the Government understands it, at no time did Milton's counsel contact counsel for Peter Hicks regarding Milton subpoena or Hicks's production of documents, whether to make additional demands or requests of Peter Hicks or to inquire as to the extent or methodology of Hicks's search.

- Following receipt of the subpoena directed to him, Lucas Hicks did engage with counsel for Milton. Specifically, counsel for Lucas Hicks and counsel for Milton discussed reaching an agreement to limit the scope of the subpoena. (*See* Email from Marc Mukasey to Ted Diskant (Sept. 25, 2022), attached hereto as Exhibit A). Counsel for Lucas Hicks agreed to run certain search terms across Lucas Hicks's email account, and review the results for responsiveness to Milton's subpoena and privilege, and produce non-privileged, responsive records. Counsel for Lucas Hicks refused to produce text messages in light of, among other things, the burden and costs it would impose, but acknowledged that it was possible that relevant text messages existed. (*Id.*). Counsel for Milton agreed to those limitations on the scope of the subpoena, and confirmed his understanding that Lucas Hicks would not search for or produce text messages. (*Id.*).

- During the course of discovery in civil litigation between Peter Hicks and Milton, Milton obtained additional documents from Peter and Lucas Hicks. (*See generally* Tuttle Decl.*).

- The additional documents consist largely of communications between Peter and Lucas Hicks that, as discussed further below, are cumulative and/or corroborative of documents offered during trial in this case. (*See generally* Tuttle Decl. Exs.). Of note, one document obtained by Milton and attached to his motion consists of an email from Peter Hicks to Lucas Hicks, in which Peter Hicks observes that Milton, among other things, "directly misrepresented to me the bona fides of the company" and likely would want to settle with Hicks to avoid others learning of this fact "in this Nikola-under-investigation climate." (Tuttle Decl. Ex. E).

5

**ARGUMENT**

**I.     Applicable Law**

Rule 33 provides, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009). Because motions for a new trial are strongly disfavored, "the standard for granting such a motion is strict," *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), and it should be granted only in "extraordinary circumstances," *McCourty*, 562 F.3d at 475 (internal quotation marks omitted); *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997); *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993); *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir. 1993). The "ultimate test [in deciding a Rule 33 motion] is whether letting a guilty verdict stand would be a manifest injustice . . . . There must be a real concern that an innocent person may have been convicted." *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotation marks omitted); *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). In short, a new trial should not be granted where "[i]t . . . cannot be said . . . that the evidence preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Sanchez*, 969 F.2d at 1415 (internal quotation marks omitted) (reversing grant of new trial based on trial court's determination that government witnesses gave perjured testimony).

Where a motion for a new trial is based on a claim of newly discovered evidence, the defendant bears a heavy burden, because relief may be granted only upon showing that (1) the evidence is newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the

evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal. *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013); *see also United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015).

Federal Rule of Criminal Procedure 37 permits a court, when an appeal is pending, to "(1) defer considering [a Rule 33] motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Crim. P. 37(a). In other words, "the district court retains jurisdiction to deny a Rule 33 motion during the pendency of an appeal, even though it may not grant such motion unless the Court of Appeals first remands the case to the district court." *United States v. Camacho*, 302 F.3d 35, 36 (2d Cir. 2002).

## II.     Discussion

Milton's arguments fall well short of the high burden required to obtain a new trial. Milton cannot demonstrate that he exercised due diligence in seeking to obtain the documents upon which he now relies prior to trial, much less can he show that any of the documents is material and not cumulative or merely impeaching. And certainly nothing that Milton now advances suggests that an innocent person has been convicted, and therefore his motion must be denied.

### A.     The Defendant Has Not Demonstrated Due Diligence

The Second Circuit has "long held that in order to constitute newly discovered evidence, not only must the defendant show that the evidence was discovered after trial, but he must also demonstrate that the evidence 'could not with due diligence have been discovered before or during trial.'" *Forbes*, 790 F.3d at 408-09 (quoting *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir. 1980)). Here, Milton has failed to advance facts to support a conclusion that he could not have obtained the various records attached to his motion with due diligence prior to or during trial. As

7

Milton explains in his brief, he *did* obtain these records through civil discovery, and there is no reason to think that if Milton had not actually sought to act upon his Rule 17 subpoenas or otherwise negotiate for additional disclosures from Peter or Lucas Hicks he could not have discovered these same documents. *See, e.g.*, *United States v. Bermudez*, 526 F.2d 89, 100 (2d Cir. 1975) (failure to exercise due diligence where defendant had reason to know where to seek records); *United States v. Walker*, No. 16 Cr. 327 (RA), 2021 WL 2349985, at *4 (S.D.N.Y. June 9, 2021) (defendant failed to demonstrate due diligence even where he made a discovery demand and served a subpoena because the "exercise of some diligence in discovery does not require the Court to separately conclude that [the records] 'could not have been discovered, exercising due diligence, before or during trial'" (quoting *United States v. Zagari*, 111 F.3d 307, 322 (2d Cir. 1997))).

Milton attempts to suggest that he exercised due diligence by characterizing his efforts as follows: "On August 29 and 30, 2022, shortly after the government filed the Superseding Indictment, Milton served Rule 17 subpoenas on Peter and Lucas Hicks." (Def. Mem. 5). In fact, Milton served those subpoenas nearly three months after the Government began producing discovery regarding the Wasatch Creeks Ranch scheme, more than two months after the Superseding Indictment was returned, and only two weeks prior to the start of trial, despite obtaining a two-month adjournment of trial specifically to prepare to respond to this charge. Indeed, Milton's assertion now that "he had no time to further investigate, given that Peter made his production mere days before the beginning of trial, and Lucas produced his documents after the trial had already begun" (Def. Mem. 19) entirely omits the relevant context that it was *Milton*

8

who chose to serve subpoenas only two weeks before trial began, and made no complaint or effort to obtain additional time.

What is more, with respect to Peter Hicks, as described above, Milton never contacted counsel and made no effort to follow up or request disclosures after receiving what Milton now characterizes as minimal productions. With respect to Lucas Hicks—and the very text messages upon which Milton now relies as newly discovered evidence—Milton agreed to limit the scope of his subpoena and not to seek to obtain text messages. (*See* Ex. A). Indeed, it appears that Milton has waived any claim with respect to this evidence, inasmuch as he made the strategic decision not to seek the evidence during trial. *Cf., e.g.*, *United States v. Kon Yu–Leung,* 51 F.3d 1116, 1122 (2d Cir. 1995) ("If . . . the party consciously refrains from objecting as a tactical matter, then that action constitutes a true "waiver," which will negate even plain error review."); *United States v. Coonan,* 938 F.2d 1553, 1561 (2d Cir.1991) (holding that, where appeal attempts "to evade the consequences of an unsuccessful tactical decision ... we have no difficulty concluding that [appellant] has waived review" of claim); *see also United States v. Krankel,* 164 F.3d 1046, 1053 (7th Cir. 1998) (noting particular reluctance to find plain error when defendant fails to object at trial "because of a tactical decision"). At any rate, the very fact that Milton continued to seek additional discovery from Peter Hicks and Lucas Hicks in his civil case demonstrates that he was well aware that additional materials might exist and that Milton cannot now point to facts sufficient to demonstrate that he exercised due diligence in seeking these records prior or during trial.

### B. The Purported Newly Discovered Evidence Relating to Materiality Does Not Provide a Basis for a New Trial

#### 1. The Purported Newly Discovered Evidence Relating to Materiality Is Not Material

Relief under Rule 33 "should not be granted unless the new evidence is material to the verdict," and "[i]n this context, evidence is not to be considered 'material' unless 'its admission would probably lead to an acquittal.'" *United States v. Lozano-Reyes*, 101 F.3d 686, 1996 WL 313934 (Table), at *2 (2d Cir. 1996) (quoting *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir. 1992)); *see also United States v. Udogwu*, 39 F. App'x 664, 645 (2d Cir. 2002) (Rule 33 motion may be granted only where "the evidence is so material that it would probably lead to an acquittal"); *United States v. Abakporo*, No. 12 Cr. 340 (SAS), 2014 WL 2608857, at *2 (S.D.N.Y. June 9, 2014) ("evidence must be material to the issue of guilt"). Milton contends that the purported newly discovered evidence undermines the materiality element of his wire fraud conviction because, according to him, the evidence suggests that Peter Hicks read certain SEC filings, which (again, according to Milton) were accurate, and therefore undermines the materiality of Milton's concededly false and inaccurate statements. This argument misapprehends the law and finds no plausible support in the documents themselves.

*First,* the element of materiality for wire fraud is assessed objectively, by asking whether "the misinformation or omission would naturally tend to lead or is capable of leading a reasonable person to change his conduct." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (internal quotation marks, alterations, and citation omitted). And the argument that a reasonable person would have read the SEC filings and, based on those filings, not have been misled by Milton's misstatements, was already repeatedly put to the jury during trial, and evidently rejected. For this reason, all of the evidence in the world that Peter Hicks read SEC filings could not possibly be

10

material to the element of materiality: the jury has concluded that, notwithstanding that the SEC filings were publicly available, the misinformation provided by Milton was still capable of leading a reasonable person to change his conduct.

This result is no surprise because, no matter how many times and how forcefully the defendant made the argument to the jury that SEC filings somehow rendered his misstatements immaterial, the argument is still illogical and unconvincing. First of all, whatever the SEC filings may contain, common sense instructs that when the founder and chief executive of a company provides additional, specific information about the company, it is perfectly reasonable to take that information into account. That is precisely the reason that Milton was repeatedly advised by others at Nikola that he had to be just as accurate in his public statements as Nikola was in it public filings, that Milton made false and misleading statements to begin with, and that Milton credited himself with boosting the stock price through his misstatements. The idea that an executive could specifically mislead an investor or anyone else by lying about what was happening inside the company and then claim that the lies were immaterial because the company also made filings with the SEC that were not inaccurate is easily rejected as a matter of common sense and logic, just as the jury did.

Moreover, the SEC filings themselves do not support this argument. For example, Milton points to this statement in one of Nikola's filings:

> Our initial plan for the station rollout begins with an eight-ton pilot station accessible to the AB brewery in Van Nuys, California. From there, we then plan to build up to 10-12 additional stations in California. These stations will supply fuel for our launch customers in those geographies that have dedicated routes in California. California is offering incentives to build out our hydrogen fueling infrastructure and deploy zero-emissions vehicles, including

11

>     opportunities for funding along major freeway corridors. We expect
>     to rollout these stations in 2022-2023.

VectoIQ Proxy Statement (May 8, 2020). (*See* Def. Mem. 10). Nothing in this disclosure undermines or renders immaterial the following, entirely inaccurate, recorded statement by Milton, Nikola's founder and chief executive, to Hicks:

> P. HICKS:     Now, Trevor, this is the plan. I mean, you're not gobbling it up right now because that would be getting too far ahead of yourself, or are you?
>
> MILTON:       No, we are on certain routes. So from LA to Phoenix we're already doing that, that's where AB InBev is with Anheuser-Busch. So they've already given us their routes –
>
> P. HICKS:     Okay.
>
> MILTON:       – and on those thirteen routes, we've already begun procuring power and planning stations and gobbling up the rates and taking energy from the grid, and we're already in that process right now. That's why we're going public. I mean, you can't go public on a hope and a dream, we have the largest hydrogen station in the Western world in our facility, fully operationa – you know, operating every day.

(GX 1400-T at 22-23). Nor, for further example, does a disclosure that competitors might also come into the market, which could adversely affect Nikola's business. (*See* Def. Mem. 11). In short, Milton's materiality theory—already rejected by the jury—is neither plausible on its face nor aided by additional documents that, according to Milton, show that Peter Hicks read SEC filings.

*Second*, the documents offered by Milton do not actually demonstrate that Peter Hicks read or appreciated any filings that would have some relevance to what Milton told him. In fact, as the documents show on their face, they largely concern procedural matters, like the timing of option

grants, not the description or substance of Nikola's business. For example, Milton points to text messages with Lucas Hicks, wherein Peter Hicks asks for a document to show when Nikola merged with VectoIQ, Lucas Hicks provides a link to an SEC filing, and Lucas Hicks directs Peter Hicks to the date of merger. (Def. Mem. 9 (excerpting Tuttle Decl. Ex. B)). A second message emphasized by Milton similarly shows nothing more than Lucas Hicks providing a link to an SEC filing on a topic that has no bearing on Milton's false and misleading statements. (Def. Mem. 9-10). Milton next points to a memo that contains a link to an SEC filing, perhaps written by Peter Hicks, that once again deals with the technicalities of the stock transfer and not with anything relevant to the misrepresentations made by Milton. (Def. Mem. 10-11 (discussing Tuttle Decl. Ex. C)). Milton goes onto rely on text messages from Lucas Hicks in which Lucas Hicks mentions a document he observed on Nikola's investor webpage (Def. Mem. 11 (excerpting Tuttle Decl. Ex. B)), and an email from Peter Hicks where he (accurately) observes that no increase in value in Nikola's stock can actually benefit him unless the stock remains at a high price at the time that he exercise his options (Def. Mem. 12 (excerpting Tuttle Decl. Ex. D)).

None of these assorted documents in fact demonstrate that Peter Hicks was reading or focusing on SEC filings, let alone comparing them to Milton's false and misleading statements. These documents are not material to Milton's conviction on any element, including materiality.

### 2. The Purported Newly Discovered Evidence Relating to Materiality Was Impeaching and Cumulative

Even if the documents offered by Milton were probative in some way, they would still be merely impeaching and cumulative, and therefore not a basis for a new trial. Indeed, inasmuch as these documents do not actually reference or bear on Milton's misrepresentations in anyway, all that they could be used for would be to seek to impeach Hicks's testimony regarding his use (or

13

nonuse) of SEC filings. And even on that count, these documents are cumulative. In fact, despite Milton's professed shock at discovering these documents, he apparently was already aware of their substance, given that, on cross-examination, Hicks was asked, "Are you aware that your son sent you a link to the SEC, correct, the SEC website?" (Trial Tr. 2168 (Hicks)).

### 3. The Purported Newly Discovered Evidence Regarding Materiality Does Not Show Manifest Injustice

Finally, the scattered links to SEC filings and other various documents relied upon by Milton here do not make out a showing of manifest injustice. As Milton rather breezily acknowledges, "[t]he government presented evidence that some of the statements did not accurately describe the *current* state of Nikola's business." (Def. Mem. 4). Another way to phrase this concession is that Trevor Milton defrauded Peter Hicks by giving false assurances about the success of Nikola through multiple, specific lies regarding the state of Nikola's business. These lies were directly responsive to the exact questions that Peter Hicks was asking in an obvious attempt to assess the value of Nikola stock options. Nothing in the documents appended to Milton Rule 33 motion suggest that there has been a miscarriage of justice or that an innocent person has been convicted.

### C. The Purported Newly Discovered Evidence Relating to Venue Does Not Provide a Basis for a New Trial

#### 1. The Purported Newly Discovered Evidence Relating to Venue Is Not Material

Milton argues that he has also unearthed evidence undermining one of the two bases for venue for Count Four. In particular, Milton contends that the wires he sent to pay Hicks not to bring a public lawsuit could not be in furtherance of efforts to hide Milton's scheme to defraud because these new documents show that Hicks himself "leveraged the report and ensuing federal

14

investigations to extract millions more from Milton." (Def. Mem. 2). Once again, the law and facts do not support these claims.

*First*, Milton's argument that Hicks thought that he might stand to benefit by Milton having to pay him to forestall public disclosure of the fraud is wholly beside the point. A wire that is sent after a victim is deprived of money or property is still in furtherance of the scheme to defraud where the wire was "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely." *United States v. Lane*, 474 U.S. 438, 451-52 (1986); *see also, e.g.*, *United States v. Rutigliano*, 790 F.3d 389, 396-98 (2d Cir. 2015) (venue proper based on mailings sent to ensure that defendants would continue to receive benefits and prevent discovery of fraud); *United States v. Scop*, 846 F.2d 135, 138-39 (2d Cir. 1988) (acts taken for the purpose of either "executing the scheme or 'lulling' victims to prevent them from complaining to the authorities" constitute conduct in furtherance of the scheme). The question, therefore, is whether *Milton* intended the payment to prevent Hicks from complaining to authorities or otherwise to forestall discovery of the fraud, not whether Hicks thought it was likely that Milton would decide to pay him. For this reason alone, the documents that Milton offers, even under the characterization provided by Milton, are irrelevant.

*Second*, the records themselves are certainly not material to a claim that there was no venue under a lulling theory; if anything, the Government's theory is forcefully corroborated by this evidence. Milton focuses principally on two documents on this topic. Milton first offers a text message from Peter Hicks to Lucas Hicks, written two days after the Hindenburg Report was published, in which Peter Hicks writes, "[m]y virtuoso performance re wcr has a third act. Call."

15

(Def. Mem. 14 (excerpting Tuttle Decl. Ex. B)). Milton offers no coherent explanation for what this text message means, let alone any cognizable connection to Milton's actions, many months later, to pay off Hicks.

Milton next points to an email written that same day from Peter Hicks to Lucas Hicks with the subject line "Nikola…opportunity not financial blow." (Def. Mem. 14-15 (describing Tuttle Decl. Ex. E). As it happens, this email provides a surprisingly accurate description of how Milton would ultimately seek to pay off Hicks in furtherance of the fraud scheme. Hicks observes that "[o]ne of the last things [Milton] wants the public or the short accuser additionally knowing in this Nikola-under-investigation climate is that" Milton, in addition to improperly circumventing his stock lock-up, "directly misrepresented to me the bona fides of the company in numerous conversations." (Tuttle Decl. Ex. E). Hicks concludes that Milton may act quickly or even "impetuously" to try to settle with Hicks to avoid claims while under scrutiny by the SEC and the public. (Tuttle Decl. Ex. E). This email is no way exculpates Milton; all it does is provide corroboration of Hicks' understanding that Milton lied to him and would seek to make a payment to him in an effort to prevent disclosure of his fraud, which is precisely the reason that the payments were in furtherance of the scheme to defraud and therefore a basis for venue.

### 2. The Purported Newly Discovered Evidence Regarding Materiality Does Not Show Manifest Injustice

Even if the purported newly discovered evidence regarding venue were not inculpatory (or at most neutral), it certainly would not demonstrate that an innocent person was convicted. As an initial matter, it is difficult to see how evidence regarding venue could ever give rise to a new trial on the basis of newly discovered evidence, since such evidence does not go to guilt or innocence. The law is clear that "venue is not an element of a crime," *United States v. Colange*, 74 F.4th 31,

34 (2d Cir. 2023), and, as the Court of Appeals for the Tenth Circuit has explained, "[v]enue is, of course, unlike the substantive facts which bear on guilt or innocence in the case," *Wilkett v. United States*, 655 F.2d 1007, 1011 (10th Cir. 1981). Indeed, "[v]enue is wholly neutral; it is a question of procedure, more than anything else, and it does not either prove or disprove the guilt of the accused." *Id.* Thus, analogously, a defendant may not avoid procedural default by claiming actual innocence in order to collaterally attack a conviction under Section 2255 for lack of venue where he or she has failed to raise the claim on direct appeal because, "[e]ven if venue were improper, it would not tend to show that [the defendant] was innocent." *United States v. Marley*, Nos. 21 Civ. 4725 (VEC), 16 Cr. 374 (VEC), 2022 WL 1210844, at *11 (S.D.N.Y. Apr. 25, 2022). "Venue has to do with the place the crime occurred, not whether the Defendant committed a crime." *Id.* So too here: Milton cannot claim innocence based on new evidence of venue and therefore he cannot receive a new trial under Rule 33 based on newly discovered evidence.

But even if a new trial could be available based on new venue evidence, and even if the evidence obtained by Milton were actually material to venue, his claim would still fail for the simple reason that the evidence adduced at trial established an entirely separate basis for venue for Count Four. As noted above, Milton wired the payment for Wasatch Creeks Ranch—clearly a wire in furtherance of his scheme to defraud Hicks of the ranch—from his own (i.e., Milton's) account at J.P. Morgan Chase Bank in Manhattan. (Trial Tr. 2417-22 (Penland); GX 937, GX 1013, GX 1523). Milton seeks to cast aside this evidence based on an assertion—not in any way supported by his purported newly discovered evidence—that "it was not foreseeable to Milton that the wire transfer from Utah or Arizona to Massachusetts would touch Manhattan." (Def. Mem. 23). Milton states, *ipse dixit*, that this wire may "have been routed through Manhattan by J.P. Morgan"

17

"without Milton's direction or even knowledge." (Def. Mem. 12). The actual evidence at trial was otherwise: the Manhattan address associated with Milton's J.P. Morgan account was included, among other places, in documents in Milton's email account and on a later contract with Hicks directly below Milton's signature. (GX 64, GX 937, GX 938, GX 1424). And even if Milton managed never to read any of the documents in his possession alerting him to the fact that his account (at a bank well-known to be based in Manhattan) was located in Manhattan, that is of little moment because Milton was certainly capable of foreseeing the fact that a wire he sent may travel from or to his account in Manhattan, even if he was not actually aware of that fact. Moreover, that evidence was admitted at trial and put before the jury, which convicted Milton, and Milton points to no new evidence relating to this wire, and therefore has advanced no basis for a new trial under Rule 33.

## CONCLUSION

For the reasons set forth above, the defendant's motions should be denied.

Dated: New York, New York
December 12, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York

By:   \_\_s/_____
Matthew Podolsky
Nicolas Roos
Assistant United States Attorneys
26 Federal Plaza
New York, New York 10007
Telephone: (212) 637-1947/2421

18