

| 1140 Avenue of the Americas, 17th Floor, New York, NY 10036 |
| phone: 212-257-4880 | fax: 212-202-6417 |
| www.shapiroarato.com |

## MEMO ENDORSED

Alexandra A.E. Shapiro
ashapiro@shapiroarato.com
Direct: 212-257-4881

December 6, 2024

<u>VIA ECF</u>

The Honorable Edgardo Ramos
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

> Milton's motion to seal is deemed withdrawn.
> SO ORDERED.
>
> _____
> Edgardo Ramos, U.S.D.J.
> Dated:  1/13/2025
> New York, New York

     Re:    *United States v. Trevor Milton*, 21-cr-478 (ER)

Dear Judge Ramos,

     We write to respectfully withdraw our prior request (Dkt. 348) for leave to file under seal Exhibit B to the Declaration of Curtis M. Tuttle and the unredacted version of Defendant's Memorandum of Law in support of his Motion for a New Trial on Count Four.

     Mr. Milton previously requested permission to file these documents under seal solely because they either consisted of, or excerpted, a document designated "Confidential Information" by Lucas Hicks in *Hicks v. Milton*, No. 2:22-cv-00166-HCN (D. Utah).  As explained in Mr. Milton's request to seal, that document should not have been designated confidential because it does not contain any information meriting such treatment.

     After Mr. Milton requested sealing here, the entirety of the information contained in Exhibit B was unsealed and placed on the public docket in *Hicks v. Milton*.  *See* 2:22-cv-00166-HCN (D. Utah), Dkt. 137-6.  Unsealing occurred after Lucas Hicks was given an opportunity to seek sealing but declined to do so.  *See id.* at Dkt. 145.

     Now that the information contained in the documents for which sealing was previously requested is publicly available, there is no possible basis for those documents to be sealed here. Thus, we respectfully withdraw the request to seal and have attached to this letter unredacted versions of Exhibit B to the Tuttle Declaration (previously docketed as a slipsheet at Dkt. 347-2) and Defendant's Memorandum of Law (previously docketed in redacted form at Dkt. 345).

              Respectfully submitted,

              /s/ Alexandra A.E. Shapiro

              Alexandra A.E. Shapiro

# Exhibit B

Apr 8, 2020 at 2:45 PM

Trevor Milton
Nikola motors

Exhibit

35

20th Mar 2024

what about him

Unique offer on ranch

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER          LH_00000275

Apr 10, 2020 at 5:10 PM

Ask for the football field or access to the data room that they gave fidelity

Him giving you the investors page on their website is retarded

Actually wait nvm they have some valuation on one of these presentation

Hold off on that

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000276

Apr 13, 2020 at 7:52 PM

What happens if you do the deal and then the transaction doesn't close?

Unlikely but worth protecting against

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000277

Apr 22, 2020 at 6:36 PM

# Nikola gets $4 million pandemic loan, as patent lawsuit against Tesla continues

The Verge

News

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Apr 30, 2020 at 10:20 PM

I know you said you don't like videos but I'm happy to have my video people tweak the video (so it looks different than during listing period) and let you use it.  I'll just have you pay whatever they charge me, which probably would only be a few hundred bucks.  My original video cost me over $2,000 and there is some great drone footage.  Maybe you could even have Lucas help you create a little website about your ranch.  Makes it look even that much more legit.  I just google www.wasatchcreeksranch.com and that domain seems to be available.  Basic websites are super cheep these days.  And you could embed the video if you end up doing that.

Thanks. Will talk with Lucas

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

seems to be a lot of buzz around the stock

maybe we do it

too strong of a signal

What does that mean?

May 12, 2020 at 1:53 PM

i think you have to do it at 7.5 base

assuming the diligence doesn't run forever

kind of a no brained

brainer

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000280

Go for deal?
Teed is studying

see if you can get a higher floor

maybe 700k shares

with 8.5 floor

No higher floor

If he buys in with stock so high I don't see why he would do the deal except if he sees balance for both sides. If he gets a  $10m property for $7.5m where the stock goes down that might be worth it to him.

Stock is at $24.60

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

May 11, 2020 at 10:59 PM



Wasatch Creeks Ranch

youtu.be

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000282

Jun 4, 2020 at 6:20 AM

Sent you a bunch of Monday emails with due diligence materials. You should take a glance to understand and ask me questions but main point is to organize into one exhibit with table of contents which we can send to Trevor and periodically update.

Ask me for hatch map and let's figure how to scan or photo to make part of exhibit

How to fund the stock purchase? Put 8.5 mil cash in the same 1031 account and use to buy stock and then sell all stock and have total cash in 1031 account

Jun 4, 2020 at 8:07 AM

Jun 4, 2020 at 12:30 PM

Stock at 35.79

Don't watch

It won't make you happy

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Jun 8, 2020 at 6:15 PM

Stock in after hours at 92

lol

after hours is meaningless

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER                    LH_00000284

Jun 9, 2020 at 3:19 PM

# Nikola founder: We want to crush the Ford F-150

finance.yahoo.com



DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000285

Jun 9, 2020 at 10:29 AM

Stock way up again

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000286

Jul 22, 2020 at 12:52 PM

Nikola is now 20 per cent over my option price

Jul 23, 2020 at 7:54 AM

**Nikola Has a Bright Future, So Buy Nikola Stock on Weakness**

investorplace.com



DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER        LH_00000287

Aug 2, 2020 at 6:58 PM

# Why Nikola Decided to Merge With a SPAC. And Why More Such Deals Are Coming.

Barron's

News

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000288

Aug 4, 2020 at 5:21 PM

Send me evidence what day Nikola merged

Aug 4, 2020 at 6:51 PM

sec.gov 

page 5

Is that what actually happened because internet says June 2

You need to explain to me the 1.9. I might have a theory

yes that is what it says

ok do i have to explain right now

No but I have a meeting on it tomorrow morning

with who

what time

Aug 6, 2020 at 8:38 AM

## For Nikola stock, no news was not good news

marketwatch.com



DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

150 days

for which

30 day exercise period starts running 150 days from June 2

then we're good i think

because his has to be 180 or more i think

will have to find

Aug 6, 2020 at 9:03 PM

Check email

Confirmation that Milton can only sell $70m of shares after 180 days

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Aug 6, 2020 at 3:06 PM

sec.gov 

all in that link

wait what about his other 7 million shares that he could buy at $10?

like 6 months after close or something

Call

150 days

for which

30 day exercise period starts running 150 days from June 2

then we're good i think

because his has to be 180 or more i think

will have to find

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER                    LH_00000292

**Nikola Stock Shoots Higher Because Companies Might Actually Want What It's Selling**

Barron's

 News

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER      LH_00000293

Aug 21, 2020 at 6:38 PM

Nikola Stock Is a Remarkably Effective Hedge Against Tesla

investorplace.com



DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000294

trevor email is sick

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000295

**Nikola Founder Giving 50 Employees $233 Million of His Stock**

Bloomberg

 News

They don't like Trevor

Sweet me neither

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000297

Sep 12, 2020 at 8:16 AM

My virtuoso performance re wcr has a third act.  Call

Sep 12, 2020 at 11:12 AM

Call

Sep 12, 2020 at 3:50 PM

**General Motors' Deal With Nikola Could Double Its Stock Price**

Barron's

 News

Sep 14, 2020 at 8:22 AM

**General Motors' Deal With Nikola Could Double Its Stock Price**

barrons.com



Barrons keeps following this. Why don't you sign up to get articles

Sep 14, 2020 at 9:50 AM

**Nikola: Assessing Defense Strategy And Potential Fallout From Shortseller Accusations...**

seekingalpha.com



Sep 15, 2020 at 9:58 AM

**Nikola Is Only as Strong as Its Tech Partnerships**

wsj.com



DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000299

Don't forget to email Trevor back

Sep 16, 2020 at 3:01 PM

**General Motors: Nikola Deal Shines The Spotlight On The Opportunity For Value Unlock...**
seekingalpha.com 

DESIGNATED CONFIDENTIAL  NFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER          LH_00000300

Sep 20, 2020 at 8:42 AM

# Why A Nikola Short Squeeze Could Be Coming 'Very Soon'

finance.yahoo.com



DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Sep 22, 2020 at 6:51 AM

Nikola Founder Trevor Milton Is Out. Wall Street Tries to Make Sense of the Chaos.

barrons.com



DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000302

Sep 25, 2020 at 11:46 AM

Any response from trevor?

Sep 25, 2020 at 2:12 PM



Call

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Oct 19, 2020 at 10:06 AM

**Nikola stock extends selloff, but J.P. Morgan said GM partnership still likely**

marketwatch.com



Ya saw that

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Oct 19, 2020 at 3:48 PM

What a New GM Deal With Nikola Could Look Like. And What Happens Without One.

barrons.com



DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000305

Nov 18, 2020 at 9:31 PM

If Trevor offered me stock value right now would you take it?

Depends

Need to discuss

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Nov 19, 2020 at 4:10 PM

Trevor just called. He think our strike price is $31. Offering to give to me for free 10% off

My guess is that the Chances are good he will not deliver the stock per options.

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000307

Nov 24, 2020 at 7:49 PM

**Nikola Stock Is Like a Runaway Truck. Options Markets Imply More Big Moves.**

Barron's

News

REDACTED - ATTORNEY CLIENT PRIVILEGED

Nov 25, 2020 at 6:12 AM

Tip-off we have that no one else has

Nikola

If we offer to sell shares to Trevor and he buys then he likely is not selling his position which is what they are talking about on CNBC.

Dec 8, 2020 at 10:08 AM

See emails re Trevor

What about

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

He is holding his stock and even sounds like he locked it up more
Also talks about his ranch deals

No sell might help stock
More information on ranch deals might help us too

Maybe

DESIGNATED CONFIDENTIAL NFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER    LH_00000310

Dec 10, 2020 at 10:53 PM



**Nikola founder whittles holdings in electric truck startup**

freightwaves.com

Why are you sending me this

A tiny bit more info on stock sold. It appears that they did not report my transaction because the share count does not add up. That is to be expected but we weren't sure

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Dec 29, 2020 at 4:09 PM

Can u tell me what was the stock daily low for nikola each of the last 3 days?

Stock was down to 13.75 at one point yesterday

Or rather on Christmas eve

Ok

Dec 29, 2020 at 6:29 PM

I am using $13.75 in my letter to Trevor. Saying that is low point in the last week. Is that right?

It touched 13.51

And closed that day at 13.75

This was Christmas eve

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Case 1:21-cv-00123-DBB Document 58 Filed 01/13/25 Page 41 of 96

Trevor has now sent email looking for answer

No time <u>until 3:30</u> at the earliest

Likely will be able to speak at approx <u>3:40pm</u>

REDACTED - ATTORNEY CLIENT PRIVILEGED

Do it

Ok

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Dec 30, 2020 at 3:46 PM



Ready?

Will call you soon

Ok

REDACTED - ATTORNEY CLIENT PRIVILEGED



Yes

Call me

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Jan 13, 2021 at 7:35 PM

Listing jron for $10m with David

Interesting

More than wcr

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000315

Trevor and I have a tentative deal

Kewl



DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Feb 23, 2021 at 8:47 AM

Please do final assessment Trevor deal is safe enough to do

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000317

Feb 25, 2021 at 8:08 AM

Just realized Trevor will likely propose average of 5 day trailing. If Thursday and Friday do not change from Wednesday close where would that put us?

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000318

Mar 2, 2021 at 6:29 PM

Trevor called. All the stock has left his account.

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000319

Mar 5, 2021 at 10:14 AM

Nikola at 15.07

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000320

Aug 16, 2021 at 10:36 PM

Reminder Trevor notes

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Sep 2, 2021 at 6:09 PM

Trying to figure out the length of the call with Trevor on April 11. We know it started around 9;45 am because that is your note. Won't your file indicate when you closed and saved it?

That's most likely when it was last saved

I thought it was at night

Idk

If you look at your note at the top it says April 11,2020 at 9:45 am. Is that just an automatic computer thing saying when you closed it out?

I believe so

Will test it soon

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

R u doing Trevor stuff?

Sep 19, 2021 at 4:44 PM

REDACTED - ATTORNEY CLIENT PRIVILEGED

Will call later

Sep 20, 2021 at 7:57 PM

When do u think!

Grinding

Can't be tonight

Ok

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Jan 9, 2022 at 1:03 PM

Reminder to look at Trevor complaint

Looking now

Jan 9, 2022 at 8:15 PM

Any comments re Trevor complaint?

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Feb 8, 2022 at 11:53 AM

Please call

Feb 8, 2022 at 1:44 PM

REDACTED - ATTORNEY CLIENT PRIVILEGED

Kk

Call me then

Ok

Feb 8, 2022 at 3:32 PM

Are we talking?

REDACTED - ATTORNEY CLIENT PRIVILEGED



DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Feb 15, 2022 at 2:27 PM

About to send proposal out to Trevor
Any comments?

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER    LH_00000326

Mar 7, 2022 at 10:12 AM

REDACTED - ATTORNEY CLIENT PRIVILEGED

Mar 7, 2022 at 12:15 PM

As the crow flies 24 miles

REDACTED - ATTORNEY CLIENT PRIVILEGED

Mar 8, 2022 at 10:13 AM

Getting back to Trevor today?

Mar 8, 2022 at 11:27 AM

Yes or late yesterday

Mar 8, 2022 at 4:41 PM

Sent to you an initial draft and then a revised

Sent my comments

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Mar 8, 2022 at 10:13 AM

Getting back to Trevor today?

Mar 8, 2022 at 11:27 AM

Yes or late yesterday

Mar 8, 2022 at 4:41 PM

Sent to you an initial draft and then a revised

Sent my comments

Ok. REDACTED - ATTORNEY CLIENT PRIVILEGED

REDACTED - ATTORNEY CLIENT PRIVILEGED

REDACTED - ATTORNEY CLIENT PRIVILEGED

Mar 9, 2022 at 3:41 PM

Trevor offered $4m

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000329

Mar 18, 2022 at 4:37 AM



**Lawsuit: Former Utah CEO charged with fraud misled seller in Morgan County land deal**

newsbreakapp.com

Mar 18, 2022 at 9:25 AM

Our complaint only refers to wasatch creeks ranch. It also expresses orders in dollar amounts

Yes I saw

We're good

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000330

Apr 27, 2022 at 9:53 AM

REDACTED - ATTORNEY CLIENT PRIVILEGED

But if you can make it at 5 let me know

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000331

Apr 27, 2022 at 4:57 PM

I will assume you are not joining us on this call in 3 minutes

Sorry super busy

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000332

May 3, 2022 at 10:01 AM

Have telephone conference with NY DA re Trevor in half an hour.  Please call me

May 3, 2022 at 4:29 PM

You will have privilege of interviewing with NY DA

REDACTED - ATTORNEY CLIENT PRIVILEGED

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000333



**The loyalist**

**Little brother**

**The fixer**

**The investor**

**The defender**

**Meet Elon Musk's trusted inner circle: Investors, researchers, family**

New York Post

 News

The guy trying to buy WCR is close friend of Musk

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000334

Sent u a 52 lot scheme for developer Watts for Bear

Wed, Aug 10 at 1:38 PM



**Nikola CEO Mark Russell to retire, replacement named**

Fox Business

 News

Wed, Aug 10 at 4:04 PM

interesting

He owned a percentage of stock I had under option. I have a potential action against him because likely knew of the option, would benefit from it but was aware of fraud.

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Wed, Aug 17 at 4:04 PM

Any word from accountants?

Frustrated with them. Switching next year. If you don't think you owe much then there will be tiny penalty and you should wait ( no penalty at all if you owe nothing). If you think you owe a lot then you would file now without LLC and file an amendment. At most you might have made $15k on the stock buy from Trevor and Hicks LLC had enough losses that $15k should very much on the high side

Alright will just wait then

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER



**Nikola (NKLA) partners with ChargePoint and will sell entire portfolio of charging solutions to fleets**

electrek.co

Thu, Nov 10 at 7:16 AM

New Hampshire?  Lake winnepesaki? Go from 9% state tax to none.

Don't remember but I think NH ocean shore is bland

Or Florida. Why just eliminate 4% when you can eliminate 9%?

My mistake. I forgot that I would be paying 5% to utah anyways. Because land is there. Not sure on money from Trevor. Will have to check

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Fri, Jan 13 at 11:42 AM



## 6 beds, 8 baths for $25,900,000 in Woodland, UT

l.hms.pt

Trevor's

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

Mon, Feb 6 at 11:44 AM

Class action against Trevor
dismissed !

Mon, Feb 6 at 5:53 PM

Class action against Trevor should be
easily resurrected.  But will slide
them further behind me

DESIGNATED CONF DENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000339

Thu, Mar 9 at 12:32 PM

If and when Trevor money then RE for sure or open a family office?

DESIGNATED CONFIDENTIAL INFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000340

Make sure you look into bridge financing

Yup
Knock on wood but we may have a lot of $ to bury
Using Wells Fargo unless you have better alternative

-Bridge financing
-Trevor deliver shares promptly, even restricted shares ore lockup expiration if possible
-Make sure trade is handled appropriately, VWAP execution

What does vwap mean?

Volume weighted average price

It's a standard algorithmic trading execution

I'm not too familiar but that's what Cynthia suggested

Should be able to discuss with Wells trading team about timing, execution. Would imagine they have a view

DESIGNATED CONFIDENTIAL NFORMATION UNDER THE D. UTAH STANDARD PROTECTIVE ORDER

LH_00000341

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

- v. -

TREVOR MILTON,

         *Defendant*.

No. 21-cr-478 (ER)

---

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR A NEW TRIAL ON COUNT FOUR**

Alexandra A.E. Shapiro
Daniel J. O'Neill
Avery D. Medjuck
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880
ashapiro@shapiroarato.com
doneill@shapiroarato.com
amedjuck@shapiroarato.com

*Counsel for Defendant Trevor Milton*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 2

FACTUAL BACKGROUND .................................................................................................. 3

    A. The Superseding Indictment And Count Four ............................................................ 3

    B. Peter Hicks Withheld Critical Documents Responsive To Milton's
       Rule 17 Subpoenas .................................................................................................... 5

    C. Hicks's Perjury At The Criminal Trial ...................................................................... 7

        1. The Government Relied On Hicks's Perjured Testimony To Prove
           Materiality ........................................................................................................ 7

        2. The Government Relied On Hicks's Perjured Testimony To Prove
           Venue ............................................................................................................... 12

ARGUMENT ......................................................................................................................... 16

   I. THE NEWLY DISCOVERED HICKS EVIDENCE REQUIRES A NEW TRIAL
      ON COUNT FOUR ..................................................................................................... 16

     A. Legal Standard ......................................................................................................... 16

     B. Milton Satisfies All Five Elements For A New Trial Pursuant To Rule 33 ............... 17

        1. Elements 1 & 2: The Hicks Evidence Was Discovered After The
           Criminal Trial Despite Milton's Diligent Efforts To Obtain It ........................... 17

        2. Elements 3, 4, & 5: The Newly Discovered Evidence Is Material,
           Non-Cumulative, And Would Have Resulted In Milton's Acquittal .................. 19

    CONCLUSION .................................................................................................................. 24

## **TABLE OF AUTHORITIES**

**Cases**                                                                 **Page(s)**

*United States v. Aguiar,*
    737 F.3d 251 (2d Cir. 2013) ........................................................... 17

*United States v. Diaz,*
    176 F.3d 52 (2d Cir. 1999) ............................................................ 19

*United States v. Ferguson,*
    246 F.3d 129 (2d Cir. 2001) ........................................................... 17

*United States v. Katsougrakis,*
    715 F.2d 769 (2d Cir. 1983) ............................................................ 1

*United States v. Owen,*
    500 F.3d 83 (2d Cir. 2007) ............................................................ 16

*United States v. Parkes,*
    497 F.3d 220 (2d Cir. 2007) ........................................................... 17

*United States v. Siddiqi,*
    959 F.2d 1167 (2d Cir. 1992) ............................................... 16, 20, 21

*United States v. Stewart,*
    433 F.3d 273 (2d Cir. 2006) ........................................................... 17

*United States v. Wallach,*
    935 F.2d 445 (2d Cir. 1991) ...................................................... 17, 21

**Rules**

Fed. R. Crim. P. 33 ................................................................... passim

Fed. R. Crim. P. 37 ......................................................................... 1

On October 14, 2022, Trevor Milton was convicted on Counts One, Three, and Four and acquitted on Count Two of the Superseding Indictment in this case.  This is a timely motion for a new trial on Count Four pursuant to Federal Rule of Criminal Procedure 33 based on "newly discovered evidence"—namely, evidence that the key witness on Count Four withheld in response to a defense subpoena.  As explained below, that evidence is material, non-cumulative, and would likely have led to an acquittal on Count Four.

Milton's appeal of his convictions and sentence is fully briefed and currently pending in the Second Circuit.  *See* No. 24-259 (2d Cir.).  The filing of a notice of appeal from a final judgment typically divests the district court of jurisdiction.  *See, e.g.*, *United States v. Katsougrakis*, 715 F.2d 769, 776 (2d Cir. 1983).  However, "[i]f a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending," the court may issue an indicative ruling stating "that it would grant the motion if the court of appeals remands for that purpose."  Fed. R. Crim. P. 37(a).  Rule 37(a) also permits a district court to deny the motion or defer consideration.

Milton respectfully requests that the Court decide this Motion on the merits now rather than deferring consideration until after the Second Circuit decides Milton's appeal.  A decision now will promote judicial efficiency by allowing any appeal of this Court's ruling on this Motion to be heard and adjudicated as part of the currently pending appeal of Milton's convictions, and by potentially narrowing the issues to be decided by the Second Circuit.

## INTRODUCTION

The government obtained a wire fraud conviction against Trevor Milton based on the testimony of Peter Hicks, a wealthy real-estate investor from whom Milton bought a Utah ranch. But the defense has now learned that Hicks intentionally withheld evidence prior to Milton's criminal trial, and the suppressed evidence reveals Hicks's trial testimony was replete with lies and distortions.

Hicks's perjured testimony was critical, because the notion of a fraud with Hicks as its victim was dubious on its face: Hicks made a multi-million-dollar profit by selling the ranch to Milton, and he could have made over a million more if he had exercised the stock options Milton granted him in connection with the deal. Then, after short sellers published a report questioning the accuracy of certain of Milton's public statements, Hicks leveraged the report and ensuing federal investigations to extract millions more from Milton. When Milton stood his ground and refused further extortion attempts, Hicks sued. In short, Peter Hicks was no victim.

Hicks shored up the government's paper-thin proof of materiality and venue. But it is now clear that much of his testimony was false. After the criminal trial concluded, the federal court overseeing Hicks's civil case against Milton ordered Hicks to submit to a forensic examination of his electronic devices. That examination revealed thousands of undisclosed, relevant documents, and suggested that Hicks had affirmatively tried to *destroy* relevant text messages. Those documents and others produced in the civil case were intentionally withheld in response to Milton's Rule 17 subpoenas, no doubt because Hicks knew the documents would make it difficult or impossible for the government to obtain a conviction.

In light of this newly discovered evidence, the Court should grant a new trial on Count Four.

**FACTUAL BACKGROUND**

**A.    The Superseding Indictment And Count Four**

Trevor Milton founded Nikola, a company focused on creating low or zero-emission heavy-duty trucks.  On September 10, 2020, roughly three months after Nikola went public via a SPAC merger, Hindenburg Research published a report (the Hindenburg Report) claiming Milton had made deceptive statements regarding Nikola's products and technology.  This led to a sharp drop in the price of Nikola stock.

The government initially charged Milton with two counts of securities fraud and one count of wire fraud.  It alleged that between November 2019 and September 2020, Milton made misleading statements about the status of Nikola's products and technology in social media and television, print, and podcast interviews, supposedly "to induce retail investors to purchase Nikola stock."  Dkt. 1 ¶ 3.

On June 22, 2022, the government filed a Superseding Indictment adding an additional wire fraud count (Count Four), which is the subject of this motion.  Dkt. 123.  Count Four alleged that in 2020, Milton made misleading statements about Nikola to persuade Peter Hicks to sell him a Utah ranch (the "Ranch") for a combination of cash and Nikola stock options.

Hicks bought the Ranch for roughly $6.85 million in March 2020.  Tr. 2149.  Three months later, he agreed to sell Milton the Ranch for $8.5 million in cash and options to purchase $8.5 million in Nikola stock at the share price prevailing at the time of contracting.  Tr. 2068-73; GX1405.  The options could be exercised between six and seven months later.  Thus, if the stock price was above the option price any time in the exercise period, the options would be "in the money."  Otherwise, they would be worthless, as options often are.  *Id.*

The allegedly misleading statements to Hicks were primarily made in an April 10, 2020 conference call between Milton, Peter Hicks, Peter's college-aged son Lucas Hicks, and a real-

estate broker.  Unbeknownst to Milton, Lucas illegally recorded parts of the call.  The first half

of the call was either deleted or not recorded.  Tr. 2046-47, 2159; *see also* DX9000-T.  On the

call, Milton discussed the status of Nikola's technology.  The government presented evidence

that some of the statements did not accurately describe the *current* state of Nikola's business,

even if they accurately described Nikola's plans and business model, as set forth in official

company documents and public SEC filings by Nikola and VectoIQ (the SPAC that took Nikola

public) referenced by Milton.

Milton's purchase of the Ranch closed in August 2020.  Hicks netted approximately $1.6

million cash, plus the stock options, only five months after he bought the Ranch.  Tr. 2155-56;

*see also* Tr. 2169.  Hicks's stock options were also "in the money" on multiple days during the

exercise period—even after the Hindenburg Report was released.  Hicks could have made at

least $1.25 million more if he exercised and then immediately sold the shares.  Tr. 2189-93;

DX6001.

But Hicks chose not to exercise.  Instead, he threatened Milton with a lawsuit unless he

agreed to new transactions even more favorable to Hicks.  Tr. 2151-52, 2127-28.  In March

2021, Milton agreed to sell Hicks up to $10 million in Nikola stock at a 20% discount.  Tr. 2131-

37; GX1424.  Hicks netted roughly another $1.6 million when he sold that stock.  Tr. 2156.

Later, Hicks pushed Milton to sell him even more discounted stock, which Milton refused.  Tr.

2144-45.  After the criminal charges were filed, Hicks attempted to extract another $36 million

in profit from Milton by offering to sell him land that Hicks had bought for $3 million for $39

million, *i.e.*, a more than 1000% markup.  Tr. 2154.  When Milton declined, Hicks sued him in

Utah federal district court, demanding $45 million in damages.  *See* Complaint, *Hicks v. Milton*,

No. 2:22-cv-00166-HCN (D. Utah) (Dkt. 2) (the "Civil Case").

4

**B.**    **Peter Hicks Withheld Critical Documents Responsive To Milton's Rule 17 Subpoenas**

1.    On August 29 and 30, 2022, shortly after the government filed the Superseding

Indictment, Milton served Rule 17 subpoenas on Peter and Lucas Hicks.  *See* Young Decl. Exs.

A and B.  The subpoenas sought, *inter alia*:

- Communications between Peter Hicks and Lucas Hicks concerning Nikola, Trevor Milton, and potential transactions with Milton (including the sale of the Ranch).

- Documents related to research and analysis of Nikola.

- Documentation of valuations of the Ranch.

- Emails to or from Hicks relating to Nikola, Milton, and the sale of the Ranch.

In response, Peter Hicks produced a trivial number of documents—under 500 pages

total—mere days before trial began.  Similarly, Lucas Hicks produced only a handful of

documents.[1]

2.    After the criminal trial, Milton sought similar discovery from Peter and Lucas

Hicks in the Civil Case.  Ultimately, discovery there proved that Peter Hicks withheld from

Milton's criminal counsel (or destroyed) critical documents plainly responsive to the Rule 17

subpoena directed to him.

Peter Hicks initially resisted producing relevant discovery, and the documents he *did*

produce made it clear he had not performed an appropriate search or collection.  For example,

Milton again requested communications between Lucas and Peter Hicks relating to Milton,

Nikola, or the Ranch.  Although Peter eventually agreed to search and produce texts, he

---

[1] Peter and Lucas also each produced a small number of documents in response to grand jury subpoenas from the government.

produced very few documents, and no text messages from the key period between April 2020 and March 2021.  Milton also sought the same information through a subpoena to Lucas Hicks, who refused production and forced Milton to move to compel.  Eventually, Lucas produced text messages between himself and Peter that had *not* been produced by Peter.  Peter then claimed he could not produce text messages between himself and Lucas sent before July 2021 because they had been "inadvertently" deleted.  *See* Civil Case Dkt. 51 at 3; Civil Case Dkt. 51-1 at 30.  Hicks testified in a deposition that the texts were lost when he dropped his phone in sand and could not be recovered on his new phone.  Tuttle Decl. Ex. A at 99-100.  Milton has retained an information technology expert who is prepared to testify that, in his opinion, the sand explanation is fanciful, and the messages most likely "became lost or missing because they were deleted selectively by intentional user action."  Civil Case Dkt. 111-34 at 14.

Milton moved to compel and sought a forensic examination of Hicks's electronic devices and email accounts.  Civil Case Dkt. 51.  The Utah district court held that a "forensic examination is warranted based on discrepancies between the documents produced by Peter Hicks and Lucas Hicks, as well as Plaintiffs' claim that certain responsive text messages are no longer available on Peter Hicks' phone."  Civil Case Dkt. 65 at 5.  Search terms applied to the data extracted from Hicks's devices revealed almost 20,000 potentially relevant documents, including 6,000 documents housed in cloud-based storage Hicks claimed to have "discovered" only after the forensic examination.  Civil Case Dkt. 98 at 2, Civil Case Dkt. 100 at 2.  None of these documents were available to Milton during his criminal trial, because neither Peter nor Lucas Hicks produced them.

### C.    Hicks's Perjury At The Criminal Trial

##### 1.    The Government Relied On Hicks's Perjured Testimony To Prove Materiality

Materiality was hotly contested at the criminal trial.  Nikola was no fraud—it was a real company developing real zero-emission trucks.  Before it went public, sophisticated corporations that performed thorough diligence invested in the company and valued it in the billions.  *See, e.g.*, GX802.  The defense also called a Harvard economist who testified as an expert and demonstrated that Milton's supposedly false public statements—which were substantially similar to his statements to Hicks on the April 10 recorded phone call—did not influence the price of Nikola stock.  Tr. 2528-35, 2562-2602; *see also* DX955.  And it was undisputed that Nikola's public SEC filings and official company press releases discussed—accurately—the exact same topics as Milton's alleged lies.  In light of Nikola's SEC filings, the defense argued that Milton's statements were not material because (1) they wouldn't alter the overall mix of publicly available information about the company, and (2) any reasonable listener would understand Milton's statements were, at worst, overly enthusiastic descriptions of Nikola's plans for the *future*, *i.e.*, the sort of "puffing" most founders and executives do.  *See*, *e.g.*, Tr. 3104-05.

Milton's statements to Hicks on the April 10 call were even *less* likely to be material than Milton's public statements regarding Nikola.  Peter Hicks was a sophisticated professional real estate investor with a law degree (Tr. 2029, 2156, 2164), and Lucas Hicks had worked at an investment bank while studying mathematics at Yale.  Moreover, Milton specifically directed Hicks to Nikola's SEC filings during the April 10 call.  GX1400-T at 30-31; Tr. 2167-69.  Hicks understood that Nikola was a pre-revenue company that had not yet sold any vehicles, that its stock would be volatile, and that the company's value was speculative.  Tr. 2164, 2156, 2191.  The purchase agreement for the Ranch contained a merger provision under which Hicks

disclaimed any reliance on extrinsic agreements or understandings.  GX1405 ¶ 8.7.  And Hicks was more focused on the cash component of the deal (Tr. 2045) and made a huge cash profit on the sale of the Ranch, after owning it for only a few months:  He got $8.5 million *plus* the stock options, after he had set $8.45 million as a target sale price.  Tr. 2169.

The April 10 phone call also plainly didn't induce Hicks to leap at the opportunity to accept Milton's offer to buy the Ranch—after the call, Hicks *rejected* Milton's offer.  He only changed his mind months later, when Milton increased the cash component above Hicks's cash target.  Tr. 2073.  Thus, the evidence suggested that the stock options were simply "gravy" on the deal, and that Nikola securities weren't material to Hicks's decision to sell the Ranch.  Tr. 3145.

So the government's proof of materiality turned substantially on Hicks's testimony.  He claimed Milton's statements during the April 10 phone call were critical to his decision to sell the Ranch because they convinced him of the value of the stock options, which Hicks said he would have otherwise believed lacked value.  Tr. 2031.  Hicks claimed he would have never agreed to the deal if not for his belief in the value of the options.  *Id.*  Hicks also claimed during the criminal trial that he never read any of Nikola's SEC filings before the Ranch sale closed in August 2020.  Tr. 2081.  When the defense asked Peter if Lucas had emailed him a link to a Nikola SEC filing, Hicks testified, "If he did, I didn't read it," and claimed to "know nothing about the SEC and how to access its information."  Tr. 2168.

That testimony was all false.

Newly discovered evidence from the Civil Case proves both Peter and Lucas Hicks accessed Nikola/VectoIQ SEC filings.  For example, on August 4, 2020, before the Ranch deal closed, Peter sent Lucas a text message asking him to "Send me evidence what day Nikola

merged." Lucas then sent a link to a Nikola SEC filing and suggested looking at "page 5." Peter responded with questions demonstrating he had accessed and read the filing:



Declaration of Curtis M. Tuttle ("Tuttle Decl.") Ex. B at LH_00000289.

On August 6, 2020, Lucas again text messaged Peter another link to a Nikola SEC filing:



*Id.* at LH_00000291.

In addition, the forensic examination of Hicks's devices uncovered a short memo, created on August 12, 2020, analyzing Hicks's option agreement with Milton. Tuttle Decl. Ex. C at 2. During his deposition in the Civil Case, Peter Hicks admitted he was likely the author of the memo (Tuttle Decl. Ex. A at 202-204), which included a link[2] to an SEC filing containing a prospectus which made clear that Milton's statements during the April 10 call described company *plans* rather than Nikola's current status. For instance, the prospectus disclosed that (1) Nikola's truck reservations were "subject to cancellation by the customer" (at 38), (2) Nikola would not rollout any hydrogen fueling stations until 2022-2023 (at 151), (3) Nikola might not be able to buy electricity at the prices necessary to achieve profitability (at 37-38), and (4)

---

[2] https://www.sec.gov/Archives/edgar/data/1731289/000104746920002928/a2241585z424b3.htm.

competitors could enter the market before Nikola, and might also build hydrogen fueling stations (at 40).

These documents—which neither Lucas nor Peter Hicks produced in response to Milton's Rule 17 subpoenas prior to the criminal trial—make clear that Peter Hicks lied about the SEC filings at the criminal trial. Indeed, during his civil deposition, Hicks was initially evasive (Tuttle Decl. Ex. A at 124, 129, 192-93, 199), but ultimately, when confronted with the withheld documents, conceded he might have read Nikola's SEC filings (*id.* at 199).

The withheld text messages also demonstrate that Peter and Lucas both understood the SEC filings contained information critical to valuing the stock options. On April 10, 2020—the day of the recorded call—Lucas texted Peter that it was "retarded" for Milton to point them to the "Investors" page on Nikola's website, which included the SEC filings and other public information on Nikola, instead of granting access to non-public diligence materials. But in a subsequent text that same day, Lucas told Peter not to request more information, because he apparently reviewed the information on the Investors' page and found it sufficient:



Tuttle Decl. Ex. B, at LH_00000276.

The new evidence also shows that even after the Ranch deal closed in August 2020, Peter Hicks understood the value of the options was extremely volatile and could easily fall to zero. In a September 2020 email to a business associate, Hicks characterized the value of the options as

11

"fools gold" and quipped about how their value would "Probably go[] away tomorrow."  Tuttle

Decl. Ex. D:

To:       frank.celeste@sothebysrealty.com[frank.celeste@sothebysrealty.com]
From:     Peter Hicks[hicksmgt@aol.com]
Sent:     Tue 9/8/2020 11:52:37 AM (UTC)
Subject:  1031

Frank
Realized over the weekend that I need to target this friday as day to get deal done. Hope you can give me something to focus on no
later than tomorrow or wednesday.

Nikola just did deal with GM so good news.  All fools gold until I can exercise options in december, but on paper I made $6.7m in 15
minutes!  Probably goes away tomorrow........

Peter

That contemporaneous email is consistent with the defense's argument that the stock options

were speculative "gravy" (Tr. 3145) and utterly inconsistent with Hicks's suggestion that he

wouldn't have done the deal if Milton hadn't convinced him the Nikola options were valuable.

        2.      <u>The Government Relied On Hicks's Perjured Testimony To Prove Venue</u>

The government's evidence of venue on Count Four also turned on Hicks's false

testimony.

The only states implicated by Milton's purchase of the Utah Ranch were Utah, Arizona,

and Massachusetts.  The parties to the contract and the attached option agreement were Hicks's

Utah-based LLCs and Milton's Arizona-based LLCs.  GX1405.  During the April 10, 2020 call,

Milton was in Utah and Peter and Lucas Hicks were in Massachusetts.  Tr. 2158.  Neither Hicks

nor Milton ever set foot in the Southern District in connection with the deal.

The government seemed to base venue on wire transfers Milton used to pay for the

Ranch, which may—without Milton's direction or even knowledge—have been routed through

Manhattan by J.P. Morgan ("JPM").  Tr. 3080.  But as the defense repeatedly noted (Tr. 2299-

2300, 2959-64) and the government conceded at trial (Tr. 2300-01, 2961), under controlling law only *foreseeable* conduct touching the SDNY can confer venue.  On appeal, the government has again conceded foreseeability is required.  *See* Brief for the United States at 43, 47, *United States v. Milton*, No. 24-259 (2d Cir. Sept. 13, 2024) ECF No. 34 ("G.Br.").[3]

So the government pursued an alternative theory of venue that turned on Hicks's testimony.  Hicks claimed that even after the Hindenburg Report was released, he didn't sue Milton because he didn't yet know if Milton's April 10 statements were accurate or inaccurate, and because Milton continued negotiations with him even after the Hindenburg Report was released.  Tr. 2130-31.  Based on Hicks's testimony, the government claimed the later discussions—including negotiations over a stock purchase agreement ("SPA") in which Milton sold Hicks Nikola stock at a discount—was all part of a continued scheme by Milton to "lull" Hicks out of learning he had been defrauded and exposing the fraud through a public lawsuit.  Tr. 2128-29, 3074; *see also* Dkt. 123 ¶ 4.  The SPA was signed roughly six months after the Hindenburg Report was released, and nearly a year after the April 10, 2020 call.  Tr. 2135.  Nonetheless, the government used Hicks's testimony to argue the SPA was part of the alleged scheme, and that venue was proper because one of Milton's transactional lawyers was in the SDNY when she sent a few ministerial emails regarding the SPA paperwork.  Tr. 2134-35, 3080-81.[4]

---

[3] The government claims in its appellate brief that Milton's JPM account had a Manhattan address.  G.Br. at 18, 44.  But that is demonstrably false.  The mailing address connected to each of Milton's accounts was in Arizona, and the routing numbers listed on Milton's JPM-issued checks were associated with Arizona and Utah, respectively.  GX1509, GX1511, GX1520.

[4] The government has relied on the same arguments on appeal to claim that the evidence of venue on Count Four was sufficient (G.Br. at 45-46) and that the Court's erroneous venue instructions were harmless (*id.* at 46-47).

But newly discovered documents from the Civil Case prove Hicks lied when he suggested Milton "lulled" him out of suing. Rather, as soon as the Hindenburg Report came out, Hicks saw "not a financial blow for me but a benefit." Tuttle Decl. Ex. E. The withheld documents completely contradict Hicks's claim that he waited to sue because he hadn't yet formed a belief whether Milton had lied to him during the April 10 call, and that Milton "lulled" him with continued negotiations. Tr. 2128-31.

For example, on September 12, 2020, two days after the Hindenburg Report was released, Peter texted Lucas, "My virtuoso performance re [the Ranch] has a third act. Call":



Tuttle Decl. Ex. B at LH_00000298.

That same day, Peter emailed Lucas ideas for obtaining more money from Milton in light of "this Nikola-under-investigation climate." Tuttle Decl. Ex. E. Peter noted there was an opportunity because Milton might "move quickly/impetuously to solve the problem." Even at that early date, Hicks referenced the likelihood of a lawsuit, noting that if Milton did not agree to

14

amend the stock option agreement by either buying the stock options at an inflated price or selling Hicks $1/share options, "we have alternatives he will not like." *Id.* The subject line of the email was "Nikola…opportunity not financial blow."

These emails undercut the notion that the post-Hindenburg negotiations between the parties were part of a scheme by Milton. The documents prove Hicks knew he would sue Milton, but Hicks schemed to extract as much money as he could before he did so.

Hicks testified that the reason he didn't sue even after the options expired in December 2020 was because, even at that late stage, he still "did not know whether any or all of [Milton's] representations were accurate or inaccurate." Tr. 2130-31. But contrary to that fanciful claim, by the end of December 2020, Peter and Lucas were openly strategizing about the anticipated lawsuit.[5] In a December 31, 2020 email to Lucas, Peter suggested trying to convince Milton to "convey[] to me 1/4 of the option stock at no cost to me." Tuttle Decl. Ex. F at 2. An advantage of that plan, he observed, was that it would "neutralize[] any later claim that I was offered an opportunity to reduce damages and failed to do so." After Lucas responded that the plan wasn't a good idea, Peter wrote back, "Still might be an important offer to make to undercut argument that I had a chance to mitigate damages and I did not do so." *Id.* at 1. In January 2021, Hicks and his counsel held a conference call. The subject line of the calendar entry for the call was "Hicks Milton Securities Fraud Litigation." Tuttle Decl. Ex. G.

By February 2021—before the execution of the SPA that the government claimed was a continuation of a scheme by Milton—Hicks knew full well that Nikola and Milton were being

---

[5] Indeed, as early as November 2020—more than three months before the SPA was executed—Hicks was blind-copying his litigation counsel on communications with Milton. Tuttle Decl. Exs. H, I. Hicks produced these emails in response to the government's grand jury subpoenas, but he omitted the BCC line showing that the emails were being sent to his litigation counsel.

investigated for fraud.  In fact, on February 29, 2021, Hicks's wife emailed him a link to an article titled "Nikola admits ousted chairman misled investors as legal costs mount."  Tuttle Decl. Ex. J.  That article referenced a February 25, 2021 SEC filing in which Nikola admitted certain of Milton's public statements, including statements that mirrored Milton's statements on the April 10 recorded phone call, were—taken literally—untrue.  Hicks withheld the email containing that link from Milton's criminal counsel, and then falsely testified at trial that as of March 2021, he "still didn't know whether the representations made by Mr. Milton were accurate or inaccurate."  Tr. 2137.

## **ARGUMENT**

### I.    THE NEWLY DISCOVERED HICKS EVIDENCE REQUIRES A NEW TRIAL ON COUNT FOUR

#### A.    Legal Standard

"Rule 33 of the Federal Rules of Criminal Procedure states that the district court may grant a new trial 'if required in the interest of justice', and it specifically contemplates that such motions may be made based on newly-discovered evidence."  *United States v. Siddiqi*, 959 F.2d 1167, 1172 (2d Cir. 1992).  "Relief is justified under rule 33 if the defendant makes a showing that the evidence is in fact 'new', *i.e.*, it could not have been discovered, exercising due diligence, before or during trial, and that the evidence is so material and non-cumulative that its admission would probably lead to an acquittal.'"  *Id.* (cleaned up).  Thus, a Rule 33 motion based on new evidence must establish five elements:  "(1) the evidence [is] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal."  *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007).  Where newly discovered evidence establishes perjury by a

16

witness, a defendant is entitled to a new trial if "but for the perjured testimony, the defendant would most likely not have been convicted." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (granting new trial based on witness perjury). If the prosecution knew or should have known of the perjury prior to the conclusion of trial, reversal is "virtually automatic." *Id.*

In deciding a Rule 33 motion, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013). As to the determinative factor—"whether newly discovered evidence would have influenced the jury"—the trial court has broad discretion. *United States v. Stewart*, 433 F.3d 273, 296 (2d Cir. 2006).

**B.    Milton Satisfies All Five Elements For A New Trial Pursuant To Rule 33**

Even assuming the government was not aware of Hicks's lies at the criminal trial, Milton easily satisfies the five elements for a new trial on Count Four, and allowing his conviction to stand "would be a manifest injustice." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).

1.    <u>Elements 1 & 2: The Hicks Evidence Was Discovered After The Criminal Trial Despite Milton's Diligent Efforts To Obtain It</u>

There can be little dispute that the evidence newly revealed in the Civil Case "could not have been discovered through the exercise of due diligence before or during trial." *United States v. Parkes*, 497 F.3d 220, 233 (2d Cir. 2007).

a.    *The Evidence Was Discovered After The Criminal Trial.*

Milton only learned of the existence of the documents and communications highlighted in this Motion through discovery in the Civil Case, years after the criminal trial concluded in October 2022. Neither Lucas nor Peter Hicks produced these documents to Milton (or, apparently, the government) in advance of the criminal trial, despite document subpoenas that

17

unambiguously encompassed them.  Nor did Milton have any independent way to know the substance of, for instance, text messages and emails exchanged between Peter and Lucas Hicks.

Indeed, Peter and Lucas Hicks tried at every turn to stymie Milton's efforts to obtain relevant evidence.  For example, after Lucas Hicks was served with a Rule 45 subpoena in the Civil Case on May 15, 2023, he refused to produce *any* documents he had not already produced in the criminal case.  Milton was only able to obtain any additional documents from Lucas by bringing a motion to compel through a miscellaneous proceeding in the SDNY.  *See In re Motion to Compel Compliance with Subpoena Directed to Lucas Hicks*, No. 23-mc-195 (JHR) (S.D.N.Y.).  And, as noted *supra* at 6, Milton was forced to obtain a court order directing a forensic examination of Peter Hicks's devices after he made the farfetched claim that documents were lost when he dropped his phone in the sand.

Hicks's admissions in the Civil Case also constitute newly discovered evidence.  Hicks testified *unequivocally* in the criminal trial that he never read SEC filings relating to Nikola.  Tr. 2081.  That claim was highly dubious under the circumstances, but Hicks stubbornly stuck to it. *E.g.*, Tr. 2168, 2199.  Similarly, Hicks played along with the government's "lulling" theory by claiming that at the time of the SPA he still hadn't formed a belief about whether Milton's April 2020 statements were true or false and was undecided about whether to sue Milton.  Tr. 2121, 2130-31.  But in the Civil Case, Hicks admitted all that testimony wasn't true.  He conceded he might have reviewed Nikola's SEC filings.  *E.g.*, Tuttle Ex. A at 199.  And he conceded that he engaged counsel in anticipation of suing Milton almost *immediately* after the Hindenburg Report was published.  Civil Case Dkt. 49 at 3.  There can be no serious question that the evidence is newly discovered, as it flatly contradicts Hicks's criminal trial testimony.

b.  *Milton Exercised Due Diligence.*

With trial fast approaching after the government superseded to add Count Four, Milton served both Peter and Lucas Hicks with Rule 17 subpoenas that would have covered the documents at issue in this Motion.  Peter purported to satisfy his obligation by producing documents in response to the subpoena.  Milton had no way to know that the production was incomplete, much less that critical evidence had been intentionally withheld.  And he had no time to further investigate, given that Peter made his production mere days before the beginning of trial, and Lucas produced his documents after the trial had already begun.

2.    Elements 3, 4, & 5:  The Newly Discovered Evidence Is Material, Non-Cumulative, And Would Have Resulted In Milton's Acquittal

a.  *The New Evidence Is Material.*

The newly discovered evidence is directly relevant to key disputed issues: whether Milton's statements on April 10, 2020 were material to Hicks's sale of the Ranch and whether the SPA was an effort to "lull" Hicks.  Thus, the newly discovered evidence easily satisfies the materiality prong, which merely requires that the evidence is "relevant to the merits of the case." *United States v. Diaz*, 176 F.3d 52, 106 (2d Cir. 1999).

Indeed, the new evidence directly contradicts testimony the government elicited during Hicks's direct examination.  Hicks testified on direct that the stock options—and thus Milton's statements on the April 10 call—were critical to his decision to sell the Ranch, even though the cash he was receiving earned him a massive profit on the sale.  *E.g.*, Tr. 2031-32.  His contemporaneous admission that the stock options were "fool's gold," the value of which would "Probably go[] away tomorrow," stands in stark contrast to that testimony.  Tuttle Decl. Ex. D.  And the government directly asked Hicks whether his research into Nikola "include[d] looking at SEC filings."  Tr. 2081.  He said no.  That Q&A was integral to the government's novel trial

19

theme:  It didn't matter that Nikola's SEC filings disclosed the truth about the company's business and technology, because even sophisticated businessmen like Hicks don't read SEC filings.  The government also elicited the details of the SPA and asked Hicks questions about his supposed disinclination to sue Milton after the Hindenburg Report in an attempt to establish the SPA as part of the alleged fraud.  Tr. 2127-31, 2135-40.

Having obtained this testimony to try to prove the elements of Count Four, the government cannot now claim that the new evidence—which goes to the same issues but directly contradicts Hicks's testimony—is immaterial.

> b.  *The New Evidence Is Not Cumulative Or Merely Impeaching.*

The newly discovered evidence is not "merely cumulative" of other evidence.  *Siddiqi*, 959 F.2d at 1173.  Hicks lied about key issues, but the documents available at trial were insufficient to bring his deception to light.

At trial, the defense attempted to cross examine Hicks on whether he or Lucas had read Nikola's SEC filings, but Hicks was evasive:  He claimed he didn't "recall that" Milton had directed Hicks to the filings during the April 10 phone call, didn't know whether Lucas had read them, and wouldn't say whether Lucas had sent him a link to them.  Tr. 2167-68.  The newly discovered texts between Peter and Lucas Hicks, coupled with the newly discovered memo which includes a link to an SEC filing, would have definitively established that Peter and Lucas Hicks had in fact read the SEC filings.  Similarly, the defense focused on whether the stock options had actually mattered to Hicks in light of the cash he received in the deal, but Hicks insisted the options, and Milton's statements, were critical.  *E.g.*, Tr. 2031.  The newly discovered "fool's gold" email would have powerfully undermined Hicks's testimony.  And with respect to Hicks's contemplated lawsuit against Milton, Hicks claimed that even as of March 2021, he hadn't formed a belief about whether Milton had lied.  Tr. 2137; *see* Tr. 2128.  Hicks's

testimony was a stretch, but the defense had no way to show the jury he was lying because he had withheld documents.  Those documents reflected Hicks's actual thinking in the months after the Hindenburg report was published and would have been highly potent on cross-examination.

Nor is the newly discovered evidence "merely impeaching."  To be sure, the new evidence would have been devastating to Hicks's credibility, because it establishes that he is willing to lie when it suits him.  Hicks not only lied on the stand, but to cover his lies he (1) affirmatively withheld evidence when responding to the Rule 17 subpoena, (2) forced Milton's civil counsel to compel a forensic examination in order to obtain documents, and (3) likely deleted relevant text messages, later claiming they had inadvertently been lost.[6]  But, as discussed, the new evidence also goes squarely to "the guilt or innocence of the defendant[]," and is thus substantively significant as well.  *Wallach*, 935 F.2d at 457.

### c.  *The New Evidence Would Likely Have Changed The Outcome.*

If defense counsel had been able to undermine Hicks's testimony with the newly discovered evidence, it "would probably have led the jury to acquit" on Count Four because the issues in dispute were critical to a conviction.  *Siddiqi*, 959 F.2d at 1174.  At a minimum, "there [i]s a significant chance that…counsel could have induced a reasonable doubt in the minds of enough of the jurors to avoid a conviction."  *Wallach*, 935 F.2d at 456 (cleaned up).  That is enough to mandate a new trial in the "interest of justice" under Rule 33.

The evidence on Count Four was hardly overwhelming.  Hicks was essentially the only witness who could provide testimony relevant to that count.  But the jury had ample reason to question the veracity of his story.  By the time of the criminal trial, he had already sued Milton

---

[6] Hicks's obstructive approach to document discovery also raises the question whether additional exculpatory documents have been withheld or destroyed.

for $45 million and had every reason to help the government secure a conviction.  *See* Tr. 2149.

And it was undisputed that Lucas Hicks had, without Milton's knowledge or permission,

illegally recorded the April 10 phone call.  Tr. 2149.  That recording, which was the key

evidence on Count Four, was inexplicably incomplete insofar as it only preserved about half the

call.  Tr. 2163.  Aspects of Hicks's testimony were also farfetched on their face.  For instance, he

claimed Milton's statements about Nikola were critical to his decision to sell the Ranch, but even

without the stock option consideration Hicks still turned an enormous profit on the sale—more

than $1.5 million in cash—after owning the land for less than six months.

      And as discussed, it was undisputed that Nikola's SEC filings *accurately* detailed the

state of the business on the subjects Hicks claimed Milton lied about, including (1) whether

Nikola's truck reservations could be cancelled, (2) the status of Nikola's electricity contracts and

production of hydrogen, and (3) the status of Nikola's hydrogen production infrastructure.  *See,*

*e.g.*, DX734 at 734-20-21, 734-24, 734-87-88.  It was therefore critical that the government

establish Hicks never looked at the SEC filings, because, by accurately describing the material

facts, those filings rendered Milton's supposed misstatements on the April 10 call immaterial in

the context of the "total mix" of information affecting Nikola's stock price.  Those filings also

demonstrated that Milton's statements on the call were clearly just optimistic statements about

Nikola's plans for the *future*, and thus not material.  Hicks testified that he "never thought" to

look at the SEC filings.  Tr. 2081-82.  But the new evidence shows Peter Hicks *did* look at the

SEC filings, as did Lucas Hicks.  And, contrary to Peter's trial testimony, they understood

Nikola's public filings were significant.  *See supra* at 11.

      The supposed basis for venue in this Court was also razor thin.  The sale of the Ranch

had no obvious connection to the SDNY:  The buyer lived in Utah and Arizona, the seller was in

22

Massachusetts, and neither of the parties ever set foot in New York in connection with the deal. Although the government suggested—without any direct evidence—that JPM may have routed some of the cash Milton used to buy the Ranch through Manhattan (Tr. 3080, 2422; GX937), a properly instructed jury would have easily rejected this theory of venue, because it was not foreseeable to Milton that the wire transfer from Utah or Arizona to Massachusetts would touch Manhattan.[7]

So the government relied heavily on Hicks's false testimony suggesting the SPA was an effort to "lull" him from discovering the fraud. It claimed the SPA "was all part of the [fraud] scheme" and that SPA-related emails to and from Milton's transactional lawyer, who was in the SDNY, were independently sufficient to establish venue.[8] Tr. 3074, 3080-81. But the newly discovered evidence shows that Hicks planned to sue as soon as the Hindenburg Report was released—there's no truth to the claim that Milton "lulled" him out of anything. To the contrary, the new evidence shows it was *Hicks* who schemed, post-Hindenburg, to leverage the "Nikola-under-investigation climate" to get more money from Milton. The jury never saw the evidence that Hicks was executing what he called the "third act" in a "virtuoso performance." That evidence fatally undermines the theory that the March 2021 SPA was a continuation of a scheme in which Hicks was the victim, because it proves that the SPA only happened because *Hicks*

---

[7] The Court erroneously omitted the foreseeability requirement from its jury instructions on venue. Tr. 3220-21. Milton is challenging that error on appeal, and as noted above, the government has conceded that the instructions were erroneous. G.Br. at 43.

[8] On appeal, the government argues there were other SPA-related wires that supported venue in the SDNY. G.Br. at 20-21, 45-46. Those arguments rely on a misportrayal of the record. *See* Reply Brief at 27-28, *United States v. Milton*, No. 24-259 (2d Cir. Oct. 4, 2024) ECF No. 43. But even putting aside the factual errors, the government's arguments *all* turn on the false notion that the SPA was an effort by Milton to "lull" Hicks.

wanted to take advantage of Milton.  A jury presented with that evidence would have rejected the government's alternative venue argument.

Similarly, the "fool's gold" email was completely consistent Milton's defense to Count Four, and utterly inconsistent with Hicks's claim that Milton's statements made him believe in the value of the stock options and sell the Ranch as a result.  The email would have substantially bolstered the defense argument that the stock options were merely "gravy" that wouldn't have moved the needle.  Tr. 3145.

In short, the evidence in connection with Count Four was already marginal at best.  The introduction of the newly discovered evidence would have tipped the balance and led to an acquittal.

## CONCLUSION

For the foregoing reasons, the Court should issue an indicative ruling stating it would grant a new trial on Count Four pursuant to Rule 33.

Dated: November 11, 2024
        New York, New York

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Daniel J. O'Neill
Avery D. Medjuck
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880
ashapiro@shapiroarato.com
doneill@shapiroarato.com
amedjuck@shapiroarato.com

*Counsel for Defendant Trevor Milton*