M987MILC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                        21 Cr. 478 (ER)

TREVOR MILTON,

              Defendant.
                                        Conference
------------------------------x

                                        New York, N.Y.
                                        September 8, 2022
                                        3:00 p.m.

Before:

                   HON. EDGARDO RAMOS,

                                        District Judge

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  JORDAN L. ESTES
     NICOLAS T. ROOS
     MATTHEW D. PODOLSKY
     Assistant United States Attorneys

MUKASEY FRENCHMAN, LLP
     Attorneys for Defendant
BY:  MARC L. MUKASEY
     KENNETH A. CARUSO
     TORREY K. YOUNG

CAHIL GORDON & REINDEL, LLP
     Attorney for Defendant
BY:  BRADLEY J. BONDI

M987MILC1

(Case called)

MS. ESTES:  Good afternoon, your Honor.

Jordan Estes, Nicholas Roos, and Matthew Podolsky for the government.

THE COURT:  Good afternoon to you all.

Before I get much further, how do you pronounce your last name?

MR. ROOS:  Roos, your Honor.

THE COURT:  Like, R-O-S-E?

MR. ROOS:  It's, R-O-O-S, but you're correct in how it's pronounced, like the flower.

THE COURT:  Okay.  Thank you.

MR. MUKASEY:  Good afternoon, Judge.

Marc Mukasey for the defendant, Trevor Milton.  Along with me is Brad Bondi to my left, Mr. Milton to his left, Ms. Torrey Young to his left, and Mr. Ken Caruso at the end of the table.

THE COURT:  Good afternoon to you all.

This matter is on for a final pretrial conference.  As is my custom at these conferences, I always ask:  Do the parties believe that we will, in fact, be going forward Monday morning?

Ms. Estes?

MS. ESTES:  Yes, your Honor, we're ready to proceed Monday.

M987MILC1

THE COURT:  Mr. Mukasey?

MR. MUKASEY:  Yes, sir.  We are ready to proceed Monday, Judge.

THE COURT:  Very well.  I know that there are a number of legal matters that we need to address, and we also need to go over the particulars and mechanics for jury selection, etc.

The trial will be held in this courtroom.  As the parties may be aware, the COVID restrictions have been substantially relaxed over the last few days, so masks are no longer required.  However, if anyone is feeling uncomfortable for whatever reason, you will not be punished if you decide to wear a mask.  I will tell the jury that as well.

As you can tell, we are still set up in the jury box for COVID social distancing, however we will have all the jurors in the box.  We will make an effort to see whether we can remove the Plexiglas from the witness stand and the podium hopefully for Monday morning, if not, as soon as we can get to it.  There's a lot of moving parts in the courtroom going on right now because there are a couple of large trials that are going on.

Let me just ask, I know that there are pending motions concerning discovery, *Brady*, etc.  I take it that Jencks Act materials have already been turned over, Ms. Estes?

MS. ESTES:  Yes, your Honor.

THE COURT:  You don't have to keep popping up.  You

M987MILC1

can remain seated, and same for you folks.

Very well.  So with respect to the motions, there are a number of motions that are outstanding, very generally speaking, at a very high level.  The defendant's pretrial motions are denied.  An opinion will issue.  However, with respect to the particular motions, I will provide the following overview at this point:

First, with respect to the motion to dismiss Counts One and Two of the indictment for lack of fair notice, I find that the indictment provided Mr. Milton with fair notice, that his allegedly false communications directed at investors could give rise to securities fraud liability, even though they were communicated using modern social media platforms, including tweets and podcasts.

With respect to his motion to dismiss Counts One and Two of the indictment for failure to allege the requisite connection with a security, I find that those counts sufficiently allege that Mr. Milton's statements were in connection with a security, as required by Federal Rule of Criminal Procedure 7(c).  Those counts track the relevant statutory language, state the approximate time and place of the crime, and thereby provide adequate notice to the defendant of the charges against him.

The in-connection-with prong of Rule 10(b)(5) is construed broadly to include public statements that affect the

M987MILC1

public's interest in the corporation's stock.

With respect to the motion to dismiss Counts Two and Three for failure to sufficiently allege that the object of the defendant's alleged scheme was money or property, I find that those counts sufficiently allege that the object of the scheme set forth in the indictment was money or property. As just indicated, these counts also track the statutory language of the relevant statutes and explicitly state that the object of the scheme was money or property.

With respect to the motion to dismiss the indictment for failure to sufficiently allege materiality, I find that it would not be appropriate to dismiss the indictment on this basis at this juncture. In the securities fraud context, a fact is material if it is one that would have been significant to a reasonable investor's investment decision. Materiality determinations are mixed questions of law and fact and, therefore, are particularly well-suited for jury resolution.

With respect to the motion to dismiss charges of scheme liability under Count One of the indictment, I find that this count sufficiently alleges scheme liability. Again, the count tracks the statutory language. That is all that is required at this juncture and it would be inappropriate for the Court to pass on the sufficiency of the facts alleged.

In any event, Mr. Milton's argument that conduct consistent of misrepresentations and omissions cannot give rise

M987MILC1

to scheme liability under Section A of 17 CFR 240.10b5 is I believe wrong.  In the Supreme Court case *Lorenzo*, the Supreme Court held that the dissemination of false or misleading statements with intent to defraud could give rise to scheme liability under that subsection.

Next, I find that Mr. Milton's argument that Count Two should be dismissed because 18 U.S.C. Section 1348(1) is unconstitutionally vague as applied to the allegations in the indictment.  It is premature.  Well-established case law teaches that Courts must wait until the conclusion of trial to determine whether a statute is unconstitutionally vague in a particular case.

Next, turning to the discovery requests, Mr. Milton's request for a bill of particulars is denied.  The proper purpose for a bill of particulars under Federal Rule of Criminal Procedure 7(f) is to provide defendant with information about the details of the charges against him.  This is necessary to the preparation of his defense and to avoid prejudicial surprise at trial.

Here, Mr. Milton was initially charged in the 48-page indictment.  That indictment was detailed as to dates and times and particular statements that he made.  He was provided with extensive discovery that was in electronic form and that was accompanied by a detailed index, and I find that these materials provide more than sufficient information to assist

M987MILC1

Mr. Milton in his preparation for trial.

Now, with respect to the motion to strike surplusage, there was a superseding indictment. It is substantially paired down.

Given that, Mr. Mukasey, is the motion to strike the surplusages, in your mind, moot?

MR. MUKASEY: It is, Judge.

THE COURT: Thank you.

Next, Mr. Milton seeks an order compelling the government to identify *Brady* material in its discovery productions and compelling the government to review the entirety of the SEC's files for *Brady* materials. That motion is also denied. Courts in this district routinely find that in the *Brady* context the government is under no duty to direct the defendant to exculpatory evidence within the discovery materials that have been produced, even where those materials are voluminous.

As regards the SEC's documents and the SEC investigation, I find that that investigation was a parallel investigation with the U.S. Attorney's Office for the Southern District of New York and not a joint investigation. Therefore, the government is under no duty to review the SEC's files for *Brady*. In any event, I'm led to understand that the government has provided the defense with those materials that it received via subpoena and those materials that were created at joint

interviews between the U.S. Attorney's Office and the SEC.

Mr. Milton's motion for an evidentiary hearing on the government's filter team protocols is denied as it is based primary on surmise.  Inadvertent disclosure of potentially privileged information to the prosecution team is not alone a basis for relief.

Finally, Mr. Milton's motion to dismiss Count Four is denied as there is no authority for relief sought by Mr. Milton, which is apparently to have facts supporting that charge that are contained within the body of the count dismissed.  The "lulling" language simply gives Mr. Milton notice of how the government may seek to prove the charge.  As I indicated, an opinion will issue.

And that brings us to the motions *in limine*.

As the parties are aware, the purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility and relevance of certain forecasted evidence.  Evidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds.  Courts considering a motion *in limine* may reserve decision until trial so that the motion can be placed in the appropriate factual context.  Moreover, the Court's ruling regarding a motion *in limine* is subject to change as the case unfolds, particularly, if the actual testimony differs from what was expected, all of which is to say that what we will be

discussing from here on in, at least with respect to the motions *in limine*, are subject to reasonable revisiting as the facts emerge.

We will consider the government's motions *in limine* first. And the first motion's to exclude the testimony of Mr. Milton's proposed experts. The first is Professor Kurfess. That name is spelled, K-U-R-F-E-S-S. Professor Kurfess is proposed as an expert in automotive engineering and will testify as to five topics: (1) vehicle development generally, including timeline; (2) vehicle prototypes, both physical and virtual; (3) battery technology as a viable source of power for semi trucks; (4) hydrogen fuel cell technology, including hydrogen's low price and abundance and Nikola's plans to build hydrogen stations; and (5) the relationship between auto makers and suppliers, including parts.

Now, based on my very rudimentary knowledge of the facts, Ms. Estes, all of these appear to be somewhat relevant. Why should I preclude Professor Kurfess from testifying?

MS. ESTES: Yes, your Honor.

So we expect Professor Kurfess will testify about how long it takes to develop vehicles, whether hydrogen production is viable. Those are things that are not really in dispute and they don't go to the heart of Mr. Milton's false statements. Mr. Milton's statements were largely about the company's progress on technology and producing these trucks and producing

hydrogen. He lied about milestones the company had hit. So whether hydrogen production is some day viable, which I understand is the testimony Professor Kurfess would give, it's irrelevant when Mr. Milton's misstatement is, "We are producing hydrogen today," which I think is going to be demonstrably false from the evidence we present at trial.

So that's our position as to why the testimony is irrelevant, because Mr. Milton's lies are really about how far along the company was. And Professor Kurfess's testimony, it could be confusing for a juror to hear that this is possible, they may get it some day, when that doesn't really go to the heart of what Mr. Milton was lying about.

THE COURT: Well, aside from that argument, which I think will likely be improper in any event, wouldn't it be useful for a lay jury to understand how it is that a car goes from concept to the road?

MS. ESTES: Your Honor, I do expect some of that. The witnesses from Nikola will talk about that. So I think in that sense, you don't actually need an expert. There will be fact witnesses that Mr. Milton's attorneys can get that sort of testimony from. So I think having an expert on that is simply going to be unnecessary in this case.

I would also note that it's unclear that Professor Kurfess is the right expert here to testify about these sorts of things. For example, on hydrogen in particular,

M987MILC1

defense produced a very large CV from Professor Kurfess and there was nothing about hydrogen in there at all.  His expertise seems to be in manufacturing, engineering.  So I think a number of the subject matters, he's not going to be the right witness to testify about; he doesn't have the expertise in it.  Whereas Nikola employees that we intend to call will be able to provide relevant testimony, lay testimony on those issues.

THE COURT:  Have the parties exchanged witness lists?

MS. ESTES:  We have sent defense our witness list, yes, your Honor.

THE COURT:  And does that witness list include employees of Nikola that are involved in these processes?

MS. ESTES:  Yes.

THE COURT:  Okay.  Mr. Mukasey, if you will be arguing this, certainly this case is about the development of automotive products, but it seems that some of these five areas will probably not even need expert testimony.  And even if they needed some more specialized testimony, it sounds like you will have Nikola employees who were actually working on these issues and that can provide the jury with this type of information.

Why do you need Mr. Kurfess for any of these topics?

MR. MUKASEY:  Judge, I'm not convinced that the Nikola witnesses will be as easy to get information out of as Ms. Estes suggests.

The heart of this case is that Mr. Milton was allegedly lying about what was going on at Nikola. We contend that this was largely a dispute about what Mr. Milton was saying, how he was saying it, and what he meant. There's a linguistics aspect to this. When I say prototype, I mean one thing; when the government says prototype, they mean something else. When I talk about doing battery technology in-house, does that mean that I will not also be doing batteries with suppliers?

So, Judge, a lot of what this case is going to come down to is what Mr. Milton meant, what he saw, and what was in his mind at the time he made the statements in question. His use of terms, technology terms, hydrogen pricing predictions, battery technology terms, the use of a term like prototype, functional, show car, all these terms are common terms in the industry but have slightly different definitions. We are not willing to rely on the government's witnesses to provide definitions.

Taking a step back --

THE COURT: I'm sorry, Mr. Mukasey, but let me stop you there.

If they are common terms in the industry and they are terms that presumably have a definition that can be determined, are you suggesting that Mr. Milton has an idiosyncratic view of these terms; and, if so, how would that expert help the jury in

M987MILC1

that regard?

MR. MUKASEY:  What I'm suggesting, Judge, is that the expert can explain how trucks are designed, manufactured, built, produced, what goes into it, how much time it takes, the future projections and promotions that companies make.  And the Nikola witnesses I don't think are necessarily going to give us what we need in that score.  Now, if they do, maybe we don't need the expert.  But Professor Kurfess can take a lot of the mystery out of this.

We have a concern that the government's case is going to essentially present what was going on at Nikola and what Mr. Milton was talking about as fallacious, as what they call vaporware, nonexistent.  It would require an expert to explain to a jury you just don't put together a hammer and nails and create a truck.  There's a massive design element to this.

I'll give you an example.  The government takes issue with the fact that Mr. Milton made statements suggesting that a particular pickup truck was built.  Well, that raises the question of, "what does built mean in the industry?"  Professor Kurfess will say, you build a truck on a computer.  And that's exactly what Mr. Milton was doing.

So when I say it comes down to linguistics, I mean that what the government says you can take as face value, a truck wasn't built with a hammer and nails.  Professor Kurfess can explain to the jury the way a truck is built is through

M987MILC1

simulations and computer-assisted design on a computer.  So when Mr. Milton says built, it is consistent with the way the truck is built in the industry.  And it's those kinds of issues, what is regular, what is common in the industry, that he will speak about.

THE COURT:  Again, and I'm trying to anticipate problems going forward.  When you say that a truck is built on a computer, I'll be honest with you, that is contrary to what my understanding of what "built" means.  I can understand if you have a concept of a truck on a computer, but that is not a truck that you can get in and drive.

Again, to the extent that that -- I don't know whether Mr. Milton is going to want to testify, and I'm certainly not going to comment on it, but beyond him getting on the stand and telling us, well, this is what I mean by this word, this is what I mean by prototype, this is what I mean by built, I don't know that an expert should be allowed to give a definition of those terms that are contrary to what, as I sit here -- and maybe I'm wrong -- I understand those fairly common terms to mean.

MR. MUKASEY:  I think you're having the same reaction that most laypeople have, which is built means built.  In the car industry, design and built means on a computer.  And I think if I can get that from Nikola witnesses -- who, by the way, say that in 3500 material -- maybe I don't need an expert.

M987MILC1

If I cannot get it from them, because I still don't know who the government is really going to call in this case, the concept of how you design a truck is critical to our defense.

THE COURT:  Let me ask you this, Mr. Mukasey:  What about the hydrogen fuel technology?  Ms. Estes tells us that Professor Kurfess apparently does not appear to be an expert in this field.

Do you disagree?

MR. MUKASEY:  He is somebody who can educate the jury on this because he has enough experience to do it.

Now, I will say that a lot of the proposed testimony of Professor Kurfess anticipates the government saying this didn't happen, this couldn't happen, this was not real, that's not real.  We need to at least reserve a spot to tell the jury that hydrogen technology is real, and here's how you can produce power for a car through hydrogen, and here's the cost inputs that go into it, including electricity.  If the government is going to concede that, depending on the way they concede it, maybe he doesn't need to talk about that.

Does he have enough under *Daubert*?  Does he have enough education and experience to educate a lay juror who's used to getting in and driving a diesel car, or a gasoline-powered car?  More than enough.

THE COURT:  By the way, apropos of nothing, I listened with great interest this morning to today's *Daily* which is

M987MILC1

about electronic and hydrogen-powered cars, and how far we have to go to get to the place where they can be rolled out on a country-wide basis.

But in any event, here's where I'm leaning with respect to Professor Kurfess. I don't know, Mr. Estes, whether you believe that additional discovery is required with respect to (a) his qualifications and (b) his actual testimony, but I am leaning towards deferring on the decision to await what the government's evidence will be, and then we can revisit whether or not Mr. Kurfess's -- strictly speaking -- is necessary and, if so, whether we should hold a *Daubert* hearing to determine the scope of his testimony.

MR. MUKASEY: I think that's entirely fair, Judge.

I don't plan on opening with Professor Kurfess. And if we can get what we need, I'm not going to waste the Court's time with an expert for the sake of calling on expert. If there are holes that need to be filled in because we have raised factual issues that we think require his expertise, we'll raise it to the Court.

THE COURT: Okay. Next is Professor Ferrell who is proposed as an expert in economics. Professor Ferrell will testify to seven topics: Investment in the stock market generally, including its risks; event studies showing statistically significant movements in Nikola's stock prices; Nikola's stock prices not being artificially inflated; behavior

of retail and institutional investors; social media activity related to Milton, Nikola, and competitors; investments in VectoIQ as distinct from investments in Nikola; and the stock price movements after September 21, 2020, not being traceable to corrective disclosures.

Ms. Estes, let me begin by asking part of what your proposed expert will be talking about is the effect of social media on investors.  So why isn't at least part of what Professor Ferrell will be talking about, or is proposed for, why isn't that a fair response to your expert?

MS. ESTES:  Your Honor, with the Court's permission, Mr. Roos will handle this one.

THE COURT:  Very well.

MR. ROOS:  Yes, your Honor.  That's a fair question.

Just to be clear, with respect to Professor Ferrell, we really just have three issues.  We're not seeking to preclude, at least at this time, the entirety of the testimony.  It really goes to just three parts of the defense disclosure.

So to answer your Honor's question directly, our expert, Professor Mayzlin is going to testify about the effect social media has on investors.  We have no quarrel with Professor Ferrell giving similar-type testimony about the same subject.  He's also an economist.

Here are the issues, your Honor.  They're all really highlighted by the defense's disclosure letter, which was

M987MILC1

Government Exhibit A to the government's motions *in limine*. And I'm looking at page 7 of the defense letter. Let me just walk through the issues.

So, number one, in that letter, the defense says a company's -- that the proposed testimony, just to be clear, is going to be "a company's stock performance is volatile and it is, therefore, risky to invest in a company's stock."

THE COURT: I'm sorry, when you say "the company," you're referring to Nikola?

MR. ROOS: Well, I think that's our inference here that when he's talking about "a company's stock being volatile and, therefore, it is risky," he's only talking about one company here, because that's the company at issue at trial.

Our concern with that line of testimony is it gets very close to what has been precluded in many cases as unfair victim blaming, essentially. A broad testimony that it's risky that you invest in the stock market is the equivalent of saying these investors should have known better than to go into the stock market. We don't see the relevance of it.

So, issue number one is just precluding him from testifying that people investing in the stock market are essentially assuming the risk.

THE COURT: To that point, Mr. Roos, I mean, it's true that -- I don't know to the extent that it's common knowledge, but it's true that there are certainly investments that are

more risky than others.  There are more segments of the economy that are more risky than others, that are more volatile than others.  And when any one of us is provided with a 401(k) plan, we are given a buffet of choices, some of which can be very risky.  You can make a lot of money on those investments, but we can also lose all of that money.

So why is that so prejudicial?  I don't see that necessarily as victim blaming.

MR. ROOS:  So, your Honor, I certainly agree with your characterization of the stock market.  The issue is that this witness is going -- the purpose is to talk about the materiality issue in the case.  And the testimony about it being risky to invest really is the type of testimony that gets to the question of whether it's a reasonable reliance of the investors to follow the defendant's statements and buy the stock.  And while that reliance question may be appropriate in some cases, it's not proper under the law in assessing materiality in a criminal case.  The standard is different.

So, certainly, the general assumption -- I think everyone knows this -- about when you buy a stock, it could go up, it could go down, I don't know why you need an expert to testify about that.  It doesn't seem particularly relevant here.  But on this particular question of, these people should have known better, that seems like something that's really inappropriate on the materiality question.

M987MILC1

THE COURT:  You said there were several topics?

MR. ROOS:  Yes.  Thank you, your Honor.

So the second is -- I'm going to quote again; this is also from the same page in the disclosure letter -- "firm specific stock price movement is the most accepted measure of whether any public information about the company is deemed to be value relevance and knew by investors in the market."

THE COURT:  I'm sorry, what was that last part?

MR. ROOS:  I think it's a typo, but it says "and knew by investors in the market." I think it was probably supposed to be "known."  I'm not really sure what was intended here.

But here's the concern:  It sounds like that Professor Ferrell is going to testify that the best measure of materiality is firm specific stock price movement.  And as our motion indicates, on page 17, that's inappropriately basically having the expert instruct the jury about how to assess materiality.

The jury is the fact-finder here.  Your Honor gives the legal instructions.  They can decide, hearing all the witness testimony, what is material.  I think it's inappropriate for them to hear, hey, firm specific stock price movement via event study is the most accepted way of assessing materiality.

THE COURT:  Do you know -- and I'll ask them -- what does that mean, firm specific stock price movement?

MR. ROOS:  So it's their expert, but I'll give you at least my reading of this, which is their expert did an event study -- so a series of regressions -- and has determined certain days where he concluded there was statistically significant stock price movement, and other days where he determined that to the extent there was a stock price movement, it was not caused by something Nikola related.  It's caused by the market or whatever other reason.  The regression didn't yield a statistically significant number.

So I think what he's testifying to here -- and again, they should correct if it's wrong -- is that he's going to say that sort of event study is the, to use the language here, most accepted measure of whether any public information of the company is deemed to be value relevant.

THE COURT:  Strictly speaking, isn't that right?

MR. ROOS:  In a criminal case, I don't think so, your Honor.  That's not a legal instruction.

Typically, your Honor would give the standard instruction about materiality.  And we'll have, for instance, investors who will testify about whether or not particular statements were material.  Your Honor is correct that that event study methodology may be as widely accepted in the context of like a PSLRA case, a civil case.  It certainly shows up in some criminal cases, but because the materiality standard is different I think it's inappropriate to have the expert tell

M987MILC1

the jury, this is the best way.

I mean, we're just talking about sort of cabining his testimony at the margins here. He'll still be able to testify about the event study, it's just going to be for the jury to weigh that against the other materiality evidence they hear in the case.

THE COURT: Okay.

MR. ROOS: The third issue, your Honor, is really just a disclosure issue. So the disclosure issue relates to both probably their expert and also the arguments they made about our expert. Because since we filed these motions, a number of months have gone by. I'll tell you that they have given us slides for their expert. We've also given them slides. So I think maybe the motions may be a little bit outdated on the disclosure issue, so I'm just going to say that what our ask is here is, we have this multi-page disclosure letter that has a lot of detailed information. We have gotten their slides. There's no text on them. We haven't got a single note of any meeting, any discussion that would be required to be produced under 26.2.

THE COURT: Between counsel and the expert?

MR. ROOS: Exactly. So that's what our ask is. We think we're entitled to additional materials under 26.2. As far as we know, they haven't moved before your Honor to not disclose it. So unless somebody was just on the phone with

M987MILC1

this guy and sort of typed up this letter, it sort of seems like there should be additional materials here.

THE COURT:  Okay.  Mr. Mukasey, let's deal with the disclosure issue first.

MR. MUKASEY:  May I tag in Mr. Bondi for this, Judge?

THE COURT:  Absolutely.

MR. BONDI:  Your Honor, may it please the Court:

First of all, with respect to the disclosure issues, we've satisfied our Rule 26.2 obligations.  We've turned over everything.  My practice personally is I don't take notes when I meet with witnesses and experts, so I personally have no notes.  We've searched our files.  We've turned over all the information that we have.  We will go back and look again.  But as Mr. Roos accurately indicated, we've turned over a lot, your Honor.  We've turned over all the event studies that Professor Ferrell did.  We've turned over slides that we intend to use, even demonstrative slides, your Honor, even before we've needed to turn them over.

THE COURT:  What are demonstrative slides versus the slides that you will be using at trial?  I'm sorry.

MR. BONDI:  One and the same, your Honor.  Slides to aid the jury in terms of explaining his opinion.

Just going to the substance, your Honor.  Mr. Roos has it wrong in terms of what Professor Ferrell will testify.  First, let me say -- and we have a motion with respect to their

M987MILC1

expert -- their expert is not an economist. Their expert is a marketing professor who talks about consumer behavior. Professor Ferrell is an economist who talks about investing and investments. His testimony, your Honor, is vanilla expert testimony that's been accepted in multiple cases in this courtroom. He served as an expert in two different criminal cases, including one as an expert called by the government for this particular office, the Southern District of New York. He's been tendered and accepted as an expert.

Going back to that what Mr. Roos was alluding to in terms of disclosures, let me just explain it. The government has alleged that Mr. Milton's statements inflated the stock. How you show whether the stock was inflated or not is through an event study. They've also said that the stock was inflated. Therefore, when the true facts came known, the stock price went down. In economist speak, that's called corrective disclosure. How do you show if there's a corrective disclosure? An event study.

THE COURT: I guess, Mr. Bondi, what I heard Mr. Roos say is, look, he's an expert, he can testify about certain things, but these are the two things we're concerned about; one of them is victim blaming, and one of them is getting too close to the line of defining for the jury what materiality is. So why don't you talk about those two things.

MR. BONDI: Sure.

M987MILC1

With respect to alleged victim blaming, your Honor, there's not going to be any of that. We have no intent of eliciting any testimony from Professor Ferrell about specific actions of investors. What he talks about is the market and the market reaction, the impact on the stock price.

There are three areas where stock could move, your Honor. One is it could move along with the rest of the market. Market goes up ten percent today, stock of that company goes up ten percent. It moves along with the market.

The second way a stock could move is it could move specific firm information, which Mr. Roos alluded to in the second part. In other words, was there an announcement about the company that caused the stock to move? Or was it a statement by Mr. Milton that caused the stock to move? Again, that's shown through an event study.

The third possible way, your Honor, is through random volatility, that the stock just moves for no explained reason. Professor Ferrell's testimony is with respect to the movement of the stock analyzed through the normal tools of an event study that every economist uses. He's not going to go up and say, jury, you have to determine that this is material or not. What he's going to talk about is how the market reacted, how the stock moved, whether the stock moved in response to statements, or whether the stock didn't move in response to statements.

M987MILC1

Your Honor, what the government knows and what we've disclosed is in virtually every instance that the government claims there's a misstatement, the stock is flat.  There's no movement in the stock prices.  Okay.  He's not going to say, therefore, it is immaterial as a matter of law.  He's not going to go there.  His testimony is vanilla economist testimony that's been accepted in every court in this district, in this circuit, your Honor.

THE COURT:  Mr. Roos, what about that?

MR. ROOS:  Well, your Honor, I think I heard three things:

Number one, that there are no notes of any meetings;

Number two, that they are not going to blame victims for investing in the stock market; and

Number three, that they are not going to suggest that this is the best way for assessing materiality.

So with those assurances, I think those are our issues.  Of course, like, if the witness strays in the direction of either of those two things when he's on the stand, we're going to object.  But hearing defense counsel saying they're not going to go the two places we were concerned about, I think that's it.

THE COURT:  Very well.  Obviously, any appropriate objections during the testimony will be considered as they come up.

M987MILC1

So, with those assurances, or that clarification at least, the government's motion to preclude Professor Ferrell's testimony is denied.

The next issue is the advice of counsel defense. Mr. Mukasey, Mr. Bondi, what is your intention with respect to that?

MR. MUKASEY:  I think Mr. Caruso is going to handle this one, Judge, if that's okay.

THE COURT:  That's fine.  I'm happy to hear all of you.

MR. MUKASEY:  Spreading the wealth.

MR. CARUSO:  Good afternoon, your Honor.  Kenneth Caruso.

We are not running an advice of counsel defense.  We are running a lack of intent to defraud/good-faith defense.

The government's burden, of course, is to prove intent to defraud or to prove a lack of good faith.  The evidence will consist of communications to Mr. Milton or from Mr. Milton in seeking a response between Mr. Milton, and what I'd like to summarize as executives of Nikola, his colleagues, his professional colleagues, the general counsel, the chief financial officers, other people.  Those communications informed Mr. Milton's state of mind and will allow us to argue that he lacked criminal intent, intent to fraud.

Now, I really liked the government's argument on this,

and I'm going to adopt it.  The government said, "evidence tending to show that others within Nikola, including others with shared responsibility for the accuracy of investor communications, were aware of Mr. Milton's statements and did not raise objection to Mr. Milton may potentially be relevant."

Yeah, do you think?  May potentially be relevant?  I think they're directly relevant.

We're going to have evidence in this case that shows that the general counsel, the president, the CFO, and several others who I won't bother to mention, they shared responsibility with Mr. Milton for the accuracy of investor communications, they knew of or became aware of these published statements, which the government alleges are fraudulent, and they did not raise objections to Mr. Milton.  That informs his state of mind.  It impacted his state of mind.  It told him, I'm not crossing a line here.

Now, we rely on the Litvak case where this type of evidence, the district judge excluded it and the conviction was reversed because, as the Second Circuit put it, when Mr. Litvak did certain things, the supervisors -- in this case, they're not his supervisors, but they're his colleagues in the so-called C suite -- saw and approved it as standard operating procedure.  Such an inference would support the attempt to introduce a reasonable doubt as to the intent to defraud.  So, that's the basis for our position.

M987MILC1

And I just want to read one other -- I think this is one of the best examples, which is why I selected it. I call it the "walk the line," with all respect to Johnny Cash. There's an e-mail between Mr. Milton and the general counsel, and I'm sorry I don't have it at my fingertips to read to you, but the general counsel says, well, we're going to go public soon so we have to be very careful, extra careful. I'm paraphrasing. And Mr. Milton says with respect to a particular communication that the GC brings to his attention, I didn't think I crossed the line. Do you have any problem with that? The general counsel writes back, no, you walked the line very well. He walked the line. General counsel tells the defendant, no, you're okay on that, you walked the line. That informs his state of mind and it impacts, oh, okay I didn't go over the line, I'm allowed to say those things.

Similar evidence. Mr. Milton is on a podcast, he's on an interview. People come across and say, hey, Trevor, great job, you did a great job. Okay. All relevant to state of mind. We rely on the Litvak case. And the government has to prove a lack of good faith. All of this evidence impacts his state of mind as good faith.

MR. ROOS: Your Honor, I'm up again.

So on this, if they're not running an advice of counsel defense, then it implicates a lot of cases in which courts have restricted sort of attempts by the defense to,

M987MILC1

under the guise of good faith, do like a shadow advice of counsel defense.

Here's what we're concerned about here to put it in concrete terms; that there are going to be questions like "weren't lawyers around?"  "Didn't you talk to lawyers all the time?"  When a lawyer is testifying, "isn't it true you talked to Milton constantly?"  The idea being to give the jury a misimpression about there being a reliance on counsel when, in fact, that's not the defense, which is a particular legal defense, that they're advancing.

So, we have sort of two asks here.  Number one is that they not do that, and we'll object if they do.  And number two is, in footnote 4 of our brief, on page 25, we cite a few cases, Petit, Shea, and a few others, in which courts have given instructions saying, basically, the defense is not doing an advice of counsel, so don't believe there's an advice of counsel defense in this case, in so many terms.  So we may ask that, your Honor, depending on how it goes.

THE COURT:  Mr. Caruso, do you intend to propose a shadow defense of counsel defense?

MR. CARUSO:  No, no.  Our evidence is going to be much more direct than that.  We don't need that limited stuff.  We've got communications -- I'm repeating myself -- to and from Mr. Milton, "great job, Trevor."  "You walked the line very well."  That's what we're going to put it.  We're not even

M987MILC1

going near that sort of semi-defense.

THE COURT:  Okay.

MR. CARUSO:  So I think your Honor can be comfortable with that.  And I'm sure that if you're not with respect to a particular exhibit, you'll know what to do.

THE COURT:  Absolutely.

I think I have a table full of very experienced defense counsel that know how to walk the line.  And if it turns out that you get a little too close, we can give a limiting instruction.

So with that caveat, the government's motion to excludes advice of counsel defense is denied as moot, and we'll take the trial testimony as it comes.

The next motion is to exclude arguments that victims acted negligently or carelessly.  Do you intend to do that?

MR. CARUSO:  No, your Honor, that is not what we intend to do.  But -- we don't intend to do that.  And maybe I should just say that and shut up.  If you want to have an argument about the law of materiality, I'm sure we can do that later, but we're not going to blame the victims.  We don't have to blame the victims.  That's not the law of materiality on either 10(b)(5) or the Title 18 crimes.

THE COURT:  Okay.

MR. PODOLSKY:  We can defer the arguments of materiality to later if you'd like.  It sounds like the motion

should be granted that they should not be permitted to essentially blame the victims by asking the questions suggesting that the victims were careless or gullable, and that provides a defense. So it sounds like we agree on that.

MR. CARUSO: Your Honor, I'm sorry, but this is one on which I really think your Honor should wait to see the evidence, what the testimony of these victims is. We don't even know what they're going to say. The SEC filings are in the public domain. They're part of the so-called totally mixed use, a term of art from the case law.

THE COURT: We're going to get to that.

MR. CARUSO: Okay.

THE COURT: I think Mr. Podolsky's approach makes sense. I do think it will be inappropriate, as I think the defense acknowledges, to blame the victims here or to make arguments that the retail investors acted negligently or carelessly. So, the motion is granted. And again, if there are close questions, we can address them at the time of trial.

Mr. Mukasey.

MR. MUKASEY: I'm sorry, Judge. I just want to make sure that we're using the term "blaming the victims" in the same way between these tables and the Court.

It's our position that what an investor looked at, whether they looked at an SEC file, or they just invested because their brother-in-law told them to invest, or they

M987MILC1

invested from a telephone mobile application versus doing some sort of diligent research, is not blaming the victim.  I do not call that or mean to suggest that that's blaming the victim or waive our right to explore that.

There's another avenue for cross-examining investors. And Mr. Caruso is right, we don't know what the retail investors are going to say.  And we have very, very scant 3500 material from a number of investors whose reasons for investing are quite opaque.

THE COURT:  How many, do you know, will be testifying?

MR. MUKASEY:  I wish I knew.  I think there's at least two or three that have been identified that I would say for sure.

MS. ESTES:  Your Honor, I think we're expecting around four, maybe five at this point.

THE COURT:  Okay.

MR. MUKASEY:  But just with regard to blaming the victim, it's clearly relevant to the issue of materiality and total mix of information whether an investor had three beers and decided to invest versus read an SEC filing and decided to invest, or didn't read an SEC filing, or didn't avail him or herself with a total mix of information.

THE COURT:  Well, let me ask you this, Mr. Mukasey. Let's say a retail investor testifies and he or she says, "I've never heard of Nikola before I saw Mr. Milton on a podcast.  I

M987MILC1

was really excited by what he said and I decided to invest," period. That's the universe of facts that you have. Would you suggest to the jury that based on that, well, this person should have done some additional research, should have read the SEC files, taken any number of other steps in order for that retail investor to have behaved reasonably or rationally?

MR. MUKASEY: I don't want to open a giant materiality can of worms at this moment because I think it's going to depend how this all comes out. I agree with Mr. Podolsky on that. But I think what information was available and the reason that the investor invested goes both to materiality, the total mix of information out there, and their credibility. I mean, you can always attack their credibility.

THE COURT: Sure.

MR. MUKASEY: So I agree with Mr. Caruso, I think it may be sort of a game-time decision once you hear the direct examination as to why somebody invested. I think they're going to have people who say they read SEC filings and they're going to have people who say they didn't.

But with regard to our cross-examination, we're going to want to explore whether these people took a flyer because they heard something for ten seconds on the internet, or whether they knew they had access to the SEC filings, whether they read them, whether they availed themselves of other potential sources of information. We're talking about the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

objective reasonable investor.  That's the standard, not any
particular government witness, not the dumbest witness in the
market, or I think, as Litvak puts it, the least-educated
investor in the market, and not the most sophisticated Goldman
Sachs investor in the market.  The objective reasonable
investor is the standard.  And I think we need to explore
whether these people are reasonable investors.

MR. PODOLSKY:  Yeah, let's talk about a reasonable
investor.  From what I gather from what Mr. Mukasey said in his
papers, his view is a reasonable investor is somehow you take
all of the investors in the market, you take all very
sophisticated people working on Wall Street, maybe you take
some people who are more retail investors, and you come up with
an average, you maybe take the average IQ investor.  And that
is not what the phrase "reasonable investor" means.

We all know what the word "reasonable" means.  We use
it in this courtroom all the time.  It means someone who makes
a decision based on reason.  It's not the average investor.
It's not an investor with a sufficient IQ to be deemed
acceptable.  And it's not an appropriate argument, I submit,
for the defense to make that these people, this class of
investor don't count, they're not victimized because, in some
ways, they don't have the investor IQ of the average investor
as they perceive it.

The question maybe is "was it reasonable?"  Was it

reasonable to listen to what Mr. Milton said?  And on that, I want to emphasize one point.  As the Second Circuit made clear, the point of the materiality inquiry is not to decide that investors or victims of whatever fraud crime of a certain low IQ aren't counted as victims.  The point of the materiality inquiry is to ensure that the defendant is actually trying to defraud and to lie about something that matters.  So, it does not matter if a retail investor is sophisticated or unsophisticated.  It just matters if they are making those decisions based on reasons.

MR. MUKASEY:  What matters, I think, according to Litvak, Judge, is whether they're in the mainstream of investors in that market.  And many factors go into whether or not they're in the mainstream.  We're not attacking people for lack of intelligence and we're not praising people for extreme sophistication.

Are they in the mainstream of investors in that market is the question Litvak asks, and that's what we're allowed to explore.

MR. CARUSO:  Excuse me.  If I could just tag-team in one point.

Mr. Podolsky is mixing up two classes of crimes which they've charged in this indictment; 10(b)(5) on the one hand, and then there's a Title 18 crime on the other hand, and this issue of reasonable investor varies between the two.

M987MILC1

With respect to 10(b)(5), the objective reasonable investor goes to materiality. With respect to the Title 18 crimes, the question of whether the defendant's words were reasonably calculated to deceive persons of ordinary prudence and comprehension goes to defendant's state of mind and intent to defraud. They're very different. The government is the one that lumped together these two types of crimes in an indictment. And our job is to pull them apart, because the law is different on each set.

I just wanted to flag that for your Honor because materiality is a major issue here, and we're going to have to make these distinctions between the two titles that are at issue here.

THE COURT: Very well.

So, I want to be clear. The government's motion to exclude arguments that victims acted negligently or carelessly is granted. I do not pretend to find, however, that that issue is that easily settled. There will be tough questions that will be asked and should be asked by the defense. The government may take issue with a certain of those questions, and when they come up, we'll deal with them. But the ruling is that he should not make arguments that victims acted negligently or carelessly. Okay?

MR. CARUSO: Understood, Judge. Thank you.

THE COURT: The next issue is the government's motion

to exclude evidence, that Mr. Milton lacked intent to defraud because he believed victims would ultimately not suffer harm. My understanding is that the defense will not be making those arguments.

Do you want to confirm that for me, Mr. Mukasey or Mr. Bondi?

MR. MUKASEY:  Confirmed.

THE COURT:  In that event, that motion is denied as moot.

The next issue is the government's motion to exclude evidence about Nikola's product and technology development after September 2020, which is, as I understand it, when Mr. Milton resigned as -- I don't know if at the time he was CEO or executive chairman, but he left Nikola.

Ms. Estes.

MS. ESTES:  Yes, your Honor.

So on this one, it's actually sort of similar to the issues with Professor Kurfess in that the heart of Mr. Milton's misrepresentations were about the progress the company had made in the summer of 2020.

So he said they were producing hydrogen at $4 a kilogram in July 2020.  So what's relevant is the status of Nikola's technology at that point in time.

(Continued on next page)

M988MIL2

MS. ESTES:  Now, whether what the company is doing a year later, whether they are producing hydrogen then, whether they have any contracts for electricity then, things like that are irrelevant and they risk sort of turning things into a minitrial over what the company was doing a year later.  What matters is the progress of the company at the time in the statements.

THE COURT:  The defense makes the point, and I think it's a good one, that by superseding to add Count Four, which takes us through March 2021, the government has basically opened the door to post-September 2020 events.  What say you to that?

MS. ESTES:  Yes, your Honor.

So, after September 2020, although Mr. Milton made some statements and a deal with Mr. Hicks that we submit was intended to lull him into not reporting Mr. Milton's earlier misstatements to authorities, he was not, for example, in January 2021, saying today Nikola's hydrogen station is producing hydrogen.  So there is nothing about his statements in that later period that would call into relevance the status of Nikola's technology after he left the company.

THE COURT:  Ms. Young.

MS. YOUNG:  So the entire nature of Mr. Milton's statements are forward-looking.  He is often asked about his plans, the plans for the company, the timing of things in the

M988MIL2

future.  And he gives timelines, time frames, and he specified them.  So when something came to fruition after September 2020, that goes to Mr. Milton's state of mind, his good faith in terms of when things would occur.

In terms of opening the door with respect to Mr. Hicks, at that conference we were told that this was the same set of proof.  So the same set of proof then would include this time period.  The idea that there is no new statements, when they are extending the period through March 2021, and conversations and a transaction through that time period, means that that time period now is at issue.

THE COURT:  Let me ask, and I don't want to step on anyone's evidence, but what was the state of play with respect to the development of this technology in March of 2021 versus September of 2020?  As I understand it, and I don't know where I get this understanding from, it may very well be from the media, some of the stuff is working now.  So I get the government's point, but what was happening in March of 2021?

MS. ESTES:  Your Honor, I will confess we haven't fully explored that with our witnesses because we don't think it is entirely relevant.  But it's a little bit of a mixed bag. My understanding is they have hit some milestones.  For instance, I think there has been news reported that they obtained an electricity rate schedule with a utility in Arizona.  On the other hand, my understanding is they have

M988MIL2

still not produced hydrogen to this today.

THE COURT:  I guess it's difficult for me to see how this may play out in front of the jury in a vacuum.  So I am going to deny the government's motion at this time without prejudice to revisiting it and certainly to appropriate objections at the appropriate time.

The next issue is the government's motion to exclude good acts evidence.

Now, I was a little, not confused, but it was a particular motion that I have not seen before because typically the good acts motions that I see is the defendant ought not to be allowed to say that he spends all of his holidays in soup kitchens.  This is not that type of good acts evidence.  This is like evidence of statements he made during the relevant time period that doesn't comport with the government's theory.

What is it that you are trying to get at, Ms. Estes?

MS. ESTES:  Yes, your Honor.

So, the point of this motion here is, we don't believe the defense should be able to argue that because he was honest about certain things with respect to the company, that that means these lies about other subjects didn't matter here.

For example, the company had some trucks where they were getting closer to production, some battery electric trucks, and to the extent he is talking about those trucks, we don't think it's significant or he should be able to argue that

M988MIL2

just because he was honest there, it doesn't mean he didn't have an intent to defraud with respect to the other statements.

And I would say that the statements he lied about are the parts of the company that had not gotten as far along as he had hoped.  So it makes total sense that where the company had actually made some progress he was truthful.  What he is doing is filling in the holes; where the company is way behind where they are supposed to be, he lies and he says they are farther along.

MR. MUKASEY:  I am going to defer to Ms. Young.

MS. YOUNG:  Your Honor, it would be extraordinarily misleading to preclude evidence of Trevor's statements regarding Nikola technology when this case is about Trevor's statements regarding Nikola technology.  And, as you noted, this is not a bank robber passing by five banks that he didn't rob.  This is not character evidence or a witness that we are looking to put on for character evidence.

All we are trying to do here is point to evidence that goes to his state of mind and context for what information was available to investors.  And, as you say, the government is kind of parsing out statements in ways that create a warped impression of his interviews.  I mean, when he is asked, what are your plans for a hydrogen station and the roll-out of a network, and then they are moving to preclude about talking about a plan for a hydrogen network.  Or, what is the status of

your technology, and he has technology that's transferred from one vehicle to another vehicle, to preclude evidence of that other vehicle creates a very misleading impression for the jury.

THE COURT:  I think that to the extent the statements that the government is looking to exclude involve the very same type of technology, the very same types of products that the government is saying that he lied about, to the extent that is the case, the government's motion is denied.  While it's certainly the case that the government will apparently argue that very specific statements that he made about very specific products were false at the time that he made them, I think that Mr. Milton is entitled to say that he was aware of other product lines within the company that relied on the very same technology, and that those products were developing in the appropriate course.  I think he is entitled to do that.  I don't think the government actually would be prejudiced by that.  You still have your arguments to make.

Ms. Estes, you wanted to say something?

MS. ESTES:  I would just say that actually some of the examples Ms. Young gave are things that we have actually marked in our exhibits.  For instance, everything really related to the hydrogen stations, we have marked where he is talking about the plan to roll out 700 stations.  So we were not intending to parse it that thinly.

M988MIL2

One thing I did want to flag for your Honor is there are some statements he makes about things that are sort of more traditional, other good acts evidence.  For instance, he has given some stock options to employees, and I think he made some donations at the early times of the pandemic, and things like that in particular we think should be excluded.

THE COURT:  That's excluded.  That kind of traditional good acts evidence.

The next issue is the government's motion to admit evidence of Mr. Milton's compensation and purchases of property.

Defense team, this is garden-variety fraud trial stuff.  Why should I keep it out?

MR. BONDI:  Your Honor, this is a 403 situation here, because what they are trying to do here is equate wealth and property that's unrelated to the alleged misstatements here.  It's not a situation, your Honor, where it is garden-variety fraud, as your Honor suggests, where somebody makes a misstatement, obtains money, and buys property.  That's not what the government is alleging here.  They are trying to bring in and assert evidence relating to purchases of real estate that happened before the alleged misstatement, a purchase of property, like an airplane, before the alleged misstatements here, unrelated and untimed to the misstatements, your Honor.  So we think it's highly prejudicial.  To the extent there is

M988MIL2

any probative value, it's substantially outweighed by the prejudicial impact.

MR. ROOS:  I know the parties have competing motions on this same issue.  The government has two points.

The first is that direct evidence about compensation, like total stock holdings which go up as the stock price goes up, bonuses he gets as the stock price goes up, those are plainly relevant.  Equally relevant are how he spends the moneys.  So, for example, times he sells stock in 2020, a period where he is making misstatements, and then buys various forms of property is relevant to, as our motion says, to make clear to the jury that this isn't just an individual who is accruing stock or stock options, but has no plans to sort of capitalize on it.

I hear what Mr. Bondi is saying about the 403 issue. I think the simple remedy for that is we won't put in evidence of him buying property or other nice things before the 2020 period.

THE COURT:  I am going to --

MR. BONDI:  Your Honor, may I be heard?

THE COURT:  Sure.

MR. BONDI:  I think the devil is in the detail, your Honor.  It's really a period of when Nikola went public.  June 4 through when the time Mr. Milton left the company in September, that's the period in question here relating to the

M988MIL2

misstatements that Mr. Roos says Mr. Milton made to, quote unquote, retail investors here.  Sales of stock --

THE COURT:  Just so I am not lost here, Mr. Bondi, wasn't the fact of the merger known prior to June?

MR. BONDI:  It was announced in March, your Honor, and it was consummated in June of 2020.

But what the issue here is, Mr. Milton was locked up from selling stock between June 4 and through December 4, 2020.  He didn't sell stock during that period.  Any sales of stock that happened after Mr. Milton left the company are entirely irrelevant to this case.

So, when he sold stock after he left the company, still maybe in 2020, that shouldn't come in.  If he sold stock before Nikola went public, that shouldn't come in either, your Honor.  Because none of that is in connection with alleged misstatements concerning the purchase or sale of a security.  The alleged misstatements involved public securities to alleged retail investors, in other words, public company investors, between that June 4 to September 30.

So, as long as Mr. Roos doesn't stray from that June 4 and September 30 period, anything that happens during that period, whether he sold or not, could come in.  But as a factual matter, your Honor, he didn't sell during that time period.

MR. ROOS:  I think Mr. Bondi is cutting the time

M988MIL2

period a little too narrow.  As your Honor pointed out when you asked him a question, the government's theory is that he was pumping the stock price from the time the merger with the SPAC is announced, so in March.  And what I was saying is that there are sales of stock during that time period.  It's totally relevant and very probative to establish that he sold stock beginning in March onwards and how he used that money.

THE COURT:  What do you intend to tell the jury about how he used the money?

MR. ROOS:  I think we will keep it relatively barebones.  We will probably have somebody who is qualified to look at bank statements and say, you know, here is the JP Morgan record, it shows this sale of stock, this amount of money coming in, you know, ask the witness, how did he spend the money?  Well, it says this, this, and this on the statement.  And maybe we will have a few receipts or something.

THE COURT:  I think, as I indicated, this is garden-variety proof in fraud cases.  It's very relevant to the motive of pecuniary gain.  I do think that Mr. Bondi is cabining the time period a little bit too tightly because, arguably, it was allegedly Mr. Milton's plan to pump up the stock so that he will have access to money later that he could use to buy nice things.

So the government's motion is granted.  However, I will be aware of the 403 implications.  You can make your

M988MIL2

point, Mr. Roos, but make it and move on, and I will be listening very carefully.

MR. ROOS:  We won't bring the airplane into the courtroom, your Honor.

THE COURT:  Very good.

The next issue is the motion to admit statements about Nikola employees pursuant to Federal Rule of Evidence 801(d)(2)(D).

What do you intend to do in that regard?

MR. ROOS:  Your Honor, the government has marked several exhibits, which are e-mails and text messages amongst Nikola employees.  The defendant is on some of them; he is not on all of them.  And under 802, these statements are admissible as statements of the employees of the defendant.

So, for instance, two engineers talking about the status of their hydrogen production at that time, two engineers talking about the status of the pick-up truck.  That's admissible.

THE COURT:  Tell me about these engineers and where they stand in the organizational structure relative to Mr. Milton.

MR. ROOS:  So, Nikola obviously has grown since the defendant was there.  I think there's hundreds of employees now.  But on many of the projects we are talking about, it was a pretty small cast of characters, and I believe the witnesses

M988MIL2

will testify that they were pretty intimately connected to the defendant.

So, for instance, on the pick-up truck that you heard about earlier, there was a handful of people, a lead designer, lead engineer, a project manager, maybe somebody connected to the batteries. The defendant dealt directly with all of them. So, for instance, text messages between them, those employees, about the status of that pick-up truck, plainly admissible. Hydrogen, same thing. The defendant was dealing directly with individuals involved in the hydrogen aspects of the business. Text messages in real time -- by the way, we are talking about real time where the alleged statements are being made. I am not talking about a year later somebody's text message.

THE COURT: These were statements that were made directly between the employee and Mr. Milton.

MR. ROOS: Either between the employee and Mr. Milton, and I think there are -- I will say this is a threshold hearsay issue. There is obviously a number of other potential exceptions, like if not being offered for the truth, offered for state of mind. But either, yes, directly with Mr. Milton or between two of them.

So, for instance, if the engineer and the designer on the pick-up truck, or the guy who issues the invoices for purchasing, or signs the invoices for purchasing hydrogen with the guy who is in charge of hydrogen stations are

M988MIL2

communicating, those are all employee-agent statements that are admissible under 801.

THE COURT:  Mr. Caruso, assuming the recitation of facts by Mr. Roos is accurate, it would seem to fall precisely within the scope of the rule.

MR. CARUSO:  I don't think so, your Honor.  This is what we call the motion to admit water-cooler gossip.

Mr. Roos said that these people who wrote these communications were employees of the defendant.  That's nonsense, nonsense.  These people were employees of Nikola.  They weren't employees of Mr. Milton.  I doubt the government is going to try to pierce the corporate veil.  I don't think so.

The rule says:  A statement is not hearsay if the statement is offered against opposing party and was made by the party's agent or employee on a matter within the scope of the employment.

The government's position is well beyond the fringe of this rule.  Normally employee statements are admissible against the employer, here, Nikola.  Mr. Milton and these declarants were co-employees, merely co-employees, of Nikola.

THE COURT:  Was he a supervisor to them?

MR. CARUSO:  He was a supervisor.  But just because he is a supervisor doesn't mean that every statement that is made about him comes in.

M988MIL2

Again, I tried to pick out just one example.  Mr. Roos said that there were statements directly to Mr. Milton.  But let's take a look at Government Exhibit 44, water-cooler gossip.  This is between two engineers and back and forth.

"This whole Nikola Badger --

THE COURT:  Mr. Caruso, can you speak a little slower, please.

MR. CARUSO:  "This whole Nikola Badger marketing thing is coming across as so corny.  Trevor did it all on his own."  It's "all" with six L's after it.  "It's so sleazy."

"And how about those interior renderings?"  And there is an emoji of people laughing.  "We have become the Duck Dynasty selling soda pop machines."

Now, my younger colleagues tell me that Duck Dynasty is a TV program and the comparison between Nikola and Duck Dynasty is not exactly a compliment.  And the soda pop machine selling is a reference to Mr. Milton's desire to have a water dispenser in the vehicle.  They think that's a laughing thing.

"Mark is silent."  Mark is the president, Mr. Russell.  "He is part of the problem.  Mark and Ken need to speak up.  They need to grow a set."  I think we all know what that means.

So, this is water-cooler gossip.  How in the world does this amount to a statement by Mr. Milton's employee or agent in the course of the agency?  These are casual comments of the kind that employees make all the time, behind the back

M988MIL2

of the employer, to blow off steam.  That's what this is.  It's not the type of evidence that comes in under 801(d)(2)(D).

Now, Mr. Roos also talked about statements to Mr. Milton, which is Exhibit 44, which certainly is not.  But if they are statements to and from Mr. Milton, you have got a whole different hearsay issue.

THE COURT:  You have a whole different what?

MR. CARUSO:  Hearsay issue.  If it's a statement to or from Mr. Milton, then you have a statement of the party opponent and completeness.  That comes in.  That's got nothing to do with 801(d)(2)(D).  These are, as I said, water-cooler gossip.

I will finish in ten seconds.  The Second Circuit in the Zagen case said, The court has to examine each statement to determine whether the requisite relationship of agency existed and to make the statements admissible against the defendant in his individual capacity.

So, I am going to suggest, your Honor, in the strongest possible terms, that this motion be deferred because it really does depend upon an examination of each statement.

THE COURT:  OK.

Mr. Roos, did you want to respond?

MR. ROOS:  Yes, your Honor.

I think part of the argument there is actually conflating weight and relevancy issues with admissibility

issues under the hearsay rule.  I understood there are two arguments.

The first is that these are employees of Nikola, the company, not the defendant.  That argument is foreclosed by two Second Circuit cases.  The first is Zagen, in which the statements of the vice president were admitted against the president of the corporation.  The second is Rue -- both of these are on page 39 of our brief -- in which the statements in the sheriff's office were admitted against the defendant sheriff.  And the court had said in Zagen and in other decisions that, really, it depends on the relationship between the declarant and the defendant.  And, here, these employees were working directly with the defendant.

The second issue, as I understood it, were the fact that some of these comments made by employees on their job site, produced by their employer, are critical of the defendant.  And that argument is also foreclosed by a Second Circuit case Pompas.  In Pompas, and I will quote it, the court said, They need only relate to a matter within the scope of agency.  The authority granted in the agency relationship need not include authority to make damaging statements, but simply the authority to take action about which the statements relate.

And that's the key here.  Which is it doesn't matter if these employees in their comments were saying we think the water fountain in the pick-up truck is a silly idea.  What

M988MIL2

matters is that their agency relationship authorized them to take action on what the statements relate to, which is the pick-up truck.  So if these are employees who are working on the pick-up truck, their statements, whether positive or disparaging, are admissible under the hearsay rule.

THE COURT:  I think that the government has the better of the argument, because even if it is water-cooler gossip, it's water-cooler gossip about the product that is at issue here and not water-cooler gossip about, for example, Mr. Milton's personal life.  But, Mr. Caruso is correct that the better course would be to defer and to deal with these issues as they come up.  OK.  So that's what we will do.

I think we are done with the government's motions *in limine* and Mr. Milton's motions *in limine* now.  And the first issue is the motion to exclude testimony of Dina Mayzlin.

Do you still want to pursue that motion?

MS. YOUNG:  Yes, your Honor.

THE COURT:  Ms. Young.

MS. YOUNG:  Your Honor, unlike Professor Ferrell, Professor Mayzlin has not been qualified as an expert by any court.  And her proposed testimony for this case will shed no light on the matters at issue.  As noted by Mr. Bondi, her background is focused on marketing and management and consumers.  Mr. Milton is not charged with consumer fraud. This is a securities and wire fraud case.

M988MIL2

And to kind of talk about her actual proposed testimony, she is focused on Mr. Milton's social media presence and purported reactions by social media users.  The supposed science behind it involves counting, counting likes, counting followers, counting posts.  Apart from relevance, this is hardly substance that requires an expert.

Lastly, her analysis is wrought with reliability issues.  She conflates users, Twitter users, Reddit posters, with investors.  They are trying to wedge themselves into an expert for a securities and wire fraud case with a professor who is focused on consumers and marketing.

And keeping with Mr. Caruso's water-cooler theme, a lot of the conversations and communications that she counts are just these online threads that don't go to Mr. Milton's state of mind.  It's not direct correspondence with him.  It's just people out in the ether chatting.  It's wholly irrelevant, it's confusing, and, quite frankly, prejudicial.

So, for all of those reasons, and those in our papers that we set forth, we move to preclude her testimony.

THE COURT:  Let me ask you, Ms. Young.  You said she has never been qualified as an expert.  Has she ever been declined as an expert by a court?

MS. YOUNG:  Not to my knowledge.

MR. ROOS:  Your Honor, I think big picture, these are weight, not admissibility questions.  I will take each of them

M988MIL2

in turn.  Professor Mayzlin is a professor of marketing.  She has an economic training background.  She has a Ph.D.  She teaches at USC.  I think she is the dean of the school.

THE COURT:  Dean of the USC business school?

MR. ROOS:  I think it's the marketing school.  But her background is -- she has a degree from MIT and her background is in quantitative analysis of, in short, how people are influenced in making purchasing decisions.

There are all sorts of types of purchasing decisions in everyone's lives.  One thing people can be a consumer of is stock.  And for that reason, her papers on purchasing decisions, what influences people to buy, have been cited in economic papers about the decision to invest and the extent to which social media influences investor behavior.

So, given the highly permissive standard in terms of expert qualifications, I think she is plainly qualified as an expert, and her testimony can help individuals on the jury understand investor behavior in this case.

Let me give your Honor a little sense of what we are talking about in concrete terms.  Her assignment in this case is to look at the extent to which the defendant's comments on social media -- and that is like Twitter, in podcasts, television shows -- influence potential investors.  And, obviously, as we have heard, that is a core issue in this case in terms of materiality, the extent to which the defendant's

M988MIL2

tweets, or his statements on a podcast, influences investors as opposed to just idle Twitter chatter.

So, the expert has done a few different types of analysis, quantitative analysis.  One is a simple one, which is a measurement of Twitter activity by the defendant.  So the number of times he is tweeting, when he is tweeting, does it increase?  And, then, sort of a secondary analysis of influence.  So, how many people are re-tweeting?  How much is it spreading?  Then, she uses a series of more sophisticated forms of analyses to measure a broader influence.  So, are the things the defendant is tweeting showing up on other investor platforms?  She looks at three in total:  Number one is Twitter; number two, the WallStreetBets, sort of an area of Reddit, which has become very popular now --

THE COURT:  What is that called?

MR. ROOS:  WallStreetBets.

In the middle of COVID, this one particular sort of forum on the Reddit website, which is called WallStreetBets, like we are making a bet on Wall Street, became really popular among retail investors.  And both popular culture, the news, and academic literature has attributed stock activity to the WallStreetBets forum.  So, for instance, it was well-known that the GameStop stock, the AMC stock went up significantly, and people attributed that to this sort of retail investor behavior on the WallStreetBets area of Reddit.

M988MIL2

So, Professor Mayzlin --

THE COURT:  No one has used this phrase so far here. So, is it the government's theory that Nikola became a meme stock?

MR. ROOS:  We are not going to be arguing that, I think necessarily, because I am not sure it really matters in the scheme of the issues in dispute.  My guess is there probably are some retail investors who will testify who will say this was a meme stock.  It was certainly a popular stock among individuals who were on these forums.

So, given the two questions here, which is whether her testimony is relevant and whether she is qualified, I think she plainly is.  And really the objections Ms. Young raised are points for cross, like, you have never testified before as an expert; you typically look at consumers, you don't do event studies.  Isn't it true people go on Twitter for fun, not for investment decisions?  Those are all cross-examination points. Given the low threshold on qualifications, there is no reason to exclude the expert, especially when the defense expert sounds like he is going to be testifying to this also.

MR. MUKASEY:  Judge, may I be heard briefly on this? I am sorry to zigzag and jump around.

THE COURT:  Mr. Mukasey.

MR. MUKASEY:  I am going to be more blunt than Ms. Young.  This is junk science.  It's completely preposterous.

M988MIL2

This is a woman who counts tweets and counts likes and counts re-tweets.  First of all, like my 11-year-old nephew does that.

Second of all, if Mr. Milton puts something out on Twitter, and somebody else re-tweeted it, who re-tweeted it to some other person, to a fifth person, and it landed in stock tweets, or Reddit, and became the discussion in Reddit, what on earth does that have to do with whether or not Mr. Milton intended to defraud investors?  He put out a tweet very often to one individual.  He put out a tweet very often that was accompanied by a similar, if not identical company tweet.

THE COURT:  You can tweet to one person?

MR. MUKASEY:  Apparently we can, Judge.  You can tweet at somebody, I think is the way you call it.

But, once he puts out a tweet, what the rest of the Twitter verse does with it, and where it goes and how it gets moved around within some chat group, it has nothing to do with Mr. Milton's intent.  If you put out a tweet and said something about a decision and it went to some Twitter group, or some stock tweets, or some Reddit group, and somebody did something crazy, that shouldn't come back on you.  It's so removed from the issues in the case, and so almost unsophisticated, that at least a *Daubert* hearing should be required here.

MR. ROOS:  I was just going to say I think maybe incorrectly two issues are being conflated, which is Milton's intent and materiality.  This is all going to whether, under

M988MIL2

the materiality standard, his social media statements could influence investors.  The government's allegation in the case is that the defendant targeted retail investors, used social media for that purpose, and so, it's a pretty essential question about whether or not his social media statements were actually influencing or have the potential to influence investors.

Candidly, I think Mr. Mukasey is downplaying sort of what is required in terms of figuring out raw Twitter numbers.  It's not as easy as I thought it would be.  But, in any event, it sounds like they have a great cross-examination outline for her, which is, Isn't it so easy?  Doesn't the fact that he tweeted a bunch not prove anything?  This is not something that requires a *Daubert* hearing.  To the extent that her methodology is not sophisticated, then there is no reason we need to do a probing inquiry and hearing.

MR. MUKASEY:  He is killing his own argument.  There is a gatekeeping function here.

THE COURT:  This is where I come out.  I will allow her to testify, but I think there is a demography here, if not anything else, Mr. Mukasey.  My gut tells me that, what is this all about, this tweeting stuff?  But my guess is, based on my knowledge of venires that I see in this courthouse, is that there will be many people of my demography in the venire, and probably on the jury, and like me, they may not appreciate the

M988MIL2

power of these tweets.  We need only look back two years in our nation's history to appreciate the power of a particular individual tweeting.  And while you may argue that Mr. Milton tweeting at an individual does not speak to his intent, I don't know that that's the case.  I don't know that he doesn't understand, like perhaps I don't understand, the power of what that tweet can do.  He may have done so very intentionally with the knowledge of what that tweet can do.  Therefore, I think that the jury may benefit from an analysis of what this newfangled social media environment is capable of producing.

MR. MUKASEY:  I think we are going to ask you to take a good look at the slides that have been proposed by the government, because she proposes 25 or 30 slides.  The language is very characterizing, it's very slanted, in terms of how she describes what she is looking at.  She runs comparisons between Mr. Milton and a bunch of other CEOs that I just don't see the relevance of.

THE COURT:  She runs an analysis?

MR. MUKASEY:  An analysis, comparisons, between how often Mr. Milton tweets versus how often other CEOs tweet, which I think couldn't be more irrelevant.  I think if not a *Daubert* hearing, at least some attention paid to what she is going to put in on direct before she testifies.

THE COURT:  If you have specific objections to specific slides, I am happy to entertain your objections.

M988MIL2

MR. MUKASEY:  Thank you, your Honor.

MR. ROOS:  Let me just say she is not the first witness.  We did produce slides as *Jencks* Act material.  But things like, if they have got an issue of a particular header on a page of the slides, I am happy to take a call from Mr. Mukasey and we can maybe tweak the language on the slide, if that's really what the issue is.

THE COURT:  Sure.

The next motion is the motion to admit VectoIQ and Nikola SEC filings as part of the total mix of information.

Do I understand the government's objection to that to be a complete objection to any SEC filings or any portions of any SEC filings coming in?

MR. PODOLSKY:  No, your Honor.  The objection is to the motion that we read, which is to ask the Court to admit in advance of trial wholesale every SEC filing that has been issued by VectoIQ or Nikola.  Frankly, I think the same arguments were made with respect to Milton's statements.  The point we are making is not to preclude any of them.  It's simply not to admit wholesale without any identification by the defense of the relevance before we can even see them.

Just saying total mix of information doesn't render every word that's been published on EDGAR or out there on the internet relevant.  We are certainly open and likely will not object to much of the SEC filings.  We simply don't think it

M988MIL2

would be appropriate, without any identification, to simply say the defense can put in whatever they like as long as they label it total mix of information.

MR. BONDI:  First of all, we intend to offer as evidence these SEC filings as business records.  They are admissible under 803(6).  There have been tons of case law on this, your Honor.  *SEC v. Jasper* out of the Ninth Circuit; Judge Cote's decision in this court in *In re WorldCom*; *Miller v. MetLife*, Judge Torres, just a few years ago here.

SEC filings are admitted to show the total mix of information available.  The standard for materiality, your Honor, that the Supreme Court outlined in *TSC Industries v. Northway*, that the SEC has on their website and the government even has in their brief, is, is the information relevant to materiality?  And the standard is there must be a substantial likelihood that the disclosure of the fact would be viewed by the reasonable investor -- it doesn't say retail investor -- as having significantly altered the total mix of information made available?

Now, your Honor, the government proposed a jury instruction, and the title of that instruction, number 5, says "false statements and omissions."  And it says, "A statement may be false if it contains half-truths or it conceals material facts."

What we propose, your Honor, is to introduce into

M988MIL2

evidence the SEC filings of the companies during the indictment period -- not before, not after, your Honor -- that deal with the same issues, your Honor, that the government says Mr. Milton made misstatements about, about hydrogen production, about the technology.  That information, your Honor, goes to the total mix of information made available.  It doesn't mean that the investor has to have read the information, just that it's available.

And that goes specifically, really, to two questions, too, your Honor, that are very important here.  So I want to pause on this.  It goes not only to materiality, because it goes to the total mix of information available, but it also goes, your Honor, to Mr. Milton's good faith and state of mind, and defeats any alleged intent to defraud.  If Mr. Milton tweets something that the government says is a half-truth, in whatever limited space that the Twitter world allows, and he knows that there is an SEC filing that came out the day before that explains all the rest of that stuff, and is available for investors, that goes to his state of mind.  He doesn't have to regurgitate every bit of that SEC filing to say here is everything that goes into that, or all of the risk factors, or all of the details about the partnerships with companies to develop the technology.  Whatever he describes about that SEC filing, the filing should come in.

It goes to the total mix.  It goes to the state of

M988MIL2

mind, your Honor.  We are not talking about just wholesale, and we don't want to pollute the jury with an avalanche of information.  What we are talking about is limited filings, during a limited time period, that deal with the exact same subject matters that the government contends Mr. Milton made misstatements about, that were available to investors.  It goes to materiality.  It goes to state of mind.

THE COURT:  Here is my concern.  Largely, I agree that it's part of the total mix.  My concern is a very, very practical one.  What exactly will you put before the jury?  What exactly will you argue before the jury?  If you're going to put in a 300-page prospectus and then read it from beginning to end and say here is a total mix of information, I am not going to let you do that.  So why don't you tell me what you want to do.

MR. BONDI:  Your Honor, my colleague, Mr. Mukasey, will get into the types of arguments we will make, but I can assure you we are not planning to read the total prospectus.  It will put all of us to sleep if we read the whole prospectus here.  But there are excerpts of a prospectus, there are excerpts of statements that are in the 10-Qs, that describe what Nikola was doing, that describes the technologies, that puts context around the statements that Mr. Milton said that were available to investors.

Mr. Mukasey.

M988MIL2

MR. MUKASEY:  Judge, I am going to be as economical as humanly possible because I fall asleep reading these things. But there are certain subject matters -- the Badger pick-up truck, the production of hydrogen, the Nikola technology -- that are squarely addressed in these.  I might read them.  I might put them up on a screen just to paragraph.

And there are risk factors for investing in Nikola. Some of those risk factors go on for pages and pages and pages. If I say to the witness, you understand that this risk factor was there and that risk factor was there, the CFO is on the stand or the general counsel, or maybe a retail investor, I am not going to read the whole thing to them.  I am going to pick out parts that I think have to do with the alleged misstatements and the disclosed risks.  And there may be a piece here and there that I would either read to the jury or excerpt for the jury on a screen, but you can rest assured I am not going to read 300 pages to the jury.

THE COURT:  I think we can discuss this issue and the issue of the podcasts and the interview together because I think they are very related in terms of the evidentiary issues and the practical issues.

I am inclined to allow this information, obviously subject to whatever particular excerpt they want to highlight for the jury, whether the government believes it is a fair response or would help to put the statements that the

M988MIL2

government is highlighting in appropriate context.  In any number of cases, very voluminous information is put before juries.  It's not all read to juries, obviously.  It's available to them if they wish to look at it.  But I am not going to prevent the admission of these documents.

How many documents are we talking about, how many pages total?

MR. MUKASEY:  With respect to the filings, Judge?

THE COURT:  Yes.

MR. MUKASEY:  There are, I think, dozens of filings.  However, in the interest of efficiency and economy, I think there are five or six that we would talk about and three or four that we would read excerpts from.

One of the issues, and it will help move the trial along, the same risk factors essentially are disclosed in every filing, so you really don't have to go through every one of them.  We are going to try to cover the time period.  So there will be a filing in March that I think we are interested in, a filing in July, and maybe two 10-Qs during that period, during the indictment period.  So it's really not a lot, and I will avoid repetition at all costs.

MR. PODOLSKY:  May I be heard on this?

THE COURT:  Sure.

MR. PODOLSKY:  I want to make sure we are framing the issue in a way that is helpful to the Court and for trial.  I

M988MIL2

want to be clear, the motion that the defense filed was to admit these, whatever, 12 or 24 filings in their entirety, without identifying what is relevant in any of them.  Many of them are hundreds of pages.  The risk factors, that is a very short and specific portion of this.  And I have to tell you, we likely will have no objection to that.  We may put those in ourselves.  The purpose of our opposition is we would like the defense to simply tell us what portions are relevant and what could be admitted.  We object to the notion they are just going to on day one admit thousands of pages of filings and we won't know the relevance.  We are happy and frankly will not likely object to much of this if they could just identify the portions of exhibits.

MR. MUKASEY:  If we can agree that the filing themselves are admissible, we will designate for you what we would like to show the jury.

MR. PODOLSKY:  I am sure your Honor has seen them. They are extensive and voluminous.  There are portions that may be relevant.  There are also hundreds of pages that have nothing to do with anything.  And I don't think it would be appropriate for the defense to say, well, we have some interest in some of this, so we are not going to tell you how we are going to use it at the end of the trial, just admit it.  We have to make a relevance determination of everything that is being offered.

M988MIL2

THE COURT:  Again, the filings are presumptively admissible, subject to the portions that Mr. Mukasey and his team will tell you about and discuss with me prior to presenting it to the jury.

MR. PODOLSKY:  That's all we want, your Honor, an understanding of what they actually intend offer into evidence.

MR. MUKASEY:  Fair enough.

THE COURT:  In my mind, the same applies to the motion concerning the entirety of the interviews, podcasts, etc.

MR. PODOLSKY:  Exactly.  We have proposed some designations for which portions we think are relevant, and I think there are many they would suggest we would not object to.

THE COURT:  I assume you weren't planning on playing every interview in its entirety to the jury.

MR. MUKASEY:  No.  We would like to get out of here before January.  But I will say this, Judge.  The government has alleged an ongoing, long-running scheme.  It encompasses all the statements that they have identified for us that Mr. Milton makes.  Within a particular podcast, we cannot necessarily identify the counterdesignation.  We can't play Whac-A-Mole, tit for tat, within every podcast.

So, Mr. Milton might say something on a Monday podcast, and we may want to designate something he said on Tuesday as the fair, complete version of that.  The rule contemplates that.  We just can't necessarily cabin it to,

M988MIL2

well, he said this at one section of the podcast and he said something else at another part of the podcast.  We view this more globally, and if they are going to put in a particular statement in a podcast, there may be another statement that Mr. Milton made, at that time or another time, that must be admitted to fairly balance out their statement.

THE COURT:  Well, I have to tell you, that stretches my idea of what it means to include information in order to properly put into context information provided by the government.  I don't know that there is the support for the idea that if Mr. Milton says something on Tuesday in a podcast, and then says something slightly different on the Thursday in another podcast, that that Thursday statement ought to come in in fairness.  I don't know that there is authority for that. They may be, but new to me.  In any event, it just sort of highlights the issue that they are presumptively admissible, but we will have to take each excerpt, each segment, as it comes up.  OK?

MR. BONDI:  Understood, your Honor.

THE COURT:  The next issue involves a motion to allow testimony concerning Britton Worthen's communications related to any statements allegedly made by Milton.  As the parties may be aware, I issued an order this morning concerning Mr. Worthen, and for the reasons set forth therein, that motion is denied.

The next issue is Mr. Milton's motion to exclude evidence of allegations made outside of the indictment period.

What is it that you are looking to avoid?

MR. BONDI:  Thank you, your Honor.

Your Honor, these statements are clearly not part of the charged conduct.  They are not in connection with the purchase or sale of the security.  And the government has expressly acknowledged they are not charging Mr. Milton for any of the pre-November 2019 activity.  Yet, the government intends or has indicated that they intend to indicate five categories of evidence under either 401 or 404(b)(2).  I want to go through these categories, your Honor, because the devil is really in the detail here, three of these categories here. Number one, Mr. Milton's alleged statements in 2016 about national gas wells.  Number two, his alleged misstatements in February 2019 about solar panels.  And three, loans made in 2015 to Nikola by Mr. Milton and his father.

I want to go through each of these categories because I think you will see that they are far, far afield from the charged conduct in here.

Let's first take up the gas wells here.  The alleged statements about gas wells in 2016 were made before Nikola changed its business model in 2016 to focus on hydrogen fuel. Previously, in 2015 and part of 2016, Nikola set out to make trucks powered by national gas turbines.  In 2016, four years

M988MIL2

before Nikola went public, they pivoted to hydrogen fuel cells.

MR. PODOLSKY:  Your Honor --

MR. BONDI:  Let me finish, your Honor.

THE COURT:  I think he may be shortcutting you.

MR. PODOLSKY:  Respectfully, I am not trying to interrupt opposing counsel.  On footnote 5 of our opposition, we made clear we do not intend to affirmatively offer evidence of those three categories, absent defendant testifying and putting his credibility at issue.  So I don't think this is going to be an issue in the government's case.

MR. BONDI:  Regardless of whether he testifies or not, they shouldn't come in.  They have nothing to do with the charged conduct.

THE COURT:  If he takes the stand, then presumably he can conceivably open the door to that.

MR. BONDI:  I agree if he opens the door and starts talking about gas wells or what he said in a private conversation about solar panels.  And, your Honor, I just want to put a footnote on that because we have serious authenticity questions about this secretly taped conversation about solar panels on the roof to some policymakers in California in 2019.  But only if, your Honor, he were to open the door, should these even come close to being introduced to the jury.  It is just propensity evidence and magnitude there, which is prohibited under *Old Chief*.

M988MIL2

Your Honor, I want to move or pivot, for lack of a better word, to the two other categories of evidence here.  One relates to the December 2016 statements relating to the functionality of a Nikola One prototype at an unveiling in 2016.  So to set the stage, your Honor, this is four years before Nikola goes public.  They do an unveiling of a Nikola One prototype truck.

The second issue deals with a Phillips commercial that Nikola then posted to a Twitter account and a podcast, and that's the infamous truck rolling down the hill one.

So, let's take these up first here, your Honor, first thing's first.

In 2020, in the indictment period, Mr. Milton is not alleged to say anything about the 2017 Phillips commercial. And that was a commercial, your Honor, that Phillips Industries shot, and they used the Nikola One prototype and they rolled it down a hill in the commercial.  And then Nikola posted it to its Twitter account and its Facebook account with the caption, "Behold the Nikola One in motion."

Your Honor, you have mentioned media, and I will tell you, one of the biggest questions I get from one of my five children, from friends, from people in the legal profession, is they say, Oh, you're going to trial about that truck rolling down the hill.  But nowhere in the indictment are they accusing a crime relating to this truck rolling down the hill.  OK.

M988MIL2

This is prejudicial through the roof.  The Second Circuit, your Honor, very recently in *United States v. Zhong* vacated a conviction where the government introduced, quote, evidence of uncharged crimes describing conduct that was significantly more sensational and disturbing than the charged crimes.  That's exactly what this is, your Honor.  They love the Nikola One rolling down the hill video because they want the jury to convict on that even though it is not charged conduct in the indictment.

THE COURT:  I don't know what that seventh circuit case is about.

MR. BONDI:  Second Circuit, your Honor.  *United States v. Zhong*, 26 F.4th 536, Second Circuit 2022.  And I can go into the facts, your Honor, if you would like.  But the fact of the matter is, if you have conduct that's 404(b) type conduct that the government tries to introduce, that just overshadows the conduct in the indictment here, that conduct can't come in.  It is just unfairly prejudicial under 403.

THE COURT:  I guess what I am trying to say is that that conduct is not more serious than the conduct that's alleged in the indictment.  The conduct that's alleged in the indictment is that Mr. Milton made statements to the effect that this technology and this product was fully functional and ready to go, and the commercial, again, portrayed the message that this product was fully functional and ready to go.  So I

M988MIL2

don't see how it's more prejudicial than the charges in the indictment.

(Continued on next page)

M987MILC3

MR. BONDI:  Respectfully, your Honor, I would disagree, and I think that even a review of any of the media around this case all --

THE COURT:  I understand that the media likes it more.

MR. BONDI:  All focus is around that, and that's why the government has inserted that into the case.  And your Honor, it has nothing to do with the statements in the indictment.  Okay.  It does not.  He does not refer back to that commercial by Phillips at all anywhere the government has alleged.  He doesn't refer back to it.  He doesn't say: Remember the truck driving down the road in the Phillips commercial?  He doesn't.  That is not part of this case.  But they want to bring it in because they want to inflame the jury.

And this goes -- your Honor, this is not a case about a truck rolling down the hill.  It's about statements that he made regarding the Badger pickup truck—that's a totally different vehicle—about hydrogen production, and about component parts that Nikola developed, Nikola Technology.

By the time Nikola went public, your Honor, they had a functioning semi truck that had done real tests, had driven on the road, had done beer deliveries for Anheuser-Busch.  That Nikola One was, using an analogy, way far in the rearview mirror here.  It had nothing to do with anything that investors were getting in 2020.  This cannot come in the case, your Honor, or it is going to be a sideshow circus about something

M987MILC3

that's irrelevant to the charges here.

THE COURT:  As I understand the government's argument——and we'll get to them in a minute——it's at least relevant because Mr. Milton reaffirmed the message during the indictment period that this was a fully functional and ready-to-go product.

MR. BONDI:  No, your Honor, he did not.  What the government has alleged is that he reaffirmed the statements in 2016 about the truck, okay, at the reveal.  The commercial, nothing to do with it.  He didn't reference the commercial.  He didn't say, Look at that commercial.  It has nothing to do with anything.  And that, your Honor, is the crux of this.  They are trying to shoehorn this in, respectfully, your Honor, into 2020, and there's nothing in 2020 about trucks rolling down the hill or him talking about trucks rolling down the hill or anything like that here.

THE COURT:  So you're not objecting to testimony concerning the unveiling?

MR. BONDI:  What I am -- your Honor, what we are objecting to is the total picture of the unveiling.  Statements that he made in 2020 --

THE COURT:  What do you mean "the total picture"?

MR. BONDI:  Fair enough, your Honor.  Statements that he made in 2020 are fair game.  We're not objecting to statements that he made in 2020 during the indictment period.

M987MILC3

We understand that.

So statements he made in 2020, let me get into some specifics here. He makes statements in 2020, or allegedly makes statements in 2020, about the Nikola One prototype was not operating on its own power. He acknowledged that. Okay? He indicates other reasons why Nikola One, the Nikola One in 2016, at the unveiling, was not driven. Those sorts of statements, your Honor, the government has designated, we understand that they're going to play those statements or try to introduce them to the jury. Understand. But that doesn't open the door wholesale to talking about a 2016 event and other statements that he made in 2016 that were not repeated or not reasserted in 2020.

THE COURT: Okay. Let me turn to the government. But before I do, it's 5 o'clock. We've been going to two hours. I'm happy to continue going, but if anyone needs a break I'm happy to break for five minutes, but I'm good.

MR. BONDI: I think we're good, your Honor. Thank you.

THE COURT: Very well. Mr. Podolsky.

MR. PODOLSKY: Let me try to kick through some of the points that were made here.

One I'll respond to quickly because it's not really at issue today, but there was a suggestion about Mr. Milton if he testified would have to open the door to particular other

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M987MILC3

things, and I just put a marker down.  By testifying, you put your credibility at issue.  That always opens the door to other instances of lack of truthfulness, so I just want to be absolutely clear about that.

Let me go to the 2016 issues.

Mr. Bondi has said repeatedly -- he has sort of described this, I think he said this is 404(b), it's more prejudicial.  But let's actually be precise.  All of these facts are alleged in the indictment.  They're all alleged in the indictment.  They are part of the criminal conduct.

This entire company started with a big unveiling by Mr. Milton where he claimed that this truck fully functioned.  It was false, completely false.  That's what the evidence will show.

He then reaffirmed this idea about a year or so later with Mr. Bondi calls it a Phillips commercial.  It's true.  This video footage was taken in the context of Phillips commercial.  The commercial itself shows this truck, the Nikola One, kind of like just coming up to a stop sign.  What Mr. Milton did, though, is he took that footage, combined it, made it look like the truck was driving through the landscape, ask then posted it to Twitter, saying, Look at the Nikola One in motion.  So this isn't a matter of the company Phillips putting up this video; this is Mr. Milton.

Then in 2020——and we point this out in our motion and

M987MILC3

it's clearly alleged in our indictment—Mr. Milton emphasized this incredible early success of Nikola as a badge of the fact that Nikola could do great things.  From -- I think it's actually in some of the SEC filings, he talks about this success that they had, they made this truck, and I will tell you this video of the truck rolling down the hill, it's actually played on a website of Nikola during this time period. It is shown on Fox behind him when he's interviewed.

THE COURT:  I'm sorry, it's shown?

MR. PODOLSKY:  It is shown on Fox Television behind him when he is interviewed.  So it's not like this is totally irrelevant and has nothing to do with what he's saying at this time.

He then is actually, in June of 2020 -- it's actually put it him:  This truck didn't work, did it?  And instead of saying, you know what, you're right, not a functioning truck, I want to be clear about that, he lied.  He lied.  He said, well, we never drove it under -- at the unveiling, it wasn't driven under its own power, but fully functioned was essentially the message, and at trial we will get into all of that.

The point I'm trying to make is, every single one of these facts is alleged in the indictment and part of the crime that that's alleged.  So to suggest that this is only coming under 404(b) is just wrong.  That's number one.  These facts are absolutely necessary for the government to prove the

charges that were returned by the grand jury.

Second, even under 404(b), even if there were an analysis of probative value versus prejudicial impact, and I should say unfair prejudicial impact, your Honor is exactly right; all of these facts, these videos, are of exactly the same nature as what's going to come in that were recorded or transpired in 2020.  They're of the same, the exact same character.  And it's true; you can tell the defense does not want this to come in because it is probative, it is highly probative of what the defendant did.  But that doesn't mean it should be excluded.

And I think on this point it is salient to note I believe the case that Mr. Bondi is referring to, the *Zhong* case, is a case about I think slave labor and physical abuse and that the actual charges of conviction related to like I think more of immigration crime.

So we're not talking about a case where we've charged Mr. Milton with, I don't know, an isolated false statement on a government form and then we want to bring in evidence of him abusing someone.  I mean, this is just not a relevant analogy to me.  This is the same type of evidence that the government will offer in this case, and it is directly probative of the issues that the jury will have to decide.

THE COURT:  The motion to exclude these statements concerning the unveiling in 2016 and the commercial is denied.

I do find that it is direct evidence of the charges that are contained in the indictment, it was part and parcel of the original indictment, and I do not believe that it is unduly prejudicial. As I've indicated, it is of the same nature of the wire fraud charges that are alleged to have been committed in 2020, and accordingly that motion is denied.

The next issue is to exclude irrelevant and unfairly prejudicial evidence of Mr. Milton's sale of Nikola shares. My understanding is that the government has responded that it will not offer such evidence. Is that correct, Mr. Roos?

MR. ROOS: Yes, your Honor. I think there are four parts of this, and I think your Honor is going to go through the next three, but if it is helpful, I can just sort of tick through our positions on them to narrow the issues here.

THE COURT: Please.

MR. ROOS: So your Honor is correct that we -- of course if a defendant testifies something different could happen, but we are not on our direct case intending to offer evidence of the post 2020 stock sales.

The second issue in the motion was Nikola's share price. I think, as our papers and their papers reference, the share price was a lot higher in 2020 than it is now. I do want to caveat something that was -- you know, our brief said sort of one thing. A superseding indictment was then returned. We said initially we weren't going to offer evidence about share

M987MILC3

price after September 21, 2020, because that was the period covered by the original indictment.  The new indictment as it relates to Mr. Hicks concerns the exercise of the options he was given in later 2020, and so the government does intend to introduce evidence relating to the stock price only with respect to Mr. Hicks to explain like why these options had become worthless and what the government has alleged is a subsequent lulling conduct.  So I do want to put that marker down, but I want to make clear that, besides that, our position hasn't change.

Now, in terms of our position, there was one other caveat within our position, which was that if the defense calls their expert and their expert testifies about, you know, sort of from a quantitative standpoint these materiality issues where we think it's relevant to cross-examine him about the stock price since then, it's a permissible line of cross relating to correct disclosures, I don't think, frankly, your Honor needs to wade into that now.  If it's still an issue and they intend to call Professor Ferrell in the defense case, we could always address it with them.  But with those two caveats, the government is not intending to get into the stock share price post the period the defendant is out of the company.

The third issue was the wealth question that your Honor ruled on, and the fourth issue relates to COVID, and on that one it's probably just better to let the defense argue it,

M987MILC3

and I'll respond.

THE COURT:  Okay.

MR. BONDI:  Your Honor, this case has nothing do with COVID.  You know, we're reminded unfortunately every day, and hopefully the Nuremberg boxes are removed, I hope, by the time we get to trial.  But this isn't about Mr. Milton preying on COVID victims or during COVID or anything like that, and that sort of nonsense, your Honor, shouldn't be part of the case.  It's extremely prejudicial, and to the extent that they want to try to interject that, we have a serious problem with that, your Honor.

MR. ROOS:  So on that, your Honor, maybe there's no issue here.  The government's obviously not going to allege that Mr. Milton gave anyone COVID or, you know, like capitalized on the pandemic.  The reality is, many of these people in 2020 were working from home.  They either were -- you know, they never were working or, because of the jobs they had, they were at home instead of at work.  And I think it's possible on direct examination that some of these people may say, I was sitting at home, I became interested in Robinhood because I was bored, and I wasn't working, and so then I started reading the internet, and I started investing.  So in that sense, I think it's impossible to sanitize COVID from the trial and our memories and everything, but I certainly don't think we're going to be trying to introduce the fact of COVID

in some way that would try to prejudice the defendant or imply that he was, like, preying on people who had COVID or anything.

THE COURT:  No.  I think, and I'll let them speak, but I think the concern is that you would attempt to prejudice Mr. Milton by suggesting not that he was preying on people with COVID, but that people were particularly vulnerable during this period of time and he knew that and he exploited that.  So is any part of your argument going to be along those lines?

MR. ROOS:  I think we will say that during the peak period people -- I think witnesses will say that during this period they were at home and became interested in investing.  I don't think anybody is testifying—and my colleagues will jump in—that they were particularly vulnerable to being defrauded because they had COVID or because the pandemic was going on. It's more just their circumstances.  They were at home.  But I don't even think anybody is going to say, like, Because I was apartment home, I was more susceptible to being defrauded. It's just going to be narrating, I got interested in investing because I was not working on a construction site or whatever. And certainly in our jury addresses we're not going to argue, like, Bob Smith was suffering from COVID and the defendant seized on that moment to --

THE COURT:  No, no, no.  Again, I don't think that the concern is that anyone had COVID and for that reason invested in Nikola.

M987MILC3

MR. MUKASEY:  Right.  Judge, you put your finger right on it.  This is sort of a back-door way of saying he victimized vulnerable people in a way that really has nothing to do with the case.  And to the extent that it can't be sanitized according to the government, I disagree with that, and I'll give you one example from a case that Ms. Young and I had in White Plains in front of Judge Seibel.

We had a case that involved health care fraud and a PPP fraud, a defendant charged with making false applications during COVID to get Payroll Protection Act money, and we argued that the government should not argue in that case -- it was charges of routine bank fraud but pled as a PPP fraud and that it happened during COVID and people were vulnerable, and Judge Seibel ruled that the case should be tried as a bank fraud case, not as a COVID PPP case, and ordered the government -- correct me if I'm overstating this, Ms. Young -- to redact references in the bank applications and in the witness testimony to PPP fraud because it was too prejudicial.

There's no reason why the witnesses and the government can't talk about the time period without referring to COVID.  If you can do it in a PPP fraud case, you can do it in this case.

MR. ROOS:  And your Honor, I guess maybe we're talking past each other.  I think this is all just witness testimony, but I think the truth is that witnesses will say they were at

home, they became interested in investing, they invested.  The reason they were at home was because of COVID.

I think there will also be evidence that the defendant was purposeful in targeting retail investors.  I don't think anybody is going to argue -- we are not going to argue and I don't think any witness is going to say that they believed the defendant was targeting anyone because of COVID, because these people were home with COVID, or anything like that.

MR. MUKASEY:  If it's so not important, drop it.

THE COURT:  Yes, but not only is it not important, Mr. Mukasey, I don't think it's prejudicial.  I don't think it prejudices Mr. Milton that some people were at home and, you know, I'm making stuff up now, but received their stimulus checks and then used their stimulus checks to invest in meme stock.  The jurors would probably dislike the witnesses for that if that were to be the testimony.

But to the extent that the story that they tell is that they were at home, you know, because -- and we were all quarantined.  So, you know, it doesn't prejudice one person more than the other.  And this is what I happened to do.  So I'm not going to prevent them from telling that story, but just tell the story and don't extrapolate from that.

MR. MUKASEY:  I think that also, by the way, opens the door to the witnesses' investment history.  If all of us -- I think it opens the door to the witnesses' entire investment

M987MILC3

history.

THE COURT:  I don't know about that.  Maybe, but as I sit here, I can't imagine why you investing in a Target 2050 mutual fund would open the door to you also investing in Nikola.

MR. MUKASEY:  We don't know.  We have been talking to the government about what is going to come out of these retail witnesses' mouths in general and who they are, and we still have a big question mark there.  So we'll take it on a case-by-case basis, but I would certainly hope the government does not gild this lily.

THE COURT:  I agree with that, Mr. Mukasey, and I will be very careful to make sure that that doesn't happen.

MR. ROOS:  Just to be clear, your Honor, I really, frankly, don't think this is going to be an issue in this case.  The only reason I am even -- I was even arguing this, and not just saying we won't do it, is we just don't want to be in a position where we have to tell witnesses in like a prep, hey, don't mention COVID.  We just don't want to freak these witnesses out about what they can and can't mention.  That's the only reason why there's even a motion practice here.  The jury addresses are not going to be "and then he preyed on the COVID victims" type of thing.

THE COURT:  Okay.  So that I think solves all of the motions *in limine*.  So we need to talk about mechanics.

M987MILC3

Ms. Rivera sent me an e-mail just two seconds ago asking me if I would prefer to be in Room 318.

(Court and deputy conferred)

THE COURT:  So we have an issue with the jury rooms because they're still configured for COVID.  Our jury, if we stay in this courtroom, will be in two separate jury rooms at least during the course of the trial.  If we go up to 318, there will be one jury room.  That would be my preference.

MR. ROOS:  Your Honor, I think I tried a case in 318 earlier this year.  It's basically the same layout as this, just two floors up.

THE COURT:  Yeah.

MR. ROOS:  That's fine with us.

MR. MUKASEY:  318 is the ceremonial one upstairs?

THE COURT:  I think it is exactly this courtroom two floors up.

MR. MUKASEY:  And it doesn't have these boxes?

THE COURT:  No.  I think it does.  So the only advantage is that the jury will be in the same jury room throughout the trial.

MR. ROOS:  I tried a case there.  It was the same.  It looks just like this.

MR. MUKASEY:  Whatever they're more comfortable with and whatever you're more comfortable with.

THE COURT:  I think I'd rather have the jury in one

jury room, so let's do 318.

Now, how long will this case take to try? The last time I asked, it was two months.

MR. ROOS: So, your Honor, there's several caveats that I'll start with.

The first is, I think we have a sense of your Honor's plan for how to conduct the days, but we haven't heard from you on this case, so I'll put a pin in that.

The second is there may be several holidays, Jewish holidays during this period, so I don't know what the Court's plans are.

All that being said, I think the government is hopeful that our case would go in in three to four weeks.

THE COURT: Okay. So let me tell you what my trial schedule is. I do have a truncated trial day but I sit Monday through Friday and I've done the math many times because I get a lot of pushback, and the difference between Monday through Friday with the truncated trial day and Monday through Thursday with a 9:30 to 5 trial day is about 20 minutes or a half hour.

I find that jurors really like going home at 2:40. Ultimately lawyers, begrudgingly, like having the afternoons to prepare for the next day. So the trial day will be as follows:

I will require the lawyers to be here at 9 to take care of any issues that need to be taken care of outside of the presence of the jury. The jury will come in at 9:30, and then

M987MILC3

we will sit for an hour and a half, from 9:30 to 11.  We'll then take a 20-minute break, and then we'll sit for another hour and a half, from 11:20 to 12:50.  We will take a second 20-minute break, and then we'll sit for the final segment, another hour and a half, from 1:10 to 2:40 in the afternoon.  And we'll break at 2:40, or at least we'll let the jury go home at 2:40 in the afternoon.

I start on time every time.  So I'll be here at 9 o'clock, likely before, on the bench.  I will bring the jury in at 9:30.  I will break for our two breaks at precisely the time that I just gave you, give or take a minute if there's someone on the stand in the middle of a particularly engrossing course of questioning.  And I let the jury go at 2:40.

Please, I don't allow drift.  So if you're going to go to the bathroom, go to the bathroom at the beginning of the 20-minute break, not at the end, because I will start with the jury without you.

So that's the trial day.  Again, in my experience, it's the same as Monday through Thursday, 9 to 5.

In terms of jury selection, I think -- have you gotten from my clerk the *voir dire* form?  No.  So she will now give you a copy of the form.  I trust that you're all familiar with it.  It's got two parts.  The entire venire will have it.

The first part of the form is directed towards particular issues that may prevent a juror from sitting on this

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

M987MILC3

trial.  And the second part of the form, that we get to only after we have a clean box, is meant to address issues for which you may want to exercise your peremptory challenges.

I would ask that, by no later than, say, 2 o'clock tomorrow afternoon, you provide me with any proposed changes to this form, including typographical errors.  I have no pride of authorship, and this is a document that's going from me to the venire.  I would want them to think that I know what I'm doing.  So, please, any typographical or other grammatical errors you can point out to me.

I would also ask that by no later than 2 o'clock tomorrow afternoon you provide me jointly with a list of individuals, witnesses, etc., who may be mentioned throughout the trial and locations that are particularly important to the trial so that the venire can take a look at that to see if they're familiar with either of those individuals or those locations.

Mr. Mukasey, so three to four weeks from the government's side.  How long on your side?

MR. MUKASEY:  Depending on your Honor's ruling about Professor Kurfess, I think it's three or four days.

THE COURT:  Okay.  So let's say four weeks.  I'll let the jury know that the trial is expected to last five.  I don't know what the Jewish holidays are in between.  I will take those holidays.

M987MILC3

And the way that I select the jury I expect you're all familiar with.  Depending on how many alternates we use, and I think we are probably safe with going with four alternates, unless the parties think otherwise.

MS. ESTES:  That's fine with us.

MR. MUKASEY:  That's fair.

THE COURT:  So that's four alternates, and the defense has ten peremptories and the government has six peremptories, then what I do is I put 32 proposed jurors in the box, as it were, and then I go one by one with the part one questions on the venire form.

I'll start with juror number 1 and I will tell the venire  I will ask juror number 1 every question on the form, and for each subsequent juror I will only ask those questions as to which they have an affirmative response, because the questions are structured so that if you have an affirmative response, that will trigger some follow-up questions by me.

As I go through, if any particular juror needs to be excused for cause, they will immediately be replaced.  That means that juror number 1 can be replaced after question five or six, in which case he or she will be replaced by another potential juror.  And I'll go through until I'm able to get through questions 1 through whatever it is, 40 or 50 on that form and determine that there is no basis to strike that person for cause.  Once I'm done with that person, I'm done with that

M987MILC3

person.  So he or she will be in the box will when we get to the peremptories.

I will generally have a very good sense of when an individual should be stricken for cause.  I may ask the parties to confer with me with respect to particular individuals if it's a close case.  The parties should, while I am questioning that individual, if they believe that additional follow-up questions should be asked, you should ask me in the moment for a sidebar so that we can ask additional follow-up questions to that juror.  Because once I sort of certify that juror, that juror will be in the box until the time we get to the peremptories.

And so when we get through the 32 individuals in the box, we will get to part two of the form, and I will ask each of the 32 individuals every question on part two.  That will give you an opportunity to determine whether or not you believe you want to exercise your peremptories with respect to any of those folks.

Yes, sir.

MR. MUKASEY:  Judge, are you open to, within some limitation and some reason, some additions or modifications to the questions in part two by 2 o'clock tomorrow?

THE COURT:  I am open to recommendations, yes.  But my philosophy with respect to this form is that it is meant to be absolutely vanilla.  It is not an opportunity for either side

M987MILC3

to advocate.  It is a document that's coming from the Court to the venire, but I will absolutely consider any changes or any additions or any deletions that you may have.

And so as soon as we are done with potential juror number 32 with part two, I'll give you ten minutes and we will move directly into the peremptory challenges.  Generally speaking, we do it in I think -- I don't know how many cycles, but it will be, you know -- I just do defense, government, defense, government, defense, government.  I don't go back and forth because I get very, very confused and then the record becomes confused, and it's all the same thing.

Yes, sir.

MR. ROOS:  Two, one; two, one; two, one; one, one?

THE COURT:  Yes.  If that adds up to ten and six. Whatever adds up to ten and six.

So that's how I pick the jury.  Any questions on that?

Okay.

In terms of the conduct of the trial, I don't put time limits on opening statements.  Don't abuse that.  In a case like this I know that it's important, I know that it can be complicated, but I would think a half hour will be sufficient to open in a case like this.  Again, but I'm not going to cut off your mic at minute thirty.

With respect to witnesses, please have your witnesses ready to go.  I will tell the jury that I will do everything

M987MILC3

within my power to get them back to their normal lives as soon as possible.  Part of that is that we fill up all of our days and we have our witnesses ready to go one after the next.  So please -- I know it's hard on you, but it's equally hard on the normal people who have day jobs.  So please have your witnesses ready.

Objections, one-word, two-word objections, "hearsay," "asked and answered."  No speaking objections.  I will generally know what the basis of the objection is and I'll answer right away, even if I get it wrong.  If there is a more difficult objection, we will discuss it at sidebar.

Okay?  Any questions on any of that?

MS. ESTES:  No.

MR. ROOS:  Actually, I'm sorry, maybe two things for the government.

First of all, is your Honor's intention to just have the prospective jurors here as long as it takes on Monday or is there a possibility it will go to Tuesday?

THE COURT:  It is my hope, and I'm happy to know that the parties anticipated that it likely won't be more than five weeks.  It is my expectation that it will take most of the day to pick the jury.  So I guess to anticipate your question, it is unlikely that the parties will be opening on Monday.

MR. ROOS:  I'm saying openings are one of our considerations.  Actually, sort of more to the point, we're

M987MILC3

just thinking about whether we should have a witness ready to go on Monday or whether if first thing Tuesday morning is fine.

THE COURT:  I mean, I think it's easy on day one for me to tell the jury, great, now you are a jury, come back tomorrow and we will start.  So you don't have to have a witness ready on Monday.

You know, theoretically, all the stars could align and we could have a jury by noon, in which case I will kick myself for telling you not to have a witness here, but it's unlikely.

MR. ROOS:  Okay.  Thank you.

MR. MUKASEY:  I just want to make sure I'm understanding.  Is it your expectation that we'll open on Tuesday morning unless somehow we get a jury by 11:30?

THE COURT:  It's my expectation, and you can count on this, that you will not have to open before Tuesday morning.

MR. MUKASEY:  Okay.  Fair enough.

THE COURT:  Hopefully we will have a jury Monday.

MR. MUKASEY:  May I raise one other issue, Judge?

THE COURT:  Sure.

MR. MUKASEY:  This all sounds very cut and dry and simple and fair and good.  We've asked the government, and I'm not trying to put them on the spot, but there are many, many witnesses that are still on their list.  There are thousands of documents at issue.  The government committed to us yesterday that they would tell us who their first week of witnesses are

M987MILC3

today.  I appreciate that very much.

The other issue that has become a bit of a problem, and I'm not sure it's your problem and I'm not sure it's the government's problem, but it's definitely our problem, is with respect to some of the 17(c) subpoenas that we have submitted to you and which you have executed.  We have attempted to serve those on two employees of Nikola.  We have been I think -- we attempted to serve it through their counsel, who I think is in the courtroom today, but declined to accept service.  I guess that's their right.  I'm not sure what the reason is behind that.  We wanted to avoid chasing people around Utah or Arizona to try to find them.  We're still looking for them.  I just wanted to put it on the Court's radar screen because these are people that the Court has issued service of process for.  And I'm not going to accuse anybody of dodging process, but there's an easy way to do this and a hard way to do this, and we are having to endure the hard way.

THE COURT:  I think you should be prepared to do it the hard way if there's no stipulation on accepting service by counsel.

MR. MUKASEY:  Would your Honor entertain an alternate service motion?

THE COURT:  You'd have to make the appropriate --

MR. MUKASEY:  If I could find authority for it.

THE COURT:  I don't know that you can.  But why don't

M987MILC3

you see whether or not counsel will relent and, if not, then make the appropriate application.

MR. MUKASEY:  Thank you your Honor.

THE COURT:  Anything else?

MR. ROOS:  Just one other thing, your Honor.  I think at many -- at least our practice, I don't know what your practice is, is in many of these cases at the final pretrial conference or right before the parties open to just put on the record whether there's been any plea discussions.  The answer is there hasn't been.  We can do it now or --

THE COURT:  No, we can do it now.  So have there been any plea discussions?

MR. ROOS:  No, your Honor.

THE COURT:  So you've not made any plea offers to Mr. Milton or his counsel?

MR. ROOS:  No written or oral plea offers.  We also have not exchanged any sort of writing relating to our view of the guidelines or anything of the sort.  There's been zero discussions about disposition.

THE COURT:  Mr. Mukasey, anything you wanted to put on the record concerning the lack of plea offer?

MR. MUKASEY:  There has been no plea offer.  No plea offer has been requested.  I don't think there's been a *Pimentel* letter either.  No *Pimentel* letter has been requested.

THE COURT:  Okay.  Anything else?

M987MILC3

MR. ROOS:  No, your Honor.

Actually, I'm sorry, just one more thing.

So obviously I think all of us are hoping these plastic boxes are gone.  If they're not by Monday or Tuesday, I guess, would it be okay if we, like -- either the U.S. Attorney's Office could help -- drag a podium in here, just so the -- I guess there is one over here, one over there?

THE COURT:  I guess my only concern is that I've been yelled at for even trying to move the podium a few feet because this is highly wired now, and so there's a screen there, there's an Elmo there.

MR. MUKASEY:  Mr. Roos will take responsibility for that.  Don't worry about it.

MR. ROOS:  I'll come in here at night with a hammer and we will just see what we can do.  I was going to suggest we could -- one of these non-tethered lecturns, we could even, Mr. Mukasey, Mr. Bondi, like, we could even put it somewhere else.

THE COURT:  Yes, that's fine.  I mean for jury -- for the jury address, you can put a podium in front of the jury box and do that.

MR. ROOS:  Okay.  But we'll try to get these things done.

MR. MUKASEY:  Judge, I have one last question.  I'm sorry.  Do you have any rules concerning jury research,

M987MILC3

potential juror research?

THE COURT:  I mean, I gave them the usual instruction that they should not do any research, that they should not do any Googling.

MR. MUKASEY:  I meant whether we can do research.

THE COURT:  Oh, I don't.  I don't have a rule about that.

Anything else?

MR. BONDI:  Your Honor, a housekeeping matter.  We have two subpoenas that the recipients have failed to provide any documents.  One was to the company and they've moved to quash, and one was to the law firm, Kirkland & Ellis.  Your Honor, we need documents.  We need documents for our defense.

And I just want to underscore some of the things that are at issue here.  One of the documents, your Honor, the indictment references an interview that Trevor did with Transport Topics, a podcast, in March of 2020.  Transport Topics reached out again in --

THE COURT:  I'm sorry, can I stop you?  Transfer of topics?

MR. BONDI:  I'm sorry.  Transport Topics.  It was a podcast.  "Transport" and then "Topics."

THE COURT:  That's the name of a podcast?

MR. BONDI:  Yes, your Honor.  These were some pretty obscure podcasts.

M987MILC3

Your Honor, there were talking points that were created for Mr. Milton for this podcast which the government alleges is a mistake -- contains mistakes.  Excuse me.

For instance, there's an e-mail that talks about, Send me the Badger Q and A once it's updated, so I have it.  I can put together a list of suggested questions for the host as well as brief Trevor.

Your Honor, talking points developed by people at the company for Trevor for his podcast here that the government contends are misstatements goes to the quintessential of good faith, of a defense, goes to his state of mind in terms of what he says.  That's part of our subpoena to the company.  We've gotten, your Honor, to date zero documents produced by the company.  They've moved to quash.  That's before you.

Your Honor, we've reached out also to a third party, a non-party called Technosports.  Technosports developed what was known as the bottom part of the Badger prototypes, the skateboards.  They indicated to us that they had very, very few documents——in fact, I think they produced 15 documents to us——because they said they saved these documents on a shared drive at Nikola.

THE COURT:  At Nikola?

MR. BONDI:  At Nikola.

We've subpoenaed those documents from Nikola, your Honor, and we've gotten zero.  We have gotten, instead, a

M987MILC3

motion to quash.

Your Honor, there are documents that the government produced and the contained -- from Nikola.  They contained links to see the attachment at a link sort of to an internal intranet system.  Now obviously, your Honor, when we click on that link, it doesn't work for us.  It is no different than an attachment to a document.  We followed up with the company for those.  Zero back.

And your Honor, you may remember in September, September 15, I appeared before you.  We looked different back then, and you may not recognize me without a mask.  But, your Honor, we argued venue before you, and your Honor heard us out for quite a while on the venue, and we appreciate that.  You made the point, your Honor, that transferring of venue wouldn't be necessarily because we could bring physical objects here perhaps, like the Badger prototypes, or that we would have the opportunity, your Honor, to present pictures and take videos. We had an inspection agreed with the company.  Mr. Frenchman and I had plane tickets with our expert, Mr. Kurfess.  Your opinion on denying venue talks about expert testimony: Mr. Milton will be able to introduce evidence in the usual form—the form of photographs, videos, demonstratives, or expert testimony.

Our expert was prepared to look at them, we had everything set up, and Nikola pulled the rug out from

M987MILC3

underneath us and denied an inspection, your Honor.  We either want the prototypes to be delivered to New York pursuant to our subpoena so we can use them -- and they exist, your Honor, and they are real, real prototype trucks that drive, those do drive, your Honor.

MR. ROOS:  Follow up.

MR. BONDI:  We either want to have them here, your Honor, or we want to have the ability to inspect those prototypes, your Honor.  And that was something we think you contemplated with respect to your ruling on venue.  And we are willing to absorb the cost, so cost isn't an issue.  We'll pay for those Badger prototypes to be taken here to New York so that we can inspect them, our expert can look at them, we will take very good care of them, your Honor, or we want at least to be able to inspect those.  We have subpoenas outstanding to Nikola on that and would ask your Honor to please rule on those.

THE COURT:  Ms. Estes, Mr. --

MS. ESTES:  Your Honor, just one thing on the Badger prototypes, and this is sort of going back to the conduct after Mr. Milton left the company.  This is an example of something that could turn into a complete sideshow at the trial because after he left the company there was work done on the Badger prototypes by people at the company.  But what's the core of the misrepresentations that we're focused on are his

M987MILC3

misrepresentations that summer about the status of the prototypes. So inspecting them now, months after his misrepresentations, you know, whatever happened to them, is irrelevant to the status of them that summer. So getting the prototypes, seeing how they are many months later, years later, frankly, is not relevant to what Mr. Milton was saying that summer and whether his statements that summer was truthful or not.

MR. BONDI: Your Honor, first of all, that goes to the weight of the evidence. And, as the government has indicated, they have witnesses who will talk about the various states of the truck. Having the prototypes -- and, your Honor, those prototypes. The evidence is undisputed that those prototypes were completed and driving as of November 2020, just shortly after Mr. Milton left the company. And your Honor, before the Nikola World that Mr. Milton said those prototypes would be ready by Nikola World, they were ready.

THE COURT: By when?

MR. BONDI: By December 2020, Mr. Milton said, We will show the prototypes. They were ready, your Honor. They were ready. They're in the showroom, or at least the last time we checked, at Nikola. They were -- one of them was there in the showroom.

THE COURT: Has Nikola moved to quash the subpoenas? Is that before me?

M987MILC3

MR. BONDI:  Yes, your Honor.  We have two subpoenas, your Honor——one to Nikola for the documents.  We've gotten, again, your Honor, a total of zero, zero documents from the company, and they've denied us the access to those prototypes.

Your Honor, if this were a case involving a murder and a murder weapon and a gun, we would have access to look and inspect the gun and to look at that gun.  This is no different, your Honor.  They're alleging misstatements with respect to those prototypes that are real, that exist, that we should have access to.

THE COURT:  That's the beauty of a truncated day.  We can bring them in early next week in the afternoon.

MR. BONDI:  We will, your Honor.

THE COURT:  Okay.

MR. BONDI:  So, your Honor, we respectfully request that you grant our motion, then.

MR. ROOS:  I'm sorry.  Your Honor is asking for --

THE COURT:  A hearing.

MR. ROOS:  A hearing next week on the motion to quash.

THE COURT:  Yes.

MR. ROOS:  Right.  I think it's -- I mean, that's really not our issue.

MR. BONDI:  Sounds good, your Honor.

MR. MUKASEY:  We'll take the hearing.

THE COURT:  Okay.  Anything else?

M987MILC3

Great.  We're adjourned.  Let me know if anything comes up tomorrow.  I'm sure you will.

COUNSEL:  Thank you, your Honor.

(Adjourned)